The agent argues that the taxpayer does not participate in the profits from the operations of the Depositor, the Custodian or the MMF during the restricted dividend period. It is obvious that the CSR holder does not profit from the operations of the Depositor because the CSR holder has only obligations and no rights with respect to the Depositor. However, as discussed in detail above, the ability of Principal Life to reap a benefit of $1 per share at the end of the restricted dividend period lies exclusively on the successful operations of the RIC, and nothing else.

The agent frequently refers to the fact that because the underlying shares are expected to be redeemed at a $1.00 per share stated value, the return earned by the CSR holder is similar to that of a loan with the attendant risk characteristics.[47] This forms a significant part of the agent's argument that the CSRs are equivalent to collateralized non-recourse debt.

In *Estate of Frank D. Stranahan v. Commissioner*,[48] the taxpayer, who anticipated making a substantial interest payment in 1964 to the Internal Revenue Service, accelerated his income in that year to avoid losing the tax benefit of the deduction by assigning all of the dividends to be declared and paid to him with respect to the stock of Champion Spark Plug Company until the assignee received an aggregate amount of $122,820. The amount received by the taxpayer on the sale of the future dividends was $115,000. The Service included the dividend income in the taxpayer's taxable income on the basis that the assignment was made solely for the purpose of avoiding income taxes and lacked any business substance.

In its recitation of the facts, the Tax Court stated that at the time of the alleged assignment of dividends, it was anticipated that each share of stock would pay cash dividends of 50 cents per quarter. It was determined that with the current dividend payment rate at that time of 50 cents per share of stock per quarter, $115,000 represented the present value of the right to receive the assigned dividends of $4.60 per share discounted at the then prevailing interest rate of 5 percent. In addition, the court noted that the Champion Spark Plug Company had a long and consistent record of paying dividends on its stock. Both the taxpayer and the assignee were familiar with the dividend records of Champion. The Tax Court concluded that "...the whole undertaking, though conducted in the form of an assignment of a property right, was in reality a loan to petitioner masquerading as a sale and so disguised lacked any business purpose..."[49]

In reversing the Tax Court's decision, the U.S. Court of Appeals disagreed with the Commissioner's view that the transaction was merely a temporary shift of funds and that no change in the beneficial ownership of the stock was effected and no real risks assumed by the son, stating that,

> The Commissioner also argues that the possibility of not receiving the dividends was remote, and that because this was particularly known to the parties as shareholders and employees of the corporation, no risks inured to the son. The Commissioner attempts to bolster this argument by pointing out that consideration was computed merely as a discount based on a prevailing interest rate and that the dividends were in fact paid at a rate faster than anticipated. [Footnote omitted.]

---

[47] Form 886A 5701 FP 03, pages 5,8,11,14, and 15

[48] 30 TCM 1078 (1971), *rev'd* and *rem'd*, 472 F.2d 867 (6th Cir. 1973).

[49] 30 TCM 1078 (1971), *rev'd* and *rem'd*, 472 F.2d 867 (6th Cir. 1973).

> However, it seems clear that risks, however remote, did in fact exist. The fact that the risks did not materialize is irrelevant. Assessment of the risks is a matter of negotiation between the parties and is usually reflected in the terms of the agreement. Because we are not in a position to evaluate those terms, and because we are not aware of any terms which dilute the son's dependence on the dividends alone to return his investment, we cannot say he does not bear the risks of ownership.[50]

Despite the fact that the CSR holder expects the value of the RIC shares to be $1 per share at the end of the restricted dividend period, such value is nevertheless dependent on the operations of the regulated investment company and is not without risk. The consideration paid for the CSRs reflects this risk. This risk is no different than if Principal Life held the shares directly. The agent does not dispute that money market fund shares constitute equity and that the risk on these shares, just like the risk on the CSRs, is like the risk of default of a bond.[51] Economic similarities can also be drawn with respect to fixed rate preferred stock, which is priced and traded like a bond. Although it can be argued that preferred stock carries more risk than debt because of subordination, one only has to consider the situation where the capital structure consists entirely of common and preferred stock. The fact that preferred stock may be senior to all other capital still does not render it debt. Thus, the degree of risk, in and of itself, does not establish whether an instrument is debt or equity.

