PRINCIPAL LIFE INSURANCE COMPANY
TAX YEAR 2001
$3,693,195

CUSTODIAL SHARE RECEIPTS

Taxpayer claims a refund based on the characterization of the custodial share arrangements as an interest in equity. The agent characterized the custodial share arrangements as a debt instrument subject to the original interest discount rules.

Facts

Principal Life Insurance Company ("Principal Life") entered into four Custodial Share agreements. The agreements were structured such that Principal Life received Custodial Share Receipts ("CSRs") and Custodial Dividend Receipts ("CDRs"). In general, each CSR evidences ownership of a certain number of shares issued by a regulated investment company ("RIC") exclusive of the right to receive dividends for a period of time. At the end of the specified term, the CSRs could be redeemed for shares in the underlying RIC. The CDRs provided that the holder of the CDR would receive dividends on the shares of the RIC after a specified term had expired.

Principal Life concluded that current tax law requires recognition of any gross increase due to adjustment in the book value of a CSR only when a recognition event occurred, such as a sale or other disposition. Principal Life based this conclusion on the fact that the CSRs constitute ownership rights in a specified number of common shares of a RIC, which represents equity and not debt for tax purposes. Thus, the original issue discount ("OID") rules under sections 1271-1275 and section 1286 were inapplicable.

The agent disagreed, citing as his primary position that each CSR establishes a debt between the depositor and the taxpayer. According to the agent, the depositor, also identified as the initial holder of the CDR, is the owner of the shares, receives the dividend income on the shares, and issues a deemed debt instrument (the CSRs) as a means of financing the purchase of the shares. The shares held in custody secure the CSRs, resulting in a non-recourse collateralized loan transaction.

Alternatively, the agent argues that (1) Principal could be treated as having purchased the entire interest in the RIC shares, including the right to all future dividends, in exchange for cash and additional payments equal to the dividends on the RIC shares; or (2) the custodial arrangement could be treated as a partnership resulting in the reallocation of income attributable to the underlying RIC shares.

Principal strongly objects to the characterization of the CSRs as a collateralized non-recourse obligation on the basis that the agent's position is contrary to the law, arbitrary and without substance. Principal also objects to the agent's alternative argument that Principal should be taxed on the dividends received by the CDR holder on the basis that case law permits a seller of stock to reserve a term interest in the dividend income from the stock. Therefore, the assignment

of income doctrine does not apply. Finally, Principal objects to the characterization of the custodial arrangement as a partnership. The transaction is, in substance, a purchase of stock with a reservation of dividend income. The custody agreement was for the convenience of facilitating the security arrangement but was not necessary for this purpose. Therefore, at most, the custodial arrangement can only be viewed as an investment trust and not as a partnership under the default rules for business entities.

Analysis

The essence of the agent's arguments is summarized below:

> The issue in the instant case turns on whether the Taxpayer acquired ownership of the MMF shares upon the purchase of the CSRs. If the depositor retained ownership of the shares, then the depositor is taxed on all dividend income earned on the shares and the taxpayer is considered to have loaned funds to the depositor in the amount of the purchase price of the CSRs. If the depositor transferred ownership of the shares, then the taxpayer is taxed on all dividend income earned on the shares and is deemed to have borrowed from the depositor, an amount equal to the present value of the anticipated dividends over the restricted dividend period (the CDS value).[1]

*I. The CSRs are not collateralized non-recourse debt instruments.*

A. Substance over form analysis

In *Frank Lyon Company v. United States,*[2] the Supreme Court articulated the basic principle the Government is to follow regarding multiple-party transactions:

> [w]here, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, which is imbued with tax-independent considerations, and which is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes.[3]

This principle carries all the more weight in light of the fact that it was applied within the context of a challenge by the Service to recast a sale-leaseback transaction as a mere financing arrangement. Its applicability in the current situation is undeniable.[4]

---

[1] Page 13 of Form 886A 5701 FP 03

[2] 435 U.S. 561, 584 (1978).

[3] *Frank Lyon Company v. United States*, 435 U.S. 561, 580 (1978).

