IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 07-06 T, 07-706 T, 08-135 T, 08-605 T
(Judge Francis M. Allegra)

PRINCIPAL LIFE INSURANCE COMPANY AND SUBSIDIARIES, et. al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

———————

UNITED STATES' MOTION FOR SUMMARY JUDGMENT AND OPENING BRIEF

———————

JOHN A. DiCICCO
 Acting Assistant Attorney General

STEVEN I. FRAHM
BART D. JEFFRESS
 Attorneys
 Justice Department (Tax)
 Court of Federal Claims Section
 P.O. Box 26
 Ben Franklin Post Office
 Washington, D.C. 20044
 (202) 307-6496
 (202) 514-9440 (facsimile)

# TABLE OF CONTENTS

**Page**

Motion of the United States for summary judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Brief of United States in support of motion for summary judgment:

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Questions presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.     The 1999 and 2000 returns and the notice of deficiency . . . . . . . . . . . . . 5

        B.     The deposit, taxpayer's letters, and assessment . . . . . . . . . . . . . . . . . . . . 6

        C.     Taxpayer's protest/contest of the deficiencies the IRS determined . . . . . . 8

        D.     Plaintiff's refund claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        E.     Taxpayer's 1998 taxable year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.     Taxpayer does not have a refundable overpayment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.     Section 6401(a) does not retroactively transform a tax paid
               within the assessment deadline into an overpayment simply
               because the IRS makes an untimely assessment . . . . . . . . . . . . . . . . . . . 13

        B.     Taxpayer's misreading of Section 6401(a) to mandate a refund
                would exceed the boundaries of a tax refund suit . . . . . . . . . . . . . . . . . . 16

        C.     Section 6401(a) does not override the distinction between a
               tax liability and a tax assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        D.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II.    Taxpayer's deposit was not converted to payments of tax, until the IRS applied the
      deposit to timely assessed deficiencies on May 27, 2005 . . . . . . . . . . . . . . . . . . . . . . . 20

**(Continuation):**

**Page**

      A.    History of Deposits and Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

          1.    Judicial Development of Deposit Concept  . . . . . . . . . . . . . . . 22

          2.    The Federal Circuit's Consideration of Deposits  . . . . . . . . . . . 26

          3.    Development of Deposit Concept in IRS Revenue
               Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

          4.    Enactment of § 6603 and Promulgation of
               Rev. Proc. 2005-18  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      B.    Under section 6603 and Revenue Procedure 2005-18, taxpayer's
          deposit was not converted to a payment on January 28, 2005, and
          therefore it is undisputed that the May 27, 2005 assessments
          were timely . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      C.    Likewise, under *Rosenman* and Federal Circuit authority, taxpayer's
          deposit was not converted to a payment on January 28, 2005, and
          therefore it is undisputed that the May 27, 2005 assessments
          were timely . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

IV.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Appendix A (Attached to brief and separately numbered):
Title 26, U.S.C.:
      § 6213(a), (b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      § 6401(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      § 6402(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      § 6501(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      § 6503(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      § 6603 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

# TABLE OF AUTHORITIES

**Page**

**Cases:**

*Ameel v. United States*, 426 F.2d 1270 (6th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Anderson v. United States*, 15 F. Supp. 216 (Ct. Cl. 1936) . . . . . . . . . . . . . . . . . . . . . . . 13

*Bachner v. Commissioner*, 109 T.C. 125 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*Baral v. United States*, 528 U.S. 431 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25, 26 28

*Bull v. United States*, 295 U.S. 247 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Cohen v. United States*, 995 F.2d 205 (Fed. Cir. 1993) . . . . . . . . . . . 14, 24, 26, 27, 33, 35

*Colt's Manufacturing Co. v. Commissioner*, 306 F.2d 929 (2d Cir. 1962) . . . . . . . . . . . 24

*Crompton & Knowles Loom Works v. White*, 65 F.2d 132 (1st Cir. 1933) . . . . . 13, 14, 17

*Dantzler v. United States*, 183 F.3d 1247 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 25

*Deaton v. Commissioner*, 440 F.3d 223 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Dysart v. United States*, 340 F.2d 624 (Ct. Cl. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ehle v. United States*, 720 F.2d 1096 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Ertman v. United States*, 165 F.3d 204 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Essex v. Vinal*, 499 F.2d 226 (8th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Ewing v. United States*, 914 F.2d 499 (4th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 14, 24

*Federal National Mortgage Association v. United States*, 379 F.3d 1303
    (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Ford v. United States*, 618 F.2d 357 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Fortugno v. Commissioner*, 353 F.2d 429 (3d Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . 24

**Cases (continued):**

**Page**

*Gabelman v. Commissioner*, 86 F.3d 609 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 26

*Hibbs v. Winn*, 542 U.S. 88 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hill v. United States*, 263 F.2d 885 (3d Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Jones v. Liberty Glass Co.*, 332 U.S. 524 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Laing v. United States*, 423 U.S. 161 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lewis v. Reynolds*, 284 U.S. 281 (1932), *modified* 284 U.S. 599 (1932) . . . 12, 16, 17, 18

*Lewyt v. Commissioner*, 215 F.2d 518 (2d Cir. 1954), *aff'd in part and rev'd
    in part on another issue*, 349 U.S. 237 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Malachinski v. Commissioner*, 268 F.3d 497 (7th Cir. 2001) . . . . . . . . . . . . . . . . . 15, 24

*Meyersdale Fuel Co. v. United States*, 44 F.2d 437 (Ct. Cl. 1930) . . . . . . . . . . . . . . . . 13

*Moran v. United States*, 63 F.3d 663 (7th Cir. 1995) . . . . . . . . . . . . . . . 14, 15, 17, 18, 24

*Muir v. United States*, 3 F. Supp. 619 (Ct. Cl. 1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*New York Life v. United States*, 118 F.3d 1553 (Fed. Cir. 1997) . . . . . . . . . 26, 27, 33, 35

*Ott v. United States*, 141 F.3d 1306 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Parker v. United States*, 573 F.2d 42 (Ct. Cl. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ramirez v. United States*, 538 F.2d 888 (Ct. Cl. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Richardson v. Smith*, 301 F.2d 305 (3d Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Rosenman v. United States*, 323 U.S. 658 (1945) . . . . . . . . . . . . . . . . . . . . 22-28, 32, 35

*Service National Corp. v. United States*, 1994 WL 912143 (D. Del. 1994) . . . . . . . . . . 15

*South Corporation v. United States*, 690 F.2d 1368 (Fed. Cir. 1982) . . . . . . . . . . . . . . . 14

**Cases (continued):**

**Page**

*Stone v. White*, 301 U.S. 532 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Thomas v. Mercantile National Bank*, 204 F.2d 943 (5th Cir. 1953) . . . . . . . . . . . 24, 25

*Tualatin Valley Builders Supply, Inc. v. United States*, 522 F.3d 937 (9th Cir. 2008) . . 33

*United States v. Dubuque Packing Co.*, 233 F.2d 453 (8th Cir. 1956) . . . . . . . . . . . . . 24

*VanCanagan v. United States*, 231 F.3d 1349 (Fed. Cir. 2000) . . . . . . . . . . 26, 27, 33, 35

*Weigand v. United States*, 760 F.2d 1072 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . 26

*Williams-Russell & Johnson, Inc. v. United States*, 371 F.3d 1350
      (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

**Statues:**

Internal Revenue Code of 1986 (26 U.S.C.):[1]

§ 6151  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22
§ 6155 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 6157 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 6159 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 6203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
§ 6213 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 11
§ 6226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 6302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 6401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 5, 11-19, 22-23
§ 6402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11, 14
§ 6501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19
§ 6502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 19
§ 6503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10
§ 6511 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 6513 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25, 26

_____

[1] Unless otherwise stated, all statutory references to Title 26 of the United States Code are to the Internal Revenue Code of 1986.  Internal Revenue Code sections are referenced throughout the brief as "§ [section]" or "Section [section]."

**Statues (continued):**

**Page**

§ 6601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
§ 6603 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 6, 7, 9, 21, 22, 29-35
§ 6656 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 7101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 7447 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 7448 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 7485 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 7608 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 7809 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
§ 9008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Current Tax Payment Act of 1943, ch. 120, 57 Stat. 126 . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Revenue Act of 1928, ch. 852, 45 Stat. 791 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

P.L. 108-357, § 842(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Miscellaneous:**

H.R. Conf. Rep. No. 108-755 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

H.R. Rep. 70-2 (1927), *reprinted in* 1939-1 C.B. (pt. 2) 384 . . . . . . . . . . . . . . . . . . . . . 15

H.R. Rep. No. 108-393 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

H.R. Rep. No. 108-548, pt. 1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Rev. Proc. 2005-18, 2005-1 C.B. 798 (2005) . . . . . . . . . . . . . . . . . . . . . . 3, 4, 21, 29-35

Rev. Proc. 84-58, 1984-2 C.B. 501 (1984) . . . . . . . . . . . . . . . . . . . . . . . . 27, 29, 31-34

Rev. Proc. 82-51, 1982-2 C.B. 839 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rev. Proc. 64-13, 1964-1 (Part 1) C.B. 674 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rev. Rul. 89-6, 1989-1 C.B. 119 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rev. Rul. 85-67, 1985-1 C.B. 364 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Miscellaneous (continued):**

**Page**

Rev. Proc. 63-11, C.B. 1964-1 497 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rep. No. 70-960 (1928), *reprinted in* 1939-1 C.B. (pt. 2) 409 . . . . . . . . . . . . . . . . . . . 15

S. Rep. No. 108-192 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Treas. Reg. § 301.6401-1(a)(1)(26 C.F.R.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

——————————

Nos. 07-06 T, 07-706 T, 08-135 T, 08-605 T
(Judge Francis M. Allegra)

——————————

PRINCIPAL LIFE INSURANCE COMPANY AND SUBSIDIARIES, et. al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

——————————

MOTION OF THE UNITED STATES FOR SUMMARY JUDGMENT

——————————

Defendant, the United States, pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"), moves for summary judgment on plaintiffs' remaining challenges to the validity of assessments on the grounds that there is no genuine issue as to any material fact and that defendant is entitled to judgment as a matter of law, as set forth in the accompanying brief.