The Supreme Court has also upheld this viewpoint. In *Frank Lyon*, the Government argued for financing treatment based on the viewpoint that Worthen regarded the various proposals only in terms of its own cost of funds and that both Worthen and the prospective investors compared the various proposals in terms of the return anticipated on the investor's equity. In dismissing this analysis as irrelevant, the Supreme Court stated:

> But all this is natural for parties contemplating entering into a transaction of this kind. Worthen needed a building for its banking operations and other purposes and necessarily had to know what its cost would be. The investors were in business to employ their funds in the most remunerative way possible. *And, as the Court has said in the past, a transaction must be given its effect in accord with what actually occurred and not in accord with what might have occurred.*[52]

Therefore, contrary to the agent's position, the taxpayer does participate in, and is at risk to, the operations of the RIC. Even though this risk may be similar to the risk on a bond, the risk is nevertheless exclusively with respect to the common shares of the RIC. This factor clearly supports the taxpayer's position.

In summary, an analysis of the factors cited by the agent in light of the provisions of the Custody Agreement and CSRs does not support the agent's theory that the CSRs are collateralized non-recourse debt instruments. Of the nine factors analyzed above, eight of the nine either support the

---

[50] *Estate of Frank D. Stranahan v. Commissioner,* 472 F.2d 867 (6th Cir. 1973).
[51] But unlike a bond, the taxpayer cannot sue the RIC for $1.00 per share.
[52] *Frank Lyon Company v. United States,* 435 U.S.561, 576 (1973). (emphasis added.)

taxpayer or do not support the agent's position. Regardless of the economic motivations of the parties, the Government cannot merely speculate on what was intended by the custodial arrangement or advance theories that bear no reality to what was actually transacted. As the Tax Court stated in *Wood Process Company*,

> But the question of the legal effect of the contract upon income tax depends upon the contract itself, rather than upon circumstances motivating its execution. [53]

The contract is clear and unambiguous. Principal Life acquired ownership rights in the underlying common shares of the regulated investment company and the right to receive dividends on those shares after the restricted dividend period.

*II. The taxpayer should not be treated as purchasing the entire interest in the shares.*

The agent argues in the alternative, that the taxpayer could be treated as having purchased the entire interest in the RIC shares, including the right to all future dividends, in exchange for cash and additional payments equal to the dividends on the RIC shares. The additional payments constitute payments of principal and interest on a deemed loan between the holder of the CSRs and the holder of the CDRs. The agent develops three lines of argument in support of his position.

A. Ability to strip dividends

The agent first argues that the dividend stream represented by the CDRs cannot be stripped or separated from the underlying RIC shares unless specifically permitted under the Code or regulations. The agent cites sections 305(e) and 1286 in support of his position.

The ability of taxpayers to strip the right to receive income from the property itself is well established. The Clinton Budget proposal for 2001 acknowledged this by stating

> Under current law, it may be possible for a person that holds income-producing property to separate, or "strip," the right to receive income from the property itself. For example, it may be possible for a taxpayer that holds dividend-paying stock to separate ownership of the right to receive the dividends from ownership of the stock. Similarly, it may be possible for the lessor of rental property to separate the right to receive the rent payments from the ownership of the underlying property.[54]

The budget proposal goes on to discuss the two approaches that have been developed to modify the result of certain income-stripping transactions. The first is the "coupon-stripping" approach, as codified in sections 305(e) and 1286. This approach essentially provides basis allocation rules for certain transactions to clearly reflect income. These provisions, however, do not directly or indirectly address a taxpayer's right to separate ownership of income from property. Because of the narrow focus of these provisions, they have no application in this situation.

---

[53] *Wood Process Company v. Commissioner*, 2 TC 810, 816 (1943).

[54] Clinton Fiscal 2001 Budget Plan, page 34.

The second is the "deemed financing" approach as codified in section 636(a) and in section 7701(l) and the underlying regulations. As discussed earlier, these provisions are statutory exceptions that create a deemed financing between two parties in a transaction otherwise structured as a sale. Again, these provisions are limited to certain transactions and have no application in this situation. Because no statutory provision exists that modifies the tax consequences of separating ownership of dividend income from the shares of a RIC, case law determines the tax consequences of the CSR transactions.