[4] The principles of *Frank Lyon* have been cited in numerous contexts. For example, *Compaq Computer Corporation,* 277 F.3d 778 (5th Cir. 2001) ["Where…there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the

This principle has two related prongs. The first involves the allocation of rights and duties between the parties. If the CSR transactions involve independent parties negotiating at arms'-length basis, are compelled by business or regulatory considerations, are imbued with tax-independent considerations, and are not solely shaped by tax-avoidance features that have meaningless labels attached, the Government should honor the allocations of rights and duties by the parties to the CSR transactions. These rights and duties are important with respect to the second prong—determining whether the substance of the transaction follows the form. Where the underlying substance follows the form, the Government is not at liberty to recast the form as something else, but must respect the form adopted by the parties.

The agent has not challenged the rights and duties allocated between the parties. As previously documented, the CSR transactions involved independent parties, were negotiated at an arm's length, fulfilled valid business and regulatory purposes, and were not solely shaped by tax-avoidance features. The fact that the CSRs have favorable tax attributes does not give the Government carte blanche to deny those attributes. As the Supreme Court stated in *Frank Lyon*:

> The fact that favorable tax consequences were taken into account by Lyon on entering into the transaction is no reason for disallowing those consequences. We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.[5]

Although the CSR transactions are clearly documented as the purchase of RIC shares held in custody, the agent has chosen to recast the CSRs as a deemed financing between Principal and the depositor. In general, whether a transaction is a sale or financing is a matter of economic substance. As stated in *Frank Lyon*:

> In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed.[6]

It is important to note, however, that where the substance of a transaction is that of a true sale, the Government does not have the discretion, absent statutory authority, to recast a transaction in the form of a deemed financing. Only in the following narrow instances can the Government statutorily recharacterize the assignment of future income as a borrowing secured by the right to the future income, not a sale. First, production payments carved out of mineral property are required to be treated as if they were mortgage loans on the property and not as an economic

---

parties."]; *United Parcel Service v. Commissioner,* 254 F.3d 1014 (11th Cir. 2001) ["The kind of "economic effects" required to entitle a transaction to respect in taxation include the creation of genuine obligations enforceable by an unrelated party. See *Frank Lyon Co...*]; and *Salina Partnership LP v. Commissioner,* TC Memo 2000-352 (2000) ["However, to be accorded recognition for tax purposes, a transaction generally is expected to have "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached."].

5 *Frank Lyon Company v. United States,* 435 U.S. 561, 565 (1978).

6 *Frank Lyon Company v. United States* 435 U.S. 561, 573 (1978). See also *Corliss v. Bowers*, 281 U.S. 376, 378 (1930); *Commissioner v. Tower,* 327 U.S. 280, 291 (1946); *Helvering v. Lazarus & Co.* 308 U.S 252, 255 (1939).

interest in the mineral property. Section 636(a). Second, arrangements involving fast-pay stock are recast as financing arrangements directly between two parties.[7]

Neither section 636(a) nor section 1.7701(1)-3 applies in this case. Therefore, if the substance of the CSR transactions is that of a sale/purchase, the Government is obligated to respect the form of the transaction.

B. Agent's primary position

The government's primary position is that the CSRs establish a debt between the depositor and the taxpayer. As stated by the agent, the cash flows of the transaction are *similar* to that of a zero coupon bond;[8] the CSRs have the *characteristics* of a non-recourse collateralized loan.[9] The agent attempts to support his position through an analysis of factors used to determine (1) whether an instrument is debt or equity under the guidance of Notice 94-47[10] and (2) whether the benefits and burdens of ownership have passed using the factors established in case law.[11] The agent asserts the following factors support his theory that the CSRs constitute a collateralized non-recourse obligation:

**Notice 94-47 Factors**

1. The CSRs are deemed to have a definite maturity date.
2. The holder of the CSR has the right, indirectly, to enforce the payment of principal and interest.
3. The CSRs are not subject to the claims of the depositor's creditors.
4. The investment in CSRs during the restricted dividend period is accounted for as an investment in zero coupon bonds.

***Grodt & McKay* Factors**

5. Title to the MMF shares does not pass to the taxpayer until after the expiration of the restricted dividend period.
6. The taxpayer does not have an equity interest in the underlying MMF shares.
7. The taxpayer does not pay any income or property taxes.
8. The taxpayer is not at risk of the depositor's business or the operations of the underlying MMF.
9. The taxpayer does not participate in the profits from the operations of the depositor, the custodian or the MMF, during the restricted dividend period.