Respectfully submitted,

s/Bart D. Jeffress
BART D. JEFFRESS
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6496
(202) 514-9440 (facsimile)

JOHN A. DiCICCO
  Acting Assistant Attorney General
STEVEN I. FRAHM
  Chief, Court of Federal Claims Section

s/Steven I. Frahm
Of Counsel

September 4, 2009

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

————————

Nos. 07-06 T, 07-706 T, 08-135 T, 08-605 T
(Judge Francis M. Allegra)

————————

PRINCIPAL LIFE INSURANCE COMPANY AND SUBSIDIARIES, et. al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

————————

BRIEF OF UNITED STATES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

————————

## INTRODUCTION

Principal Life Insurance Company and others (collectively "taxpayer") commenced these consolidated tax refund actions, seeking to recover from the Internal Revenue Service alleged overpayments of tax, penalties, and interest for the taxable years 1995 through 2003. Taxpayer's complaints pleaded multiple grounds for recovery, including challenges to the validity of certain assessments. Those challenges sought refunds of approximately $500 million in tax, penalties, and interest, on the grounds that most of the assessments the IRS made against taxpayer for the tax years 1996 through 2000 were untimely (e.g. doc. #22-8). On October 21, 2008, the Court entered an order (doc. #38) providing for discovery on taxpayer's untimely assessment claims. After discovery on the claims was completed, taxpayer conceded the timeliness of all assessments that were attributable to net operating or capital loss carrybacks and stated it would continue only with its challenges to portions of the assessments for tax years 1998, 1999, and

- 1 -

2000 (doc. #45).  On May 27, 2009, the Court entered an order (doc. #46) allowing defendant to move for summary judgment on taxpayer's remaining challenges, and this motion and brief now follow.[2]

The skeletal facts underlying taxpayer's untimely assessment claims are simple and undisputed:  On December 29, 2004, the IRS mailed a statutory notice of deficiency to taxpayer.  In the notice, the IRS determined deficiencies in income tax and penalties for taxpayer's 1996 through 2000 tax years of approximately $390 million.  To stop interest from accruing on the tax and penalties, taxpayer deposited (versus paid) $444 million with the IRS on January 13, 2005.  Fifteen days after the deposit, on January 28, 2005, taxpayer delivered a letter to the IRS, requesting that the IRS "now (today) apply the deposit . . . to payment of the federal income tax, interest and penalty . . . for [tax years 1996-2000]."  On May 27, 2005, the IRS assessed the tax and penalties reflected in the notice of deficiency.

Taxpayer contends that certain of the assessments for the 1999 and 2000 tax years in the approximate amount of $100 million were too late.  Taxpayer contends that its January 28 letter converted its deposit into payments of tax, and that the conversion had the effect of shortening the period for the IRS to make assessments from May 30, 2005, to March 31, 2005.  According to taxpayer, therefore, the assessments made on May 27, 2005, were untimely, and should be refunded as an "overpayment" pursuant to sections 6401 and 6402 of the Internal Revenue Code.

Taxpayer's claim fails on its own terms.  Its theory is that it paid taxes within the period

---

[2] This brief generally addresses only taxpayer's remaining challenges to the assessments for the 1999 and 2000 tax years, as to which taxpayer seeks refunds approximating $100 million.  Taxpayer's remaining challenges to the assessments for the 1998 tax year, by which taxpayer seeks a refund approximating $80,000, involve distinct issues that warrant separate treatment.  Accordingly, we specifically address the 1998 tax year *infra* at subpart E (p.11).

for assessment and that its payments became refundable because the IRS assessed the taxes after the period expired.  It is well settled, however, that where payment of a tax is made before the expiration of the period of limitations, but assessment of the liability is not made until after the period expires, the payment does not constitute a refundable "overpayment" within the meaning of section 6401(a).  Rather, the IRS is entitled to retain the payment unless the taxpayer establishes on the merits that the taxpayer is not liable for the taxes in dispute.

In addition, taxpayer is wrong that it converted its deposit into payments of tax on January 28, 2005.  If the conversion did not occur on that date, then it is undisputed that the period to assess was not shortened, but expired on May 30, 2005, and therefore that the assessments of May 27, 2005, were timely.  The conversion posited by taxpayer is premised on the assumption that a taxpayer may make a deposit with the IRS and thereafter direct the IRS to convert the deposit into a payment, whenever a taxpayer wants, with the effect that the period to assess tax is cut short.  The rules governing the making and use of deposits contradict taxpayer's position.

The rules governing the making and use of deposits are set forth in section 6603 of the Internal Revenue Code and Revenue Procedure 2005-18 and generally do not permit a taxpayer to control the use of a deposit after it is made.  In particular, they provide that a deposit does not convert to a payment until the deposit is used to pay an assessed liability.  Taxpayer therefore could not convert its January 13, 2005 deposit into a payment on January 28, 2005, before the IRS made assessments four months later on May 27.

The rules for deposits set forth in section 6603 and Revenue Procedure 2005-18 were promulgated by Congress and an express delegation of congressional authority, and apply to

deposits, like taxpayer's, made after October 22, 2004.  These rules therefore supersede all prior rules governing deposits and control whether taxpayer was permitted to convert its deposit into a payment before the IRS made an assessment.

However, even under the rules for deposits that predate section 6603, taxpayer's deposit did not become a payment on January 28, 2005, and the assessments therefore were timely.  The rule that developed in the Federal Circuit was as follows: if, following the issuance of a notice of deficiency, a taxpayer remits an amount to satisfy the liability at issue and accompanies the remittance with a protest of that liability, then the remittance is a deposit as a matter of law and becomes a payment only when it is used to pay the assessment of that liability.  Under this rule, taxpayer's deposit in response to the notice of deficiency did not convert to a payment before the IRS made assessments in May 2005, and used the deposit to satisfy them.  This is because taxpayer consistently protested the liabilities asserted in the notice, including when it made its deposit.

In summary, even if taxpayer were correct that it converted its deposit into a payment, the payment was made before the period to assess expired and therefore does not give rise to a refundable overpayment unless taxpayer proves its case on the merits.  In addition, under both the rules for deposits set forth in section 6603 and Revenue Procedure 2005-18 and the rules predating the enactment of section 6603, taxpayer was not permitted to direct the IRS to convert its deposit into a payment before the IRS assessed the liabilities, and therefore the assessments were timely.  For either one of those two reasons, defendant is entitled to summary judgment on taxpayer's remaining challenges to the validity of assessments for its 1999 and 2000 tax years.

## QUESTIONS PRESENTED

**1.** Where payment of a tax is made before the expiration of the period of limitations, but assessment of the liability is not made until after the period expires, does the payment become a refundable "overpayment" within the meaning of section 6401(a) merely as a result of the tardy assessment?

**2.** Under the rules governing the making and use of deposits, was taxpayer authorized to direct the IRS to convert its deposit into a payment before tax liabilities were assessed?

## STATEMENT OF FACTS

### A. The 1999 and 2000 returns and the notice of deficiency

Taxpayer filed returns for its taxable years 1999 and 2000, and later entered into an agreement with the IRS extending the period to assess an income tax deficiency for those years until December 31, 2004.  (Prop. Find. ¶ 1).[3]

On December 29, 2004, the IRS mailed a statutory notice of deficiency to taxpayer for its taxable years 1996 through 2000.  The notice determined that taxpayer owed additional tax and penalties for those years in the respective amounts of $362,030,347 (tax) and $27,377,423 (penalty).  For taxable year 1999, the respective amounts were $164,888,638 (tax) and $10,848,700 (penalty), and for taxable year 2000, they were $128,727,605 (tax) and $7,294,419 (penalty).  (Prop. Find. ¶ 2).[4]

_____

[3] Section 6501(a) provides the default rule that taxes must be assessed within three years after the taxpayer files its return.  An exception set forth in section 6501(c)(4) allows the taxpayer and the IRS to extend the period for assessment beyond the initial three-year period.

[4] The mailing of the notice of deficiency two days before the period to assess was set to expire started a ninety-day period during which taxpayer was entitled to file a petition in the United States Tax Court and the IRS was prohibited from assessing income tax against the

### B.       The deposit, taxpayer's letters, and assessment

To stop interest from accruing on the amounts specified in the notice of deficiency,

taxpayer remitted a deposit of $444,000,000 to the IRS on January 13, 2005.  On the same day,

Mr. Bruce Graves (taxpayer's attorney of record in this case), as taxpayer's authorized

representative, hand delivered a letter regarding the deposit to the IRS.  In the letter, taxpayer

designated the remittance as "a deposit in the nature of a cash bond" "[i]n accordance with

Section 6603 of the Internal Revenue Code and Section 4.01 of Revenue Procedure 84-58."  It

also designated a portion of the total deposit for each of taxpayer's taxable years 1996 through

2000.  For example, $202,000,000 of the deposit was designated for 1999 and $153,300,000 for

2000.  Finally, "[i]n accordance with Section 6603(d)," taxpayer specified the entire deposit as

having been made "with respect to a 'disputable tax,' as that term is defined in section

6603(d)(2)(A) of the Code."  (Prop. Find. ¶ 3).

The IRS treated the remittance as a deposit made pursuant to section 6603, and posted it

as such to taxpayer's accounts for taxable years 1996 through 2000, in accordance with the

amount specified by taxpayer for each year.  The IRS posted the remittance by using the codes

for posting a deposit to a taxpayer's account: Transaction Code 640, Blocking Series "990-999",

and Designated Payment Code 12.  (Prop. Find. ¶ 4).

On January 28, 2005, taxpayer delivered a second letter regarding the deposit to the IRS.

---

taxpayer.  § 6213(a).  Because of this prohibition, the period to assess was suspended for one-
hundred fifty days: the ninety-day period during which the IRS was prohibited from making an
assessment, plus sixty days.  § 6503(a).  After tacking on the two days that remained on the
original assessment period before it was suspended, the period to assess therefore expired on
May 30, 2005.  *See Ramirez v. United States*, 538 F.2d 888, 891-893 (Ct. Cl. 1976) (time
remaining in assessment period when notice of deficiency issues is "tacked" on after one-
hundred fifty day suspension ends).

After recounting the history of the notice and subsequent deposit, taxpayer requested that "the [IRS] now (today) apply the deposit for each year to payment of the federal income tax, interest and penalty in the following amounts for each year in ascending order:

| Year | Tax | Penalty | Interest |
|------|-----|---------|----------|
| 1996 | $8,806,758 | $961,609 | $2,032,704.38 |
| 1997 | $22,097,933 | $780,951 | $1,728,429.98 |
| 1998 | $37,509,413 | $7,491,744 | $6,303,004.87 |
| 1999 | $164,888,638 | $10,848,700 | $24,358,720.79 |
| 2000 | $128,727,605 | $7,294,419 | $19,182,961.25 |

Taxpayer further requested that "any deposit not applied to the payment of tax, interest or penalty for any of these years be applied to payment of the deficiency for the year 2000 . . .," and that "any deposit remaining after payment of all deficiencies (including interest) for these years should be refunded (with interest pursuant to section 6603) to [taxpayer]. . . ."  (Prop. Find. ¶ 5).