### 1. Assignment of income doctrine

The assignment of income doctrine essentially denies a taxpayer the ability to assign to another party the tax consequences of income that the taxpayer has earned or controls, gratuitously or without adequate consideration.[55] However, where the "tree" is transferred along with the "fruit," the tax burden is also transferred.[56]

There are several important corollaries to the assignment of income doctrine. The first is that where the taxpayer assigns the right to future income to another party for adequate consideration, the taxpayer will be taxed on that income as having currently received it.[57]

A second corollary to the assignment of income doctrine, and one which the agent omits in his write-up, is that *where the taxpayer neither earns the income nor controls the income, the taxpayer cannot assign the income, either gratuitously or for consideration.*[58]

In *Bettendorf v. Commissioner*,[59] Catherine Bettendorf, the owner of shares of stock in the Bettendorf Company, transferred legal title of the shares to her brother but reserved the right to the income for the remainder of her life. Citing its decision in *Alfred LeBlanc v. Commissioner,*[60] the Board of Tax Appeals concluded that the brother, as purchaser of the stock, was first the recipient of that income and therefore was taxable on it.[61]

The Court of Appeals distinguished *LeBlanc* from the instant case, noting that Catherine Bettendorf was the absolute owner of the stock and as an incident to such ownership she was entitled to all the earnings or dividends derived from them. By contract, however, she transferred the legal title to the stock, retaining by the terms of that same contract the right to the income during her life. In finding that the income was at no time that of the brother's because by the very

---

[55] *Old Colony Trust Company v. Commissioner,* 279 U.S. 716 (1929); *Lucas v. Earl*, 281 U.S. 111 (1929); *Corliss v. Bowers,* 281 U.S. 376 (1930); *Helvering v. Horst,* 311 U.S. 112 (1940).

[56] *Blair v. Commissioner,* 300 U.S. 5 (1937); *Caruth Corporation v. U.S.*, 865 F.2d 644 (1989).

[57] *Hort v. Commissioner,* 313 U.S. 28 (1941); *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260 (1958); *Estate of Frank D. Stranahan v. Commissioner,* 472 F.2d 867 (1973).

[58] *Bettendorf v. Commissioner*, 49 F.2d 173 (8th Cir. 1931); *Heminway v. Commissioner,* 44 TC 96 (1965).

[59] Id.

[60] 7 B.T.A. 256.

[61] In *Alfred LeBlanc,* the petitioner was a stockholder and continued to own the stock. He assigned the income of the stock to his son but refused to transfer the stock. The Board held that both the stock and the earnings belonged to the petitioner.

contract under which he held the legal title, he was bound to account to the donor for the income, the Court of Appeals stated,

> We should regard the substance rather than the form. The simple fact appears to be that the petitioner was, so far as the income from these securities was concerned, a trustee, a fiduciary and not a beneficiary. The purpose of the income tax law was to tax incomes actually and substantially derived, rather than such as might be constructively received. We must assume that it was not the purpose of the act to penalize an individual because he might be the innocent agency by or through whom a substantial income as derived for someone else. The Government will not resort to sharp practice, nor invoke technical construction or fiction, which will manifestly thwart the goodfaith intention of its taxpayers, for the purpose of visiting a tax burden upon one, who in fact did not, except by construction, derive any beneficial income from the transaction. The income which petitioner received from these securities was not the income with which one pays debts.[62]

In *Heminway v. Commissioner,*[63] the petitioner, Willard Heminway, also acquired stock pursuant to a stock purchase agreement whereby the seller, Madeleine Holden, retained a life interest in the dividends. The Service contended that Heminway was the legal and beneficial owner of the dividends, and that his agreement to pay over future dividends was either an anticipatory assignment of future income or constituted part of the purchase price for the stock.

The Tax Court, citing *Bettendorf*, found that Heminway was either a fiduciary or an agent for Holden and was not taxable on the dividends on the stock because he did not derive any income therefrom. The Tax Court also noted that Holden, as the beneficial owner, paid the tax imposed on the amounts paid over by Heminway, as dividends, and not as capital gains incident to the sale of the stock.