---

[7] In 1993, Congress granted Treasury the authority to prescribe regulations recharacterizing any multiple-party financing transaction as a transaction directly among any two or more parties. To date, Treasury has only issued regulations under this authority dealing with financing arrangements involving fast-pay stock which can be found in Treas. Reg. § 1.7701(l)-3. Moreover, both situations were identified as exceptions to current law as part of a 2001 Clinton budget proposal to characterize a strip of a right to receive future income from income-producing property.

[8] Form 886-A 5701 FP 03, page 5.

[9] Form 886-A 5701 FP 03, page 5.

[10] 1994-1 C. B. 357.

[11] *See, e.g., Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221 (1981).

C. Economic substance and the rights and duties of the parties

Before examining these factors to see whether they support the agent's position, it is important to identify the basic premise underlying the agent's analysis of these factors. As mentioned earlier, this premise is that the substance of the transaction is a collateralized non-recourse obligation.[12] If this premise is shown to be false from the start, most of the agent's arguments are rendered non sequiturs.

According to the Supreme Court in *Frank Lyon,* it is not merely sufficient to argue that an instrument bears a resemblance to collateralized non-recourse debt. The rights and duties assumed by all parties to the transaction must be examined to see if such an arrangement was, in substance, made.

In applying a traditional analysis of substance over form, the contractual rights and duties of the parties to the transaction are first identified. Then, the nature of such rights and duties are examined to see if they are shaped by business realities and tax-independent considerations. Finally, the substance of such rights and duties are examined to see if they correspond to the form.

This is not the approach taken by the agent. The agent first concludes that the transaction is a collateralized non-recourse debt transaction. Based on this conclusion, the agent points out similarities with debt instruments to support his claim that the CSRs are collateralized non-recourse debt instruments. However, the agent's conclusion is no better than the assumptions on which it is based. If the actual duties and rights of the parties, as evidenced by the transaction documents, fail to support the agent's analysis, then the agent's conclusion is also false.

An examination of the transaction must begin with an examination of the contract(s) between the parties. As the Tax Court stated in *Wood Process Company*,

> But the question of the legal effect of the contract upon income tax depends upon the contract itself, rather than upon circumstances motivating its execution.[13]

Also, in *Frank Lyon:*

> [A]s the Court has said in the past, a transaction must be given its effect in accord with what actually occurred and not in accord with what might have occurred.[14]

The agent argues that the transaction could be viewed as a collateralized non-recourse debt issuance. Such speculation, however, carries no weight. What matters is what is actually

---

[12] "The CSR transaction has the characteristics of a non-recourse collateralized loan..." Form 886A 5701 FP 03, page 5; the "...obligation is similar to a non-recourse collateralized obligation..." Form 886A 5701 FP 03, page 9; "The CSR instruments possess many attributes of debt and it is determined that the substance of the transaction is one of a collateralized debt." Form 886A 5701FP 03, page 11.

[13] *Wood Process Company v. Commissioner*, 2 TC 810 (1943).

[14] *Frank Lyon Company v. United States* 435 U.S. 561 (1978).

contained within the four corners of the Custody Agreement.[15] An examination of the provisions of the Custody Agreement clearly demonstrates that the transaction that occurred granted ownership of common shares in a RIC to the holder of the CSRs (i.e., Principal Life) and a security arrangement favoring the holder of the CDRs (i.e., the Depositor).

According to the Custody Agreement and CSR, Principal Life is the owner of the RIC shares held by the Custodian.[16] As such, Principal Life has all the traditional rights of ownership including voting rights,[17] the right to income from the shares after the restricted dividend period,[18] the right to liquidation proceeds representing any return of capital on the shares,[19] and the right to transfer the shares for valuable consideration.[20]

The Custody Agreement explicitly states that it is intended to create a security arrangement as well as a paying agency.[21] The terms of the security arrangement provide that during the restricted dividend period, the holders of the CSRs have no right to cause the redemption of any of the shares.[22] Holders of the CSRs agree not to vote affirmatively for the dissolution of the Issuer or any change in the investment objectives, etc., which could cause the Issuer not to qualify as a money market fund under Rule 2a-7 of the Investment Company Act.[23] The security arrangement is effective only for the restricted dividend period; after this time, for purposes of the Custody Agreement, the CDRs shall no longer be outstanding,[24] and the CSR holder shall have the right to withdraw the shares[25] and terminate the custodial arrangement.[26]

Most revealing is the ability of the CSR holder to terminate the custodial arrangement by directly assuming the obligations of the Custodian with respect to the corresponding holder(s) of CDRs.[27] The CSR holder accomplishes this by delivering the CSRs to the Custodian for cancellation and delivering documentation to the CDR holders sufficient to provide such holders with a valid perfected, first priority security interest in the shares acceptable to the CDR holders in their sole discretion.