    In response to taxpayer's January 28 letter, the IRS did not post the January 13, 2005, deposits to taxpayer's accounts for taxable years 1996 through 2000 as payments of tax, interest, and penalty.  (Prop. Find. ¶ 6).

    On May 27, 2005, the IRS assessed deficiencies in income tax and penalties against taxpayer for the taxable years 1996 through 2000 as follows:

| Taxable Year | Assessed Income Tax | Assessed Penalty |
|--------------|---------------------|------------------|
| 1996 | $8,806,758 | $961,609 |
| 1997 | $22,946,915 | $780,951 |
| 1998 | $38,337,779 | $7,491,744 |
| 1999 | $164,888,638 | $10,848,700 |

- 7 -

| 2000 | $129,256,136 | $7,294,419 |
|---|---|---|

(Prop. Find. ¶ 7).[5]

The assessments were attributable to net operating or capital loss carrybacks, with the exception of assessments totaling $31,552,157 (tax) and a portion of $10,848,700 (penalty) for the taxable year 1999, and assessments totaling $59,062,216 (tax) and $7,294,419 (penalty) for the taxable year 2000.  (Taxpayer also believes that $80,736 of the assessment of tax for taxable year 1998 was not attributable to a carryback).  Taxpayer has conceded its challenges to the timeliness of the assessments to the extent the assessments were attributable to any carryback and now contends only that the portions of the assessments just enumerated for tax years 1999 and 2000 (and 1998) (and assessments of interest related thereto) were untimely.  (Prop. Find. ¶ 8).

On May 27, 2005, the IRS used taxpayer's January 13, 2005 deposit to pay the deficiencies assessed that day.  (Prop. Find. ¶ 9).

**C.     Taxpayer's protest/contest of the deficiencies the IRS determined**

It was the taxpayer's practice, known to the IRS, to pay the amount the IRS determined was due after an audit (e.g. in a notice of deficiency or in a revenue agent report), and then file an administrative claim for refund and (if necessary) a refund suit with respect to disputed issues. (Prop. Find. ¶ 10).

Before the IRS mailed the notice on December 29, 2004, taxpayer informed the IRS that

---

[5] If the assessments on May 27, 2005, were timely, then subsequent assessments of related interest were also timely.  *See* §§ 6502(a), 6601(g) (providing generally that interest may be assessed and collected within ten years of the timely assessment of the tax to which the interest relates).

it intended to contest at least some of the liability determinations that were later reflected in the notice.  Also prior to issuance of the notice, taxpayer informed the IRS that it "disagreed" with various adjustments proposed by the IRS that were subsequently included in the notice (as support for some of the determined deficiencies).  (Prop. Find. ¶ 11).

On January 13, 2005, when Mr. Graves delivered taxpayer's letter regarding the deposit to the IRS, he informed the IRS that taxpayer intended to contest the deficiencies in income tax and penalties determined in the notice, either (1) by filing a refund claim with the IRS and then suing for a refund or (2) by filing a petition in the United States Tax Court for redetermination (of the deficiencies in income tax and penalties determined in the notice).  (Prop. Find. ¶ 12).

In both its January 13 and January 28 letters, taxpayer represented that the entire deposit was made "with respect to a 'disputable tax,' as that term is defined in section 6603(d)(2)(A) of the Code."  That section defines a "disputable tax" to mean "the amount of tax specified at the time of the deposit as the taxpayer's reasonable estimate of the maximum amount of any tax attributable to disputable items."  § 6603(d)(2)(A).  The term "disputable item" in turn is defined as "any item of income, gain, loss, deduction, or credit if the taxpayer has a reasonable basis for its treatment of such item, and reasonably believes that the Secretary also has a reasonable basis for disallowing the taxpayer's treatment of such item."  § 6603(d)(3)(A).  By specifying the full amount of the deposit as with respect to a "disputable tax," taxpayer conveyed and the IRS understood that taxpayer disagreed with the liabilities asserted in the notice.  (Prop. Find. ¶ 13).

On February 22, 2005, taxpayer told the IRS it was in the process of contesting the tax and penalties determined in the notice of deficiency for tax years 1999 and 2000 by paying them and filing an administrative refund claim.  (Prop. Find. ¶ 14).

Taxpayer never advised the IRS that it agreed with the liabilities determined in the notice of deficiency.  (Prop. Find. ¶ 15).[6]

**D.    Plaintiff's refund claims**

On or about January 26, 2007, taxpayer filed refund claims with the IRS for the taxable years 1996 through 2000, seeking refunds of all of the income tax and penalties, plus interest, paid with respect to the notice of deficiency.  Taxpayer's refund claims included challenges to the timeliness of the IRS' May 27, 2005, assessments for the 1999 and 2000 taxable years. (Prop. Find. ¶ 17).

In the refund claims, taxpayer acknowledged that (i) pursuant to section 6213(a), the mailing of the notice of deficiency two days before the period to assess expired triggered a period during which the IRS was prohibited from assessing income tax against taxpayer; (ii) pursuant to section 6503(a), the period to assess was suspended while the IRS was prohibited from making an assessment and for sixty days thereafter; and (iii) "typically" the suspension would have extended the period to assess for 150 days until May 30, 2005, including the default ninety-day period during which assessment was prohibited after issuance of a notice of deficiency plus the sixty-day period following the end of the ninety-day prohibition.

Despite this, taxpayer contended that the period for assessment ended on March 31, 2005. Taxpayer contended that the prohibition on assessment terminated on January 28, 2005, when it requested that the "[IRS] apply the deposit [of January 13] . . . to payment of the federal income

---

[6] In publicly available disclosures, taxpayer stated in March 2005 that it intended to file claims for refund with respect to "disputed adjustments" underlying the deficiencies determined in the notice, and that a minority of the determined deficiencies were "attributable to both contested issues and adjustments that [it] ha[d] accepted."  The disclosures contained no further specification of the "accepted" adjustments.  (Prop. Find. ¶ 16).

- 10 -

tax, interest and penalty . . . ."  According to taxpayer, its letter converted its deposit into a

payment and the payment ended any prohibition on assessment pursuant to section 6213(b)(4).

Taxpayer reasoned that the payment commenced the sixty day suspension period that follows the

end of a prohibition on assessment, and therefore that the period to assess expired on March 31,

2005 (period suspended 30 days while assessment prohibited from December 29, 2004, until

January 28, 2005, plus 60 days, plus two days for time remaining on assessment period when

suspension began).

In sum, taxpayer argued that it paid tax on January 28, 2005, that its payment caused the

period to assess to expire on March 31, 2005, and that the payment became a refundable

overpayment (pursuant to sections 6401 and 6402) after the IRS failed to assess taxes before the

March deadline.  (Prop. Find. ¶ 18).

E.     **Taxpayer's 1998 taxable year**

Taxpayer contends that $80,736 of the $38,337,779 assessment on May 27, 2005, for

1998 was untimely.  Resolution of the issue turns on whether the $80,736 assessment was

attributable to a carryback.  If it was, then taxpayer concedes the assessment was timely.  If it

was not but arose instead out of 1998, then taxpayer contends the assessment was untimely,

because the period for assessing an income tax deficiency arising solely from taxpayer's 1998

tax year (and not attributable to a carryback) ended on June 30, 2003.  The record shows that the

assessed amount was attributable to a carryback.  While taxpayer testified that the notice of

deficiency demonstrated the assessment arose solely from its 1998 taxable year, taxpayer was

unable at its deposition to explain why and has not attempted to do so since.  (Prop. Find. ¶ 19).[7]

## ARGUMENT

## I.      Taxpayer does not have a refundable overpayment.

Taxpayer's challenges to the validity of assessments rest on the premise that its deposit was converted to a payment of tax before the period to assess expired.  On the basis of that conclusion, taxpayer further argues that the IRS did not assess certain of its income tax liabilities and penalties within the period for assessment, and, still further, that section 6401(a) renders the payments refundable.

Taxpayer's theory, however, has been rejected by the courts that have considered it. Indeed, it is well established by decisions of the former Court of Claims that the IRS is entitled to retain payments made by a taxpayer prior to the expiration of the period for assessment, even if the IRS did not assess the taxpayer's liability before the assessment period expired, unless the taxpayer establishes on the merits that the taxpayer has made an overpayment of tax.

Taxpayer's theory, moreover, is fundamentally inconsistent with the nature of a refund suit, which requires that the taxpayer demonstrate that the United States has money that properly belongs to the taxpayer.  Where the payments in dispute were owed at the time the taxpayer paid them (e.g. pursuant to a notice of deficiency) and paid during the period in which a timely assessment could have been made, there is simply no refundable overpayment.  *See Lewis v. Reynolds*, 284 U.S. 281 (1932), *modified* 284 U.S. 599 (1932).

---

[7]  Defendant is willing to continue to work with taxpayer on this matter to determine whether it can be resolved without judicial intervention.

**A.      Section 6401(a) does not retroactively transform a tax paid within the assessment deadline into an overpayment simply because the IRS makes an untimely assessment.**

Section 6401(a) is a definitional statute, providing that the term "overpayment" includes "that part of the amount of the payment of any internal revenue tax which is assessed or collected after the expiration of the period of limitation properly applicable thereto."  That definition has been part of the Internal Revenue Code, in essentially the same form, for at least 80 years.[8]  *See also Treas. Reg.* § 301.6401-1(a)(1).  The courts uniformly have construed section 6401(a) to authorize a refund of only those payments made after an untimely assessment or collection effort.  Contrary to taxpayer's position, the statute does not authorize the United States to refund taxes that are collected before the time for assessment expired.