Thus, where the property (i.e., the "tree") is transferred but the income from the property is reserved, the income is taxed to the one who reserves it.[64] However, where the property is transferred and the income from the property is reserved to pay part of the consideration for the purchase, the income is taxable to the purchaser of the property.[65]

Although the Termination Agreement is arguably a separate agreement and should not even be considered when examining the terms of the Custody Agreement to see whether Principal Life acquired, indirectly, an interest in the dividends, an examination of its impact shows that it does

---

[62] 49 F.2d 173 (8th Cir. 1931).

[63] 44 TC 96 (1965).

[64] See also, *Montgomery v. Commissioner*, 73 TCM 3095 (1997) [citing *Heminway* as providing that "a taxpayer does not realize income by acting as a mere conduit for the transfer of funds on behalf of another"]; *Lazarus v. Commissioner*, 58 TC 854 (1972) [trust held no corpus; transaction was a transfer of stock to the trust with a reservation of the right to have $75,000 of the annual income thereof distributed to petitioners]; *McCulley Ashlock v. Commissioner*, 18 TC 405 (1952) [by contract of sale whereby petitioner purchased real property and the seller retained possession and rents for a period of time, the seller retained legal ownership as well as control, benefits, and unfettered command of the rents].

[65] *Ellison v. Commissioner*, 80 TC 378 (1983).

not change the basic application of *Bettendorf* and *Heminway*. The Termination Agreement provides that in exchange for consideration of $100, the CSR holder promises to purchase the CDRs from the holder in the event of the liquidation of the Issuer or the failure of the Issuer to maintain its status under Rule 2a-7 under the Investment Company Act of 1940 as a money market fund or similar entity. The purchase price is set at 95% of the estimated present value of dividends foregone during the remaining restricted dividend period.

In *Bettendorf v. Commissioner,*[66] the contract of sale executed between Joseph Bettendorf and Catherine Bettendorf provided that in the event Joseph Bettendorf sold the shares generating the reserved dividends, Joseph Bettendorf was to pay at least quarterly a sum equal to the rate of interest paid by savings banks on savings deposits in the City of Davenport. The Service argued that the contract vested the petitioner with the absolute legal title to the securities, with power of disposition, and provided that if he should sell, then he was to pay a sum equal to the rate of interest paid by savings banks, indicating under certain contingencies that Joseph Bettendorf might be required to pay a sum equal to the rate of interest rather than the actual income from these securities. The Court of Appeal's brief answer was that this had no relevancy to the issue at stake because the contingency had not arisen and the Court was dealing only with actual income from the securities.

The same is true for the Termination Agreement. The agreement takes effect only in the event of two remote contingencies, neither of which is in the control of the holders of the CSRs, unlike *Bettendorf*. In the meantime, the CDR holder receives only the dividends paid on the underlying RIC shares during the restricted dividend period.[67] If the operations of the RIC are unable to support a $1 per share value, the CDR holder potentially would not receive any dividends. In this situation, the CDR holder only has recourse to the Issuer.[68] The Termination Agreement does not guarantee the amount or the timing of these dividends in any way. Therefore, apart from the occurrence of the contingent events, the Termination Agreement has no force or application and the CDR holder is at risk to the amount of dividends actually paid (or not paid) by the RIC.

In summary, in the absence of a statutory exception, case law controls the tax treatment of the CSRs. Because the fundamental substance of the transaction consists of the acquisition of RIC shares subject to a reservation of dividends for a period of time, *Bettendorf* and *Heminway* are directly on point and constitute the controlling law in this situation.

B. <u>Ability to transfer ownership of the dividends</u>

The agent also argues that there was a transfer of the ownership of the dividends to the CDR holder and that the transfer was ineffective stating that:

> [U]nder U.S. tax principles, the owner of a dividend is considered to be the owner of the stock on which the dividend is paid on the record date for the dividend. Therefore, the sale of a dividend or other current income stream does not constitute a sale of the security. *Consequently, without the sale of the underlying shares, the*

---

[66] 49 F.2d 173 (8th Cir. 1931).
[67] Custody Agreement, Section 4.1(a); Form of CDR, page B-2.
[68] Custody Agreement, Form of CDR, page B-2.