It is clear from these provisions that the real economic benefit of the custodial arrangement is derived by the CDR holder who receives a security interest in the shares to guarantee payment of the dividends during the restricted dividend period. The only benefit derived by the CSR holder

---

[15] The Custody Agreement also contains the Forms of Opinions of Counsel and Forms of the CSR and CDR.

[16] CSR; Custody Agreement, Section 2.2(a).

[17] Custody Agreement, Section 2.5(a), providing for such rights to be exercised through the Custodian. Note that the Custodian is merely the nominal holder for the CSR holder; Section 2.4(g) provides that the Custodian is permitted to notify the Issuer of the identity of any Holder of CSRs if and to the extent necessary to permit the Issuer to comply with the requirements of the Investment Company Act of 1940.

[18] CSR; Custody Agreement, Section 2.2(b).

[19] CSR; Custody Agreement, Section 4.1(b).

[20] CSR; Custody Agreement, Section 2.4(b).

[21] 2nd Whereas, Page 2, Custody Agreement.

[22] Custody Agreement, Section 2.2(c).

[23] Custody Agreement, Section 2.5(b).

[24] Custody Agreement, Section 2.2(b).

[25] Custody Agreement, Section 2.6(a).

[26] Custody Agreement, Section 2.6(b).

[27] Custody Agreement, Section 2.6(c).

from the custodial arrangement is convenience. Before any prospective purchaser of the RIC shares can acquire an interest in those shares through the CSR, the purchaser must first agree to the terms of the Custody Agreement granting a security interest in those shares to the CDR holder.

In summary, the form and substance of the Custody Agreement and the sale of the CSRs are to transfer ownership rights in the RIC shares to the CSR Holder subject to a security interest in the RIC shares by the CDR holder. That this is truly the substance of the transaction can be seen in an analysis of the factors identified by the agent in support of his position.

D. Analysis of the factors identified by the Agent

As evident by the transaction documents, the CSRs were issued primarily for convenience (and indeed can even be cancelled without affecting the economic substance of the transaction). Because the CSRs have no real substance or meaning apart from ownership of the underlying shares, it could be argued that an analysis of the various debt/equity factors such as maturity dates, the right to enforce the payment of principal and interest, subordination to the claims of general creditors, etc., does not carry any more weight than the instrument itself does. It is one thing to analyze an instrument that has substance; it is another thing to analyze an instrument that is ephemeral and transient in nature.

However, because the CSRs impart real legal rights and duties during the period of time they are in existence, they should be examined to see whether those rights and duties (i.e., the substance) match the form of the instrument—ownership of the underlying RIC shares. An examination of the particular factors identified by the agent as supporting debt treatment, *in view of the contractual and economic rights and duties of the parties to the transaction*, clearly supports the substance of the CSRs as ownership of common shares in a RIC.

**1. Maturity date**

The agent argues that the CSRs have a definite maturity date because the shares are held in custody for the CSR holder and that it is reasonable to assume that the underlying shares will retain their $1.00 stated value. The real substance of the matter is that Principal Life is the owner of those shares. Although held indirectly, the CSRs do not confer anything other than ownership rights in the shares with a reservation of income. This is made clear by the fact that Principal Life has the option to terminate the custodial arrangement and withdraw the shares subject to a perfected first priority interest. Because the CSRs may or may not be outstanding at the end of the restricted dividend period, any reference to a deemed "maturity date" is meaningless.