Long ago, the First Circuit held that where an amount is paid to the IRS before the expiration of the period of limitations, but the liability is not assessed until after the period of limitations has expired, the amount in question does not constitute an overpayment under the essentially similar predecessor of section 6401(a).  *See Crompton & Knowles Loom Works v. White*, 65 F.2d 132 (1st Cir. 1933).  The former Court of Federal Claims expressly agreed with the First Circuit in *Anderson v. United States*, 15 F. Supp. 216, 224-225 (Ct. Cl. 1936).  *See also Meyersdale Fuel Co. v. United States*, 44 F.2d 437, 446 (Ct. Cl. 1930) ("Taxes may be and often are collected without assessment, . . . but, in such a case, the tax, if legally due, cannot be recovered merely because it had not been formally assessed"); *Muir v. United States*, 3 F. Supp. 619, 621 (Ct. Cl. 1933) (". . . [i]t is not necessary that a tax be assessed before it can legally be

---

[8] *See* Section 607 of the Revenue Act of 1928, ch. 852, 45 Stat. 791, 874.  Section 607 differed slightly from section 6401(a) in that the former used the phrase "assessed or paid," while section 6401(a) says "assessed or collected."

- 13 -

collected.  If a tax is due and is collected without assessment it cannot be recovered on that

ground alone").[9]  Since those early decisions, the Federal Circuit also has agreed:

> The outcome of this case turns on whether the Cohens' remittance to the IRS of April 23, 1987, [before expiration of the period for assessment] constituted a payment or a deposit.  *If a payment, as the government argues, the government is entitled to retain the remittance in partial satisfaction of the proposed deficiencies for 1980.*  Alternatively, if the remittance was a deposit, a payment did not occur until the formal assessments of June and August of 1987; because those assessments were untimely, the remittance became an overpayment pursuant to I.R.C. § 6401(a), and the Cohens are entitled to a refund pursuant to I.R.C. § 6402(a).

*Cohen v. United States*, 995 F.2d 205, 207 (Fed. Cir. 1993) (emphasis added).[10]

The Fourth Circuit followed *Crompton* in holding that a taxpayer's payment within the

assessment period is not transformed into an overpayment under section 6401(a) if there is not

also a timely assessment.  *See Ewing v. United States*, 914 F.2d 499, 504 n. 13 (4th Cir. 1990)

("[A] payment of properly owed taxes within the statutory period for assessment is not an

overpayment even if there is no formal assessment.").  And, the Seventh Circuit, in *Moran v.*

*United States*, 63 F.3d 663, 666, 670 (7th Cir. 1995), rejected the taxpayers' suit for refund of

payments made within the assessment deadline, even though the IRS had made an untimely

---

[9] In *South Corporation v. United States*, 690 F.2d 1368, 1370-1371 (Fed. Cir. 1982), the Federal Circuit adopted the rule that decisions of the former Court of Claims entered before September 30, 1982 would be deemed to constitute the law of the circuit and, as such, would be binding precedent unless overturned by the Federal Circuit sitting *en banc*.

[10] There is no question that where the IRS has neither collected nor assessed the subject tax prior to the expiration of the statute of limitations, the amount remitted by the taxpayer is an overpayment under § 6401 that must be either credited against any outstanding liability or refunded by the IRS under § 6402.

assessment of the liabilities.[11]  *See also Bachner v. Comm'r*, 109 T.C. 125 (1997); *Service Nat'l Corp. v. United States*, 1994 WL 912143 (D. Del. 1994).

More recently, the Eleventh Circuit held that "an untimely assessment of taxes otherwise properly owed and paid within the statutory period for assessment and collection does not create an 'overpayment' entitling the 'late-assessed' taxpayer to a refund."  *Williams-Russell & Johnson, Inc. v. United States*, 371 F.3d 1350, 1352-1353 (11th Cir. 2004).  "To summarize, if a taxpayer duly pays its taxes . . . but is not timely assessed for the same, then the IRS is barred from collecting any tax deficiencies.  However, that same untimely assessment does not also entitle the taxpayer to a refund, unless, of course, it actually paid more than it owed (as indicated by the assessment) and timely files a refund claim."  *Williams-Russell*, 371 F.3d at 1353; *see also* Rev. Rul. 85-67, 1985-1 C.B. 364 ("[w]here taxes and interest legally due have been paid before the expiration of the period of limitations for assessment, they cannot be recovered by the taxpayer merely because they have not been formally assessed").

The courts' interpretation of section 6401(a) is supported by the legislative history accompanying the passage of section 607 of the Revenue Act of 1928, the statutory precursor to section 6401(a).  The House Report to that provision notes that "regardless of the correct tax liability," any payment shall be an overpayment "if made *after* the period of limitation on assessment" (emphasis added).  Similarly, the Senate Report refers to recovery of amounts "paid after" the period of limitation on assessments has run.[12]

---

[11] *Moran* was overruled by *Malachinski v. Comm'r*, 268 F.3d 497 (7th Cir. 2001), solely on an unrelated burden-of-proof issue.

[12] *See* H.R. Rep. No. 2, 70th Cong. 1st Sess., and S. Rep. No. 960, 70th Cong., 1st Sess., *reprinted in* 1939-1 (Part 2) C.B. 384, 406, 409, 438.

**B.      Taxpayer's misreading of Section 6401(a) to mandate a refund would exceed the boundaries of a tax refund suit.**

To adopt taxpayer's view of section 6401(a), and to endorse a refund under the circumstances of this case, would not only run counter to all authorities that have interpreted the proper reach of section 6401(a), but would also exceed the proper boundaries of a refund suit, as they have been defined by the Supreme Court.

The origins of a refund suit are in an action for "money had and received."  *See Stone v. White*, 301 U.S. 532, 534-535 (1937).  In a refund suit, a taxpayer is obliged to show that the United States has money that properly belongs to the taxpayer.  Thus, the taxpayer must demonstrate that there is an "overpayment" of tax in the sense of a "payment in excess of what is properly due," *Jones v. Liberty Glass Co.*, 332 U.S. 524, 531 (1947), or, stated differently, that the tax was in fact not owed at the time that it was paid, *Lewis*, 284 U.S. at 283.  Accordingly, a refund suit lays open for consideration a taxpayer's entire tax liability for the period at issue.  *Id.*; *see also Parker v. United States*, 573 F.2d 42 (Ct. Cl. 1978); *Dysart v. United States*, 340 F.2d 624 (Ct. Cl. 1965).  In sum, for there to be an overpayment entitling taxpayer to a refund, it must establish that the United States collected more money from the taxpayer than it had a right to receive.

If a taxpayer has paid taxes before the period of limitations on assessment has expired, there has been no overpayment, even if the period for assessment has passed.  And, where the United States has collected the tax before the limitations period has expired, and the taxpayer seeks a refund, the Government may offset against the refund claim any other taxes the taxpayer owes for that year, even if the assessment period on those other taxes has expired.  The Supreme

Court has explained these principles:

> An overpayment must appear before refund is authorized.
> Although the statute of limitations may have barred the assessment
> and collection of any additional sum, it does not obliterate the right
> of the United States to retain payments already received when they
> do not exceed the amount which *might have been properly
> assessed and demanded*.

*Lewis*, 284 U.S. at 283 (emphasis added); *see also Moran*, 63 F.3d at 666; *Bachner*, 109 T.C. at

130 ("Applying the doctrine of *Lewis v. Reynolds* . . . even though assessment and collection of

petitioner's tax liability is now barred by the statute of limitations, [the Commissioner] has the

right to retain prior timely payments to the extent they do not exceed the amount of petitioner's

actual tax liability.").

Similarly, in *Crompton & Knowles Loom Works*, the First Circuit, in construing the

predecessor to section 6401(a), held that even though the IRS has not timely assessed certain

interest paid, there was no "overpayment" because the amount sought in the refund suit was "a

sum legally owed the government under the tax statutes" (65 F.2d at 133-134):

> In our opinion the statute covers all cases where an assessment and
> payment are made after the period of limitation had expired, or
> where the assessment was made before and the payment is made
> after the expiration of the period of limitation.  This we think was
> the understanding of Congress in the matter. . . .  If the interest in
> this case had been assessed and paid, or even paid, after the period
> of limitation had expired, we think it would be recoverable. . . but
> being paid before and being due it cannot be recovered.

In short, section 6401(a) does not negate the basic principle of tax law that for there to be

a viable refund suit for an overpayment - in the sense of a suit that ends in recovery - a taxpayer

must prove that the taxpayer has paid more tax than the taxpayer owes.  "That the assessment

here was made late therefore does not change the fact that the taxes were justly owed and paid,

- 17 -

so it would be nonsensical to allow a taxpayer to recover those taxes now." *Williams-Russell*, 371 F.3d at 1353.

### C.    Section 6401(a) does not override the distinction between a tax liability and a tax assessment.

A corollary of *Lewis* is that the tax liability and the tax assessment are separate matters, and an assessment is not a prerequisite to liability.  To read section 6401(a) (with taxpayer) as overriding that principle and allowing a refund of a tax that was paid in response to a notice of deficiency before the period to assess expired, but not assessed or not timely assessed, would make no sense.  Such reading would make liability and assessment inseparable.  It is, by now, however, well established that a tax liability is independent of the IRS's assessment of that liability.  *See Baral v. United States*, 528 U.S. 431, 437 (2000); *Moran*, 63 F.3d at 666 ("[Taxpayers] owed taxes, and the government's failure to assess them timely does not change that fact.").

Hence, a tax can be properly owed and paid without an assessment; indeed, liability often arises prior to its assessment.  Likewise, the lack of an assessment does not retroactively eliminate a tax liability; it simply bars further administrative collection of that liability.

Liability arises on account of the taxpayer's realizing income.  "[T]he liability of the taxpayer" exists independently of the assessment thereof (§ 6203), and can be both paid and collected *without assessment*.  *See e.g.* §§ 6151 (taxpayer must make out returns and pay taxes without assessment); 6513 (taxes deemed paid regardless of assessment).  The assessment of a liability is "essentially a bookkeeping notation [that] is made when the Secretary or his delegate establishes an account against the taxpayer on the tax rolls."  *Laing v. United States*, 423 U.S. 161, 170 n. 13 (1976); *see also Hibbs v. Winn*, 542 U.S. 88, 100 (2004); *Bull v. United States*,

- 18 -

295 U.S. 247, 259 (1935) (assessment does not create the liability but merely acts as a judgment for taxes found due).  The assessment is a formal determination that the taxpayer owes money; it is a prerequisite to, and sets limits on, various kinds of collection activity regarding the liability. *See e.g.* § 6502 (permitting collection by levy or a court action within ten years of assessment). An assessment is not, however, a prerequisite to the collection of the taxes due and owing under the Internal Revenue Code.  For example, section 6501(a) of the Code expressly authorizes the Government to forcibly collect a tax "without assessment" by instituting court proceedings, provided it does so within the applicable period of limitations for assessment.