> *sale of the right to receive dividends does not transfer ownership of the dividends for tax purposes.* Instead the "seller" is considered to sell a contractual right to the "buyer" to receive equivalent dividend payments. Accordingly, the formation of the custodial share arrangement does not separate the ownership of the income from the ownership of the underlying shares it merely allocates a stream of payments between the two parties.[69]

The agent does not cite any authority for his position, although his argument is very similar to that of the Government's in *Estate of Frank D. Stranahan v. Commissioner,*[70] a Tax Court memorandum decision that was subsequently overturned by the U.S. Court of Appeals for the 6th Circuit. It is worth noting the facts of the case because of the striking similarities to the agent's position.

In its analysis of the transaction, the Tax Court found it significant that a shareholder has no right to share in the profits of a corporation under normal circumstances until the directors in their discretion declare a dividend as the primary basis for its conclusion. As stated by the Tax Court:

> Ordinary dividends are the distributions of earnings of a corporation to its stockholders. A corporation is not authorized to distribute earnings as dividends to those not stockholders, except under the authority and at the request of those entitled to receive them as stockholders. When dividends are declared the corporation then becomes indebted to its stockholders for the amount. [Citation omitted.] If the stockholder assigns his right to receive the dividend, the corporation by paying the dividend to the assignee satisfies an obligation to the stockholder. The right to receive it from the corporation accrues by virtue of the stock ownership. It is a stockholder's right although they are paid to others whose rights are derived from the stockholder's right to receive them. The situation is analogous to a case where A owes B a debt and authorizes C to pay money owing to him to satisfy the debt. In so far as A is concerned, he receives income when his debt to B is paid.[71]

Therefore, in the Tax Court's view the "alleged" assignment did not result in any substantial change in the taxpayer's control over the shares. Because there was no effective separation of the "fruit" from the "tree," the taxpayer was taxable on the income when and as received by the assignee. This, in essence, is the agent's argument.

However, in *Estate of Frank Stranahan v. Commissioner,*[72] the Court of Appeals did not place any weight on this argument. What the Court of Appeals found weighty was the fact that a taxpayer who assigns future income for consideration in a bona fide commercial transaction will ordinarily realize ordinary income in the year of receipt. After examining the cases cited by the Tax Court in its analysis above, the Court of Appeals found it significant that in two out of the three cases cited by the Tax Court, there was *no consideration paid* in exchange for the

---

[69] (Form 886A 5701 FP 03, page 12) (emphasis added.)
[70] 30 TCM 1078 (1971).
[71] 30 TCM 1078 (1971).
[72] 472 F.2d 867 (6th Cir. 1973).

assignment of dividends. In the third case, involving the sale of future partnership profits, the Court of Appeals found it significant that the assignment was recognized as ordinary income in the year the assignment was executed. The Court of Appeals thus disregarded who held title to the dividends (i.e., the holder of record) and looked at who received the economic benefit from such dividends. This is simply an application of the classic substance-over-form doctrine.

The Tax Court in *Heminway* also applied this substance-over-form analysis, stating that,

> Respondent's principal contention, that the right to receive dividends cannot be severed from the "bundle of rights" which comprise a share of stock, does not further our inquiry. It is true the corporation could pay dividends only to Heminway as the shareholder of record, [citation omitted], and that Heminway did receive them; but as we have found as a fact, he received them as either an agent or a fiduciary and did not *derive* income from them. [Citation omitted.] Respondent's statement that Heminway was the only person entitled to receive the dividends and thus is taxable thereon, is a conclusion which does not follow from its premise, for no tax is imposed upon the receipt of a dividend in a fiduciary or agency capacity. Respondent's conclusion that Heminway was the beneficial owner of the shares is not supported by the facts of this case.[73]

Nor are the agent's arguments with respect to this transaction supported by the facts of the CSR transaction. The terms of the contract that grant ownership rights in the regulated investment company shares to the CSR holder also reserved ownership rights in the dividends to the CDR holder for a term of years.[74] The shares are acquired through the Custodian by the Depositor,[75] acting as agent for the principal,[76] who the IRS agent has identified in this case as the initial holder of the CDR.[77] A purchaser of the CSRs, therefore, can only acquire ownership in the underlying regulated investment company shares by agreeing to the reservation of the dividends for a term of years and does not acquire any beneficial interest in those dividends. Contrary to the agent's position, there is no transfer of dividend rights.