In analyzing whether the CSRs provide for an unconditional promise to pay a sum certain on a fixed maturity date, the agent points to the fact that the RIC expects to maintain a constant $1 per share stated value. Notwithstanding the fact that Principal Life expects to receive RIC shares worth $1 apiece, Principal Life remains entirely exposed to the operations of the RIC to maintain this value as evidenced by the following terms of the CSRs and the Custody Agreement:

- The CSRs evidence ownership of the shares and the right to receive all dividends on the shares after the restricted dividend period.[28]
- The CSR holder is entitled to all amounts characterized as a return of capital both during and after the restricted dividend period.[29]
- In the event of any nonpayment in respect of the shares, the CSR holder is entitled to proceed against the Issuer in any manner deemed appropriate.[30]
- The sole obligor with respect to the shares is the Issuer.[31]

Economically, the CSRs do not confer more rights or fewer risks on the holder than if the holder held the RIC shares outright. The fact that there is low risk in the transaction does not mean that there is no risk. The agent appropriately cites the funds' prospectuses as disclaiming any guarantee that the fund will always maintain a $1 per share price. Although remote, there is still risk that the fund's asset value per share may drop below this amount. The terms of the Custody Agreement and CSRs reflect this risk and assign it exclusively to the CSR holder.

In summary, the fact that the RIC expects to maintain a $1 per share value does not mean that this value is guaranteed and is not any more indicative of a maturity date than if Principal Life held the shares directly. It is clear that any holder of the RIC shares would have reason to expect that the fund would still be valued at $1 per share, whether held directly or through a custodial arrangement. This factor does not provide any support to the agent's position.

**2. The right to enforce payment of principal and interest**

The agent argues that because the holder of the CSRs has the right to the possession and liquidation of the RIC shares held by the custodian, the CSRs are deemed to be similar to a non-recourse collateralized obligation. Therefore, the holder of the CSRs has the right, indirectly, to enforce the payment of principal and interest.

This, of course, ignores the true substance of the Custody Agreement as a security arrangement *for the benefit of the CDR holder*. The holder of the CSR has the right to the possession and liquidation of the RIC shares simply because it is the owner of those shares. The agent cites *Mapco Inc. v. United States*[32] as support for arguing that the right to receive the RIC shares gives the CSR holder an indirect right to enforce the payment of principal and interest.

Mapco, Inc., a common carrier of petroleum products through an interstate pipeline system, had a net operating loss of approximately $4.7 million that would expire by the end of 1966. In order to generate sufficient income to utilize the NOL, Mapco assigned 75% of all its pipeline revenues to Rock Creek Corporation for $4 million until such time as Rock Creek received back the principal sum of $4 million plus an amount equal to interest at the rate of 6.375% per annum plus expenses. Rock Creek borrowed the sum of $4 million from Chemical Bank to acquire the pipeline revenues. The $4 million received by Mapco was used to acquire certificates of deposit from

---

[28] CSR, page 1.
[29] CSR, page 2.
[30] CSR, page 2.
[31] CSR, page 1.
[32] 556 F.2d 1107, 1110 (Ct. Cl. 1977)

Chemical Bank. The maturity dates of the CDs corresponded with the anticipated dates for the repayment of the $4 million loan to Chemical Bank.

The U.S. Court of Claims ruled that the transaction was actually a loan rather than an assignment of future revenue in return for a lump sum payment. The court stated that various factors showed that the buyer was certain to be repaid in full and that the buyer had no dominion or control over the revenue payments and none of the usual risks or benefits associated with ownership of property. In addition, the fact that Mapco deposited the $4 million proceeds in Chemical Bank CDs implied that Mapco indirectly guaranteed repayment.

The agent argues that in similar fashion, the Depositor deposited the RIC shares with the Custodian in order to indirectly secure the Depositor's obligation with respect to the CSR holder (i.e., the deemed loan). The agent's theory thus has the holder of the CSRs standing in the shoes of Rock Creek, which was the ultimate beneficiary of the CDs issued by the bank to Mapco. If Mapco defaulted on the revenue payments, Rock Creek could defease its obligation with respect to its loan to Chemical Bank by virtue of the certificate of deposit proceeds received by the bank from Mapco.

Without belaboring the many differences between *Mapco* and the CSR transactions, the agent's use of *Mapco* to support his theory that the shares are held as collateral for the CSR holder is relevant only if, in fact, the CSR holder is the ultimate beneficiary of the collateral arrangement (i.e., stands in the same position as Rock Creek did in *Mapco)*. The Custody Agreement, however, was executed for the benefit of the CDR holder who is the true beneficiary of the security arrangement. Therefore, *Mapco* has no relevance to this situation. This factor does not support the agent's position.