In sum, there can be both payment and liability without assessment.  While a formal assessment is required to permit the IRS to take certain administrative actions to enforce collection, the United States is authorized to collect a tax without assessment by simply accepting a payment to satisfy a proposed liability where forcible collection is not necessary. Thus, while a tardy assessment might preclude the IRS from subsequently taking forcible administrative collection activities, it should have no effect at all on its right to retain earlier payments.

Taxpayer's reading of section 6401(a) would contravene this system, by making liability and assessment inseparable.  Under taxpayer's view, the failure to assess within the limitations period would retroactively eliminate a tax liability that was paid before the period expired.

But section 6401(a) should not be read to overturn the careful distinction the Internal Revenue Code makes between liability and assessment.  Rather, as we have demonstrated, section 6401(a) functions to cancel out an assessment made after the expiration of the statute of limitations with respect to any unpaid taxes, as well as to make potentially refundable any

payments collected after the applicable period of limitations.

**D.  Conclusion**

Taxes collected within the period of assessment cannot be recovered unless the taxpayer establishes that it does not, in fact, owe them.  Contrary to this fundamental principle, taxpayer's theory is premised on making a payment of tax before the period to assess expired.  Taxpayer argues that it made a payment of tax on January 28, 2005, that the payment shortened the period to assess to March 31, 2005, and therefore that the subsequent assessments of May 27, 2005, were untimely and rendered the payment refundable.  As we have demonstrated, if taxpayer is correct, the amount "paid" was not a refundable overpayment, because it was collected within the period taxpayer concedes the IRS could have made an assessment.  To recover any of it, taxpayer must show on the merits that it did not owe the money.  Taxpayer will have that opportunity in the next phase of this litigation.  For now, however, defendant is entitled to summary judgment on taxpayer's challenge to the validity of the assessments.

**II.  Taxpayer's deposit was not converted to payments of tax, until the IRS applied the deposit to timely assessed deficiencies on May 27, 2005.**

After making a deposit on January 13, 2005, the taxpayer sought to convert the deposit into payments only fifteen days later on January 28, 2005.  Taxpayer contends the conversion occurred and leads to the conclusion that the assessments in May were untimely and that its payments are refundable.

To the contrary, as we demonstrate below, taxpayer's deposit was not converted to payments on January 28, 2005, and, on that basis, it is undisputed that the period to assess did not expire until May 30, 2005, and therefore that the May 27, 2005 assessments were timely.

The rules governing the making, acceptance, and use of deposits are set forth in section

6603 of the Internal Revenue Code and Revenue Procedure 2005-18.  Those rules apply to

deposits, like taxpayer's, made after October 22, 2004.  They provide that a taxpayer is not

entitled to direct the IRS to convert a deposit into a payment, as taxpayer attempted to do here.

Rather, a deposit does not become a payment until the deposit is used to pay an assessed tax

liability.  Accordingly, taxpayer's attempt to convert its deposit into a payment before

assessment fails, with the result that the assessments were timely.

Before Congress enacted section 6603, however, the Internal Revenue Code did not

contain (or specifically authorize administrative promulgation of) rules governing the making,

acceptance, and use of deposits.  Instead, the rules originated in IRS' administrative practices

and then developed in judicial decisions and IRS revenue procedures.  These non-statutory rules

have been superseded by the enactment of section 6603 (and the promulgation of Revenue

Procedure 2005-18 pursuant to the specific grant of authority in section 6603(a)), and therefore

have no affect on whether taxpayer's deposit converted to a payment.

But even if the rules predating section 6603 were applicable, they only confirm that the

assessments were timely.  Under those rules as they developed in the Federal Circuit, a

remittance in response to a notice of deficiency was a deposit and did not become a payment

before it was used to satisfy an assessment, if the remittance was made while the taxpayer

protested the underlying liability.  Since taxpayer consistently protested the tax liability

underlying the assessments (including when it made its deposit), there is not a conversion of the

deposit into payments under those rules.

Before explaining these matters in greater detail, we set forth in the next section a history

of the development of the deposit-payment concept in the tax law.

A.      **History of Deposits and Payments**

1.      **Judicial Development of Deposit Concept**

Although the term "payment" frequently appears in the Internal Revenue Code (*see*, *e.g.*,

§§ 6151, 6155, 6157, 6159, 6401, 6511), the concept of a "deposit" was notably absent before

Congress enacted section 6603 in 2004.  Indeed, to the extent the term "deposit" was present at

all in the Internal Revenue Code, the context was not the payment/deposit distinction involved

here.[13]  Hence, there was no *statutory* basis for treating any remittance by a taxpayer as a deposit,

rather than as a payment.

Rather, the concept of a deposit evolved through case law, beginning with the Supreme

Court's decision in *Rosenman v. United States*, 323 U.S. 658 (1945).  *Rosenman* was a suit on a

claim for refund, which, the IRS asserted, had been filed too late.  The Supreme Court construed

the remittance in that case to have been made pursuant to a "deposit arrangement," whereby the

taxpayer made a contingent remittance to stop the running of penalties and interest, and the

Government treated the remittance as a cash bond with respect to which it was not obliged to pay

interest if the money was returned to the taxpayer.  *Id.* at 662-663.  Accordingly, because the

remittance was a deposit, rather than a payment, the taxpayer's suit was not time-barred.

_____

[13] The term "deposit" was found in the Internal Revenue Code in a remittance sense only in reference: (1) to excise taxes on gasoline, air or sea tickets, etc. (*see* § 6302(f)); (2) to amounts withheld at the source and required to be deposited at certain financial institutions (*see* §§ 6302(g), 6656); (3) to certain bonding requirements (*see* §§ 7101, 7485); (4) to retirement provisions for Tax Court judges (*see* §§ 7447, 7448); (5) to amounts seized as a result of a criminal investigation (*see* § 7608); (6) to the process of banking collected taxes, sales proceeds, etc. (*see* 7809); (7) to matters relating to presidential matching funds (*see* § 9008); and (8) the deposit requirement to commence a partnership action in the Court of Federal Claims or District Court (*see* § 6226), enacted in 1982, the only instance even arguably involving income taxes, but not the payment/deposit question at issue in this case.

*Rosenman* is premised on the Supreme Court's determination that the taxpayer intended to make--and the IRS agreed to accept--a remittance that was a deposit, not a payment.  As the Supreme Court viewed the situation, *Rosenman* involved an "interim arrangement" to cover future contingencies, towards which the IRS had adopted a "practical construction," accepting such remittances as "payments in escrow," and "under such . . . arrangement[s]" holding the money "not as taxes duly collected . . . but as a deposit made in the nature of a cash bond."  *Id.* at 662.  Thus, the IRS and the taxpayer in *Rosenman* had reached an express or implied-in-fact agreement to accept the remittance in that case as a "deposit . . . in the nature of a cash bond." *Id.*  The "deposit" relationship in *Rosenman* was, in short, not premised on any statutory authority--for none existed at that time--but on the consensual arrangement derived from the IRS's own practice.  *Rosenman* merely stands for the proposition that the IRS and the taxpayer can enter into a consensual arrangement for acceptance of a particular remittance as a deposit.[14]

*Rosenman* gave rise to differing interpretations among the courts of appeals on the question of whether a remittance preceding assessment could ever be a payment of tax.  At least

---

[14]As noted, at the time the disputed remittance was made in *Rosenman* (1935), the IRS did not consider the remittance as an overpayment on which interest would accrue if it turned out that the taxpayer owed a lesser sum.  And that fact played a large role in the Supreme Court's reasoning that the remittance there was not a payment.  *See* 323 U.S. at 663 ("If it is not a payment in order to relieve the Government from paying interest on a subsequently determined excess, it cannot be a payment to bar suit by the taxpayer for its illegal retention.  It will not do to treat the same transaction as payment and not as payment, whichever favors the Government").  But Section 4(d) of the Current Tax Payment Act of 1943, 57 Stat. 126, 140 (now codified as Section 6401(c) of the Internal Revenue Code of 1986), which the Supreme Court specifically refused to consider in *Rosenman* (*id.* at 663) because it was enacted after the remittance in question there was made, provided that "[a]n amount paid as tax shall not be considered not to constitute an overpayment solely by reason of the fact that there was no tax liability in respect of which such amount was paid."  Thus, with the changed statutory landscape, it is by no means clear that the Supreme Court would reach the same conclusion today if faced with the facts of *Rosenman*.

six circuits rejected a per se "no-payment-prior-to-assessment" rule.  *See e.g. Moran v. United States*, 63 F.3d 663 (7th Cir. 1995), *overruled on other grounds by Malachinski v. Comm'r*, 268 F.3d 497 (7th Cir. 2001); *Cohen v. United States*, 995 F.2d 205, 209 (Fed. Cir. 1993); *Ewing v. United States*, 914 F.2d 499 (4th Cir. 1990); *Ameel v. United States*, 426 F.2d 1270 (6th Cir. 1970); *Fortugno v. Comm'r*, 353 F.2d 429 (3d Cir. 1965); *Richardson v. Smith*, 301 F.2d 305 (3d Cir. 1962); *Lewyt v. Comm'r*, 215 F.2d 518 (2d Cir. 1954), *aff'd in part and rev'd in part on another issue*, 349 U.S. 237 (1955); *Colt's Manufacturing Co. v. Comm'r*, 306 F.2d 929 (2d Cir. 1962); *Hill v. United States*, 263 F.2d 885 (3d Cir. 1959).  Those circuits generally are of the view that whether a remittance is a payment or a deposit depends on all the facts and circumstances surrounding the remittance, albeit with differing emphasis on which facts are entitled to more weight than others.  *See e.g. Moran*, 63 F.3d at 669 ("We thus disagree with the implications of the Federal Circuit's conclusion in *Cohen* that the decision to dispute a liability necessarily signifies an intent not to make a payment on that liability."); *Ewing*, 914 F.2d at 503-504 (considering several factors, including the intent of the taxpayer, the date the tax liability is defined, and the IRS treatment of the remittance).

On the other hand, two circuits adopted a per se rule that there could be no payment of tax until there was an assessment.  *See United States v. Dubuque Packing Co.*, 233 F.2d 453 (8th Cir. 1956); *Thomas v. Mercantile National Bank*, 204 F.2d 943 (5th Cir. 1953).  This per se rule was questioned, however, even by those courts that initially endorsed it.  *See Ford v. United States*, 618 F.2d 357, 361 (5th Cir. 1980) (following *Thomas* as precedent although expressing view that it should be overruled); *Essex v. Vinal*, 499 F.2d 226 (8th Cir. 1974) (where, without discussing *Dubuque Packing*, the court distinguished *Rosenman* and held that remittances of

estimated taxes before assessment were payments where the taxpayer had intended the monies as payments and the IRS had treated the remittances as payments).