In summary, Principal Life acquired ownership of the shares through the same contract that reserved the ownership of the dividends through the CDR. Therefore, Principal Life did not acquire any beneficial interest in the dividends that would result in the dividends being taxable to Principal Life.[78] Principal Life is at most a fiduciary or agent for the CDR holder, who is the true owner of the dividends for tax purposes during the restricted dividend period.[79]

C. <u>The assignment-of-income doctrine applies where only the income is sold</u>

---

[73] *Heminway v. Commissioner*, 44 T.C. 96, 101 (1965).
[74] Custody Agreement; CSR.
[75] Custody Agreement, Section 2.1(a).
[76] Custody Agreement, definitions.
[77] Form 886-A 5701 FP 03, Page 4.
[78] *Bettendorf v. Commissioner*, 49 F.2d 173 (8th Cir. 1931); *Heminway v. Commissioner,* 44 TC 96 (1965).
[79] See Section 2.6(c) of the Custody Agreement allowing the holder of the CSRs to terminate the custody agreement and assume directly all of the obligations of the Custodian with respect to the CDR holder.

Finally, the agent argues that if Principal Life retains the income-producing property (i.e., the RIC shares) and carves income or a partial interest out of the property, the assignment-of-income doctrine applies.

This is recasting the transaction to fit a theory and does not comport to what was actually done. The CSR specifically provides that Principal Life is the owner of shares issued by a RIC *exclusive of the right to receive distributions* (other than in respect of a return of capital) on such shares paid on or prior to the end of the restricted dividend period. Because Principal Life contractually acquired the RIC shares *exclusive* of the right to the dividends for the restricted dividend period, Principal Life has no legal right or ability to carve such income out of the shares and transfer it to another. Therefore, the case law cited by the agent dealing with the assignment of income doctrine does not apply. The case law dealing with the second corollary to the assignment of income doctrine (e.g., *Bettendorf and Heminway*) does apply, based on a comparison of the facts of these cases with the facts of the CSR transaction.

*III. The custodial arrangement cannot be treated as a partnership.*

As his last alternative position, the agent argues that the custodial arrangement could be treated as a partnership resulting in a reallocation of income attributable to the underlying RIC shares.

1. <u>Characterization of the custodial arrangement as a constructive trust for Federal tax purposes</u>

The agent first assumes, without discussion, that the custodial arrangement constitutes a constructive trust under Treasury Regulation § 301.7701-4. Treasury Regulation § 301.7701-1(a)(1) provides that whether an organization is an entity separate from its owners for federal tax purposes is a matter of federal tax law and does not depend upon classification under local law. Treasury Regulation § 301.7701-1(a)(2) provides that a joint venture or other contractual arrangement may create a separate entity for federal tax purposes if the participants carry on a trade, business, financial operation, or venture and divide the profits therefrom. Generally, a joint undertaking merely to share expenses does not create a separate entity for federal tax purposes. Neither does the mere co-ownership of property that is maintained, kept in repair, and rented or leased.

Treasury Regulation § 301.7701-4(a) defines the term "trust" as an arrangement created either by a will or by an inter vivos declaration whereby trustees take title to property for the purpose of protecting or conserving it for the beneficiaries under the ordinary rules applied in chancery or probate court. Generally, an arrangement will be treated as a trust under the Internal Revenue Code if it can be shown that the purpose of the arrangement is to vest in trustees responsibility for the protection and conservation of property for beneficiaries who cannot share in the discharge of this responsibility and, therefore, are not associates in a joint enterprise for the conduct of business for profit.

Where the custodial functions of an arrangement are merely ministerial in nature, the arrangement does not constitute a trust, but rather a principal-agent relationship. The basic distinction between these two is that in a trust relationship, the trustee has the responsibility and discretionary

authority to protect and conserve the property on behalf of the beneficiaries who cannot share in the discharge of this responsibility.[80]

The following summary of the duties and powers of the Custodian indicates that the Custodian does not have the responsibility or authority to protect and preserve the shares on behalf of the CSR holders:

1. The Custody Agreement explicitly states that it is created as a security arrangement and paying agency.[81]
2. The Custodian does not have the authority to assign, transfer, pledge, set-off or otherwise dispose of any of the shares or dividends.[82]
3. The Custodian is prohibited from taking any action with respect to the RIC shares except at the direction of the CSR holder. The CDR holder has no ability to control the actions of the Custodian.[83]
4. The Custodian cannot vote the RIC shares in its discretion. At most, the Custodial can only abstain on any ballot where the holder of the CSRs has given no direction.[84]
5. The Custodian is not authorized to proceed against the Issuer in the event of a nonpayment or to assert the rights and privileges of holders of the CSRs and does not have any duty to do so. The Custodian is only required to take action that is necessary or appropriate to preserve the right of such holder to proceed directly and individually against the Issuer and only at the request of a CSR holder.[85]
6. The Custodian is not under any obligation to appear in, prosecute or defend any action, suit or other proceeding in respect of the shares or the CSRs.[86]
7. During the restricted dividend period, any holder of CSRs may terminate the custody agreement in respect of the shares and assume directly all of the obligations of the Custodian to the corresponding holder(s) of the CDRs.[87]

In summary, the provisions of the Custody Agreement do not create a trust relationship among the parties but rather a principal-agent relationship between the Custodian and the CSR holder that may be terminated at will by the CSR holder.

B. <u>If the custodial arrangement is deemed to be a constructive trust, it constitutes an investment trust and not a business entity</u>

The agent argues that the arrangement creates investment interests that differ from the interests that would be obtained by direct investment in the assets. Because an investment trust with multiple classes of ownership interests will ordinarily be classified as a business entity under Treasury Regulation § 301.7701-2, the agent argues that the custodial arrangement should be

[80] Treasury Decision 8080, 1986-1 CB 371; *City National Bank and Trust Company v. United States*, 109 F.2d 191 (7th Cir. 1940); Treas. Reg. Sec. 301.7701-4(a).
[81] Custody Agreement, 2nd Whereas, Page 1.
[82] Custody Agreement, Section 2.1(d), Page 4.
[83] Custody Agreement, Section 2.2(c), Page 5.
[84] Custody Agreement, Section 2.5(a), Page 7.
[85] Custody Agreement, Section 5.1(c), Page 12.
[86] Custody Agreement, Section 5.1(e), Page 13.
[87] Custody Agreement, Section 2.6(c), Page 8.

classified as a business entity and a partnership by default. The agent's position is based on his conclusion that the share and dividend receipts represent two different classes of ownership interests and that the multiple classes of ownership interests permit the investors, by transferring one of the certificates and retaining the other, to fulfill varying investment objectives of seeking primarily either dividend income or capital appreciation from the stock.

Under Treasury Regulation § 301.7701-4(c), an investment trust will be classified as a trust (and not a business entity) if it meets the following two conditions:

1. There is no power under the trust agreement to vary the investment of the certificate holders, and
2. The investment trust has a single class of ownership interests, or, if multiple classes of ownership interests exist, the trust was formed to facilitate direct investment in the assets of the trust and the existence of multiple classes of ownership interests is incidental to that purpose.

In 1986, Treasury added the second requirement because of the rise of multiple class trusts, which departed from the traditional form of fixed investment trusts by providing beneficiaries with diverse interests. As stated by Treasury in T.D.8080,[88]

> The existence of varied beneficial interests may indicate that the trust is not employed simply to hold investment assets, but serves a significant additional purpose of providing investors with economic and legal interests that could not be acquired through direct investment in the trust assets. Such use of an investment trust introduces the potential for complex allocations of trust income among investors, with correspondingly difficult issues of how such income is to be allocated for tax purposes.[89]

Without conceding the fact that the custodial arrangement does not rise to the level of a constructive trust, the custodial arrangement would still qualify as an investment trust because it meets both conditions mandated by Treasury Regulation § 301.7701-4(c). The first condition is met because the Custodian does not have the authority to assign, transfer, pledge, set-off or otherwise dispose of any of the shares or dividends.[90]

The second condition is also met, because the CSRs were formed to facilitate direct investment in the RIC shares and the existence of the CSRs is incidental to that purpose. This is clear by the fact that the custodial arrangement can be terminated and the CSRs can be cancelled without affecting any of the interests of the parties in the RIC shares.[91]

Example 4 of Treasury Regulation § 301.7701-4(c)(2) supports this conclusion. In Example 4, a corporation purchases a portfolio of bonds and transfers the bonds to a bank under a trust agreement in exchange for certificates evidencing interests in the bonds. Under section 1286,

---

[88] 1986-1 CB 371.
[89] Id.
[90] Custody Agreement, Section 2.1(d), Page 4.
[91] Custody Agreement, Section 2.6(c), Page 7.

stripped coupons and stripped bonds are treated as separate bonds for federal income tax purposes. Example 4 concludes that the existence of multiple classes simply provided each certificate holder with a direct interest in what is treated under section 1286 as a separate bond and which could be acquired by direct investment.