One difference between *Mapco* and the current transaction is worth noting. In *Mapco*, Mapco was the original owner of the property, of which it then tried to sell part of its future revenue stream, and remained the owner of the property at the end of agreement. As discussed below under the assignment of income cases, the ownership of the RIC shares has been sold to the Taxpayer, subject to the reservation of dividends during a certain period of time. This represents a fundamental difference from the facts in *Mapco*.

### 3. Lack of subordination

The agent argues that because the RIC shares are held in a custodial account and are not subject to claims by the depositor's creditors, the CSRs are not subordinate to the claims of the general creditors of the Depositor because the CSR holder's right to the RIC shares is superior. Again, this argument ignores the substance of the Custody Agreement as a security arrangement for the benefit of the CDR holder. Obviously, the CSR holder's rights to the regulated investment company shares are superior to that of any other party because the CSR holder is the owner of those shares and bears the risks and rewards of such ownership, as already detailed. Note that if the CDR holder goes bankrupt, the creditors of the CDR holder step into the shoes of such holder in respect of the security arrangement. Therefore, the CSR holder could actually find itself in the position of maintaining the shares as collateral for the benefit of the creditors of the CDR holder.

If the CSR holder defaults on any of the obligations that it assumes under the Custody Agreement,[33] the shares could be forfeited to make payment on the dividends to be paid on the CDRs. Therefore, the shares represented by the CSRs could be subject to the claims of the general creditors of the CDR holder. This factor does not support the agent's position but rather the taxpayer's.

**4. Accounting treatment as a zero-coupon bond**

The agent states that the intent of the parties regarding the treatment of the instruments as debt or equity for non-tax purposes is an important factor in determining whether a debtor-creditor relationship exists. According to the agent, the letter from Coopers & Lybrand concluded that the CSRs should be accounted for as "...an investment in zero coupon bonds..." during the restricted dividend period, and "...as an investment in a money market fund..." after the restricted dividend period.[34]

The agent places far too much weight on this factor. In *Frank Lyon,* the Supreme Court stated the following,

> In concluding that there is this distinct element of economic reality in Lyon's assumption of liability, we are mindful that the characterization of a transaction for financial accounting purposes, on the one hand, and for tax purposes, on the other, need not necessarily be the same.... *Accounting methods or descriptions, without more, do not lend substance to that which has no substance.*[35]

The accounting method suggested by Coopers & Lybrand does not change the substance of the CSR transaction in the least. In fact, the Coopers & Lybrand memo supports the treatment of the CSRs as equity, viewing them as representing beneficial ownership of the shares via the custodial arrangement and providing the CSR holder the right to receive all economic benefits of the shares, excluding the dividends during the restricted dividend period. The accounting treatment recommended by Coopers & Lybrand is based solely on an economic similarity with a zero coupon bond. As further discussed below, this does not affect the fundamental substance of the CSRs as ownership of the underlying RIC shares. Therefore little, if any, weight should be accorded the statutory accounting treatment.

**5. Passage of title**

The passage of title is one of those factors that tend to be commonly discounted by the courts. However, this factor favors the taxpayer in this situation because the shares are registered in the name of the Custodian only as nominal holder,[36] and the Custodian is permitted to notify the Issuer of the identity of any Holder of CSRs if and to the extent necessary to permit the Issuer to

---

[33] Custody Agreement, Section 2.6(c).
[34] Form 886-A 5701 FP 03, page 11.
[35] *Frank Lyon Company v. United States,* 435 U.S. 561, 577 (1978) (emphasis added).
[36] Custody Agreement, Section 2.5(a).

comply with the requirements of the Investment Company Act of 1940.[37] Further, as noted above, Taxpayer can terminate the custodial arrangement and take title directly in the RIC shares.

**6. Lack of equity interest in RIC shares**

The agent states that the holder of the CSR does not possess all the benefits and burdens of ownership of the underlying shares because (1) the CSR holder does not participate in the results of operations because all earnings are paid as dividends to the CDR holder, and (2) the holder is restricted from liquidating the shares prior to the expiration of the restricted dividend period.[38] If, as the agent argues elsewhere, Principal Life has the expectation that the RIC shares will be maintained at $1 per share, upon what can this expectation be based *other than* the successful operations of the regulated investment company? It is contradictory to insist on the one hand that the shares are reasonably expected to be $1 per share at the end of the restricted dividend period and to argue, on the other hand, that this has nothing to do with the operations of the RIC.