Ultimately, the per se rule adopted by the Fifth and Eighth Circuits was abrogated by the Supreme Court in *Baral v. United States*, 528 U.S. 431 (2000).  In ruling that remittances of estimated income tax and withholding tax were paid prior to assessment because statutory "deemed paid" provisions (§ 6513) directed that they were paid on the due date of the taxpayer's income tax return, the Supreme Court pointed out that the Internal Revenue Code "directly contradicts the notion that payment may not occur before assessment."  *Id.* at 437.  While acknowledging that one passage in *Rosenman* seemed to suggest that payment only occurs at assessment, the Supreme Court distinguished *Rosenman* on the grounds that it did not involve a "deemed paid" provision, and further clarified that *Rosenman* did not hold that a tax payment is made only when it is assessed.  *Id.* at 438.  After *Baral*, the Fifth Circuit recognized the abrogation of the "no-payment-prior-to-assessment" rule it had adopted in *Thomas* and begrudgingly followed in *Ford*.  *See Deaton v. Comm'r*, 440 F.3d 223, 229-231 (5th Cir. 2006).

The Supreme Court's decision in *Baral* confirmed the validity of distinguishing between the treatment of remittances where a specific provision of the Internal Revenue Code controlled the character of the remittance and where a specific provision did not.  *See e.g. Ehle v. United States*, 720 F.2d 1096 (9th Cir. 1983) (withheld taxes are payments as a matter of law under § 6513(b)).  Similarly, for example, where a taxpayer submits a Form 4868 filing extension request along with an estimated tax remittance, the majority of appellate courts that have considered the situation have classified that kind of remittance as a payment as a matter of law. *See Dantzler v. United States*, 183 F.3d 1247, 1250-1251 (11th Cir. 1999) (court held that

- 25 -

remittance with Form 4868 was a payment when made, "based on the specific statutory and regulatory scheme at issue in this case"); *Ertman v. United States*, 165 F.3d 204, 207-208 (2d Cir. 1999) (Form 4868 remittances are estimates of taxpayer's liability and, therefore, fall under § 6513(b)(2), making them payments as a matter of law); *Ott v. United States*, 141 F.3d 1306, 1309-1310 (9th Cir. 1988) (same, noting that Form 4868 "clearly provides that any funds remitted with the form will be considered a payment of tax"); *Gabelman v. Comm'r*, 86 F.3d 609, 611-613 (6th Cir. 1996) (same, holding that the "regulations clearly require [extension] requests to be accompanied by an estimated tax payment"); *Weigand v. United States*, 760 F.2d 1072, 1074 (10th Cir. 1985) (same, holding that "section 6513 applies to any estimated tax payment"); *but see VanCanagan v. United States*, 231 F.3d 1349 (Fed. Cir. 2000) (although decided after *Baral* and describing the *Dantzler* line of cases as "persuasive authority," Federal Circuit applied facts-and-circumstances approach to remittances accompanying Form 4868); *Deaton*, 440 F.3d 223 (same).

### 2.      The Federal Circuit's Consideration of Deposits

As noted *supra*, after *Rosenman*, the Federal Circuit has generally applied a facts-and-circumstances approach to determine whether a remittance is a payment or a deposit. *See VanCanagan v. United States*, 231 F.3d 1349, 1352-1353 (2000); *New York Life v. United States*, 118 F.3d 1553, 1559-1560 (Fed. Cir. 1997); *Cohen v. United States*, 995 F.2d 205, 208-209 (Fed. Cir. 1993).  Unlike other circuits, however, a dispositive factor in the analysis under Federal Circuit law is a protest of the underlying tax liability contemporaneous with the remittance.  Thus, as a matter of law in the Federal Circuit, a remittance of a tax liability made under protest is a deposit rather than a payment of tax, if the remittance is made in response to a

proposed deficiency and before the tax was assessed.  *See New York Life*, 118 F.3d at 1559,

quoting *Cohen* ("'[t]he remittance [taxpayer] made . . . under protest, after a notice of deficiency

but in clear circumstances of contest prior to expiration of the period of assessment, was a

deposit as a matter of law'"); *Cohen*, 995 F.2d at 209 (remittance was a deposit as a matter of

law where taxpayers "adopted a clear position at every stage, and acted consistently.  'We

protest and we contest.'").  This rule of law applies, even if, as in *Cohen* and *New York Life*, the

taxpayer consistently characterized the remittance as a "payment."  By contrast, where a

remittance is not made under protest prior to expiration of the period to assess tax, then other

facts and circumstances may dictate that the remittance is in fact a payment, including the labels

attached to the remittance by the taxpayer.  *See VanCanagan*, 231 F.3d at 1353.

### 3.      Development of Deposit Concept in IRS Revenue Procedures

Simultaneous to the development of the concept of a deposit in judicial opinions after

*Rosenman*, the IRS adopted a series of Revenue Procedures that spelled out, in detail, the process

whereby a taxpayer could make a deposit to stop the running of interest on an anticipated

deficiency.  *See* Rev. Proc. 84-58, 1984-2 C.B. 501 (superseding Rev. Proc. 82-51, 1982-2 C.B.

839 (updating Rev. Proc. 64-13, 1964-1 (Part 1) C.B. 674 (enlarging Rev. Proc. 63-11, C.B.

1964-1, 497))); *see also* Rev. Rul. 89-6, 1989-1 C.B. 119.  Those revenue procedures directed

taxpayers how to make remittances that would be treated as deposits for that purpose.

For example, section 4.01 of Revenue Procedure 84-58 set forth the procedures whereby

a taxpayer responding to a notice of deficiency could make a "deposit," rather than a "payment,"

of tax.  A deposit was in the nature of a cash bond designed to stop the running of interest on a

proposed deficiency.  Such a deposit generally was subject to return upon request, until such

time as the IRS was entitled to make an assessment of the liability.  Because deposits were not payments of tax, no interest was owed by the IRS on them (sec. 5.04).

Through such procedures, the IRS was establishing the terms of the consensual arrangement recognized in *Rosenman* for making, accepting, and using a particular remittance as a deposit versus a payment.  In other words, the revenue procedures established the parameters of the IRS's consent to accept and handle deposits.

For a deposit to exist, there had to be a mutual undertaking of the parties in accordance with the IRS' established procedures: the taxpayer tenders the remittance in a particular way; the IRS treats the remittance in a particular way; the taxpayer agrees to forgo interest on the amount tendered; and the IRS agrees to return the remittance on demand, without interest, prior to assessment.  *See Baral*, 528 U.S. at 439 n. 2 ("We note that the Service has promulgated procedures to govern classification of a remittance as a deposit or payment in this context.  See Rev. Proc. 84-58, 1984-2 Cum. Bull. 501").  Failure to follow the procedures meant there was no meeting of the minds between taxpayer and IRS, and therefore no express or implied "arrangement" for the making, accepting, and handling of a deposit under *Rosenman*.  Thus, because the deposit relationship was a creature of agreement, not statute, and because the terms of a deposit agreement had been spelled out in published revenue procedures, the IRS should not have been bound to treat remittances that did not comply with those procedures as deposits, no matter what the other circumstances surrounding the remittance may have been.

Nevertheless, the courts generally and the Federal Circuit specifically did not adopt this view of the revenue procedures, but permitted other kinds of remittances to pass muster as deposits, even if they were made outside the parameters of the IRS's consent to accept and

- 28 -

handle deposits that had been established in those revenue procedures.  These authorities

overwhelmingly considered the entire facts and circumstances surrounding a remittance when

determining whether it was a payment or deposit, as described *supra*.

### 4.        Enactment of § 6603 and Promulgation of Rev. Proc. 2005-18

Against this backdrop, Congress provided a statutory basis for deposits for the first time

in 2004 when it enacted section 6603 of the Internal Revenue Code.  While Congress recognized

that Revenue Procedure 84-58 provided a mechanism for making a deposit in the nature of a

cash bond, and understood the procedures for and characteristics of such deposits, Congress

believed "an improved deposit system" was needed:

> The Committee believes that taxpayers should be able to
> limit their underpayment interest exposure in a tax dispute.  An
> improved deposit system will help taxpayers better manage their
> exposure to underpayment interest without requiring them to
> surrender access to their funds or requiring them to make a
> potentially indefinite-term investment in a non-interest bearing
> account.  The Committee believes that an improved deposit system
> that allows for the payment of interest on amounts that are not
> ultimately needed to offset tax liability when the taxpayer's
> position is upheld, as well as allowing for the offset of tax liability
> when the taxpayer's position fails, will provide an effective way
> for taxpayers to manage their exposure to underpayment interest.
> However, the Committee believes that such an improved deposit
> system should be reserved for the issues that are known to both
> parties, either through IRS examination or voluntary taxpayer
> disclosure.

H.R. Rep. No. 108-548, pt. 1, at 305 (2004); *see also id.* at 304-305 (discussing law prior to

enactment of § 6603, including a deposit made pursuant to Rev. Proc. 84-58).[15]

Section 6603 permits a taxpayer to deposit cash with the IRS toward certain taxes

_____

[15] *See also* H.R. Conf. Rep. No. 108-755, at 633-634 (2004); S. Rep. No. 108-192, at
207-208 (2003); H.R. Rep. No. 108-393, at 225-226 (2003).

(including income taxes) that have not been assessed at the time of the deposit.  § 6603(a).  The

deposit immediately stops the running of underpayment interest to the extent the deposit is

eventually used to pay tax.  § 6603(b).  Before it is used to pay tax, however, the deposit may be

recovered by the taxpayer upon written request (unless collection of tax is in jeopardy).

§ 6603(c).  In addition, unlike deposits made prior to the enactment of section 6603, the new

deposit system allows for overpayment interest to be paid in certain circumstances on deposits

that are returned to a taxpayer.  Overpayment interest is allowed to the extent the deposit is

attributable to a "disputable tax" (§ 6603(d)).  "Disputable tax" is defined as "the amount of tax

specified at the time of the deposit as the taxpayer's reasonable estimate" of the amount of tax, if

any, that is attributable to "disputable items."  § 6603(d)(2)(A).  "Disputable item" in turn is

defined as any item "if the taxpayer has a reasonable basis for the treatment of such item, and

reasonably believes that the Secretary also has a reasonable basis for disallowing the taxpayer's

treatment of such item."  § 6603(d)(3)(A).