Example 4 illustrates the governing principle that if an interest in an asset can be obtained directly, the use of multiple ownership interests in a trust arrangement will be viewed as merely facilitating the direct investment and will not cause the trust to be treated as a business entity. The presence of a statutory provision in Example 4 (i.e., section 1286) is incidental to the application of this principle. It is clear that under case law stock can be sold to another party with the seller reserving a term interest in the dividend income.[92] The use of a custodial arrangement to establish a security interest in the RIC shares is for convenience only and not out of necessity. The same arrangement could have been accomplished directly, without the use of the custodial arrangement.[93]

The agent alludes to the application of Example 3 in this situation by stating that the CSRs enable the holders to fulfill varying investment objectives of seeking primarily dividend income or capital appreciation from the stock. Example 3 deals with the situation where a participant, in exchange for depositing shares of stock, received two certificates that could be separated and traded independently. One certificate represented the right to dividends and the value of the underlying stock up to a specified amount; the other certificate represented the right to appreciation in the stock's value above the specified amount. Example 3 concludes that the multiple classes of ownership interests are designed to permit investors, by transferring one of the certificates and retaining the other, to fulfill their varying investment objectives of seeking primarily either dividend income or capital appreciation from the stock held by the trust. Because the trust in Example 3 serves to create investment interests with respect to the stock held by that trust that differs significantly from direct investment in the stock, the trust in Example 3 is not formed to facilitate direct investment in the assets of the trust and therefore is a business entity.

While Example 3 has superficial similarities to the CSRs, there are substantive differences that distinguish these two situations. The receipts were created to facilitate a security arrangement favoring the depositor, who retained the dividends on the RIC shares during the restricted dividend period. The CDRs do not impart any other rights in the RIC shares. Also, because the RIC pays out all of the earnings of the fund through dividends, there is no realistic expectation for capital appreciation on the part of either holder. The economic interest of both holders in the shares involves the receipt of dividend income: currently for the CDR holder, prospectively for the CSR holder. Finally, as mentioned above, this security arrangement could have been structured without the use of the Custody Agreement and the issuance of the CSRs.

In summary, assuming for the sake of argument that the custodial arrangement constitutes a constructive trust, the custodial arrangement would qualify as an investment trust under Treasury Regulation § 301.7701-4(c). The custodial arrangement does not provide the Custodian with any power to vary the interests of the CSR holders in the RIC shares and the Custody Agreement and

---

[92] See *Bettendorf* and *Heminway*.

[93] See Section 2.6(c) of the Custody Agreement.

CSRs do not create interests in the RIC shares that could not otherwise be created apart from the use of the custodial arrangement. The custodial arrangement is simply the vehicle of choice used to administer the security agreement entered into by the parties for the benefit of the CDR holder.

## SUMMARY

In summary, based on an analysis of the Custody Agreement and the CSRs, the substance of the CSR transactions is a purchase of shares of common stock in a regulated investment company and a security agreement for the benefit of the CDR holder who retains the right to receive the dividends paid by the RIC during the restricted dividend period. The agent's primary position that the CSRs are collateralized non-recourse debt instruments is arbitrary and without substance.

Case law governing the acquisition of property subject to a term interest provides that the purchaser is at most a fiduciary or agent for the party retaining the term interest. Therefore, the assignment of income doctrine does not apply and Principal Life does not acquire a beneficial interest in the dividends paid by the RIC during the restricted dividend period. Nor can Principal Life be deemed to have bought the dividends.

Finally, because the custodial arrangement is only used to facilitate the security agreement and is not necessary for this purpose, the custodial arrangement should not be treated as a business entity, such as a partnership under the default classification rules for business entities.