It is obvious from the provisions of the Custody Agreement and the CSR that the CSR holder's return is exclusively dependent on the cash flow generated by the RIC. Such cash flow arises solely as the result of the RIC's operations. During the restricted dividend period, the CSR holder is at risk that the RIC will not be able to generate sufficient earnings to maintain a $1 per share fund value and may have to liquidate at a value of less than $1 per share. After the restricted dividend period, the CSR holder is still at risk to the RIC's operations to maintain the fund value and to pay dividends. Therefore, the CSR holder's return is necessarily dependent upon the risks inherent in the RIC whether during or after the restricted dividend period.

The agent also points out that the CSR holder is restricted from liquidating the underlying shares. This ignores the fact that the CSR holder is able to benefit economically from the shares by transferring the CSRs in return for valuable consideration. This is no different in principle than selling American Depositary Receipts (ADRs) representing shares of foreign stock.[39]

In summary, both of these issues support the taxpayer's position that it is the owner of the RIC shares and has assumed the economic risks and rewards with respect to those shares.

**7. The taxpayer does not pay any income or property taxes**

The agent argues that because only the CDR holder reports income from dividends paid by the underlying MMF and bears the expenses of the Custodian during the restricted dividend period, this factor favors debt treatment.

In general, "...tax is upon income as to which, in the general application of the revenue acts, the tax liability attaches to ownership."[40] Because what is owned is at dispute in this issue, the burden of tax liability can only flow from the resolution of this issue, not resolve it. Principal

---

[37] Custody Agreement, Section 2.4(g).
[38] Page 11 of Form 886A 5701 FP 03.
[39] Need cite to what he is referring.
[40] *Blair v. Commissioner*, 91 F.2d 992 (2d Cir. 1937).

Life is consistent in its treatment of the CSRs by deferring the recognition of income (and thus tax) until it has sold the RIC shares, either indirectly (i.e. through the CSRs) or directly.

The Custody Agreement allocates expenses according to the benefits derived by the parties. The charges and expenses of the Custodian are payable by the CDR holder during the restricted dividend period[41] because this party receives the primary benefit of the custodial arrangement during this time. The charges and expenses of the Custodian after this period are payable by the holder of the CSRs[42] simply because the CDRs are no longer outstanding[43] and derive no further benefit from the custodial arrangement.

In addition, withholding tax on any payments with respect to any CSR is borne by the party who owns such receipt[44] and the expenses of any action incurred by the Custodian to determine the characterization of amounts received in the event of a return of capital of the shares are to be allocated on a proportionate basis among the holders of the affected CSRs to the extent of payments received by the Custodian.[45] Thus, the allocation of expenses and taxes corresponds to the economic benefits derived by the parties, consistent with the ownership rights imparted by each CSR.

Finally, as further discussed in the section dealing with the application of the assignment of income doctrine, the fact that the Depositor is the only party taxable on the dividends received during the restricted dividend period (and whom the taxpayer presumes is actually paying tax on such income as dividends and not capital gains), supports the taxpayer's position that the CDR holder has reserved the dividend income on the shares for a period of time, but not the shares themselves.[46]

### 8. The taxpayer is not at risk of the Depositor's business or the MMF

The taxpayer's exposure to the risks of the operations of the RIC has already been discussed. The taxpayer is not at risk to the Depositor's business simply because the CSRs confer ownership in the common shares of the RIC, not the Depositor. Because the CSR holders own clear distinct assets, neither party has risk with respect to the bankruptcy of the other. This does not support debt treatment. However, if the CSR holder terminates the custody arrangement during the restricted dividend period and assumes the obligations of the Custodian, the Depositor is potentially at risk to the holder of the CSRs to perform the obligations of the Custodian. This situation is contrary to the agent's position and supports the taxpayer's position.

### 9. Lack of participation in the profits from the operation of the MMF

---

[41] Custody Agreement, Section 5.7.

[42] Custody Agreement, Section 5.7; Section 2.1(b).

[43] Custody Agreement, Section 2.2(b).

[44] Custody Agreement, Section 3.2.

[45] Custody Agreement, Section 5.1(d).

[46] See *Heminway v. Commissioner,* 44 TC 96 (1965). In referring to the taxation of dividends reserved by the seller of stock, the court stated, "As the beneficial owner [of the dividends] she is liable for, and has paid, the tax imposed on the amounts paid over by Heminway, as dividends, and not as capital gains incident to the sale of her stock."