 Congress also authorized the IRS to prescribe rules for the making, accepting, and use of

deposits.  § 6603(a) ("Such a deposit shall be made in such manner as the Secretary shall

prescribe."); H.R. Conf. Rep. No. 108-755, at 634 (2004) ("The Secretary may issue rules

relating to the making, use, and return of the deposits").  The IRS implemented this mandate by

publishing Revenue Procedure 2005-18, 2005-1 C.B. 798.  Under the general rule of Revenue

Procedure 2005-18, section 4.01(1), a taxpayer may make a deposit by remitting a check or

money order "accompanied by a written statement designating the remittance as a deposit,"

designating "the type(s) of tax" and "the tax year(s)" for which the deposit is made, and

identifying the amount of the deposit, if any, that is a "disputable tax."

Section 6.01 provides that a deposit does not become a payment until the IRS uses the deposit to pay an assessed tax: "A deposit made pursuant to section 6603 is not subject to a claim for credit or refund as an overpayment until the deposit is applied by the Service as payment of an assessed tax of the taxpayer." Nothing in the revenue procedure permits a taxpayer to convert a deposit into a payment of tax (or, for that matter, of penalty and/or interest) that has not been assessed. Thus, while a taxpayer may recover a deposit at any time before the deposit is used to pay tax, the taxpayer is not allowed to redesignate a deposit as a payment of an unassessed liability.

This was not a new rule. Under Revenue Procedure 84-58 that governed deposits prior to the enactment of section 6603, a deposit could be recovered upon request, but could not be designated as a payment of tax (penalty, and/or interest), until the IRS made an assessment of the underlying liability. Only after an assessment was made would the IRS honor the request of a taxpayer to allocate a deposit between tax, penalty, and/or interest:

> Taxpayers may not make designations of remittances treated as deposits in the nature of a cash bond. If a liability is ultimately assessed and the deposit applied as a payment of tax, the Service will allocate the payments in accordance with any designation then made by the taxpayer. If no allocation is designated by the taxpayer, the remittance will be applied first to tax, then to penalties, and then to interest.

Rev. Proc. 84-58, section 6.04.[16]

---

[16] Both the new and old revenue procedures contain one possible exception to this rule (that does not apply to this case). Where a deposit is made during an examination but before issuance of a notice of deficiency and, upon completion of the examination, it is determined that the deposit exceeds the amount of tax due, the taxpayer is permitted to "elect to have [the excess] applied against another assessed or unassessed liability." Rev. Proc. 2005-18, section 4.02(3). While the language permitting the taxpayer to "appl[y]" the excess of a previous deposit to an "unassessed liability" is admittedly imprecise, it can only mean to allocate the excess to

Revenue Procedure 2005-18 applies to the taxpayer's January 13, 2005 deposit, because the revenue procedure, although not published until March 28, 2005, applies retroactively to deposits made after October 22, 2004 (section 10).  In addition, when taxpayer remitted its deposit, it provided an accompanying letter stating the deposits were made pursuant to section 6603 and seeking the benefit of overpayment interest on any returned deposit that is available only under the new deposit system.

Finally, because Congress decreed that section 6603 "shall apply to deposits made after [October 22, 2004]," *see* P.L. 108-357, § 842(c)(1), and because section 6603(a) states that deposits must be made "in such manner as the Secretary shall prescribe" and the Secretary has prescribed the manner of making a deposit in Revenue Procedure 2005-18, the case law on deposits beginning with and arising out of *Rosenman*, including the Federal Circuit's decisions

---

another type of tax and/or tax year, and not to order the IRS to convert the deposit into a payment of an unassessed liability.  This is because (i) the revenue procedure explicitly provides that a deposit does not convert to a payment absent assessment (section 6.01), (ii) the section of the revenue procedure in which this language occurs (section 4.02) addresses the treatment of deposits made during examinations and is explicit when it intends to speak about converting a deposit into a payment (section 4.02(1): ". . . deposit will be applied against the assessed liability as a payment of tax. . .", section 4.02(2): ". . . [portion of] deposit . . . posted to the taxpayer's account as a payment of tax upon the expiration of the 90 or 150-day period during which assessment is stayed. . . ."; ". . . tax will be assessed . . . and the deposit will be applied as payment of the tax upon the expiration of the 90 or 150-day period."); and (iii) the requirement of a writing to "apply" the excess deposit is akin to that required for the original remittance wherein a deposit is designated to a particular tax and a particular tax year.

In any event, to the extent the Court might conclude that the language "applied against . . . unassessed liability" allows a taxpayer to convert a deposit into a payment before assessment, that right would be limited to the very narrow circumstances set forth in section 4.02(3) (deposit made during an examination but before issuance of a notice of deficiency is in excess of ultimate liability determined to be due), and not applicable to the completely different circumstances of this case (deposit made after issuance of a notice of deficiency (*see* section 4.05) and attempt of taxpayer to convert the deposit into payment before liability has been assessed).

For the predecessor to the rule discussed in this footnote, see Revenue Procedure 84-58, section 4.02(4).

in *Cohen*, *New York Life*, and *VanCanagan*, has been superseded for deposits made after October 22, 2004.  Now that Congress has provided a statutory scheme for deposits and explicitly delegated authority to the Secretary to promulgate the rules governing them, the rules governing the making, acceptance, and use of deposits, including when and how a taxpayer may continue to exercise control over a deposit after remittance, are determined solely by reference to the statute and the revenue procedure.[17]  For a deposit to exist, there must be compliance with those procedures, and, similarly, attempts to control a deposit that are prohibited or not authorized by those procedures are null and void.

> **B.      Under section 6603 and Revenue Procedure 2005-18, taxpayer's deposit was not converted to a payment on January 28, 2005, and therefore it is undisputed that the May 27, 2005 assessments were timely.**

In response to the notice of deficiency mailed on December 29, 2004, taxpayer, on January 13, 2005, remitted $444,000,000 to the IRS and designated the remittance as "a deposit in the nature of a cash bond" "[i]n accordance with Section 6603 of the Internal Revenue Code and Section 4.01 of Revenue Procedure 84-58."  Following taxpayer's designation, the IRS treated the remittance as a deposit and posted it as such to the taxpayer's accounts for taxable years 1996 through 2000.  Fifteen days later, on January 28, 2005, taxpayer delivered a second letter regarding the deposit to the IRS, asking that "the [IRS] now (today) apply the deposit . . . to payment of the federal income tax, interest and penalty . . . for [tax years 1996-2000]."

---

[17] Revenue Procedure 2005-18 is entitled to substantial deference.  *See Tualatin Valley Builders Supply, Inc. v. United States*, 522 F.3d 937, 944-948 (9th Cir. 2008) (O'Scannlain, concurring) (revenue procedure entitled to *Chevron* deference where it was promulgated pursuant to specific delegation of authority); *cf. Federal Nat'l Mortgage Assoc. v. United States*, 379 F.3d 1303, 1307-1309 (Fed. Cir. 2004) (revenue procedure not promulgated pursuant to congressional delegation of law-making authority not entitled to *Chevron* deference).

It is undisputed that the remittance taxpayer made on January 13, 2005, was a deposit pursuant to section 6603.  Because taxpayer complied with the procedures governing how to make a deposit, the IRS was required to treat it as a deposit and it did so.

Once the remittance was accepted and posted to taxpayer's accounts as a deposit, taxpayer could recover it upon request, but otherwise could not control its use.  Since Section 6.01 of Revenue Procedure 2005-18 explicitly prohibits a deposit from becoming a payment before there is an assessment, taxpayer could not, prior to an assessment, direct the IRS to convert the deposit to a payment.  (Similarly, section 6.04 of Revenue Procedure 84-58 prohibited a taxpayer from designating a deposit to pay unassessed liabilities, and required the IRS to allocate the deposit to tax, penalty, and interest in accord with the taxpayer's wishes only after the IRS made an assessment).

Taxpayer's attempt to convert its deposit into a payment before the IRS made an assessment, therefore, ran afoul of the procedures governing the use of deposits.  If taxpayer wanted to pay the liability arising from the notice of deficiency on January 28, 2005, taxpayer could have recovered its deposit by requesting its return and then remitted the returned amount to the IRS in accordance with the authorized procedures for making an advance payment (e.g. as an undesignated remittance).[18]  Had taxpayer done so, the IRS would have had a fair opportunity to process the remittance as a payment, and indeed would have been required to do so.  Taxpayer, however, did not follow the procedures for advance payments, but attempted to

---

[18] *See* Rev. Proc. 2005-18, section 4.05(1) ("An undesignated remittance made after the mailing of a notice of deficiency in complete or partial satisfaction of the deficiency will be considered a payment of tax, will be posted to the taxpayer's account as soon as possible, and will not deprive the Tax Court of jurisdiction over the deficiency.").

implement a conversion procedure that was prohibited by the governing rules and now seeks to parlay its unauthorized approach into a windfall.  Taxpayer cannot design a procedure of its own making that contradicts the rules Congress authorized the IRS to promulgate.  And it certainly cannot bind the IRS to follow such a procedure.  Having elected to remit a deposit, taxpayer bound itself to follow the rules governing the use of the deposit, which do not empower it to convert the deposit to a payment before the IRS makes an assessment.

Because taxpayer's deposit did not convert into a payment on January 28, 2005, it is undisputed that the period to assess did not expire until May 30, 2005, and therefore the assessments the IRS made three days earlier on May 27, 2005, were timely.  *See supra* note 4.

> **C.**     **Likewise, under *Rosenman* and Federal Circuit authority, taxpayer's deposit
> was not converted to a payment on January 28, 2005, and therefore it is
> undisputed that the May 27, 2005 assessments were timely.**

As discussed above, the enactment of section 6603 in 2004 and the promulgation of administrative rules pursuant to the specific grant of authority in section 6603(a) (Rev. Proc. 2005-18, 2005-1 C.B. 798) fundamentally changed the deposit/payment landscape and abrogated the prior rules governing deposits.

But even if the Federal Circuit's pre-6603 decisions on deposits in *Cohen*, *New York Life*, and *VanCanagan*, applied here, the IRS' assessments were still timely.  As explained *supra* in Part II.A.2., the Federal Circuit has held that if, following the issuance of a notice of deficiency, the taxpayer remits an amount to satisfy the liability at issue and accompanies the remittance with a protest of that liability, then the remittance is a deposit as a matter of law and can not become a payment until it is used to pay an assessed tax.  As a result, if the IRS subsequently fails to make a timely assessment or to assess at all, the remittance remains a deposit and is

refundable at the request of the taxpayer.  Moreover, under the Federal Circuit's bright line rule, the labels a taxpayer applies to its remittance, such as calling it a "payment," are irrelevant.

The Federal Circuit's rule prevents taxpayer's attempt to convert its deposit into a payment.  Taxpayer consistently protested and/or contested the liabilities at issue, beginning in 2004 and continuing to the filing of administrative refund claims in 2007 (and continuing even during the litigation of this case).  As a result, its deposit did not convert to a payment on January 28, 2005, but remained a deposit until it was applied to timely assessed liabilities on May 27, 2005.

Before the IRS issued the notice of deficiency to taxpayer on December 29, 2004, (i) the IRS was well aware from its past audits of taxpayer's returns that taxpayer followed a practice of paying any amount the IRS determined was due and then filing a refund claim on any disputed issues; (ii) taxpayer had informed the IRS that it intended to contest at least some of the liabilities that were ultimately determined in the notice; and (iii) taxpayer had disagreed with adjustments that were subsequently included in the notice to support some of the deficiency determinations.

When taxpayer remitted its deposit on January 13, 2005, its authorized representative informed the IRS that taxpayer intended to sue to recover the liabilities asserted in the notice.  Both taxpayer's letter accompanying its deposit and its letter attempting to convert the deposit into a payment specified the entire amount of the liability as tax items for which taxpayer claimed it had a reasonable reporting position, and both the taxpayer and the IRS understood the letters to mean that taxpayer disagreed with the entire liability.  Later, on February 22, 2005, taxpayer confirmed its protest of the deficiency notice, communicating to the IRS that it was in

the process of contesting the liabilities determined for 1999 and 2000.  Finally, taxpayer never advised the IRS that it agreed with any of the liabilities determined in the notice of deficiency, and, when taxpayer filed refund claims with the IRS in January 2007, it sought recovery of the full amount of the assessments.  (Indeed, taxpayer did not formally concede any part of its claims until the parties filed a joint status report with the Court on May 22, 2009 (doc. #45), after completion of discovery on taxpayer's untimely assessment claims).

In summary, beginning during the audit and continuing in an unbroken pattern after the IRS issued the notice of deficiency, taxpayer repeatedly and consistently protested and/or contested the liability the IRS proposed in the notice and ultimately sought its complete return. Under Federal Circuit law, there is no room to conclude other than that taxpayer's deposit of January 13, 2005, did not convert to a payment on January 28, 2005, while taxpayer's ongoing protest continued, but remained a deposit until it was used to pay assessed taxes.  This occurred on May 27, 2005, three days before the period to assess expired.  As a result, the assessments were timely.

## III.    Conclusion

For one or both of the two independent grounds set forth above, the Court should enter summary judgment in favor of defendant on taxpayers' remaining challenges to the validity of IRS assessments of tax, penalty, and interest for the 1998, 1999, and 2000 tax years.

WHEREFORE, defendant requests that its motion be granted.

Respectfully submitted,

s/Bart D. Jeffress
BART D. JEFFRESS
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6496
(202) 514-9440 (fax)

JOHN A. DiCICCO
Acting Assistant Attorney General
STEVEN I. FRAHM
Chief, Court of Federal Claims Section

s/Steven I. Frahm
Of Counsel

Attorneys for Defendant

September 4, 2009

- 38 -

# Appendix A: Statutes and Regulations

**SEC. 6213.   RESTRICTIONS APPLICABLE TO DEFICIENCIES; PETITION TO TAX COURT.**

**[Sec. 6213(a)]**

(a)    TIME FOR FILING PETITION AND RESTRICTION ON ASSESSMENT.– Within 90 days, or 150 days if the notice is addressed to a person outside the United States, after the notice of deficiency authorized in section 6212 is mailed (not counting Saturday, Sunday, or a legal holiday in the District of Columbia as the last day), the taxpayer may file a petition with the Tax Court for a redetermination of the deficiency.  Except as otherwise provided in section 6851, 6852, or 6861 no assessment of a deficiency in respect of any tax imposed by subtitle A or B, chapter 41, 42, 43, or 44 and no levy or proceeding in court for its collection shall be made, begun, or prosecuted until such notice has been mailed to the taxpayer, nor until the expiration of such 90-day or 150-day period, as the case may be, nor, if a petition has been filed with the Tax Court, until the decision of the Tax Court has become final.  Notwithstanding the provisions of section 7421(a), the making of such assessment or the beginning of such proceeding or levy during the time such prohibition is in force may be enjoined by a proceeding in the proper court, including the Tax Court, and a refund may be ordered by such court of any amount collected within the period during which the Secretary is prohibited from collecting by levy or through a proceeding in court under the provisions of this subsection.  The Tax Court shall have no jurisdiction to enjoin any action or proceeding or order any refund under this subsection unless a timely petition for a redetermination of the deficiency has been filed and then only in respect of the deficiency that is the subject of such petition.  Any petition filed with the Tax Court on or before the last date specified for filing such petition by the Secretary in the notice of deficiency shall be treated as timely filed.

**[Sec. 6213(b)]**

(b)    EXCEPTIONS TO RESTRICTIONS ON ASSESSMENT.–

. . .

(4) ASSESSMENT OF AMOUNT PAID.– Any amount paid as a tax or in respect of a tax may be assessed upon the receipt of such payment notwithstanding the provisions of subsection (a).  In any case where such amount is paid after the mailing of a notice of deficiency under section 6212, such payment shall not deprive the Tax Court of jurisdiction over such deficiency determined under section 6211 without regard to such assessment.

**SEC. 6401.      AMOUNTS TREATED AS OVERPAYMENTS.**

**[Sec. 6401(a)]**

(a)      ASSESSMENT AND COLLECTION AFTER LIMITATION PERIOD.– The term "overpayment" includes that part of the amount of the payment of any internal revenue tax which is assessed or collected after the expiration of the period of limitation properly applicable thereto.

. . .

**SEC. 6402.      AUTHORITY TO MAKE CREDITS OR REFUNDS.**

**[Sec. 6402(a)]**

(a)      GENERAL RULE.– In the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall, subject to subsections (a), (d), (e), and (f) refund any balance to such person.

. . .

**SEC. 6501.      LIMITATIONS ON ASSESSMENT AND COLLECTION.**

**[Sec. 6501(a)]**

(a)      GENERAL RULE.– Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.  For purposes of this chapter, the term "return" means the return required to be filed by the taxpayer (and does not include a return of any person from whom the taxpayer has received an item of income, gain, loss, deduction, or credit).

. . .

**SEC. 6503.     SUSPENSION OF RUNNING OF PERIOD OF LIMITATION.**

**[Sec. 6503(a)]**

(a)     ISSUANCE OF STATUTORY NOTICE OF DEFICIENCY.–

(1) GENERAL RULE.– The running of the period of limitations provided in section 6501 or 6502 (or section 6229, but only with respect to a deficiency described in paragraph (2)(A) or (3) of section 6230(a)) on the making of assessments or the collection by levy or a proceeding in court, in respect of any deficiency as defined in section 6211 (relating to income, estate, gift and certain excise taxes), shall (after the mailing of a notice under section 6212(a)) be suspended for the period during which the Secretary is prohibited from making the assessment or from collecting by levy or a proceeding in court (and in any event, if a proceeding in respect of the deficiency is placed on the docket of the Tax Court, until the decision of the Tax Court becomes final), and for 60 days thereafter.

. . .

**SEC. 6603.     DEPOSITS MADE TO SUSPEND RUNNING OF INTEREST ON POTENTIAL UNDERPAYMENTS, ETC.**

**[Sec. 6603(a)]**

(a)     AUTHORITY TO MAKE DEPOSITS OTHER THAN AS PAYMENT OF TAX.– A taxpayer may make a cash deposit with the Secretary which may be used by the Secretary to pay any tax imposed under subtitle A or B or chapter 41, 42, 43, or 44 which has not been assessed at the time of the deposit.  Such a deposit shall be made in such manner as the Secretary shall prescribe.

**[Sec. 6603(b)]**

(b)     NO INTEREST IMPOSED.– To the extent that such deposit is used by the Secretary to pay tax, for purposes of section 6601 (relating to interest on underpayments), the tax shall be treated as paid when the deposit is made.

**[Sec. 6603(c)]**

(c)     RETURN OF DEPOSIT.– Except in a case where the Secretary determines that collection of tax is in jeopardy, the Secretary shall return to the taxpayer any amount of the deposit (to the extent not used for a payment of tax) which the taxpayer requests in writing.

**[Sec. 6603(d)]**

(d)     PAYMENT OF INTEREST.–

- 3 -

(1) IN GENERAL.– For purposes of section 6611 (relating to interest on overpayments), except as provided in paragraph (4), a deposit which is returned to a taxpayer shall be treated as a payment of tax for any period to the extent (and only to the extent) attributable to a disputable tax for such period.  Under regulations prescribed by the Secretary, rules similar to the rules of section 6611(b)(2) shall apply.

(2) DISPUTABLE TAX.–

(A)     IN GENERAL.– For purposes of this section, the term "disputable tax" means the amount of tax specified at the time of the deposit as the taxpayer's reasonable estimate of the maximum amount of any tax attributable to disputable items.

(B)     SAFE HARBOR BASED ON 30-DAY LETTER.– In the case of a taxpayer who has been issued a 30-day letter, the maximum amount of tax under subparagraph (A) shall not be less than the amount of the proposed deficiency specified in such letter.

(3) OTHER DEFINITIONS.– For purposes of paragraph (2)–

(A)     DISPUTABLE ITEM.– The term "disputable item" means any item of income, gain, loss, deduction, or credit if the taxpayer–

(i) has a reasonable basis for its treatment of such item, and

(ii) reasonably believes that the Secretary also has a reasonable basis for disallowing the taxpayer's treatment of such item.

(B)     30-DAY LETTER.– The term "30-day letter" means the first letter of proposed deficiency which allows the taxpayer an opportunity for administrative review in the Internal Revenue Service Office of Appeals.

(4) RATE OF INTEREST.– The rate of interest under this subsection shall be the Federal short-term rate determined under section 6621(b), compounded daily.

**[Sec. 6603(e)]**

(e)     USE OF DEPOSITS.–

(1)     PAYMENT OF TAX.– Except as otherwise provided by the taxpayer, deposits shall be treated as used for the payment of tax in the order deposited.

(2)     RETURNS OF DEPOSITS.– Deposits shall be treated as returned to the taxpayer on a last-in, first-out basis.