IN THE UNITED STATES COURT OF FEDERAL CLAIMS

———————————

NO. 1:07-cv-00006-FMA
(Consolidated with Nos.
07-706, 08-135, and 08-605)
(Judge Francis M. Allegra)

PRINCIPAL LIFE INSURANCE COMPANY AND SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

———————————

**PLAINTIFF'S APPENDIX II
TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT
AND
PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

———————————

Bruce Graves
Brown, Winick, Graves, Gross,
Baskerville and Schoenebaum, P.L.C.
Suite 2000, Ruan Center
666 Grand Avenue
Des Moines, Iowa 50309
Telephone: 515/242-2400
Fax: 515/283-0231

ATTORNEY FOR PLAINTIFF

# APPENDIX II

## INDEX TO PLAINTIFFS' APPENDIX

|  |  | Plaintiffs' Bates Stamp |
|---|---|---|
| **EXHIBIT A:** | **DEPOSITIONS** |  |
| **Exhibit A-1** | Excerpts from Deposition of Christine H. Heth | II0001-II0013 |
| **Exhibit A-2** | Excerpts from Deposition of James F. Hale | II0014-II0045 |
| **Exhibit A-3** | Excerpts from Deposition of Terri Lynn Bassett | II0046-II0098 |
| **Exhibit A-4** | Excerpts from Deposition of Richard Pullen | II0099-II0137 |
| **Exhibit A-5** | Excerpts from Deposition of Lillian Chen | II0138-II0158 |
| **Exhibit A-6** | Excerpts from Deposition of David H. Boucher | II0159-II0222 |
|  | and Excerpts from Report of David H. Boucher, Boucher Deposition Exhibit 2 | II0223-II0237 |
| **EXHIBIT B:** | **DEFENDANT'S DISCOVERY RESPONSES** |  |
| Exhibit B-1 | Excerpts from United States' Response to Plaintiffs' First Set of Requests for Admission | II0238-II0253 |
| Exhibit B-2 | Excerpts from United States' Response to Plaintiffs' First Set of Interrogatories | II0254-II0266 |
| Exhibit B-3 | Excerpts from United States' Response to Plaintiffs' Second Set of Interrogatories | II0267-II0277 |
| Exhibit B-4 | Excerpts from United States' Response to Plaintiffs' Third Set of Interrogatories | II0277a-II0277f |
| Exhibit B-5 | Excerpts from United States' Response to Plaintiffs' Second Set of Requests for Admission | II0277g-II0277i |

**EXHIBIT C:**　　**FORM 872 CONSENTS TO EXTEND TIME TO ASSESS TAX**

　　Exhibit C-1　　Tax period ended 12/31/1998　　II0277j-II0277m

　　Exhibit C-2　　Tax periods ended 12/31/1999 and 12/31/2000　　II0278

**EXHIBIT D:**　　**EXCERPTS FROM STATUTORY NOTICE OF DEFICIENCY**　　II0279-II0294a

**EXHIBIT E:**　　**FORMS 4340 – CERTIFICATE OF ASSESSMENTS, PAYMENTS, AND OTHER SPECIFIED MATTERS**

　　Exhibit E-1　　Form 4340, period ending Dec. 31, 1996　　II0295-II0314

　　Exhibit E-2　　Form 4340, period ending Dec. 31, 1997　　II0315-II0329

　　Exhibit E-3　　Form 4340, period ending Dec. 31, 1998　　II0330-II0336

　　Exhibit E-4　　Form 4340, period ending Dec. 31, 1999　　II0337-II0347

　　Exhibit E-5　　Form 4340, period ending Dec. 31, 2000　　II0348-II0363

**EXHIBIT F:**　　**TAX MODULES (TXMOD)**

　　Exhibit F-1　　TXMOD, year ending 1996　　II0364-II0374

　　Exhibit F-2　　TXMOD, for year ending 1997　　II0375-II0384

　　Exhibit F-3　　TXMOD, year ending 1998　　II0385-II0390

　　Exhibit F-4　　TXMOD, year ending 1999　　II0391-II0398

　　Exhibit F-5　　TXMOD, year ending 2000　　II0399-II0410

**EXHIBIT G:**　　**490 ACTIVITY SUMMARY, 1996, 1997, 1998, 1999, 2000**　　II0411-II0415

**EXHIBIT H:**　　**FORMS 2859, REQUEST FOR QUICK OR PROMPT ASSESSMENT**

　　Exhibit H-1　　Form 2859 for period ended Dec. 1996　　II0416

| Exhibit H-2 | Form 2859 for period ended Dec. 1997 | II0417 |
| Exhibit H-3 | Form 2859 for period ended Dec. 1997 | II0418 |
| Exhibit H-4 | Form 2859 for period ended Dec. 1998 | II0419 |
| Exhibit H-5 | Form 2859 for period ended Dec. 1999 | II0420 |
| Exhibit H-6 | Form 2859 for period ended Dec. 1999 | II0421 |
| Exhibit H-7 | Form 2859 for period ended Dec. 2000 | II0422 |
| Exhibit H-8 | Form 2859 for period ended Dec. 2000 | II0423 |

**EXHIBIT I:**     **FORMS 3552(C), PROMPT ASSESSMENT BILLING ASSEMBLY**

| Exhibit I-1 | Form 3552(C) for period ended Dec. 1998 | II0424 |
| Exhibit I-2 | Form 3552(C) for period ended Dec. 1999 | II0425 |
| Exhibit I-3 | Form 3552(C) for period ended Dec. 1999 | II0426 |
| Exhibit I-4 | Form 3552(C) for period ended Dec. 2000 | II0427 |

**EXHIBIT J:**     **CALENDAR OF CHRISTINE H. HETH; MONDAY, JANUARY 3, 2005 THROUGH FRIDAY, JANUARY 28, 2005**     II0428-II0432

**EXHIBIT K:**     **FINANCIAL STATEMENTS**

| Exhibit K-1 | Excerpts from Consolidated Financial Statements, Principal Financial Group, Inc., for year ended Dec. 31, 2004 | II0433-II0435 |
| Exhibit K-2 | Excerpts from Financial Statements, Principal Life Insurance Company, for year ended Dec. 31, 2004 | II0436-II0438 |
| Exhibit K-3 | Excerpts from Statutory-Basis Financial Statements, Principal Life Insurance Company, for year ended Dec. 31, 2004 | II0439-II0440 |
| Exhibit K-4 | Preliminary draft of income tax disclosures for 2004 audited financial statements. | II0441-II0444 |

**EXHIBIT L:**     **SUMMARY RECORD OF ASSESSMENTS**     II0445-II0448

**EXHIBIT M:**     **INTERNAL PRINCIPAL WORKSHEETS**

Exhibit M-1     Summary of Adjustments, Carrybacks, and
Tax Effects     II0449-I0449c

Exhibit M-2     Reconciliation to IRS 01/13/2005 Computations     II-0450-II0456

**EXHIBIT N:**     **PRINCIPAL INTERNAL MEMORANDA**

Exhibit N-1     Minutes of meeting with IRS representatives
October 21, 2004     II-0457-II0458

Exhibit N-2     Minutes of meeting with IRS representatives
October 21, 2004 by Rich Pullen     II0459-II0460

Exhibit N-3     Minutes of meeting with IRS representatives
December 17, 2004     II0461-II0462

Exhibit N-4     Memorandum to Board Audit Committee
January 14, 2005     II0463-II0464

Exhibit N-5     Memorandum to John Schmidt from
Rich Pullen, Jan. 27, 2005     II0465

**EXHIBIT O:**     **PRINCIPAL CORRESPONDENCE WITH
DEUTSCHE BANK**

Exhibit O-1     John Schmidt letter to Brian McGuire,
Deutsche Bank, Nov. 1, 2004     II0466-II0467

Exhibit O-2     Brian McGuire response to John Schmidt,
November 2, 2004     II0468

**EXHIBIT P:**     **LETTER TO IRS, JAN. 28, 2005, WITH
RECEIPT NOTED BY CHRISTINE HETH**     II0469-II0470

**EXHIBIT Q:**     **INTERNAL PRINCIPAL EMAILS**

Exhibit Q-1     Electronic mail of Lillian Chen dated
January 4, 2005, 6:09 PM     II0471

Exhibit Q-2     Electronic mail of Rich Pullen dated
January 5, 2005, 1:59 PM     II0472

| | | |
|---|---|---|
| Exhibit Q-3 | Electronic mail of Ellen Lamale dated January 6, 2005, 5:41 PM | II0473 |
| Exhibit Q-4 | Electronic mail of Randy Bergstrom Dated January 11, 2005, 11:32 AM | II0474 |
| Exhibit Q-5 | Electronic mail of John Schmidt Dated January 11, 2005, 4:15 PM | II0475-II0476 |
| Exhibit Q-6 | Electronic mail of John Schmidt Dated January 12, 2005, 8:45 AM | II0477 |
| Exhibit Q-7 | Electronic mail of Lillian Chen Dated January 17, 2005, 11:54 AM | II0478-II0479 |
| Exhibit Q-8 | Electronic mail of John Schmidt Dated January 17, 2005, 1:16 PM | II0480 |
| Exhibit Q-9 | Electronic mail of Greg Elming Dated January 19, 2005, 12:22 PM | II0481 |
| Exhibit Q-10 | Electronic mail of Rich Pullen Dated January 20, 2005, 9:50 AM | II0482 |
| Exhibit Q-11 | Electronic mail of Lillian Chen Dated January 20, 2005, 10:08 AM | II0483 |
| Exhibit Q-12 | Electronic mail of John Schmidt Dated January 21, 2005, 7:41 AM | II0484 |
| Exhibit Q-13 | Electronic mail of Rich Pullen Dated January 21, 2005, 3:24 PM | II0485 |
| Exhibit Q-14 | Electronic mail of Rich Pullen Dated January 25, 2005, 9:40 AM | II0486 |
| Exhibit Q-15 | Electronic mail of John Schmidt Dated January 27, 2005, 3:21 PM | II0487 |
| Exhibit Q-16 | Electronic mail of Rich Pullen Dated January 28, 2005, 10:18 AM | II0488 |
| Exhibit Q-17 | Electronic mail of Rich Pullen Dated January 28, 2005, 1:19 PM | II0489 |

Exhibit Q-18    Electronic mail of John Schmidt
                Dated January 28, 2005, 2:59 PM              II0490

Exhibit Q-19    Electronic mail of John Schmidt
                Dated February 20, 2005, 10:39 AM            II0491

**EXHIBIT R:**    **INTERNAL IRS EMAILS**                    II0492-II0494

**EXHIBIT S:**    **IRS CASE NOTES**                         II0495

**EXHIBIT T:**    **AFFIDAVIT OF RICHARD PULLEN**            II0496-II0499

**EXHIBIT U:**    **FORM 5701 EXECUTED 6/29/04,**
                  **ISSUE 33, TAX YEAR 2000**               II0500

# EXHIBIT A

# DEPOSITIONS

# EXHIBIT A-1

jd    (VIDEOTAPED DEPOSITION OF CHRISTINE H. HETH)

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2    PRINCIPAL LIFE                 )
     INSURANCE COMPANY AND          ) NO. 1:07-cv-00006-FMA
3    PRINCIPAL FINANCIAL            ) (Consolidated with
     GROUP, INCORPORATED,           ) Nos. 07-706, 08-135
4                                   ) and 08-605)
          Plaintiffs,               )
5                                   ) VIDEOTAPED DEPOSITION
     vs.                            )       OF
6                                   )   CHRISTINE H. HETH
     UNITED STATES OF AMERICA,)
7                                   )
          Defendant.                )    ORIGINAL
8    ------------------------)

9

10            THE VIDEOTAPED DEPOSITION OF

11   CHRISTINE H. HETH, taken before Janice M. Doud,

12   Certified Shorthand Reporter and Notary Public

13   of the State of Iowa, commencing at 9:10 a.m.,

14   on the 11th day of March, 2009, at 666 Grand

15   Avenue, Suite 2000, Des Moines, Iowa.

16

17

18

19

20

21

22        Reported by:   Janice M. Doud, C.S.R.

23            THIS ORIGINAL
              DEPOSITION/TRANSCRIPT IS BEING
24            PROVIDED TO YOU FOR
              PROTECTION AGAINST LOSS,
25            DESTRUCTION, TAMPERING OR
              DETERIORATION.

2

jd      (VIDEOTAPED DEPOSITION OF CHRISTINE H. HETH)

1                    A P P E A R A N C E S

2    Plaintiffs by:      BRUCE GRAVES
                         JARED A. YEPSEN
3                        Attorneys at Law
                         Brown, Winick, Graves, Gross,
4                          Baskerville & Schoenebaum
                         666 Grand Avenue, Suite 2000
5                        Des Moines, Iowa 50309
                         (515) 242-2400
6
     Defendant by:       BART D. JEFFRESS
7                        Trial Attorney
                         U.S. Department of Justice
8                        Tax Division
                         Court of Federal Claims
9                          Section, Room 8804
                         554 Fourth Street, N.W.
10                       Washington, D.C. 20001
                         (202) 307-6496
11
     Also present:       John Schmidt
12                       Jack Forsberg

13   Videographer:       Joanna Gisvold

14

15

16

17

18

19

20

21

22

23

24

25

II 0002

jd      (VIDEOTAPED DEPOSITION OF CHRISTINE H. HETH)

1                          I N D E X

2      Examination by:              Page

3      Mr. Graves                   4

4

5

6

7

8      Exhibit                      Marked

9      (Exhibits A through Q were marked prior to the

10     deposition commencing.)

11

12

13

14

15

16

17

18·

19

20

21

22

23

24

25

HUNEY-VAUGHN COURT REPORTERS, LTD.
(515) 288-4910

II 0003

4

jd    (VIDEOTAPED DEPOSITION OF CHRISTINE H. HETH)

1              THE VIDEOGRAPHER:  On the record

2    beginning the videotape deposition of Christine

3    Heth, requested by the plaintiffs in the matter

4    of Principal Life Insurance Company and

5    Principal Financial Group, Incorporated,

6    plaintiffs, versus United States of America,

7    defendant, in the United States Court of Federal

8    Claims, Number 1:07-cv-00006-FMA held in the

9    offices of the Brown Winick Law Firm, 666 Grand

10   Avenue, Suite 2000, Des Moines, Iowa, on

11   March 11th, 2009.  The approximate time is 9:10

12   a.m.  My name is Joanna Gisvold, videographer of

13   Fidelity Video Services, Des Moines, Iowa.

14   Counsel will please identify themselves for the

15   record.

16              MR. GRAVES:  Bruce Graves for the

17   plaintiff, Principal.

18              MR. JEFFRESS:  Bart Jeffress for

19   the Department of Justice Tax Division on behalf

20   of the United States, defendant.

21              MR. FORSBERG:  Jack Forsberg,

22   chief counsel's office, IRS.

23              MR. YEPSEN:  Jared Yepsen, Brown

24   Winick Law Firm, plaintiff.

25              MR. SCHMIDT:  John Schmidt,

jd    (VIDEOTAPED DEPOSITION OF CHRISTINE H. HETH)

1    Principal Financial Group.

2                    THE VIDEOGRAPHER:  The oath will

3    now be administered by Janice Doud, certified

4    shorthand reporter of Huney-Vaughn Court

5    Reporters, Des Moines, Iowa.

6                    CHRISTINE H. HETH

7    called as a witness, having been first duly

8    sworn, testified as follows:

9                    · DIRECT EXAMINATION

10   BY MR. GRAVES:

11       Q.    Would you state your name and address

12   for the record, please?

13       A.    My name is Christine H. Heth, H-e-t-h.

14   My address -- Do you want my work address?

15       Q.    That would be fine.

16       A.    It's 210 Walnut Street, Des Moines,

17   Iowa 50309.

18       Q.    Now, Ms. Heth, you and I have known

19   each other for a number of years in representing

20   our respective clients.  Would it be okay if we

21   proceed on a first-name basis?

22       A.    Certainly.

23       Q.    Thank you.  Have you ever had your

24   deposition taken before?

25       A.    No.

jd    (VIDEOTAPED DEPOSITION OF CHRISTINE H. HETH)

1    Hand the witness Exhibit B, if you would.

2       Q.    The court reporter has handed you

3    Exhibit B, Chris.  Do you recognize that letter?

4       A.    Yes, I do.

5       Q.    All right.  That letter is addressed to

6    Mr. Hale, but it says that it was

7    hand-delivered.  Do you know whether it was

8    hand-delivered to you or to Mr. Hale?

9       A.    No, I don't.  I would guess that it was

10   hand-delivered to me because that would be what

11   we would normally do out there.

12      Q.    All right.  Let me ask you this:  Once

13   that stat notice was issued and we got to this

14   point, January 13, 2005, were you still on

15   Principal's premises?

16      A.    Yes, I was.

17      Q.    If the exam was over, what were you

18   still doing on Principal's premises?

19      A.    Starting the next exam.

20      Q.    Okay.  Do you recall whether at that

21   time you were also looking at claims for refund?

22      A.    No, I wouldn't think I would have been.

23      Q.    All right.  Did you then just continue

24   on Principal's premises with the next exam?

25      A.    I would think so.

28

jd    **(VIDEOTAPED DEPOSITION OF CHRISTINE H. HETH)**

1      **Q.**    All right.  So do I understand you

2    correctly that the extent of your involvement

3    was to file it away and leave the rest up to Jim

4    Hale?

5      **A.**    Yes.

6                    MR. GRAVES:  All right.  I'll ask

7    the court reporter to hand you Exhibit C.

8                    THE WITNESS:  Thank you.

9      **Q.**    Let me back up just a minute, Chris.

10   Did Principal ever sign a Form 870 in connection

11   with the stat notice?

12     **A.**    Not that I recall.  I wouldn't think

13   you would.

14     **Q.**    All right.  Why do you say you wouldn't

15   think you would?

16     **A.**    Because that's like an agreement form,

17   and we already stat noticed them, which is

18   already a legal document.  You don't need an

19   agreement with a stat notice.

20     **Q.**    All right.  Now, Exhibit C, do you

21   recognize Exhibit C?

22     **A.**    Yes, I do.

23     **Q.**    And that also says that it's addressed

24   to Jim Hale and in addition Nancy Beatty, but

25   over on the right there is some writing.  Is

29

jd    **(VIDEOTAPED DEPOSITION OF CHRISTINE H. HETH)**

1     that your writing?

2     **A.**    Yes, it is.

3     **Q.**    And it says "Received 1-28-05"?

4     **A.**    Uh-huh.  Yes.

5     **Q.**    And to the best of your recollection,

6     was that delivered to you on Principal's

7     premises?

8     **A.**    Yes.

9     **Q.**    And do you recall who delivered it to

10    you?

11    **A.**    No.

12    **Q.**    All right.  What did you do with it?

13    **A.**    I filed it with the other one.

14    **Q.**    Did you talk --

15    **A.**    I'm sorry.

16    **Q.**    I'm sorry?

17    **A.**    I'm sorry I laughed.

18    **Q.**    Oh.  Did you talk with Jim Hale about

19    it?

20    **A.**    I'm sure -- It looks like it was

21    hand-delivered because I wrote "Received" on it

22    even though it doesn't have "Hand-Delivered" on

23    it.  So I assume I delivered this to Jim in the

24    office.  I don't know.  But, then again,

25    Principal could have mailed -- they could have

jd    **(VIDEOTAPED DEPOSITION OF CHRISTINE H. HETH)**

1    directing that a cash bond be applied to payment

2    of the tax?

3        **A.**    From Principal?

4        **Q.**    From anyone.

5        **A.**    No.

6        **Q.**    Did you read the letter when it was

7    delivered to you?

8        **A.**    Yes.

9        **Q.**    And what did you understand Principal

10    intended to do or to accomplish with the letter?

11        **A.**    Take the payments and apply them in the

12    manner that they designated.

13        **Q.**    All right.  And they were requesting

14    that that be done when?

15            MR. JEFFRESS:  Well, are you --

16    Objection here.  I don't think it's clear

17    whether she's reading it now and telling you

18    that or you're asking about her recollection at

19    the time.

20        **Q.**    I'm asking -- Yes, I'm asking what you

21    understood Principal's purpose was or what they

22    were intending to accomplish at the time when

23    you read this letter.

24        **A.**    I felt when this letter arrived that it

25    was not my responsibility to do this, that this

```
 1    was Jim Hale's area.  I mean, I delivered it to
 2    him.  It's not even addressed to me.  And I
 3    filed it.  I mean, I didn't do anything with it.
 4        Q.   Did you read it?
 5        A.   I'm sure I scanned it.  I mean, I
 6    wouldn't have spent a lot of time on it.  I can
 7    see what you're getting at.  I see that in that
 8    second paragraph on that second page it says
 9    "today."  That wouldn't have meant anything to
10    me.
11        Q.   Why?
12        A.   It's not -- It wasn't within what I
13    considered my job.
14        Q.   When did you turn it over to Jim Hale?
15        A.   I have no idea.  It's probably not
16    likely that I ran it right over there.
17        Q.   Even though it says "today," you don't
18    think he got it that day?
19        A.   He may not have.
20        Q.   So did you -- did you contemplate the
21    letter at all when you got it or did you just
22    file it away?
23        A.   I pretty well filed -- I gave it to
24    Jim.  If it came to me, I gave it to Jim.  This
25    could have been mailed, the way it is.  But,
```

34

jd    (VIDEOTAPED DEPOSITION OF CHRISTINE H. HETH)

1    yeah, I would have just filed it away.

2        Q.    Did you look up the rev proc that's

3    referred to there?

4        A.    No.

5        Q.    Okay.

6                MR. JEFFRESS:    Well, which rev

7    proc?

8        Q.    2002-26.

9        A.    No.

10        Q.    Did you look up any rev proc?

11        A.    No.

12        Q.    Are you familiar with the term

13    "designation letter"?

14        A.    In what context?

15        Q.    Are you familiar with the term

16    "designation letter" in connection with a letter

17    that designates payment of the tax and/or how it

18    should be allocated?

19        A.    No.

20        Q.    Okay.    Were you aware of any provisions

21    of the Internal Revenue manual or rev procs that

22    describe how such a letter should be handled?

23        A.    No.

24        Q.    You left that up to Jim Hale?

25        A.    Uh-huh.

jd     (VIDEOTAPED DEPOSITION OF CHRISTINE H. HETH)

1        A.    No.

2        Q.    All right.  Let's go to Exhibit N.

3    Take a minute to look over Exhibit N, if you

4    would, please.  Do those look familiar to you?

5        A.    No.

6        Q.    You've not seen those before?

7        A.    No.

8        Q.    Okay.  Let's go on to Exhibit O.

9    Take a minute and look that over, please.  Have

10   you -- Are you familiar with that form?

11       A.    No.

12       Q.    Okay.  Not seen that form before?

13       A.    No.  I mean, I can see that it's some

14   form of transcript; and there's a million

15   different transcripts at the IRS.  I've never

16   seen this one.

17       Q.    There's a million different transcripts

18   at IRS?

19       A.    Well, okay, that's exaggerating; but

20   there's more -- It's a database, and you can

21   print it out different ways, just like Principal

22   can print out their books in different ways,

23   so --

24       Q.    All right.  What's -- Are you familiar

25   with the term "master file," the IRS's master

jd    (VIDEOTAPED DEPOSITION OF CHRISTINE H. HETH)

1                    C E R T I F I C A T E

2              I, the undersigned, a Certified
Shorthand Reporter and Notary Public of the
3    State of Iowa, do hereby certify that I acted as
the Certified Shorthand Reporter in the
4    foregoing matter at the time and place indicated
herein; that I took in shorthand the proceedings
5    had at said time and place; that said shorthand
notes were reduced to typewriting under my
6    supervision and direction, and that the
foregoing pages are a full and correct
7    transcript of the shorthand notes so taken; that
said transcript was not submitted for review.

8

9              I further certify that I am
neither attorney nor counsel for, or related to
10   or employed by any of the parties in the
foregoing matter, and further that I am not a
11   relative or employee of any attorney or counsel
employed by the parties hereto, or financially
12   interested in the action.

13              IN WITNESS WHEREOF, I have
hereunto set my hand and seal this 18th day of
14   _March_____, 2009.

15

16   CERTIFIED SHORTHAND REPORTER
and NOTARY PUBLIC

17

18

19

20

21

22

23

24

25

# EXHIBIT A-2

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2    PRINCIPAL LIFE                )
     INSURANCE COMPANY AND         ) NO. 1:07-cv-00006-FMA
3    PRINCIPAL FINANCIAL           ) (Consolidated with
     GROUP, INCORPORATED,          ) Nos. 07-706, 08-135
4                                  ) and 08-605)
          Plaintiffs,             )
5                                  ) VIDEOTAPED DEPOSITION
     vs.                           )          OF
6                                  )    JAMES F. HALE
     UNITED STATES OF AMERICA,)
7                                  )
          Defendant.              )
8    -------------------------)    ORIGINAL

9

10              THE VIDEOTAPED DEPOSITION OF

11   JAMES F. HALE, taken before Janice M. Doud,

12   Certified Shorthand Reporter and Notary Public

13   of the State of Iowa, commencing at 1:26 p.m.,

14   on the 11th day of March, 2009, at 666 Grand

15   Avenue, Suite 2000, Des Moines, Iowa.

16

17

18

19

20

21

22        Reported by:  Janice M. Doud, C.S.R.

23                           THIS ORIGINAL
                             DEPOSITION/TRANSCRIPT IS BEING
24                           PROVIDED TO YOU FOR
                             PROTECTION AGAINST LOSS,
25                           DESTRUCTION, TAMPERING OR
                             DETERIORATION.

jd     (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1                    A P P E A R A N C E S

2    Plaintiffs by:     BRUCE GRAVES
                        JARED A. YEPSEN
3                        Attorneys at Law
                        Brown, Winick, Graves, Gross,
4                          Baskerville & Schoenebaum
                        666 Grand Avenue, Suite 2000
5                        Des Moines, Iowa 50309
                        (515) 242-2400
6
     Defendant by:      BART D. JEFFRESS
7                        Trial Attorney
                        U.S. Department of Justice
8                        Tax Division
                        Court of Federal Claims
9                          Section, Room 8804
                        554 Fourth Street, N.W.
10                       Washington, D.C. 20001
                        (202) 307-6496
11
     Also present:      John Schmidt
12                       Jack Forsberg

13   Videographer:      Joanna Gisvold

14

15

16

17

18

19

20

21

22

23

24

25

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

```
 1                    I N D E X

 2   Examination by:          Page

 3   Mr. Graves               5, 72

 4   Mr. Jeffress             58

 5

 6

 7

 8

 9   Exhibit                  Marked

10   (Exhibits A through Q were marked prior to the

11   deposition commencing.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

jd    **(VIDEOTAPED DEPOSITION OF JAMES F. HALE)**

1                    THE VIDEOGRAPHER:  On the record

2    beginning the videotape deposition of James

3    Hale, requested by the plaintiffs in the matter

4    of Principal Life Insurance Company and

5    Principal Financial Group, Incorporated,

6    plaintiffs, versus United States of America,

7    defendant, in the United States Court of Federal

8    Claims, Number 1:07-cv-00006-FMA, held in the

9    offices of the Brown Winick Law Firm, 666 Grand

10   Avenue, Suite 2000, Des Moines, Iowa, on

11   March 11th, 2009, and the approximate time is

12   1326.  My name is Joanna Gisvold, videographer

13   of Fidelity Video Services, Incorporated,

14   Des Moines, Iowa.  Counsel will please identify

15   themselves for the record.

16                   MR. GRAVES:  Bruce Graves for the

17   plaintiff, Principal.

18                   MR. JEFFRESS:  Bart Jeffress from

19   the Department of Justice Tax Division on behalf

20   of the defendant.

21                   MR. FORSBERG:  Jack Forsberg,

22   chief counsel office, IRS.

23                   MR. SCHMIDT:  John Schmidt,

24   counsel Principal Financial Group.

25                   THE VIDEOGRAPHER:  The oath will

**II 0017**

jd    **(VIDEOTAPED DEPOSITION OF JAMES F. HALE)**

1    now be administered by Janice Doud, certified

2    shorthand reporter of Huney-Vaughn Court

3    Reporters, Des Moines, Iowa.

4                    JAMES F. HALE

5    called as a witness, having been first duly

6    sworn, testified as follows:

7                    DIRECT EXAMINATION

8    BY MR. GRAVES:

9        Q.    Would you state your name and address

10    for the record, please?

11        A.    Yes.  James F. Hale, but I go by Jim.

12    I live at 15000 Wildwood Drive in Clive, Iowa.

13        Q.    All right.  Mr. Hale, you and I have

14    known each other through the years in

15    representing our respective clients; and is it

16    okay if we proceed on a first-name basis?

17        A.    Yes, sir, that's fine.

18        Q.    Okay.  Have you ever had your

19    deposition taken before?

20        A.    The only time that I've had a

21    deposition, and I don't know whether you would

22    call it a deposition or not, is back in the

23    mid-'80s I fired a revenue agent, if you will,

24    and we had an administrative hearing where there

25    was an administrative judge, court reporters,

**II 0018**

1      Q.    Okay.  Do you remember anything about

2      global interest netting?

3      A.    I remember hearing about it, but that's

4      about it.

5      Q.    All right.  Were those calculations

6      left to others?

7      A.    Yes.

8      Q.    Who made those calculations?

9      A.    I do not know.

10     Q.    If you had a case such as Principal's

11     that involved global interest netting or a hot

12     interest, how would you be sure that it was

13     done?

14     A.    That is what we deem to be a

15     processing-type function, or I believe it's a

16     processing-type function, and the review staff

17     would have someone and/or the processing

18     section.  Again, I don't know who has ultimate

19     responsibility for that.

20     Q.    And what do you mean by the "processing

21     function"?

22     A.    Well, there's folks within the Internal

23     Revenue Service that that is their job, is to --

24     when a revenue agent closes a case file, it can

25     go to processing people; and they compute the

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

 1    interest, try and solicit payment, do whatever

 2    is necessary to complete final closing actions

 3    on that case.

 4        Q.    That's helpful.  Thank you.

 5              Where are those processing people

 6    located?  Would they have been located within

 7    your offices or within here in Des Moines?

 8        A.    No, sir.

 9        Q.    Where would they be located?

10        A.    It varies as to what period of time one

11    is talking about.  With the many reorganizations

12    of the service --

13        Q.    Let me interrupt you and just say this.

14        A.    Okay.

15        Q.    Let's bring it home to the statutory

16    notice for the years -- the statutory notice

17    that was issued on December 29, 2004.  In fact,

18    that's Exhibit A; and I'll ask the court

19    reporter to give you a copy of that so that it

20    refreshes your memory.

21        A.    Okay.

22        Q.    Do you recall that, Jim?

23        A.    I don't know as I've ever seen it

24    before, Bruce, but I definitely recall issuing

25    it or hearing about it being issued.  This was

14

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    from the St. Louis review staff, as I recall.

2        Q.    And where would the processing staff

3    have been located at that time, at the time that

4    was issued?

5        A.    I do not know whether St. Louis

6    processed it or whether it went back to

7    St. Paul, Minnesota.

8        Q.    Were there processing functions in both

9    places?

10        A.    Yes, sir.

11        Q.    And who did you report to, Jim?

12        A.    At the time this particular stat notice

13    was issued, I believe it was Jim Roosey; and

14    then subsequent to that was Ron Rossi.  But I

15    believe when this was issued, it was Jim Roosey,

16    who was based in Chicago.

17        Q.    And where was Mr. Rossi based?

18        A.    Milwaukee.

19        Q.    And when did that change occur, do you

20    know?

21        A.    I would say it was a couple -- I'm just

22    guessing -- a couple years after I became the

23    manager.  So roughly July 2003.  And that's

24    rough.

25        Q.    Well, just to try and refresh your

II 0021

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    memory, you note that Exhibit A is dated

2    December 29, 2004.

3        A.    Uh-huh.

4        Q.    Well, maybe I misunderstood you.  I

5    thought that -- Well, so you're saying that you

6    were reporting to Mr. Rossi at this time?

7        A.    No.  No.

8        Q.    Oh.

9        A.    Jim Roosey --

10       Q.    Roosey.

11       A.    -- I'm almost positive was my manager

12   when this stat notice was issued.  And Jim

13   Roosey was in Chicago.

14       Q.    All right.  And what's the other

15   gentleman's name in Milwaukee?

16       A.    The other gentleman's name is Ron

17   Rossi.  And he was my next boss after another

18   reorganization.

19       Q.    And that was after this time?

20       A.    Yes, sir.

21       Q.    About how long after this time?

22       A.    I would say at least a year and a half.

23       Q.    Okay.  Okay.  Were you in regular

24   communication with Mr. Roosey in Chicago?

25       A.    Yes.

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    Q.    In the normal course of business, how

2    often would you talk to Mr. Roosey or exchange

3    e-mails with him or communicate with him in some

4    fashion?

5    A.    Well, I would say almost daily if

6    you're including both e-mails and phone

7    conversations, yes.

8    Q.    All right.  I asked you a few questions

9    about hot interest and global interest netting.

10   Let me ask you a few more about interest.  Are

11   you familiar with the difference between

12   underpayment interest and overpayment interest?

13   A.    I know that there's a difference; but

14   other than that, I do not know specifics.

15   Q.    Okay.  Do you know which is higher?

16   A.    No.

17   Q.    Okay.  Do you know anything about a

18   ten-day grace period regarding interest?

19   A.    I vaguely remember it, but nothing

20   specifically.  I know there's a difference.

21   That's all I can remember.

22   Q.    Okay.  Can you remember what type of

23   events would stop the accrual of underpayment

24   interest?

25   A.    Well, payment.

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    action with regard to this letter?

2        A.    I don't know what you're getting at.

3        Q.    Well, let me try and ask it another

4    way.

5                    Who entered it into IRS's

6    computer system?

7        A.    I don't know.

8        Q.    Would you have given a copy of the

9    letter to the -- or talked to or notified the

10    processing staff that you referred to earlier?

11        A.    Yes, I'm sure I would have.

12        Q.    And forgive me if I don't remember, but

13    where were they located at the time?

14        A.    Well, we -- again, we had -- the review

15    staff, I'm sure, had a processing section in

16    St. Louis; and then St. Paul was our designated

17    large case processing center.

18        Q.    I see.

19        A.    So I do not know which of the two

20    handled this.

21        Q.    Is it likely that one of those two

22    entered it into the IRS's computer system?

23        A.    Yes.

24        Q.    Would they have been the ones or would

25    it have been your staff who assigned transaction

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    a couple of weeks later.  Do you recall -- Take

2    a minute and look over Exhibit C, and then I'll

3    ask you a question or two about it.

4        A.    Okay.

5        Q.    Okay.  Do you recall receiving that

6    letter?

7        A.    Vaguely.

8        Q.    Can you recall whether it was delivered

9    to you by Chris Heth or whether you received it

10   in the mail?

11       A.    No.

12       Q.    Okay.  If my math is right, that letter

13   is dated fifteen days after the January 13

14   letter.  During that period of time, did you

15   have any -- do you recall any conversations with

16   Principal about the matters referred to in

17   either letter?

18       A.    I don't recall exactly.  I know that

19   the -- let's say the major area of concern was

20   that we did not want the monies refunded nor did

21   Principal want the monies refunded.

22       Q.    And there was a chance that that might

23   occur; right?

24       A.    Yes.

25       Q.    And do you recall talking to Rich

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    Pullen about that?

2        A.    Yes, vaguely I do.

3        Q.    And did you say anything to Rich about

4    what to do if a refund check issued?

5        A.    We did not want them to cash the check;

6    and, as I recall, they did not want --

7        Q.    Okay.

8        A.    -- the check cashed either.

9        Q.    Okay.  Did you make any efforts to see

10   to it that -- or to stop any refund from

11   occurring?

12       A.    Yes.  I made several calls to folks, if

13   you will, within the processing section, trying

14   to ensure that the monies were not refunded.

15       Q.    And which processing section?

16   St. Louis or St. -- or St. Paul or both?

17       A.    I would guess both.

18       Q.    Okay.  And the folks that you

19   mentioned, would that have included Carol

20   Dailing?

21       A.    The name sounds familiar, but I cannot

22   be sure.

23       Q.    Okay.  Do you recall anybody else, the

24   name of anyone else you would have talked to in

25   those -- in either of those processing sections

1    about stopping that -- making sure a refund

2    didn't occur?

3        A.   No.  I do know that I talked to a lot

4    of folks; but, I'm sorry, I do not remember

5    exact names.

6        Q.   And about how many phone calls do you

7    suppose you made in that regard?

8        A.   I would say a dozen.

9        Q.   Okay.  Over what period of time?  One

10   day or two days or three?

11       A.   From the date of the January 28th

12   letter, I would say probably a week.

13       Q.   Okay.  And why were you concerned that

14   a refund might be generated?  What caused you to

15   think that a refund might be generated?

16       A.   There was no assessment at that time.

17       Q.   Would the fact that there was already

18   an advance payment showing up on the books from

19   the January 13 letter have anything to do with

20   it?

21            MR. JEFFRESS:  Objection.  That

22   calls for a legal conclusion.

23            MR. GRAVES:  No, I'm just asking

24   if he knows whether that was a reason within IRS

25   as to why it might have generated a refund.

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1                 MR. JEFFRESS:  Objection, vague.

2        Q.    You can answer.

3                 MR. JEFFRESS:  You can go ahead

4    and answer.

5        A.    Well, I mean, let's be honest.  There

6    was differences in the two letters, in the

7    January 13th letter and in the January 28th

8    letter, regarding how Principal wished to have

9    the monies applied.

10       Q.    Do you know whether or not the

11   January 1 letter -- I'm sorry, the January 13

12   letter resulted in an entry on the transcripts

13   called advance payment?

14       A.    I do not recall.

15       Q.    When a payment came in prior to a

16   deficiency being assessed, do you know what it

17   was recorded as?  I mean, would it be recorded

18   as an advanced payment or what would it be

19   recorded as?

20                MR. JEFFRESS:  Objection.  The

21   question calls for a legal conclusion, contains

22   legal argument.

23       Q.    Go ahead.

24       A.    Sometimes the taxpayer would tell us,

25   just as Principal did, how they wanted the

jd    **(VIDEOTAPED DEPOSITION OF JAMES F. HALE)**

1    monies applied.  Sometimes they want it applied

2    fully to tax.  Sometimes they'd want it applied

3    to interest first.  Sometimes there was

4    differences in advance payments versus cash

5    bonds.  And at this point I do not recall the

6    differences.  I know there were differences.

7        Q.    Okay.  And that letter of January 28,

8    Exhibit C, refers to how they wanted the tax

9    applied, doesn't it?

10        A.    Yes, sir.

11        Q.    On page 2, divided between tax, penalty

12    and interest?

13        A.    Yes, sir.

14        Q.    Was that done?

15        A.    I do not know.

16        Q.    What did you do with this letter after

17    you received it?

18        A.    I would have obviously corresponded

19    with Nancy, who was the first person on the

20    letter, made sure that she received the letter

21    and asked her to follow the instructions that

22    Principal had asked for.

23        Q.    To your knowledge she would have been

24    the proper person to do that?

25        A.    If she was not, I believe that she

1    would have said this is not my responsibility,

2    if you will, and here's what we need to do

3    henceforth.

4        Q.    Do you recall her telling you that?

5        A.    No.

6        Q.    Okay.  Okay.  Would you have talked to

7    Mr. Roosey about this letter?

8        A.    Yes, I'm sure I would have communicated

9    to him in either phone or an e-mail.

10       Q.    Do you know whether or not you sent him

11   a copy of it?

12       A.    No.

13       Q.    Okay.  Had you ever before received a

14   letter directing that a cash bond previously

15   sent in be applied to the tax?

16                MR. JEFFRESS:  Objection,

17   misleading.  Also objection, calls for legal

18   conclusion.

19       Q.    I'm asking if you ever received before

20   this letter of -- if you ever received before a

21   letter directing that a cash bond be applied in

22   payment of the tax.

23                MR. JEFFRESS:  Objection.  It's

24   legal argument.  The application of the deposit

25   in some sort of way, it's a legal conclusion.

II 0030

1    January 28th, Exhibit C, that I believe you

2    testified that you called a number of people to

3    stop a refund from being generated.

4              Were you attempting at that time

5    to get the previous remittance referred to in

6    the letter, the January 13 remittance, were you

7    attempting to get that applied to the payment of

8    the tax, penalty and interest referred to in

9    this January 28 letter?

10             MR. JEFFRESS:  Okay.  Objection.

11   Calls for legal conclusion.

12        Q.   You may answer whether or not you were

13   attempting to do that.

14        A.   I was attempting to follow Principal's

15   desires as to how they wanted the monies

16   applied.

17        Q.   As referred to on page 2 of the letter?

18        A.   Yes, sir.

19        Q.   Okay.

20             MR. JEFFRESS:  Bruce, can I break

21   in here?

22             MR. GRAVES:  Uh-huh.

23             MR. JEFFRESS:  Why don't you ask

24   him what he understood by what they were asking,

25   the letter.

jd    **(VIDEOTAPED DEPOSITION OF JAMES F. HALE)**

1    **Q.**    Mr. Hale, Jim, looking at page 2 of

2    that letter, in that second paragraph, beginning

3    in the middle, it says, "hereby request that the

4    Internal Revenue Service now (today) apply the

5    deposit for each year to payment of the federal

6    income tax, penalty and interest in the

7    following amounts for each year in ascending

8    order."

9                        Did you understand what that

10    provision meant, what that instruction meant?

11    **A.**    I did not look up the revenue

12    procedure; but, again, the -- Principal has

13    outlined how they wanted the monies applied.

14    **Q.**    Okay.  And it was clear to you how they

15    wanted the monies applied?

16    **A.**    Yes.

17    **Q.**    All right.  Was there anything about

18    the letter that was unclear to you, Jim?

19    **A.**    No.

20    **Q.**    Okay.

21                        MR. JEFFRESS:  Well, if I may,

22    rather than coming back to it later, do you mind

23    if I ask a question just to try to --

24                        MR. GRAVES:  You can come back to

25    it later.

**HUNEY-VAUGHN COURT REPORTERS, LTD.**
**(515) 288-4910**                    **II 0031a**

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1        Q.    Okay.  And do I recall correctly that

2    you think you did exchange some e-mails with

3    either Roosey or the folks in St. Paul or the

4    folks in St. Louis?  Did I -- Am I recalling

5    that correctly?

6        A.    I believe that most of it was via

7    phone.

8        Q.    Oh, okay.  Those dozen phone calls you

9    referred to earlier over maybe the course of a

10   week?

11       A.    Uh-huh.  Yes.

12       Q.    Were you aware of -- Well, strike that.

13             Did anyone that you talked to,

14   such as Mr. Roosey or the folks in St. Paul or

15   St. Louis, give you any advice or tell you what

16   to do regarding the letter?

17       A.    No.

18       Q.    Do you recall St. Paul telling you that

19   the payment would be applied to the tax that

20   day?

21       A.    I do not recall.

22       Q.    Okay.  Did anybody talk about assessing

23   the tax about this time in connection with that

24   January 28 letter?

25       A.    The conversations were such that we did

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    not want the tax to be assessed at that time.

2        Q.   Why would that have been?

3        A.   Because of the statutory notice.

4        Q.   I see.  Did you feel the statutory

5    notice prevented you from assessing the tax at

6    that time?

7        A.   Principal did -- As I recall, Principal

8    did not sign a waiver of agreement.

9        Q.   An 870.

10        A.   Yes, sir.  They submitted payment via

11    wire transfer.  So I am not a processing expert,

12    but I believe that there was no authority within

13    the ninety-day period to assess the tax.

14        Q.   Because they had not signed an 870.

15        A.   Yes.

16        Q.   Let's go to Exhibit D.  Take a look at

17    Exhibit D, Jim, and I'll ask you a question

18    about that.

19        A.   Okay.

20        Q.   Do you recall that letter?

21        A.   No.

22        Q.   Okay.  If this letter had come to you,

23    what would have been done with it?

24        A.   Since the processing section has

25    primary responsibility for handling the monies

II 0033

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    in question, I would have contacted either one

2    of the folks at -- that were cc'd at the bottom

3    or possibly at least two of them, not Chris,

4    that were within the processing section to,

5    again, ensure that the monies were applied per

6    Principal's wishes.

7        Q.    Okay.  Clarify for me, was Nancy Beatty

8    in the processing section?

9        A.    I believe she was.  On the January 28th

10   letter, it's addressed to her in Cincinnati.  So

11   I believe she had something to do with

12   processing, yes.

13       Q.    Okay.  Jim, are you -- you say you have

14   very little knowledge of transaction codes.

15   Just let me ask you this:  Do you know what

16   Transaction Code 640 is?

17       A.    I -- If I were guessing, I think it's

18   advance payment; but I do not know.

19       Q.    Okay.  Do you know what the term

20   "blocking series" means?

21       A.    No, sir.

22       Q.    Okay.  Who was the person responsible

23   for deciding when the assessment would be made?

24       A.    It was not me.

25       Q.    Do you know who it would have been?

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    **A.**   St. Louis review staff would have

2    coordinated whether their staff in St. Louis

3    would have done the assessment or possibly

4    St. Paul could have done the assessment.

5    **Q.**   One of the processing sections that you

6    referred to earlier?

7    **A.**   Yes, sir.

8                   MR. GRAVES:  Okay.  We're about

9    at the end of the videotapes, so why don't we

10    use this occasion to take a little break.

11                  THE VIDEOGRAPHER:  Off the record

12    ending Tape 1 at 1422.

13                  (A recess was taken.)

14                  THE VIDEOGRAPHER:  On the record

15    beginning Tape 2 at 1426.

16    **Q.**   Jim, I think you'll agree that the

17    Internal Revenue Service has the capability of

18    producing a lot of paper, a lot of records; and

19    we're just going to go through some of those

20    now.

21                  MR. GRAVES:  Would you hand the

22    witness, please, Exhibits E through J.

23    **Q.**   Take a minute and look through those,

24    if you will.  You don't have to go over every

25    line.  I just wanted to ask you generally, are

jd      (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1      but I cannot be sure.

2          Q.   Okay.  Is it fair to say there are many

3      types of transcripts of a taxpayer's account

4      that can be obtained from the IRS's computer?

5          A.   Yes.

6          Q.   In your experience do the different

7      types generally show the same thing or are they

8      sometimes in conflict?

9          A.   Generally speaking, they should show

10     the same thing, one would hope.

11         Q.   Okay.  Let's move on to -- Well, let me

12     back up a minute here.  I'm still on Exhibit O.

13     Jim, please look at the last page of each one of

14     those.  Tell me in which cases you see a credit

15     balance as the last entry.

16         A.   Page 5 has a credit balance; page 8 has

17     a credit balance; the bottom of page 10, credit

18     balance; page 14, credit balance.  And I

19     can't -- I cannot tell on my copy of page 16.  I

20     don't see the minus figure there.

21         Q.   Okay.  So these are credit balances

22     showing up as of January 13, 2005; is that

23     correct?  Did you look at the dates in the

24     process?

25         A.   I don't see the dates.

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    I want to refer you to the e-mail, the e-mail at

2    the bottom or the 12:09 p.m. on February 23 from

3    Chris Heth to Carol Dailing.  Do you recall

4    conversations with Chris Heth about that subject

5    or such a conversation with Chris?

6        A.    I don't recall exactly; but, again, you

7    can see the premise behind the e-mail.

8        Q.    What is the premise?

9        A.    That the 1999-2000 case was submitted

10    for closing actions.

11        Q.    And what -- That's my question for you.

12    What does that mean, closing actions?

13        A.    Transmitted to the appropriate

14    processing center.

15        Q.    And process it, I guess; right?

16        A.    Yes.

17        Q.    Okay.  If you turn the page and go to

18    the next page, please take a minute and look at

19    that.  And you'll notice that the following page

20    is exactly the same, but it has a different

21    taxable year up on the top.

22        A.    Okay.

23        Q.    Okay.  Do you know who would have

24    written these notes?

25        A.    No, sir.

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    Q.    Do you recall -- It says here -- It

2    says, "I also discussed the notation on one of

3    the AIMS prints that said, 'Pat, case is full

4    paid, when closing - close agreed rather than

5    default.'"  First, do you know who Pat would

6    have been?

7    A.    No.

8    Q.    And the Form 3198 that's referred to

9    there is what kind of a form?

10    A.    That's a special handling notice.

11    Q.    And do you know if there would have

12    been one on this case or multiple ones, one for

13    each taxable year?

14    A.    One for each taxable year would be the

15    correct approach.

16    Q.    Okay.  Then the next sentence says,

17    "Jim verified that since full payment was

18    received, (no signatures) we will close agreed

19    per full payment."  Do you remember that?  Do

20    you remember verifying that to someone?

21    A.    I remember the scenario as to how we

22    would close it, yes.

23    Q.    Okay.  And is that correct where it

24    says a close -- "will close agreed per full

25    payment"?

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1       A.    Yes.

2       Q.    Okay.  Down in that next paragraph

3   refers to Tax Mods and Transaction Code 560, and

4   then it refers to ASED BB.  Do you know what

5   that means?

6       A.    Carry-back.

7       Q.    BB?

8       A.    As I recall, yes.

9       Q.    Refers to a carry-back; is that right?

10      A.    Yes.  I'm sorry.

11      Q.    Okay.  Going on to page 5 of Exhibit B,

12  do you know why you sent a copy to George Hertz

13  to keep him in the loop?

14      A.    My guess is he was acting for me.

15      Q.    Oh, did he act for you from time to

16  time?

17      A.    Occasionally.

18      Q.    Okay.  Looking at the next e-mail,

19  June 23rd, 1:15 p.m., from you to Mr. Roosey, it

20  refers to Status 56.  What is Status 56?

21      A.    I believe it's a processing-type

22  status.

23      Q.    What does it mean?

24      A.    I don't recall exactly.

25      Q.    Down at the bottom, the last e-mail on

II 0039

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1      Q.    With a copy to Mr. Roosey.

2      A.    Uh-huh.  Yes.

3      Q.    And still you can't recall who Sue West

4    is?

5      A.    No.  But, again, she has to be a

6    processing person.

7      Q.    Okay.  The second e-mail from you to

8    Sue West at 3:45 p.m. on June 9 says that the

9    case is getting a lot of attention due to the

10   dollars involved.

11     A.    Uh-huh.

12     Q.    Was that true?

13     A.    Yes.

14     Q.    Who was giving it a lot of attention?

15     A.    I think it's fair to say that you do

16   not have a corporate taxpayer that pays the

17   government $444 million often.

18     Q.    So who was paying a lot of attention to

19   it?

20     A.    We were all paying a lot of attention

21   to it.

22     Q.    Mr. Roosey?

23     A.    Yes.

24     Q.    The processing people?

25     A.    Yes.

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1      Q.   You and Chris Heth?

2      A.   Yes.

3                 MR. GRAVES:  That's all I have.

4                 MR. JEFFRESS:  All right.  Well,

5      let's break, and then we'll come back with some

6      questions.

7                 MR. GRAVES:  Okay.

8                 THE VIDEOGRAPHER:  Off the record

9      at 1515.

10                (A recess was taken.)

11                THE VIDEOGRAPHER:  On the record

12     beginning Tape 3 at 1535.

13                CROSS-EXAMINATION

14     BY MR. JEFFRESS:

15     Q.   Okay.  Jim, I'd like to direct you to

16     Exhibit C, if we can find it in that pile.

17     A.   Got it.

18     Q.   You got it?  Okay.  You remember you

19     answered some questions earlier on Exhibit C?

20     A.   Uh-huh.

21     Q.   Okay.

22     A.   Yes.

23     Q.   Let's go to page 2 of that exhibit; and

24     in, specifically, the second full paragraph, it

25     starts with, "In accordance with Sections 3.02."

64

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    was received" -- "no signatures" in a

2    parenthetical -- "we will close agreed per full

3    payment."  Do you see that sentence?

4        A.    Yes, sir.

5        Q.    Do you recall making that verification?

6        A.    Yes.

7        Q.    And what did you mean by it at the

8    time?

9        A.    Just exactly what I said.  Principal

10   did not sign the waiver form, the 870, so the

11   processing folks needed to know how to close the

12   case using proper procedures.

13       Q.    And what did you mean by "full payment

14   was received"?

15       A.    That would be full payment of tax,

16   interest and penalties.

17       Q.    But what did you mean by the word

18   "payment"?

19             MR. GRAVES:  Objection.

20       Q.    Let me clarify.  By "payment" did you

21   mean that the IRS had received the monies?

22       A.    Yes, sir.

23       Q.    Did you mean anything else?

24       A.    No.

25       Q.    So when you use the word "payment," you

II 0041a

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1                    Do you recall you provided some

2    testimony on this issue of the potential for the

3    issuance of a refund that neither Principal

4    wanted or the IRS wanted?

5        A.    Yes, sir.

6        Q.    And you were making some calls?

7        A.    Yes.

8        Q.    How did that concern come about?

9        A.    Because of the fact that a statutory

10    notice was issued, we could not assess the tax

11    per the Internal Revenue Code until the ninety

12    days had expired; and then, as my memory serves

13    me, the Internal Revenue Service was allowed --

14    after the ninety-day period expired, we were

15    then allowed sixty days to assess the tax and

16    complete appropriate closing actions.

17        Q.    But do you recall when you were first

18    concerned with the potential of a refund?

19        A.    Well, as of -- as of the date that

20    Principal submitted the monies.

21        Q.    Is that Exhibit B?

22        A.    Yes, sir.

23        Q.    So it's Exhibit B, as far as you

24    recollect, that triggered the concern about a

25    potential refund?

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    **A.**    Yes.  And to clarify that, I'm looking

2    at Exhibit B, page 2, Principal themselves says

3    the taxpayer acknowledges that the full amount

4    of the deposit is made with respect to a

5    disputable tax.  So, in other words, in my

6    lingo, they're saying that "We do not agree with

7    the tax."

8    **Q.**    And how did -- Did you just have this

9    concern by yourself as a result of this

10   January 13 remittance or did someone else bring

11   it to your attention?

12   **A.**    I -- I do not recall.

13   **Q.**    But you do remember conversations with

14   Rich Pullen about this issue?

15   **A.**    Yes.  And, again, as earlier testimony,

16   I believe we talked about the fact that

17   Principal was very concerned.  They did not --

18   They did not want the monies refunded.

19   **Q.**    I may be going over ground, but did

20   you -- did you have this concern yourself or did

21   it come from some other place?

22              MR. GRAVES:  Objection.  Asked

23   and answered.

24   **Q.**    You can go ahead.

25   **A.**    As of January 13th, quite honestly, all

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    I was trying to do was follow the instructions

2    that Principal had asked the Internal Revenue

3    Service to do.

4        Q.    Why did you think that there was a

5    chance that some of this remittance might be

6    refunded?  And, actually, let me clarify that.

7    Is it refunded automatically or how would -- how

8    would -- what was the concern about?

9        A.    The concern was that, again, there was

10   no, quote, assessment that could be made.  So

11   here the -- here the United States Government is

12   getting a check from a taxpayer for four -- or

13   not a check, a wire transfer for $444 million;

14   and we needed to know, the Internal Revenue

15   Service needed to know, how the taxpayer wanted

16   those monies applied.  And that's all we were

17   trying to do.  That's all Principal was trying

18   to do in Exhibit B.

19       Q.    But why would that -- Why would that

20   create a concern of a refund?

21       A.    Because there was no assessment.

22       Q.    So the concern is holding monies

23   without an assessment?

24       A.    Yes.

25       Q.    Do you know if that's possible?

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1    misleading, it's leading, and it's

2    argumentative.

3    **Q.**    When I was questioning you before, what

4    did you say about what you understood Principal

5    wanted with regard to the tax, interest and

6    penalty here?

7                MR. JEFFRESS:  Same objection.

8    **Q.**    You may answer, Jim.

9    **A.**    That the monies be credited to

10    Principal's account per the instructions in this

11    letter.

12    **Q.**    Right.  In other words, that the

13    receipt of money -- if you're going to say

14    payment means the receipt of money, that the

15    receipt of money be applied to the payment of

16    this tax, penalty and interest in this amount?

17                MR. JEFFRESS:  Misquotes the

18    witness, misleading, argumentative.

19    **Q.**    Is that right, Jim?

20    **A.**    That the monies received via wire be

21    credited to the appropriate year in the amounts

22    that are stated in Exhibit C, page 2, in the

23    middle of the page.

24                MR. GRAVES:  All right, then,

25    that's all I have.

jd    (VIDEOTAPED DEPOSITION OF JAMES F. HALE)

1                    C E R T I F I C A T E

2              I, the undersigned, a Certified
Shorthand Reporter and Notary Public of the
3    State of Iowa, do hereby certify that I acted as
the Certified Shorthand Reporter in the
4    foregoing matter at the time and place indicated
herein; that I took in shorthand the proceedings
5    had at said time and place; that said shorthand
notes were reduced to typewriting under my
6    supervision and direction, and that the
foregoing pages are a full and correct
7    transcript of the shorthand notes so taken; that
said transcript was not submitted for review.

8

9              I further certify that I am
neither attorney nor counsel for, or related to
10    or employed by any of the parties in the
foregoing matter, and further that I am not a
11    relative or employee of any attorney or counsel
employed by the parties hereto, or financially
12    interested in the action.

13              IN WITNESS WHEREOF, I have
hereunto set my hand and seal this 18th day of
14    _____March_____, 2009.

15

16    _____
CERTIFIED SHORTHAND REPORTER
17    and NOTARY PUBLIC

18

19

20

21

22

23

24

25

# EXHIBIT A-3

# CERTIFIED COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PRINCIPAL LIFE INSURANCE     :   No. 1:07-cv-00006-FMA
COMPANY AND SUBSIDIARIES, et   :
al.,                             :   **Deposition of:**

       Plaintiff,        :   **TERRI LYNN BASSETT**

vs.                              :

UNITED STATES OF AMERICA,     :

       Defendant.       :

April 15, 2009 - 9:02 a.m.

Location:  IRS Building
301 North Conference Room
105 East 23rd Street
Ogden, Utah   84401

Reporter:  Teri Hansen Cronenwett
Certified Realtime Reporter, Registered Merit Reporter
Notary Public in and for the State of Utah



GARCIA & LOVE
COURT REPORTING AND VIDEOGRAPHY

257 East 200 South • Suite 300 • Salt Lake City, UT 84111 • 801.538.2333 • Fax 801.538.2334

*Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09*

# A P P E A R A N C E S

For the Plaintiff:        Bruce Graves
                          BROWN, WINICK, GRAVES, GROSS,
                          BASKERVILLE and SCHOENEBAUM, PLC
                          666 Grand Avenue, Suite 2000
                          Des Moines, Iowa 50309-2510
                          (515) 242-2400
                          (515) 283-0231
                          graves@brownwinick.com

For the Defendant:        Bart D. Jeffress
                          United States of America
                          U.S. Department of Justice, Tax
                          Division
                          Court of Federal Claims Section
                          555 - 4th Street, N.W.
                          Washington, D.C. 20044
                          (202) 307-6496
                          (202) 514-9440
                          bart.d.jeffress@usdoj.gov

# I N D E X

Witness                                          Page

TERRI LYNN BASSETT

        Examination by Mr. Graves                  4

        Examination by Mr. Jeffress              102

        Further Examination by Mr. Graves        117

# E X H I B I T S

| Number | Description | Page Marked |
| --- | --- | --- |
| 1 | Memo, 4-6-09, Area Counsel to Bassett | 5 |
| 2 | TXMOD year ending 1998 | 27 |

2

*Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09*

| | | |
|---|---|---|
| 3 | DEF PRIN 0000436 | 29 |
| 4 | DEF PRIN 91, etc. | 46 |
| 5 | Transcript of Principal Life, 12-31-95 | 62 |
| 6 | Summary Record of Assessments, 5-27-05 | 63 |
| 7 | Transcript of Principal Life, 12-31-98, '99, '00, '01 | 66 |
| 8 | Case Notes Regarding | 81 |
| 9 | TXMOD year ending 1996 | 86 |
| 10 | Transcript of Principal Life, 12-31-96 | 86 |

3

| | |
|---|---|
| 1 | April 15, 2009                                    9:02 a.m. |
| 2 | **P R O C E E D I N G S** |
| 3 | **TERRI LYNN BASSETT**, |
| 4 | called as a witness at the instance of the plaintiff, having |
| 5 | been first duly sworn, was examined and testified as follows: |
| 6 | **EXAMINATION** |
| 7 | **BY MR. GRAVES:** |
| 8 | **Q.**    Would you state your name for us, please. |
| 9 | **A.**    Terri Lynn Bassett. |
| 10 | **Q.**    And your work address? |
| 11 | **A.**    Well, the address is the Scowcroft Building in |
| 12 | Ogden, Utah.  I'm not sure of the street address. |
| 13 | **Q.**    Is that an Internal Revenue Service building? |
| 14 | **A.**    Yes, it is. |
| 15 | **Q.**    Okay.  And what is your birth date, Ms. Bassett? |
| 16 | **A.**    (Birth date given but redacted.) |
| 17 | **Q.**    Okay. |
| 18 | **MR. JEFFRESS:**  Actually, do you mind if we strike |
| 19 | that from the record and I'll tell you why. |
| 20 | **MR. GRAVES:**  Let's go off the record. |
| 21 | **MR. JEFFRESS:**  All right. |
| 22 | **(Discussion off the record.)** |
| 23 | **MR. GRAVES:**  All right.  Based on the |
| 24 | off-the-record discussion, I would like to direct the court |
| 25 | reporter to redact Ms. Bassett's birth date. |

4

**II 0049**

1    your deposition taken before?

2        **A.**    No.

3        **Q.**    Okay.  Well, it shouldn't be too painful.  I'll

4    just ask you a series of questions, and you will provide the

5    answers, which the court reporter will take down as she has

6    indicated.

7            If I ask you a question and it's unclear to you

8    what I am really inquiring about, what the question is, by

9    all means, ask me to clarify it and because we want to make

10   sure that we have a meeting of the minds on what we're

11   talking about.

12           And if you need a break anywhere along the way, by

13   all means, just let me know, and we'll take a break.  And

14   it's likely probably that I'll need a break before you do,

15   but if you do need one, just let me know.

16           Okay.  Let's start with having you tell us your

17   employment history with the Internal Revenue Service, with

18   location and dates, if you will.

19       **A.**    I started in 1986 in extracting.  By location do

20   you mean physical address of the building?

21       **Q.**    If it's in Ogden --

22       **A.**    Okay.

23       **Q.**    -- it's okay to say just Ogden.

24       **A.**    Ogden.  All of my history is in Ogden.

25       **Q.**    Okay.

                                                        6

*Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09*

1    A.    So I was in extracting for a year and a half.  In

2  August of 1987 I went to collection.  I was there for a year.

3  In 1988 I went to examination.  I was in examination up until

4  1999.  Then I went to accounting.  I was in accounting for

5  two and a half years.  In 2002 I returned to examination, and

6  that is where I currently work.

7    Q.    Okay.  And what is your title today?

8    A.    Lead tax examining technician.

9    Q.    Would you go back for us, and starting with

10  extracting, tell us the functions of those departments that

11  you mentioned and what your duties were in them.

12    A.    In extracting I worked in receipt and control.

13  That is where the mail comes in.  We open and -- we would

14  open and sort the mail.  Those were the basic duties.  Is

15  that enough?

16    Q.    Yes.

17    A.    Okay.  In collections I worked under clerical

18  support for the collection tax examiners in the service

19  center.  In examination I worked in two different areas but

20  basically the same duties.  It was processing cases that had

21  been audited, so the audit was completed, and we would

22  process them and post them to our system.

23         In accounting I worked in nonmaster file.  The

24  duties there were varied.  We dealt with the nonmaster file

25  accounts and the maintenance of those accounts, which ranged

7

II 0051

*Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09*

1  from issuing notices to providing support to the field

2  offices for those nonmaster file accounts.

3       In examination, when I returned, I worked in the

4  TEFRA area for a year as a report writer, and then I was

5  picked up in the processing area which I now work in.

6       Q.  And what are your duties as lead tax -- what is it?

7  Lead tax something?

8       A.  Examining technician.

9       Q.  Examining technician and what are your duties

10  there, please?

11      A.  Again, generally it is processing of cases that

12  have been audited.  It's just in more technical -- dealing

13  with restricted interest.

14      Q.  Have -- do you supervise people?

15      A.  Clarify what you mean by supervise.

16      Q.  Do people report to you?

17      A.  No.

18      Q.  Are you called upon to assist people?

19      A.  Yes.

20      Q.  And explain that a little bit.  In what types of

21  circumstances do you assist people?

22      A.  On a daily basis technical questions are referred

23  to me.

24      Q.  Uh-huh.

25      A.  And as-needed basis, I perform -- it's what we call

8

1   OJI, on-the-job instructing for new hires.

2       Q.   Oh.  Is that a formal course of instruction?

3       A.   It's -- well, they are given a formal course of

4   instruction, and then after they come out of that

5   instruction, they still needs hands-on help.  And I do

6   perform that.

7       Q.   Okay.  Are you a designated assessment officer?

8       A.   No, I am not.

9       Q.   Have you ever been?

10      A.   No.

11      Q.   Okay.  What is the master file?

12      A.   Master file is our computer system that we use to

13  record the information we need to deal with the tax

14  assessments and accounts.

15      Q.   For particular taxpayers or all taxpayers?

16      A.   All taxpayers.

17      Q.   Does each taxpayer have an account in the master

18  file?

19      A.   The accounts in master file are based on filing of

20  tax returns, so if they filed a tax return, then yes, they

21  should have an account.

22      Q.   And what are transaction codes?

23      A.   Transaction codes are given to actions input to the

24  master file to designate what that action is.

25      Q.   By action, do you refer to an event that has been

9

II 0053

Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09

1     Q.    Okay.  Do you know what they do?

2     A.    Not their particulars.

3     Q.    Do they or do they not perform processing functions

4   similar to those performed here by you?

5          MR. JEFFRESS:  Don't speculate, Terri, only if you

6   know.

7     Q.    (By Mr. Graves)  Correct.

8     A.    I wouldn't know that.

9     Q.    Okay.  What would cause a particular revenue

10  agent's case to go for processing in St. Paul or St. Louis

11  versus Ogden?

12    A.    There is a system -- well, I don't know if I would

13  call it a system.  Different field agents or field offices

14  are under different sections of the service centers, and

15  different service centers support the different sections.  So

16  based on what section they were under, then their processing

17  would go to that specific service center.

18    Q.    What would account for a revenue agent or

19  supervisor talking to different processing centers about the

20  same case?

21          All right.  Let me put it another way.  Are you

22  aware of any such instances?

23    A.    I could speculate.

24    Q.    No.  Don't speculate.

25    A.    Yeah, I don't want to.  I don't think I could

                                                              15

1   answer that unless I knew the particulars as to why they

2   were -- they might have been talking to the different service

3   centers.

4        Q.   Okay.  Do those other -- well, strike that.  Are

5   assessments of the tax done here in your examination

6   division?

7        A.   Yes.

8        Q.   Do these other processing centers also do

9   assessments?

10       A.   Yes, they do.

11       Q.   Does the examination division here do computations

12   of underpayment interest?

13       A.   Yes, they do.

14       Q.   Do the other processing centers also?

15       A.   Yes, they do.

16       Q.   Okay.  Do you know what software program is used

17   for interest computations?

18       A.   Are you asking what software program we use?

19       Q.   Yes.

20       A.   The software program that we use is from -- I

21   apologize.  I know the acronym for it is DMI.  I believe the

22   name is Decision Modeling Incorporated.

23       Q.   All right.  And how long have you used that

24   program?  Do you know?

25       A.   I do not know the exact time frame.

16

1  Q.  Do you know whether it was being used in 2004,

2  2005?

3  A.  Yes, it was.

4  Q.  Might the name of the program be Interest Net?

5  A.  Yes.  I believe that is the name of the program.

6  Q.  Okay.  Ms. Bassett, I neglected to ask you about

7  your education history, so would you please give us your

8  education history, going way back and starting with

9  elementary school?

10  A.  Are you asking for places?

11  Q.  Yes.

12  A.  Kindergarten?

13  Q.  Did you go to a number of different elementary

14  schools?

15  A.  I did.  My father was in the military.

16  Q.  I see.  Was there one that you attended for more

17  years than others?

18  A.  Yes, there was.

19  Q.  And where was that?

20  A.  Roy Elementary School in Roy, Utah.

21  Q.  Okay.  And then where did you go to high school?

22  A.  Roy High School.

23  Q.  For your entire high school --

24  A.  Yes.

25  Q.  -- experience?  Okay.  And then any

17

II 0056

1    Q.    Okay.  Are you familiar with the term "hot

2  interest"?

3    A.    Yes, I am.

4    Q.    And what does that refer to?

5    A.    That is the old terminology of what is an increase

6  of 2 percent to the interest rate on corporations.

7    Q.    And when does that kick in?

8    A.    Thirty days after notification.

9    Q.    What kind of notification?

10    A.    It can be either when a 30 day letter, a 90 day

11  letter or a notice of assessment is issued.

12    Q.    Okay.  Now, we talked a little bit ago about the

13  master file and taxpayers accounts as they appear in that

14  master file.  Let's go into that in a little more detail.

15  When a transcript is ordered, is that what the transcript

16  shows; namely, the master file as record of the taxpayer's

17  account?

18    A.    Yes.

19    Q.    And are there different types of transcripts?

20    A.    Yes.

21    Q.    And would you tell me what those might be or what

22  types of different transcripts are you aware of?  Let me help

23  you.  Is the TXMOD or TXMOD-A a specific type of transcript?

24  That's all caps, T-A-X-M-O-D.

25    A.    Actually, it's TXMOD.

20

II 0057

1    Q.    Okay.  Are TXMOD and TXMOD-A the same thing?

2    A.    I am not sure if you can actually use TXMOD without

3    the A.  I am not aware that you can.  I think TXMOD goes

4    along with the A.

5    Q.    All right.  Are you familiar with a type of

6    transcript called MFTRA-C?

7    A.    Yes.

8    Q.    And would you spell that for the court reporter?

9    A.    M-F-T-R-A-C.

10   Q.    And what type of transcript is that?  I mean, well,

11   let me put it another way.  What's the difference between a

12   TXMOD transcript and MFTRA-C transcript?

13   A.    The main difference would be the format of the

14   transcript.  The information should be very similar.

15   Q.    So the information that appears on one should also

16   appear on the other?

17   A.    I have not had experience with MFTRA-C in many,

18   many years, so I am speaking just from memory.

19   Q.    And what is your memory about whether the same

20   entry would appear on both?

21   A.    I believe the MFTRA-C may not have all of the

22   information.  Again, this is just from memory.

23   Q.    When is the last time you saw a MFTRA-C transcript?

24   A.    More than 10 years ago.

25   Q.    I see.  Do you have an understanding as to whether

21

**II 0058**

*Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09*

1  one of those two types of transcripts is more complete than

2  the other?

3        MR. JEFFRESS:  I will object.  Lack of foundation.

4     Q.  (By Mr. Graves)  You may go ahead and answer.

5     A.  TXMOD has all of the information on an account, so

6  in generally speaking, TXMOD would have more information.  If

7  another transcript didn't have all of the information, then

8  yes, TXMOD would have everything.

9     Q.  Okay.  And you indicated earlier there was a

10 difference in formats between the two types of transcripts.

11 Can you explain what the difference in formats is?

12    A.  Just the line-by-line format may not be exactly the

13 same.  You know, say the top line on TXMOD may not match the

14 top line on MFTRA-C.

15    Q.  Okay.  Are those two different types of transcripts

16 produced for different people?  For different functions?  Let

17 me strike that.  Let me ask it another way.

18        Would the examination division and operation that

19 you are familiar with rely more on one of those two types of

20 transcripts than the other or work with one more than the

21 other?

22    A.  Yes.

23    Q.  And which one would that be?

24    A.  We work primarily with TXMOD.

25    Q.  Okay.  Do you know who works with MFTRA-C?

                                                          22

1    A.    I am not aware.

2    Q.    Okay.  Now, you indicated that you worked in

3  accounting for, if my calculation is correct, about three

4  years?

5    A.    Two and a half.

6    Q.    Two and a half.  Okay.  And how does accounting's

7  function differ from examinations?

8    A.    Accounting and examination are different functions.

9  I'm not sure I know exactly what you are asking me.

10    Q.    What does accounting do?

11    A.    Where I worked in accounting in nonmaster file, we

12  processed the assessments and notices from, you know, for

13  nonmaster file.  We -- I guess the duties, okay, in

14  examination would be that you would prepare the documents

15  needed to process.  And in accounting, they received those

16  same documents, and then we process them to the nonmaster

17  file.

18    Q.    I see.  And in examination -- I'm sorry.  Yeah, in

19  examination, where do you receive the documents from?

20    A.    Well, in examination we receive the case files.  Is

21  what what you mean by documents?

22    Q.    Yes.  I thought you referred to documents before,

23  and I am asking what you were referring to.

24    A.    Okay.  Well, the audit is conducted by the

25  examiner, wherever that might be, whether in the field or in

23

II 0060

1   the service center.  That case file is sent to examination to

2   process.  Then examination would then in processing complete

3   documents to finish the processing and pro -- some of those

4   documents possibly could be sent over to accounting for them

5   to process those documents, but I don't mean the whole case

6   file, just the documents that are prepared to process.

7       Q.   Just the appropriate documents that are appropriate

8   to transmit to accounting?

9       A.   Yes.

10      Q.   And then where are the assessments made, in exam or

11  in accounting or both?

12      A.   Both.

13      Q.   Both, okay.  Who -- when a taxpayer sends in money,

14  who deals with the money?  Now, I am not asking here how it's

15  recorded.  I am asking who deals with where it's deposited.

16      A.   I do not know exactly.

17      Q.   Do you -- well, are there different types of

18  accounts that a taxpayer's money sent in might be deposited

19  in?

20      A.   I am not familiar with the -- any accounts other

21  than, I know from working with tax accounts that they show as

22  posted, but --

23      Q.   Okay.

24      A.   -- I'm not aware of how they are deposited.

25      Q.   Okay.  Are you aware of any general accounts versus

                   24

Teri Hansen Cronenwett, CRR, RMR

Garcia & Love Court Reporting & Videography

II 0061

```
 1   suspension accounts?

 2        A.   No.

 3        Q.   So you are not aware or familiar with a taxpayer's

 4   money being deposited to a suspension account?

 5        A.   No.

 6        Q.   Okay.  Do you know who Chris Heth is?

 7        A.   No.

 8        Q.   Okay.  Do you know who Jim Hale is?

 9        A.   No.

10        Q.   Okay.  Do you know who Jim Roosey is, R-O-O-S-E-Y?

11        A.   No.

12        Q.   Okay.  Do you know who Nancy Beatty is?

13        A.   No.

14        Q.   To your knowledge, you have never talked with any

15   of those people?

16        A.   Not to my knowledge.

17        Q.   Okay.  How about Lola Parker?

18        A.   Yes.

19        Q.   Who is Lola Parker?

20        A.   She worked in examination previously.

21        Q.   In 2004, 2005?

22        A.   Yes.

23        Q.   Is she no longer there?

24        A.   No.

25        Q.   Did she work for you?
```

                                                            25

**II 0062**

1  incorrect entries.  Would that be correct?

2     **A.**  Yes.

3     **Q.**  Still on the bottom half of that page, the first

4  entry on that page starts with a transaction code 640 and a

5  date of 1-13-2005.  Do you see that?

6     **A.**  Yes.

7     **Q.**  Okay.  What does that mean?

8     **A.**  What does the whole entry mean?

9     **Q.**  Yes.

10    **A.**  A remittance was received on the date of January

11  13th, 2005.  The transaction code 640 indicates it's for a

12  deficiency.  The designated payment code 12 indicates that it

13  is a deposit, cash bond deposit, and also in the DLN, the

14  document locator number, the 99 in the third section of that

15  number is also an indication of the deposit.

16    **Q.**  What is DLN?  What is the full DLN?

17    **A.**  The DLN starts with 72.

18    **Q.**  The 72319-013-99001-5?

19    **A.**  Correct.

20    **Q.**  And the 99 that appears in that DLN is a reference

21  to blocking series 999?

22    **A.**  99.

23    **Q.**  99.  Is there a difference between 99 and 999?

24    **A.**  No.  Actually, it is -- the blocking series is the

25  990.

                                                        32

1      **Q.**     990?

2      **A.**     Yes.

3      **Q.**     Okay.  And what -- and the 640 as first item in

4    that is a transaction code; is that correct?

5      **A.**     That is correct.

6      **Q.**     And what does that transaction code mean?

7      **A.**     It means that the remittance was for a deficiency

8    that has not posted yet.

9      **Q.**     Okay.  Have you ever seen Principal's letter of

10   that date, January 13, 2005?

11     **A.**     Sorry.

12            **MR. JEFFRESS:**  Are you all right, Terri?

13            **THE WITNESS:**  Swallowed ice.

14            **MR. JEFFRESS:**  Okay.

15     **A.**     Okay.  I apologize.  Could you repeat the question?

16     **Q.**     **(By Mr. Graves)**  Have you ever seen Principal's

17   letter dated January 13, 2005 that -- regarding that amount

18   and that entry?

19     **A.**     Well, possibly.  I did not -- well, I have not

20   recently reviewed any of the letters that were indicated, but

21   I possibly could have seen it previously.

22     **Q.**     I see.  Well, then let's focus on the amount there,

23   $51,121,858.40.

24     **A.**     Okay.

25     **Q.**     Does the minus sign of that mean that that's a

                                                                33

```
 1   credit?
 2        A.    Yes.
 3        Q.    To the account?
 4        A.    Yes.
 5        Q.    Do you know any reason why that amount recorded on
 6   that date does not coincide with the cash bond deposit
 7   designated by Principal?
 8        A.    Yes, I do.
 9        Q.    And what would that be?
10        A.    On the following page, DEF PRIN 439.
11        Q.    Uh-huh.
12        A.    In the top section there is a transaction code 640
13   with an R behind it.
14        Q.    I see it.
15        A.    Okay.  That -- that 640, if you look directly below
16   it, has corresponding 642 transaction code.
17        Q.    I see it.
18        A.    Okay.  So on this account, a portion of that
19   remittance was moved, which is indicated by the transaction
20   642, which you notice does not have a minus sign.  And when
21   master file does -- or when a 642 is input, master file will
22   then take that portion of the original 640 and move it to be
23   next to the corresponding transaction code 642.  You can
24   verify that this 640-R was originally part of that other 640
25   transaction code by the transaction date and the DLN.
```

34

*Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09*

1   **A.**   The last three?

2   **Q.**   Yes.

3   **A.**   Well, generally speaking, a 12 status means the

4   account has been settled, or in this case it appears to be

5   overpaid.

6   **Q.**   And what was the date of that determination?

7   **A.**   There are two separate dates, 12-20-1999 and July

8   4th, 2005.  That's what it appears according to that.

9   **Q.**   I see.  Okay.  And what is the status 21 entry?

10  **A.**   Status 21 would be an assessment was made on that

11  date.

12  **Q.**   All right.  Do you have page 442?

13  **A.**   No.

14  **Q.**   What is your next page?

15  **A.**   444.

16  **Q.**   And what year does that relate to?

17  **A.**   1999.

18  **Q.**   All right.  And if you look down the first half of

19  the page, there's another 640 entry.  Would you explain that

20  entry to us, please.

21  **A.**   The transaction code 640 indicates a remittance for

22  a deficiency was received on the date of January 13th, 2005.

23  The designated payment code indicates it was the cash bond

24  deposit, and again, the blocking in the DLN also indicates

25  the cash bond deposit.

40

1    **Q.**    And if the amount of the cash bond deposit shown

2    there, the 200,609,308.77 is les than the amount of the cash

3    bond designated by the taxpayer, would your answer be much

4    the same as it was in the situation we just talked about with

5    regard to 1998?

6    **A.**    Yes, it would be.

7    **Q.**    Okay.  And I apologize if I asked this before, but

8    do you know whether that 200,609,308.77 was held in any kind

9    of a suspension account?

10    **A.**    No, I do not.

11    **Q.**    Okay.  But again, it shows as a credit balance.  Is

12    that right?

13    **A.**    It shows as a credit posting, yes.

14    **Q.**    Yes.  Credit posting.  Now, going down there's

15    another one of those 560 entries, and I take it, as you

16    indicated before, that indicates a waiver or extension of the

17    assessment statute expiration date?

18    **A.**    Yes, some type of extension.

19    **Q.**    Okay.  Which would have taken it to what date?

20    **A.**    This entry shows May 30th, 2005.

21    **Q.**    Okay.  How would that entry have gotten on there?

22    **A.**    I can't answer that without speculating.

23    **Q.**    I don't want you to speculate.

24    **A.**    Okay.

25    **Q.**    Ms. Bassett, I want to draw a distinction here

41

**II 0062e**

1     **A.**   Yes.

2     **Q.**   And do you know the nature of that assessment, what

3     gives rise to it?

4     **A.**   Generally a TC 308 with the interest computation

5     date indicates a carry-back adjustment.

6     **Q.**   All right.

7          **(Deposition Exhibit No. 4 was marked.)**

8     **Q.**   **(By Mr. Graves)** All right. Ms. Bassett, I believe

9     the court reporter has just handed you Exhibit 4. What is

10    the first page that you have of Exhibit 4?

11    **A.**   DEF PRIN 91.

12    **Q.**   Okay. And this is a Form 2859. Are you familiar

13    with this form?

14    **A.**   Yes.

15    **Q.**   Where is this form generated? Where is it filled

16    out?

17    **A.**   In processing.

18    **Q.**   In your operation?

19    **A.**   Yes.

20    **Q.**   And again, just pursuing Mr. Jeffress's last point,

21    you had no involvement with these 2859s at the time of

22    Principal's case in 2004, 2005?

23    **A.**   That is correct.

24    **Q.**   Okay. Now, please turn to DEF PRIN 93. Are you

25    there?

46

**II 0063**

1    A.    Yes.

2    Q.    All right.  Do you see that same number of

3    40,294,059 appearing there on Line 12?

4    A.    Yes.

5    Q.    That being the same number that appears in DEF PRIN

6    444 under the 308 transaction code?

7    A.    Yes.

8    Q.    And is DEF PRIN 93 telling us that that's the

9    portion of the assessment for that year that is attributable

10   to an adjustment to an NOL carry-back?

11   A.    Yes.

12   Q.    And what are the numbers up above then on the -- on

13   DEF PRIN 93?

14   A.    In the same section?

15   Q.    Yes.

16   A.    It shows a transaction code 300 with a money

17   amount.

18   Q.    Do you see that same amount on DEF PRIN 444?

19   A.    Yes, I do.

20   Q.    And transaction code?

21   A.    Yes.

22   Q.    And what would that be -- what would that relate

23   to?

24   A.    That would be a tax assessment.  We refer to those

25   as general adjustments, as opposed to carry-back adjustments.

47

II 0064

1      Q.    And would it be fair to say that that's the amount

2    of the tax attributable to the noncarry-back issues in this

3    taxable year?

4      A.    Yes.

5      Q.    And then what is the next item, 10,848,700?

6      A.    That shows the reference code 680 for that money

7    amount.

8      Q.    Yes.

9      A.    Which corresponds on DEF PRIN 444 as a transaction

10   code 240.

11     Q.    Yes.

12     A.    For that same amount with penalty code 680.

13     Q.    Yes.  And that means it's a penalty assessment?

14     A.    Yes.

15     Q.    Okay.  Sticking with DEF PRIN 444 for a minute,

16   under that transaction code 300, do you see the line that

17   begins or the entry that begins with 870?

18     A.    Yes.

19     Q.    It appears to me to indicate 870, date of January

20   13, 2005.  Is that what that indicates?

21     A.    Yes.

22     Q.    And would that signify that an 870 was signed on

23   that date?

24     A.    If an 870 waiver date is signed, that is the place

25   that that information would appear.

48

**II 0065**

*Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09*

1    Q.    Okay.  Is -- well, is that, is the -- is DEF PRIN

2   444 the result of what was entered on DEF PRIN 93?

3    A.    Yes.

4    Q.    Okay.  And on DEF PRIN 93, therefore, someone

5   entered 870 agreement date, TC 300 only.  01-13-2005.  Do you

6   see that?

7    A.    Yes.

8    Q.    So that's why DEF PRIN 444 would show that?

9    A.    Yes.

10    Q.    And would that have been Lola Parker?

11    A.    I don't know.

12    Q.    Well, let me ask it another way.  Does Lola

13   Parker's name there over on the right side -- I take it L.

14   Parker is Lola Parker.

15    A.    Yes.

16    Q.    Does that mean that she prepared this form?

17    A.    Yes.  That does mean she prepared this form.

18    Q.    Okay.  And I -- this form, is it correct that the

19   date in the upper right-hand corner of 5-26-2005 means that's

20   the date she prepared it?

21    A.    Yes.

22    Q.    And do you see just under that, it means agreed.

23   What does that refer to?

24    A.    Just that Lola, when she completed the form, she

25   checked the box saying that it was an agreed case.

49

II 0066

1    Q.    Okay.  And back over on the other side, on the left

2    side of that form, DEF PRIN 93, just under the 870 agreement

3    date there is a 23-C date, and tell me what that box refers

4    to and what it means.

5    A.    When Form 2859 is completed and we require the

6    assessment to be made very quickly, we designate in that box

7    a specific 23-C date that we need the assessment to be made

8    on.

9    Q.    And so that indicates that she wanted the

10   assessment made on 5-27-2005?

11   A.    Yes.

12   Q.    And this relates, as the next line shows, to the

13   taxable year ending December 1999?

14   A.    Yes.

15   Q.    All right.  And if you look way down at the bottom

16   right, it says, "Manual assessment.  Do not send notice."

17   Tell me what that means.  First of all, what does manual

18   assessment mean?  As opposed to what?  An automatic

19   assessment?

20   A.    A manual assessment, as opposed to an assessment

21   that we would input directly to the computer system.

22   Q.    Isn't this being input to the computer system?

23   A.    This form is actually sent to revenue accounting,

24   who then inputs it through their system, which then inputs it

25   to the master file system.  But if we do not require a manual

50

II 0067

1    assessment, we can input the assessment directly into our

2    computer without having to fill out this form.

3         Q.    When is a manual assessment required, and when is

4    it not?

5         A.    The majority of manual assessments are done because

6    of statute-imminent cases.

7         Q.    Statute of limitations?

8         A.    Yes.

9         Q.    Being imminent?

10        A.    To be able to input to our computer, we have to

11    have more than 60 days.

12        Q.    For automatic input?

13        A.    Yes.

14        Q.    So this refers to some need for hurrying it along?

15        A.    Uh-huh.

16        Q.    Is that a yes?

17        A.    Sorry.

18        Q.    Now, what does that mean to, do not send notice?

19        A.    I do not know.

20        Q.    Okay.  Now, Ms. Bassett, flip back, if you will, to

21    DEF PRIN 91.

22        A.    Okay.

23        Q.    Would the same things that you testified to with

24    regard to DEF PRIN 93 apply in general to DEF PRIN 91; that

25    is, it was filled out by Lola Parker on May 26, 2005, that

51

**II 0068**

1        (Recess from 10:49 to 10:59 a.m.)

2      Q.   (By Mr. Graves) All right.  Let's go back on the

3    record.  Ms. Bassett, you will see that following those Forms

4    2859 there are some other forms that called 3552-C, I

5    believe, and they appear at DEF PRIN 92 and 96.  Would you

6    tell us about those forms, please; what they are, what their

7    purpose is, who prepares them.

8      A.   This is a form that is generated in accounting,

9    revenue accounting, based on the processing of the Form 2859.

10     Q.   So that's why its date would be 527 on the upper

11   right-hand corner?

12     A.   Yes.

13     Q.   Okay.  And it shows in the assessment date of

14   5-27-2005?

15     A.   Yes.

16     Q.   It also shows an 870 agreement date, does it?

17     A.   Yes.

18     Q.   And had an interest compensation date?

19     A.   Yes.

20     Q.   What -- down in the bottom right-hand corner it

21   says transfer balance.  What does that mean?

22     A.   I am not sure of the terminology, transfer balance,

23   but the amount is the amount from the 2859 that was indicated

24   as payments on the tax module.  Line 23.

25     Q.   So those are showing as payments as of that date.

53

II 0069

1  **MR. GRAVES:** Well, may I see your Exhibit 5?

2  **(Deposition Exhibit No. 6 was marked.)**

3  Q.  (By Mr. Graves) Ms. Bassett, I apologize for the

4  little mix-up in the exhibits, but I'm going to hand you what

5  has now been marked as Exhibit 6, which is the exhibit that I

6  wanted to refer to.  And I notice that this one was produced,

7  according to DEF PRIN 227, here.  Is that correct?  It was

8  certified here?

9  A.  Yes.  That is correct.

10  Q.  And who is Cecilia Hillman?

11  A.  According to this, she's a supervisor accounting

12  technician.

13  Q.  And do you know her?

14  A.  No, I do not.

15  Q.  And what does that mean, do you know there, Ogden

16  W&I submission processing?

17  A.  Ogden wage and investment submission processing.

18  Q.  Turning then to page DEF PRIN 228, is that what

19  follows next?

20  A.  Yes.

21  Q.  Are you familiar with this form?

22  A.  Yes.

23  Q.  What is this form and what's it used for?

24  A.  From my understanding, this form is used to

25  document assessments made on a specific date, and they are

63

II 0070

1    recorded and authorized by the designated assessment officer.

2        **Q.**    Can we tell from this exhibit or from any of the

3    exhibits that we have looked at this morning who the

4    designated assessment officer was on these with regard to

5    Principal?

6        **A.**    On page or DEF PRIN 229, it shows it being signed

7    by the assessment officer.

8        **Q.**    Do you know Christine Stromberg?

9        **A.**    I do.

10        **Q.**    Is she in your department?

11        **A.**    No, she is not.

12        **Q.**    Where is she?

13        **A.**    She is in accounting.

14        **Q.**    And would that be the same as revenue accounting?

15        **A.**    Yes.

16        **Q.**    Okay.  And up in the left-hand corner it refers to

17    RACS report 6.  Is this the same as or a successor to a 23-C?

18        **A.**    I believe, yes, that's what the report was called

19    previously was the 23-C.

20        **Q.**    In other words, a 23-C would be prepared and would

21    generate an assessment, and now a RAC 6 is doing the same

22    thing.  Is that right?

23        **A.**    Yes.  It was the report that was the same as this.

24    It was just done without use of the RACS system.

25        **Q.**    Yes.  And RAC -- I knew at one time, but what does

                   64

**II 0071**

1  RAC stand for?

2      **A.**    Revenue accounting control system.

3      **Q.**    Okay.  And revenue accounting would have done both

4  the 23-Cs and the RAC 6s?

5      **A.**    Correct.

6      **Q.**    Anyone else?

7      **A.**    Not that I'm aware of.

8      **Q.**    Okay.  Now, looking at DEF PRIN 228, it's called a

9  summary record of assessments.

10     **A.**    Yes.

11     **Q.**    What does that mean, summary?  What's this

12  summarizing?

13     **A.**    This report does not break out the assessments

14  based on specific taxpayers or entities.  It's a summary of

15  all of the assessments made for different types of tax.

16     **Q.**    So the redacted portions on this form could relate

17  to other taxpayers?

18     **A.**    Yes.

19     **Q.**    Is it likely that that's what those redacted

20  portions related to?

21     **A.**    Yes.

22     **Q.**    So in summary record, do you know whether or not

23  it's supposed to indicate all the assessments made by revenue

24  accounting that day?

25     **A.**    Yes, that's what it's supposed to tell us.

65

II 0072

1    Q.    Okay.  Do you know whether or not the amount that

2    appears there on the corporation line in the bottom half of

3    the page all relates to Principal?

4    A.    I believe it does.

5    Q.    Okay.  Looking at DEF PRIN 230, can you tell me

6    whose initials those are in the right-hand side of the page?

7    A.    I do not know.

8    Q.    Okay.  All right.  I am going to go back to Exhibit

9    5.  Now, I notice that DEF PRIN 0001 was certified as a

10   certification that came out of Kansas City.  Is there a

11   processing center in Kansas City?

12   A.    Yes.

13   Q.    And looking at DEF PRIN 2 -- well, let's pause for

14   a minute and hand you the next exhibit as well.

15            **(Deposition Exhibit No. 7 was marked.)**

16   Q.    **(By Mr. Graves)**  Browsing through Exhibits 5 and 7,

17   Ms. Bassett, do you recognize this form?

18   A.    Yes.

19   Q.    And what is this form?

20   A.    Form 4340.

21   Q.    And what's the function or purpose of Form 4340?

22   A.    It is also a transcript of the accounts.

23   Q.    So it's a different type of transcript than the

24   TXMOD or the MFTRA-C that we've talked about before?

25   A.    Correct.

66

II 0073

*Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09*

1    context synonymous with a 90 day letter?  Is that what it

2    means?

3         A.   No.  It is their first notice of assessment.

4         Q.   I see.  Meaning that looking at the 4340, that --

5    would you interpret that to mean that on 5-27-2005 the first

6    notice of their assessment was sent to Principal?

7         A.   Yes.

8         Q.   Okay.  Now, let's go to the year 2000 and to page

9    DEF PRIN 67.

10        A.   Okay.

11        Q.   And compare the TXMOD for 2000, if we can.  So the

12   Form 4340 at DEF PRIN 67 where it is showing, in the middle

13   of the page, January 13, 2005, advanced payment of deficiency

14   cash bond credit for 153,300,000 is the same entry that

15   appears on DEF PRIN 451 in the middle of the bottom section

16   with transaction code 640.  Would that be right?

17        A.   Yes.

18        Q.   And if you look at the next page, those quick

19   assessments there, would it be your conclusion that those

20   amounts, as with the prior year, reflected the breakdown

21   between the portion of the assessment attributable to the

22   adjustment to the NOL carry-back and the portion attributable

23   to the year 2000?  Do you see where I am referring to, DEF

24   PRIN 68?

25        A.   Yes.

74

1    Q.    Do you want to look at the 859 in that regard you?

2  This would be DEF PRIN 98.

3    A.    And 97?

4    Q.    And 97, right.

5    A.    Yes.   They do.

6    Q.    Okay.  Now, down at the bottom of DEF PRIN 68, the

7  4340 there is again one of those entries on 8-11-2005,

8  advanced payment of deficiency cash bond credit, followed

9  immediately by an interest assessed entry.

10   A.    Yes.

11   Q.    I take it that's similar to the situation you just

12 described before with regard to 1999, as far as what the

13 TXMOD shows?

14   A.    Yes.

15   Q.    Okay.  Now, if you go to DEF PRIN 69, I see three

16 entries dated 1-13-2005, 1-13-2005, 1-13-2005 relating to

17 different taxable years, 1999, 1997, 1998.  Do you see that?

18   A.    Yes.

19   Q.    But there's no cash bond credit on these?

20   A.    Right.

21   Q.    So what's happening here?

22   A.    Those remittances were transferred into this 2000

23 tax year from those other tax years.

24   Q.    And recorded as a payment as of January 13, 2005?

25   A.    Correct.

75

*Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09*

1    assessment statute expiration date.  So any time a new 560

2    would go on, then that would show an R on the original 560,

3    and I believe there was another one.

4        Q.   At the bottom of page 453.

5        A.   Yes.  I just found it, too.  So even though it

6    shows the same statute expiration date, just the fact that

7    another one was input places that R on the first one.

8        Q.   Okay.  So do I understand you correctly that page

9    DEF PRIN 453 is indicating that the statute of limitations

10   was extended to 5-30-05 and that is what accounts for the

11   entry on DEF PRIN 67, or on the 4340, DEF PRIN 67?

12       A.   Yes.

13            **MR. JEFFRESS:**  I think that's misleading.

14       A.   Okay.  Well, maybe restate the question.

15       Q.   **(By Mr. Graves)**  From the tax module --

16       A.   Uh-huh.

17       Q.   -- tell me whether someone like yourself reading

18   the tax module could tell whether the statute of limitations

19   had been extended to 5-30-2005 or not, and I mean, and

20   whether that remained in effect as opposed to being canceled

21   out.

22       A.   Well, the 560 is generally just indicating that

23   there was an entry made for a statute extension.  It doesn't

24   verify that particular date as a valid statute extension.

25       Q.   No, but looking at the TXMOD, would you conclude

                                                          78

1   that there was in effect, as of the date this TXMOD was

2   produced, an extension to 5-30-2005, or that that had been

3   canceled out?

4          **MR. JEFFRESS:**  Well, objection, misleading.

5      **Q.**   **(By Mr. Graves)** What would you conclude from

6   looking at that TXMOD?

7      **A.**   Which DEF PRIN number?

8      **Q.**   453 and 451, the 560 entries.

9      **A.**   I would say that this original 560 at the time was

10  input by someone, and to say that it's a valid extension, you

11  would -- you would have to verify that.  But the indication

12  of the R is that later on there has been other -- an update

13  to the assessment statute expiration date.

14          And the same would be applicable for the additional

15  560.  You know, at that time that that 560 was input, someone

16  has said there is some kind of statute extension.  But you

17  would still have to verify that before you could act on that

18  information.

19     **Q.**   Looking at the 4340 then.

20     **A.**   Yes.

21     **Q.**   In the context of the TXMOD, can you tell me why

22  the 4340 shows that the statute of limitations was extended

23  to 5-30-2005 as of the date of this transcript in 2007?

24     **A.**   Which page on the Form 4340?

25     **Q.**   67.

                                                                79

**II 0077**

1    **A.**    That entry there for the assessment statute is just

2    an indication that on the date of 4-15-05 that entry was

3    made, but for a full picture, you would have to read into the

4    whole account transcript to see if there were any other

5    entries made.  And again, they would still have to be

6    verified.

7    **Q.**    So are you saying the 4340 may not tell the whole

8    picture?

9    **A.**    Well, just the fact that an entry was made for a

10   statute extension at that time -- statute extensions can be

11   varied as to what they cover, for instance, and so it's just

12   common that you would verify that.  You couldn't just assume.

13   **Q.**    Sitting here today, Ms. Bassett, looking at that

14   entry on the 4340, can you tell whether the statute was

15   actually extended to that date or not?

16   **A.**    No.

17   **Q.**    Would the same be true with regard to the entry

18   that appears at the bottom of DEF PRIN 71?

19   **A.**    Yes.  That would be true.

20   **Q.**    How about DEF PRIN 57?

21   **A.**    Yes.

22   **Q.**    Same?

23   **A.**    Yes.

24   **Q.**    Same.  All right.  When we first started today, you

25   referred to a note from someone.  Did that note regard this

80

**II 0078**

1   matter?

2       **A.**   Not in regards to the statute extension to 5-30 of

3   '05.

4       **Q.**   Okay.

5       **A.**   Well, in a way it did, because it said that was the

6   correct statute for the years that had been incorrectly

7   extended to 4-18-2008, I think, something like that.

8               **MR. GRAVES:**   Bart, did you say you have that note?

9               **MR. JEFFRESS:**   Oh, Terri, you have a copy, right?

10              **THE WITNESS:**   I do.

11              **MR. GRAVES:**   If we took a break, she could get it?

12  Okay.  Can we do that?

13              **MR. JEFFRESS:**   Yeah.  Sure.

14              **MR. GRAVES:**   Let's do that.  Off the record.

15              (Lunch Recess from 12:27 p.m. to 1:03 p.m.)

16              (Deposition Exhibit No. 8 was marked.)

17      **Q.**   (By Mr. Graves)  All right.  Going back on the

18  record after our break, I believe we were talking about the

19  certain entries in the 4340 and attempting to trace them back

20  to the TXMODs regarding the extension of the statute of

21  limitations.  Ms. Bassett, you have provided us with a

22  document, and we have labeled it Exhibit 8.  And I believe

23  you now have it before you; is that correct?

24      **A.**   Yes.

25      **Q.**   Do -- what is your understanding about where this

                                                        81

1    document came from?

2        **A.**    The document was located in the case file.

3        **Q.**    Here in Ogden?

4        **A.**    When the case file was originally here in Ogden, at

5    the time of these assessments, then, yes.  The case file was

6    in Ogden.

7        **Q.**    By case file, you are referring to the box of

8    materials that get transmitted from the field to the

9    processing center?

10       **A.**    Generally that's how the case files are sent from

11   the field, and generally, yes, they do have boxes.

12       **Q.**    So do I understand that what you are saying is that

13   that's the type of case file in which this was found?

14       **A.**    Yes.

15       **Q.**    Do you know who found it?

16       **A.**    I do not recall.

17       **Q.**    Okay.  Do you know who authored the note?

18       **A.**    There's not really any indication of the author on

19   this note.

20       **Q.**    But you have no knowledge otherwise?

21       **A.**    No.

22       **Q.**    Okay.  Exhibit 8 has a section that appears in the

23   middle of the page, starts in the middle of the page under

24   the designation 5-25-05.  Is this the note that you were

25   referring to earlier with regard to extension of the statute

                                                        82

1    of limitations?

2        A.    Yes.

3            MR. GRAVES:  Off the record a minute.

4            (Discussion off the record.)

5        Q.    (By Mr. Graves)  During the off-the-record

6    discussion, Ms. Bassett, we zeroed in on a couple of pages of

7    the 4340 that have entries referring to extensions of the

8    statute of limitations.  And I am looking at DEF PRIN 49, 57,

9    and 67.  Can you get those before you, please.

10       A.    Okay.

11       Q.    I see four different entries on the 4340 that refer

12   to extension of the statute of limitations.  First one on DEF

13   PRIN 49.  Next one on DEF PRIN 56.

14       A.    56?

15       Q.    Yes, and also on 57.

16       A.    Okay.

17       Q.    And then also on 67.

18       A.    Okay.

19       Q.    The note only refers to the statute of limitations

20   expiration date as of -- the assessment statute expiration

21   date being 5-30-05; isn't that right?  I mean, I guess my

22   question is, does the -- does the note that you referred to

23   relate to any of these entries other than the ones on 57 and

24   67?

25       A.    Well, in the middle of the note it refers to the

                                                              83

1   statute date of 4-14 of 2008, which is indicated in DEF PRIN

2   49.

3       Q.   Yes.  Is the note -- well, let me ask it this way.

4   What does -- you know what that sentence means, the next

5   sentence?  It says, "However, further review indicated that

6   these involved carry-back and enlisted the ASED BB.  What is

7   BB?

8       A.   Excuse me.  The code BB indicates a carry-back.

9   It's just something they would use in the statute stating

10  that there's also carry-back issues that would affect the

11  statute.

12      Q.   Then the next sentence said, this, and I refer --

13  and I assume the "this" means that it's referring to the

14  further review.  And what the further review showed would

15  indicate that the carry-back years of '96, '97 and '98 would

16  carry the loss year statute of 5-30-05.  Does that mean to

17  you that the entry showing the statute of limitations date as

18  expiring in '08 was in error?

19      A.   Yes.

20      Q.   And so is then the purpose of the note, as you

21  understand it, to correct it by getting the statute of

22  limitations expiration date back to 5-30-05?

23      A.   Yes.

24      Q.   And in your view, is that the reason for the

25  entries on DEF PRIN 57 and 67?

84

II 0082

1       **MR. JEFFRESS:** Eight.

2       **Q.** **(By Mr. Graves)** -- 8 refers to?

3       **A.** Yes.

4       **Q.** Okay. Does -- do the -- does the 4340 show the

5    correction of that statute of limitations expiration date

6    that is referred to in the second paragraph of Exhibit 8?

7       **A.** Yes.

8       **Q.** Could you give me the pages where that correction

9    appears?

10      **A.** DEF PRIN 27, 41, and 50.

11      **Q.** And how does -- what is the nature of the entry

12   where it appears?

13      **A.** The entry is listed under a transaction code that

14   is an additional tax assessed by examination.

15      **Q.** In each case?

16      **A.** In the first one. In the second two, it is in

17   relation to what is listed as a prior tax abated by

18   examination.

19      **Q.** May I see those? You are referring to where those

20   entries say ASED 2005-05-30?

21      **A.** Yes.

22      **Q.** Okay. Now, going back to pages 57 and 67 and those

23   entries regarding the assessment statute expiration date

24   extended to 5-30-2005, what in your view would be the source

25   of those entries?

87

*Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09*

1    MR. JEFFRESS:  What exhibit are you on, Bruce?

2    MR. GRAVES:  The 4340.

3    MR. JEFFRESS:  Seven?

4    THE WITNESS:  They're also included in seven.

5    MR. JEFFRESS:  Okay, okay.

6    THE WITNESS:  Page 57 and 67.

7    MR. GRAVES:  57 and 67.

8    MR. JEFFRESS:  Okay.

9    A.    Well, I previously said that transaction 560 is

10   used for, if there's been a statute extension.

11   Q.    (By Mr. Graves)  And did we determine previously

12   that 560 shows up in the TXMODs for these two years, '99 and

13   2000, that would account for those two entries?

14   A.    I'm sorry.  Could you repeat the first part of

15   that?

16   Q.    Are those entries in -- on DEF PRIN 57 and DEF PRIN

17   67 regarding the assessment statute expiration date extended

18   to 5-30-2005, are those borne out by a transaction code 560

19   to that effect in the TXMODs?

20   A.    Yes.

21   Q.    I apologize if we've been over this, but could you

22   show me where that is in the TXMODs?

23   A.    Oh, DEF PRIN 444 in Exhibit 2.

24   Q.    Just above the middle of the page?

25   A.    Yes.  And DEF PRIN 451 in the bottom portion.

88

II 0084

*Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09*

1    Q.   And would it be fair to say, Ms. Bassett, in your

2    view that those entries are not due to any Form 872 or

3    extension of the statute by the taxpayer, but rather due to

4    the correction that the note refers to, Exhibit 8, the

5    correction made by Jim -- suggested by Jim Hale?  Or can you

6    tell?

7    A.   I would have to say no, that it is not due to the

8    correction listed in this note because of the time frame of

9    when those 560s were entered and the date on the note.

10   Q.   When were those 560s entered?

11   A.   The 560 on DEF PRIN 44 was entered 4-15-2005.

12   Q.   Yes.

13   A.   And the same date is on the DEF PRIN 451 for that

14   560.

15   Q.   Can you say, then, what gave rise to the 560?

16   A.   From the information I have from the note and the

17   information on the TXMOD, no, I can't really say what that

18   560 was coming from.

19   Q.   Going back to 1998, if the extension of the statute

20   of limitations for that year was due to the loss carry-back

21   as suggested by Jim Hale, that wouldn't apply to

22   noncarry-back issues in 1998, would it?

23        MR. JEFFRESS:  Objection, that's vague.

24   Q.   (By Mr. Graves) Well, let's go to the 2859 for

25   1998.  Do you have that, DEF PRIN 91?

89

1    A.    Yes.

2    Q.    Can we tell from that form whether that 38,337,779

3    is all net operating loss, is all attributable to a net

4    operating loss or not?

5    A.    Yes.

6    Q.    Yes, we can tell?

7    A.    Yes, we can tell.

8    Q.    And what can we tell?

9    A.    The entry was made with a transaction code 308, and

10    the interest computation date was entered there above it.

11    Q.    And 308 is the net operating loss -- or the loss

12    carry-back transaction code?

13    A.    It is the transaction code that would carry an

14    interest computation date, and yes, generally that implies

15    the carry-back.

16    Q.    Okay.  Okay.  Now, transaction code 680, I think

17    you indicated, referred to a designated interest payment.

18    A.    Yes.

19    Q.    And what is 690?

20    A.    It is a designated penalty payment.

21    Q.    And what does the term "designated" in each of

22    those mean?  Who does the designating?

23    A.    The taxpayer.

24    Q.    Okay.  And under your practices and procedures here

25    and in your experience, what constitutes an effective

90

II 0086

1  designation by the taxpayer that it wants a particular amount

2  applied to interest or penalty?  How does a taxpayer go about

3  making such a designation?

4      **A.**    When a remittance is originally submitted, they

5  will make that designation at that time.

6      **Q.**    And how do they do it?  I mean, is it by phone, by

7  letter, by fax, by smoke signal?

8      **A.**    In my experience, it is in writing with a letter

9  submitted at the time of the remittance also submitted.

10      **Q.**    Okay.  Are there any formal requirements for such a

11  designation in terms of what it has to contain before it will

12  be recognized as an effective designation?

13      **MR. JEFFRESS:**  At this point actually, I'm -- I

14  don't think she can really answer that.  I think this is

15  getting into an area that's beyond the testimonial

16  authorization.

17      **MR. GRAVES:**  I don't think so because we're talking

18  about transaction code 680 and 690, designated interest

19  payment and designated penalty payment and what the

20  procedures of this office are with regard to them.

21      **MR. JEFFRESS:**  You are talking about what the

22  taxpayer has to do to require the IRS to take some kind of

23  action, and in the context of this case it's related to the

24  letter, and it's explicitly excluded from the authorization.

25      **MR. GRAVES:**  I am asking under the procedures of

91

**II 0087**

1    other taxpayers.  I wouldn't object to a general question

2    about, does she have experience in the area of posting

3    deposits as payments.  But the way you phrase the question I

4    think could call for information about other taxpayers.

5        **Q.    (By Mr. Graves)** Do you have any experience in

6    applying cash bonds to payment of tax, penalty or interest?

7        **A.**    No.

8        **Q.**    Has it ever been done in this office to your

9    knowledge?

10        **A.**    I don't know.

11        **Q.**    In this office do you act on instructions from

12    taxpayers from time to time?

13            **MR. JEFFRESS:**  Objection, vague.  You can answer.

14        **A.**    Yes.

15        **Q.    (By Mr. Graves)**  I saw a sign posted outside that

16    said, "Quiet, representatives on the been to taxpayers," so I

17    take it from time to time you talk to taxpayers on the phone.

18    Is that right?

19        **A.**    Yes.

20        **Q.**    About what types of matters?

21            **MR. JEFFRESS:**  You can answer that to the extent it

22    doesn't divulge any information protected by Section 6103.

23    If you have to divulge any 6103 information, you cannot

24    answer that question.

25        **Q.    (By Mr. Graves)** Do you want me to ask the question

95

II 0088

1   again?

2       **A.**   Yes, please.

3       **Q.**   What types of matters do you talk to taxpayers

4   about?

5       **A.**   For the most part, my duties are more involved with

6   interest computations, and generally those are the types of

7   questions that I am involved with.

8       **Q.**   Talking about interest calculations?

9       **A.**   Yes.

10      **Q.**   I imagine that from time to time taxpayers have

11   different calculation of interest than your calculations.

12   Would that be fair to assume?

13      **A.**   Yes.

14      **Q.**   And that you try to resolve that then over the

15   phone?

16      **A.**   To some extent.

17      **Q.**   All right.  Do you ever call the taxpayer for that

18   purpose?

19      **A.**   No.

20      **Q.**   Okay.  So if you have questions about the case,

21   would you go back to the field office or local agent to

22   resolve those or as opposed to going to the taxpayer?

23      **A.**   That is an option.

24      **Q.**   What other options are there when you have

25   questions about how to handle a matter or need more

96

II 0089

1  information?

2     **A.**  Research or we could seek advice from our local

3  interest offices.

4     **Q.**  Okay.  And do you sometimes do research into the

5  Internal Revenue Manual or the Rev Procs?

6     **A.**  Yes.

7     **Q.**  How often would you say that occurs?

8     **A.**  That's really hard to say on a general basis how

9  often that occurs.  It's on a case-by-case scenario.

10     **Q.**  Once a month?  Once every six months?  Once a week?

11     **A.**  If I had to say, probably once a week.

12     **Q.**  Okay.  Are you aware of any circumstances when the

13  master file will just go ahead and automatically kick out a

14  refund?

15     **A.**  Yes.

16     **Q.**  What types of circumstances are those?

17     **A.**  If a transaction code 670 is posted to an account

18  without a hold on it, which would be a transaction code 570,

19  if the amount of the remittance -- if the amount of the

20  remittance was a smaller amount than a master file could

21  possibly turn around and issue and generate a refund.

22     **Q.**  What is transaction code 670?

23     **A.**  It is a payment.

24     **Q.**  And how is it distinguished from 640?

25     **A.**  640 is a designated payment of deficiency, and a

97

**II 0090**

1    670 is just a payment.

2        **Q.**    An undesignated payment?

3        **A.**    Yes.

4        **Q.**    Have you ever experienced a situation where the

5    master file kicked out a refund because it thought a

6    particular remittance was a duplicate payment?

7        **A.**    Have I had the experience?

8        **Q.**    Do you know of an experience?

9        **A.**    No.

10       **Q.**    All right.  We're about done.  Can you tell,

11   Ms. Bassett, from looking at the 4340s or the TXMODs or any

12   of the forms we've talked about, whether or not Principal was

13   ever charged any hot interest?

14       **A.**    No.  I could not be able to tell you that.

15       **Q.**    Do you see any hot interest anywhere in the TXMODs?

16       **MR. JEFFRESS:**  For the record, what is the witness

17   looking at?  Exhibit 9.

18       **Q.**    **(By Mr. Graves)** Let me ask this while you're

19   looking.  How would it appear?

20       **A.**    An indication of the 2 percent interest would be

21   located on the first page of TXMOD.

22       **Q.**    I see.  And did you see any on the first pages of

23   any of those TXMODs?

24       **A.**    In Exhibit 9 there is one indicator on DEF PRIN

25   426.

                                                              98

1    A.    Because I have nine also.

2    Q.    I just want to follow up on that last question

3    about what do the transcripts reflect in terms of date of

4    payment, and let's just look at DEF PRIN 438.  And that's in

5    Exhibit 2.

6    A.    Okay.

7    Q.    We'll wait for counsel to get it.

8          MR. GRAVES:  438?

9          MR. JEFFRESS:  Yeah.

10         MR. GRAVES:  Of Exhibit 2.  Uh-huh.  I have it.

11         MR. JEFFRESS:  Ready?

12         MR. GRAVES:  Yes.

13   Q.    **(By Mr. Jeffress)** Okay.  So Ms. Bassett, there, I

14   believe you testified earlier about the 640 code.  Do you

15   recall that?

16   A.    Yes.

17   Q.    And here I am looking at the one that has

18   approximately 51 million next to it.  Do you see that?

19   A.    Yes.

20   Q.    And if I recall, you said this was a deposit?

21   A.    Yes.

22   Q.    So it's not -- this is not a payment then?

23         MR. GRAVES:  Objection, leading.

24   Q.    **(By Mr. Jeffress)** You can answer.

25   A.    The transaction code 640 with the designated

103

II 0092

```
 1   payment code 12 is cash bond deposit.
 2        Q.   And what does this transcript then reflect as to
 3   when that posted deposit became a payment?
 4        A.   The assessment of tax was dated 5-27-05, and that's
 5   when the deposit would have paid that tax.
 6        Q.   All right.  Earlier I thought you said that when
 7   looking at the transcripts, you thought January 13 might
 8   reflect the payment.  Did you misspeak?
 9        A.   The deposit -- I'm sorry.
10        Q.   Take your time.
11        A.   Okay.  We are looking at a deposit that was, the
12   deposit has been received on January 13th, 2005.  That is the
13   date that it was received.  At the time we received it, we
14   have designated it as deposit as of that date to pay a
15   determined -- or a deficiency, which is then later posted.
16        Q.   When is the deficiency later posted?
17        A.   The deficiency is posted on May 27th, 2005.
18        Q.   And that's when the deposit is used to pay the
19   deficiency.  Is that what you said before?
20             MR. GRAVES:  I'll just enter an objection as
21   leading.
22        Q.   (By Mr. Jeffress)  Let me rephrase that.  Does --
23   how would you determine, from looking at this transcript
24   here -- this is page 438 -- when that deposit was used to pay
25   the tax or pay anything for that matter?
```

104

**II 0093**

1      A.    Well, the payment is just -- once the -- can I

2    start over again?  Once the remittance comes in and it is

3    designated here as a 640 with designated payment code 12 as a

4    deposit, it will stay there just as that, what it is, a

5    deposit, until the fact that we finally make the assessment

6    of the deficiency.  So then, you know, at that time then we

7    would apply that payment towards that deficiency.

8      Q.    And when did that occur here?  Can you tell?

9      A.    On May 27th, 2005.

10     Q.    Let me point you to Exhibit 4, and keep that page

11   open on Exhibit 2.  Do you recall answering some questions

12   about Exhibit 4?

13     A.    Yes.

14     Q.    At the top there, there's a couple boxes.  One it

15   says agreed, and one says unagreed.  Do you see those?

16     A.    Yes.

17     Q.    What does the unagreed mean?

18     A.    Unagreed would refer to a case where we have not

19   received a signed waiver.

20     Q.    And how -- what would agreed mean?  And if it has

21   more than one meaning, what would the range of meanings be?

22     A.    Well, agreed can mean a signed waiver was received

23   or in the course of dealing the agent conducting the audit

24   has received some sort of agreement from the taxpayer.  The

25   signed waiver would -- is a requirement to have an agreed

                                                              105

II 0094

1  case after a 90 day letter is issued.

2      Q.    Is the -- is the agreed box there that's checked,

3  is that connected at all to the -- on the left half of that

4  page where it says 870 agreement date?  Are those two

5  connected at all?

6      A.    Yes.

7      Q.    All right.  And in those boxes next to 870

8  agreement date, it says January 13, 2005.  Do you see that?

9      A.    Yes.

10      Q.    We were just looking at Defendant PRIN 438 which

11  shows that as being the date of the deposit.  Do you recall

12  that?

13      A.    Yes.

14      Q.    Is there any significance to that?

15      A.    There could be, but I can't say definitely yes or

16  no.

17      Q.    Okay.  So from looking at this document, you are

18  not sure?

19      A.    No, I'm not sure.

20      Q.    Terri, going down to line 23 on the left-hand side,

21  it says payment on tax module.  Do you see that?

22      A.    Yes.

23      Q.    Okay.  Do you know, does that refer to the deposit

24  on Defendant PRIN 438?

25      A.    It refers to an amount of credit on the account for

106

II 0095

*Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09*

1    Q.    Is that the only thing unagreed would mean?

2    A.    After a 90 day letter was issued, it could indicate

3    that the time it had expired for the 90 days and that it was

4    defaulting out of the 90 day statutory notice of deficiency.

5    Q.    Okay.  I guess I do want to go back to just the

6    first page of Exhibit 4.  Still back on this agreed issue.

7    Remember we were -- I just asked you some questions about the

8    checked agreed box.

9    A.    Yes.

10    Q.    And then 870 agreement date and that being the

11    deposit date.  Do you recall all that?

12    A.    Yes.

13    Q.    Is it possible that that checked agreed box simply

14    refers to the fact that the deposit had been received?

15    **MR. GRAVES:**  If you know.

16    A.    I couldn't say for sure.

17    Q.    **(By Mr. Jeffress)** Okay.  Can you look at Exhibit 8?

18    That's this case note.  Just to be clear in the record, do

19    you recall answering a series of questions related to Exhibit

20    8?

21    A.    Yes.

22    Q.    And in all of your answers, as I understood it, you

23    were referring only to the second note on the page, the one

24    that begins with the notation of May 25, 2005.  Is my

25    understanding correct?

108

1      **A.**    Yes.

2      **Q.**    And I believe you testified that -- I believe

3    Mr. Jeffress asked you with regard to May 27, 2005, how you

4    would determine when to apply the previous cash bond deposit

5    as a payment.  Do you remember that?  I think you testified

6    that the assessment would do it.

7           **MR. JEFFRESS:**  I'm going to object.  Testimony is

8    what it is.

9      **Q.**    **(By Mr. Graves)** Do you recall those questions about

10   how you would determine when to apply it as a payment?

11     **A.**    Yes.

12     **Q.**    All right.  But did I understand your prior

13   testimony correctly today that you indicated that you have

14   not had any experience with converting a cash bond to a

15   deposit as a result of a taxpayer's designation?

16          **MR. JEFFRESS:**  Objection.  That misquotes the

17   witness.

18     **Q.**    **(By Mr. Graves)** Have you had any experience in

19   converting a deposit to a payment as a result of a taxpayer's

20   designation?

21          **MR. JEFFRESS:**  Again, same objection.  You can

22   answer, Terri.

23     **A.**    Okay.  Per a taxpayer's designation, no.

24          **MR. GRAVES:**  Okay.  That's all I have.

25          **MR. JEFFRESS:**  I don't have any follow-up to that.

                                                              118

*Principal Life v. USA * Depo of TERRI LYNN BASSETT * 4-15-09*

1                    C E R T I F I C A T E

2   STATE OF UTAH        )
    COUNTY OF SALT LAKE )

3        THIS IS TO CERTIFY that the deposition of TERRI LYNN

4   BASSETT was taken before me, Teri Hansen Cronenwett,

5   Certified Realtime Reporter, Registered Merit Reporter, and

6   Notary Public in and for the State of Utah.

7        That the said witness was by me duly sworn to testify;

8   that the testimony was reported by me in Stenotype, and

9   thereafter transcribed by computer, and that a full, true,

10  and correct transcription is set forth in the foregoing

11  pages, numbered 4 through 116 inclusive.

12       I further certify that the original transcript of the

13  same was delivered to the witness for reading and signature

14  before a Notary Public, and to be returned within 30 days of

15  the date hereon.

16       I further certify that I am not of kin or otherwise

17  associated with any of the parties to said cause of action,

18  and that I am not interested in the event thereof.

19       WITNESS MY HAND and official seal at Salt Lake City,

20  Utah, this 27th day of April, 2009.

21  My commission expires:
    February 6, 2011

22

23



24  *Teri Hansen Cronenwett*
    Teri Hansen Cronenwett, CRR, RMR

25  License No. 91-109812-7801

Notary Public
TERI HANSEN CRONENWETT
9613 Presidential Drive
South Jordan, Utah 84095
My Commission Expires
February 6, 2011
State of Utah

                                    121

*Teri Hansen Cronenwett, CRR, RMR*
*Garcia & Love Court Reporting & Videography*          **II 0098**

# EXHIBIT A-4

1

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3    PRINCIPAL LIFE INSURANCE      )
     COMPANY AND PRINCIPAL         ) No.
     FINANCIAL GROUP,              ) 1:07-cv-00006-FMA
4    INCORPORATED,                 ) (Consolidated with
                                   ) Nos. 07-706, 08-135,
5            Plaintiffs,           ) and 08-605
                                   )
6        vs.                       ) DEPOSITION OF
                                   ) RICHARD PULLEN
7    UNITED STATES OF AMERICA,     )
                                   )
8            Defendant.            )
     --------------------------)

9

10              THE DEPOSITION OF RICHARD PULLEN,

11   taken before Nancy S. Warren, Certified

12   Shorthand Reporter and Notary Public of the

13   State of Iowa, commencing at 9:25 a.m.,

14   March 12, 2009, at Suite 2000, Ruan Center,

15   666 Grand Avenue, Des Moines, Iowa.

16

17

18

19                              COPY

20

21

22

23

24

**II 0099**

3

```
 1                    I N D E X

 2

 3    Examination by:      Page

 4    Mr. Jeffress         4
      Mr. Graves           115
 5
      Exhibit              Offered
 6
          1                4
 7        2                8
          3                14
 8        4                23
          5                37
 9        6                41
          7                43
10        8                46
          9                48
11       10                54
         11                56
12       12                58
         13                59
13       14                61
         15                62
14       16                64
         17                65
15       18                66
         19                69
16       20                72
         21                73
17       22                74
         23                75
18       24                81
         25                82
19       26                86
         27                98
20       28                99
         29                104
21       30                110

22                    Requests

23    Form 5701s           Page 114, Line 6

24    Jim Hale file        Page 114, Line 9
      notes
25
```

4

```
 1                    RICHARD PULLEN,

 2    called as a witness, having been first duly

 3    sworn, testified as follows:

 4                    DIRECT EXAMINATION

 5    BY MR. JEFFRESS:

 6         Q.   Can you state your full name and

 7    address for the record?  Business address is

 8    fine.

 9         A.   Richard Pullen, 711 High Street in Des

10    Moines, Iowa 50392.

11         Q.   Mr. Pullen, my name is Bart Jeffress.

12    I represent the defendant in this case, the

13    United States.  I'm with the Tax Division, the

14    United States Department of Justice.  Do you

15    understand all that?

16         A.   Yes, I do.

17                    (Exhibit No. 1 was marked for

18                    identification by the reporter.)

19         Q.   Mr. Pullen, have you seen Exhibit 1

20    before?

21         A.   Yes, I have.

22         Q.   Do you know what the document is?

23         A.   It's the notice that there is going to

24    be a deposition.

25         Q.   Are you here today pursuant to that
```

II 0101

10

1      Q.    Prior to December 29th, 2004, did you

2  have any communications with the Internal

3  Revenue Service about the income tax and penalty

4  determinations made in Exhibit 2?

5      A.    Do you mean about the exact amounts

6  that were going to show up on this document?

7      Q.    Not necessarily the exact amounts, but

8  the determination of income tax deficiencies and

9  penalty for these tax years in Exhibit 2, '96

10  to 2000.

11      A.    We had conversation about tax

12  deficiencies and penalties.

13      Q.    During the -- When?

14      A.    We have discussions on the adjustments

15  throughout the audit.  For this, these amounts,

16  I'm not sure exactly when we talked about the

17  totals that were going to show up on here.

18      Q.    All right.

19              And when was the timing of the

20  audit, from when to when?

21      A.    I don't know the exact dates.  They

22  usually last 18 months or more.

23      Q.    Did the audit end on December 29th

24  of 2004?

25      A.    No, it did not.

11

1        Q.    When did it end?

2        A.    I don't know when we provided our last

3   documentation.

4        Q.    Do you have any estimate?

5        A.    No, I do not.  We have worked a long

6   time on interest for this audit.

7        Q.    Was the audit going on in the last half

8   of 2004?

9        A.    Yes, it was.

10        Q.    So the audit was going on at least by

11   June 2004?

12        A.    Yes.

13        Q.    Was it going on before that?

14        A.    Yes, it was.

15        Q.    Did it continue after that?

16        A.    Yes.

17        Q.    Did it continue into December of '04?

18        A.    Yes, it did.

19        Q.    So during that time frame, June 2004 to

20   December 2004, did you have any communications

21   with the Internal Revenue Service about the

22   income tax deficiencies and penalties for these

23   years here in Exhibit 2?

24        A.    Yes, we did.

25        Q.    Okay.

12

1             When did you have those?

2      A.   I don't know the exact dates of when we

3  had the conversation.

4      Q.   Do you recall any specific ones?

5      A.   For exact issues and amounts, no, I

6  don't recall the specifics.

7      Q.   Were there a lot?

8      A.   I can't put a number on it.

9      Q.   All right.

10            Well, again, we're in this time

11  frame from June to December of 2004.  Do you

12  think you were talking to the Internal Revenue

13  Service on a weekly basis?

14      A.   I probably talked to -- I talked to the

15  Internal Revenue Service on a weekly basis.

16      Q.   About the deficiencies and penalties

17  that would ultimately end up being determined in

18  Exhibit 2?

19      A.   I can't say that our conversations were

20  about the deficiencies that showed up here.

21      Q.   Do you know at all whether you talked

22  to the Internal Revenue Service about the

23  deficiencies and penalties that ultimately ended

24  up appearing in Exhibit 2?

25            MR. GRAVES:  Mr. Jeffress, may I

II 0104

1          MR. GRAVES:  Excuse me.  Are you

2     asking about the numbers or about the issues?

3          MR. JEFFRESS:  Both, numbers and

4     issues.

5     A.     I had some communication with them.

6     Not -- I did not discuss the issues with them,

7     and I don't know if other people did.

8     Q.     Do you recall what you discussed?

9     A.     One thing I discussed was their

10    spreading of the penalty to all the years.

11    Q.     What was the substance of those

12    discussions?

13    A.     They just did a with and without

14    calculation, and so because of carrybacks that

15    we have, if the adjustment would have been made

16    or would not have been made for these issues, so

17    it went back to the various years, and, again,

18    it was a mathematical computation.

19    Q.     All right.

20          Do you remember when you had

21    those conversations?

22    A.     Not the exact day.  We also discussed

23    how we're going to make -- for us to make the

24    payment to the IRS.

25    Q.     Plaintiffs discussed that with the IRS?

37

1       A.   Yes, we did.

2       Q.   And do you remember what those -- the

3    substance of those conversations?

4       A.   They were -- they let us know how we

5    can make an overnight payment to the IRS, the

6    proper procedures.

7       Q.   And anything else about those

8    discussions?

9       A.   Not that I can recall.

10      Q.   Do you know when those were?

11      A.   About paying the --

12      Q.   Yeah, those conversations.

13      A.   They would happen after we received it

14   in January and before January 13th.

15      Q.   During any conversations the plaintiffs

16   had, did you indicate you agreed with the

17   deficiency notice?

18      A.   No, we did not.

19      Q.   Did you indicate that you disagreed

20   with it?

21      A.   I cannot recall if we had made the

22   exact comment we disagreed.

23               (Exhibit No. 5 was marked for

24               identification by the reporter.)

25      Q.   Do you recognize Exhibit 5?

38

1    A.    Yes, I do.

2    Q.    Do you need time to read it?

3    A.    No.

4    Q.    Exhibit 5, for the record, is marked

5    with Bates stamp DEF PRIN 194 and DEF PRIN 195.

6                On DEF PRIN 195, is that Lillian

7    Chen's signature?

8    A.    Yes, it is.

9    Q.    How do you know that?

10    A.    I have seen her signature many times.

11    Q.    What's the -- what was the purpose of

12    this letter?

13    A.    As the letter states, this was --

14    letter was to apply the deposit to our tax

15    liability.

16    Q.    What's the plaintiffs' understanding of

17    what that means?

18                MR. GRAVES:  Objection to the

19    extent that calls for a legal conclusion.

20                You can go ahead and answer,

21    Rich.

22    A.    That -- My understanding was this was

23    going to be applied to our tax liability at that

24    time based on the amounts we had paid and we had

25    calculated.

1     Q.    And what did the plaintiffs mean by the

2   word "applied"?

3     A.    It was going to be recognized in our

4   modules on your IRS that it was a payment of

5   tax.

6     Q.    This phrase on DEF PRIN 195, if I can

7   direct you to that, it's about halfway down on

8   the page.  It says, "apply the deposit for each

9   year to payment of the federal income tax,

10  interest and penalties."

11              Do you see that?

12    A.    Yes, I do.

13    Q.    Do you know where that phrase comes

14  from?

15    A.    No, I do not know exactly where that

16  phrase comes from.

17    Q.    Do you know who wrote that?

18    A.    No, I do not know who had put the memo

19  together.

20    Q.    Do you know whether that phrase is

21  found anywhere in Internal Revenue procedures

22  governing remittance?

23    A.    No, I do not.

24    Q.    The beginning of that paragraph, it

25  starts with a prepositional phrase, "In

II 0108

44

1      Q.   You have never met him, you've never

2   spoken to him?

3      A.   No.

4      Q.   How about Bruce Graves?

5      A.   I know who Bruce is.

6      Q.   Is that Mr. Graves' signature on

7   page 146, Exhibit 7?

8      A.   Yes, it is.

9      Q.   Do you know what this letter is talking

10  about?  Do you have familiarity with it?

11     A.   I have familiarity with it.

12     Q.   Okay.

13              Can you explain that?

14     A.   Apparently, there is some

15  indemnification in the legal documents for our

16  investment, Whispering Woods, and based on legal

17  advice they were obtaining from the client to

18  whether we -- if we pay this amount due in

19  statutory notice of deficiency, would that in

20  any way affect us in the indemnification

21  agreement.

22     Q.   Let me direct you to page 146 of that

23  same exhibit, Exhibit 7, and just the top

24  paragraph.  Tell me what's going on there.

25     A.   I don't know for sure.  I didn't write

45

1    the letter.

2        Q.    Well, was there some suggestion that

3    you might go to tax court if Deutsche Bank

4    wanted you to?

5        A.    This letter is asking their

6    interpretation.  Principal decides whether we'll

7    go to tax court or not based on whether the

8    Deutsche Bank wants us to or not.

9        Q.    So you're asking for their input?

10       A.    Of how it will affect this particular

11   one item.

12       Q.    So as of January 4, 2005, at least,

13   plaintiffs already knew they were going to

14   contest this one item?

15       A.    We disagreed with this item.

16       Q.    Had you informed the Internal Revenue

17   Service about that before January 4, 2005?

18       A.    I couldn't -- I don't know when we

19   would have informed them.

20       Q.    But you might have; right?

21       A.    We could have.

22       Q.    In one of those forms you mentioned

23   before, 7501?

24       A.    5701?

25       Q.    Yes.

46

1        A.    We could have.  I don't know if they

2    had provided us an adjustment at this time.

3        Q.    Does Principal keep copies of those

4    forms?

5        A.    Yes, we do.

6                (Exhibit No. 8 was marked for

7                identification by the reporter.)

8        Q.    All right.

9                For the record, Exhibit 8 is

10   Bates-stamped PL.PRIN. 147 through PL.PRIN. 151.

11   Mr. Pullen, I'd like you to look at that first

12   and let me know whether these five pages

13   actually go together.

14       A.    I cannot tell exactly if these were the

15   exact items.  They appear that they could be.

16       Q.    It appears that all five could go

17   together?

18       A.    They could.

19       Q.    But you're not sure?

20       A.    Right.

21       Q.    Are you familiar with the Exhibit 8?

22       A.    Yes.

23       Q.    Are those plaintiffs' E-mails and

24   attachments?

25       A.    Yes, they are.

1     A.    Yes.

2     Q.    -- what's that about?

3     A.    That is saying that I have been in

4     contact with Chris to find out their timing on

5     how much their calculation of the interest would

6     be so we could make the -- remit our money to

7     the IRS before January 13th.

8     Q.    Why was it important to determine the

9     interest?

10    A.    Because we were wanting to pay the

11    penalty tax and interest at one time.

12    Q.    Okay.

13          But in Exhibit 2, the statutory

14    notice of deficiency, it doesn't give an exact

15    calculation of interest; correct?

16    A.    That is correct.

17    Q.    So is that what's giving rise to these

18    communications?

19    A.    Yes, it is.

20    Q.    All right.

21          Let's go to the bottom E-mail,

22    the one written by Lillian Chen.  Do you see it?

23    A.    Yes, I do.

24    Q.    This goes back a little bit to

25    something you referred to before.  Third

1    then the increase, as shown in other exhibits

2    you have, the amount increased substantially at

3    the end, and we maybe hadn't communicated the

4    increase to those individuals at that time

5    because they are not in the tax department.

6        Q.   All right.

7             Again, this E-mail says there are

8    also several issues that the IRS charged --

9    well, just paraphrasing -- is charging the

10   plaintiffs twice?

11       A.   Correct.

12       Q.   But as you sit here today, you can't

13   identify those in Exhibit 2?

14       A.   I cannot identify every one of them.

15   The guarantee is identified there, and the

16   Whispering Woods is one of the other ones.

17       Q.   Now, what about this sentence here,

18   "John told me that we are most likely to pay and

19   file claim for refund and not go to tax court"?

20             Do you see that?

21       A.   I see that.

22       Q.   Is "John" John Schmidt?

23       A.   That is correct.

24       Q.   So is that plaintiffs' intent at this

25   time, January 4th of 2005?

53

1       A.    I don't know.   That is how Principal is

2    typically -- in the audits I have been involved

3    in, we pay and file refund claims.

4       Q.    Can you go into that a little more?

5    What do you mean by "typically"?

6       A.    I have been involved in two audits.

7    This would have been the first audit that -- and

8    just listening to -- we file -- pay the tax, and

9    then take the procedures after that, so what

10   court that dictates us go to or what process.

11      Q.    And as of this date, January 4, 2005,

12   do you know whether this had been communicated

13   to the Internal Revenue Service, this --

14      A.    I don't know if we had communicated it

15   to them or not.

16      Q.    Lillian Chen, would she know?

17      A.    I don't know.   You'll have to ask her.

18      Q.    The second-to-last paragraph, talking

19   about "underpayment interest," what's that

20   about?

21      A.    That is just Lillian was informing

22   people of the underpayment interest rate, that

23   if we -- that we will be charged on the

24   underpayment of tax we have right now.

25      Q.    And what's that referring to, an

54

```
 1    increase to 7 percent after January 28th?  Do

 2    you know?

 3        A.   If we don't pay by a certain date, the

 4    hot interest rate kicks in --

 5        Q.   The hot --

 6        A.   -- which is --

 7        Q.   Go ahead.

 8        A.   -- which is a higher rate than normal

 9    rate.

10        Q.   Was hot interest a concern for the

11    plaintiffs?

12        A.   Yes, it is.

13        Q.   Why?

14        A.   Because it's a higher interest rate,

15    and on four hundred-some million, it's a lot of

16    money.

17                 MR. JEFFRESS:  All right.  Let's

18    go to Exhibit 10.

19                     (Exhibit No. 10 was marked for

20                 identification by the reporter.)

21                 MR. GRAVES:  May we go off the

22    record for a minute?

23                     (An off-the-record discussion

24                 was held.)

25                 MR. JEFFRESS:  All right.  Back
```

II 0115

55

1    on the record.

2        Q.    All right.  We're looking at

3    Exhibit 10, which is Bates-stamped PL.PRIN 103

4    to PL.PRIN 104.  It has an E-mail string on it

5    of three E-mails.

6                    Have you had a chance to read

7    through that?

8        A.    Yes.

9        Q.    Do you recognize this E-mail?

10       A.    I recognize this E-mail.

11       Q.    Is it plaintiffs' E-mails?

12       A.    Yes, it is.

13       Q.    Can you just explain what's going on

14   here in the communications?

15       A.    This is a communication of how do we

16   calculate the interest amount that will

17   eventually be assessed against Principal.

18       Q.    Just stepping back from the exhibits

19   for a minute, we looked at a bunch of E-mails;

20   correct?

21       A.    Correct.

22       Q.    And a lot of them have the same names

23   on them?

24       A.    That is correct.

25       Q.    I haven't bothered to ask you each time

```
 1              (Exhibit No. 18 was marked for

 2          identification by the reporter.)

 3              MR. GRAVES:  Would you read that

 4    last answer back?

 5              (Requested portion of the record

 6          was read.)

 7              MR. GRAVES:  Do you want to add

 8    anything to that?

 9              THE WITNESS:  He is an attorney

10    in the tax department.

11     . Q.    As opposed to the entire tax

12    department?

13        A.   That is correct.

14        Q.   Over which is Lillian Chen?

15        A.   That is correct.

16        Q.   Okay.

17              Exhibit 18, the Bates stamps

18    go in reverse order.  It's PL.PRIN. 118 to

19    PL.PRIN. 117.  That's intentional.

20              Do you recognize these E-mails?

21        A.   Yes, I do.

22        Q.   Do you know what they're about?

23        A.   The -- starting from 117, our

24    controller is just questioning the applicability

25    of the interest from the IRS, and then we have
```

1    asked, as you say, David Boucher questions, and

2    then the top -- the top one was a summary of a

3    conversation I had with Chris Heth when we were

4    trying to complete the interest calculations and

5    receive the information from the IRS.

6         Q.   All right.

7                   That first paragraph of the

8    E-mail it looks like you wrote?

9         A.   That's correct.

10        Q.   Does that -- does that accurately

11   reflect your conversation with Chris Heth?

12        A.   Yes.

13        Q.   And this sentence, "Carol said we will

14   not be required to pay anything this month

15   unless we sign the waivers," does that

16   accurately reflect what you heard from Carol

17   Dailing?

18        A.   That is -- I did not talk to Carol.  I

19   talked -- Everything I received is through

20   Chris.

21        Q.   Does that sentence accurately reflect

22   what Chris told you Carol said?

23        A.   That's what I wrote, and I assume back

24   at that time, yes, that's what I wrote.

25        Q.   All right.

II 0118

70

1    conversations with others that we need to make

2    sure that we get the payment made by

3    January 29th, and then there is some -- there

4    was questions on how does it affect the interest

5    calculation and when will we be charged

6    interest, and, then, so I had talked to Chris

7    and she talked to Jim, and they didn't know

8    about how -- how everything went together, and

9    then David Boucher has told us that the -- we

10   had to make sure we paid whatever was on the

11   statutory notice.

12        Q.    And in this E-mail there's a -- do you

13   see the word in the second sentence,

14   "designate"?  It's preceded by "if we do not

15   designate"?

16        A.    Right.

17        Q.    What did you mean by that?

18        A.    I don't know if that was the word I put

19   in there, I had a special meaning for it.  I

20   meant that if we did not apply it to specific

21   periods.  That is what my interpretation was.

22        Q.    If you do not apply what to the

23   specific period?

24        A.    The tax -- we had tax penalties and

25   interest we had paid the IRS.

II 0119

71

1      Q.   On January 13th?

2      A.   On January 13th.

3      Q.   Now, going to the sentence here, it

4   says, "The concern we have had is that we did

5   not pay the full amount of interest with the

6   cash bond."

7           Do you see that?

8      A.   Yes, I do.

9      Q.   What did you mean by that?

10     A.   We had not received the final interest

11  calculations from the IRS.  We did not want to

12  be underpaid.  We wanted to pay the entire

13  amount of interest of tax and penalties, so we

14  had a concern that we hadn't done that.

15     Q.   And then a little further down, it

16  says, "Thus we have paid more than the amount on

17  the stat notice."

18           Do you see that?

19     A.   Yes.

20     Q.   And what did you mean by that?

21     A.   Our amount we paid to the IRS was more

22  than the amount on the stat notice, and that's

23  basically what it was.

24     Q.   Sorry for the delay.  I'm trying to

25  figure out what might be best for you and best

II 0120

74

1    to?

2        A.    That was referring to that -- My

3    interpretation at that time was we needed to

4    inform the Service within 30 days of where to

5    apply the amounts that we had already remitted

6    to the Service.

7        Q.    We're done with that exhibit.

8              Are you an officer, by the way?

9        A.    Yes.

10       Q.    Do you know the difference between a

11   deposit and payment for tax purposes?

12       A.    I have not studied that issue.  I would

13   not be an expert to identify the difference

14   between a deposit -- the technical definition

15   between a deposit and a payment.

16       Q.    All right.

17              (Exhibit No. 22 was marked for

18              identification by the reporter.)

19              MR. JEFFRESS:  Exhibit 22 is

20   PL.PRIN. 136.  Do you have that, Counsel?

21              MR. GRAVES:  Yes.

22       Q.    All right.

23              Mr. Pullen, do you recognize this

24   E-mail?

25       A.    Yes, I do.

75

1      Q.   Is it plaintiffs' E-mail?

2      A.   Yes, it is.

3                 (Exhibit No. 23 was marked for

4            identification by the reporter.)

5      Q.   Okay.

6                 Exhibit 23, for the record, is

7    PL.PRIN. 137.  Can you -- Do you recognize this

8    E-mail?

9      A.   Yes.

10     Q.   Do you know what it's about?

11     A.   Yes, I do.

12     Q.   Can you explain it?

13     A.   This was to make sure -- to work with

14   Jim and Chris and others in the IRS so when our

15   payments we have made shows up in our module as

16   large overpayments, they do not get sent back to

17   us.

18                The conversations that we had was

19   that the process may automatically send them

20   back when they show up as overpayments, so I did

21   not want anybody to cash the check, and I was

22   informed if I got a check, to put "void" on it

23   and send it back.

24     Q.   Okay.

25                What do you mean when you just

**II 0122**

1    said "modules"?  What did you mean by that?

2        A.    The IRS has -- When any payments go

3    from us to the IRS, they record them in modules,

4    and it will show whether they have overpayments,

5    underpayments, anything else.

6        Q.    And who were you speaking with?

7        A.    In this situation, we were working

8    through Jim and Chris, our local individuals, to

9    make sure the money did not come back to us.

10       Q.    Okay.

11                   And what money are you referring

12   to?

13       A.    The money we paid the IRS on

14   January 13th.

15       Q.    The 440 million?

16       A.    The $440 million.

17       Q.    And you were concerned that there might

18   be an automatic refund?

19       A.    That is correct.

20       Q.    And why did you have that concern?

21       A.    Because I was told if it sits in our

22   module, by showing large refund, their systems

23   could automatically just kick it out if no one

24   puts a hold on that payment.

25       Q.    Who told you that?

1        A.    In this we were working with Jim and

2    Chris to get that done, and I had been told that

3    in other times by the IRS too.

4        Q.    Do you recall if you were specifically

5    told that in this instance?

6        A.    I can't tell if I was exactly, what

7    they exactly told me.  As you can see in this

8    E-mail, it is talking about who was going to put

9    the indication on it to not -- make sure it does

10   not refund.

11       Q.    And when you say in other instances,

12   would those have been before this or after this?

13       A.    Before this instance.

14       Q.    So you were generally aware a hold

15   could be put on the money?

16       A.    That is correct.

17       Q.    And that would prevent an automatic

18   refund?

19       A.    That is correct.  I was aware there

20   could be procedures.  I don't know what they

21   will call it.

22       Q.    Did you ever get a refund check?

23       A.    No, we did not.

24       Q.    Do you see the sentence here that

25   says -- and we're looking at page 137.  It says,

II 0124

78

```
 1    "The person in St. Paul is not sure how to do

 2    that."

 3       A.    Okay.

 4       Q.    Do you know what you were referring to

 5    there?

 6       A.    This is Jim Hale, was through Jim and

 7    Chris.  The person in St. Paul was not sure how

 8    to put the hold on the payment to make sure it

 9    did not get refunded.

10       Q.    And how about this sentence here where

11    it says, "Jim faxed them a copy of the letter

12    and they will apply the payment today"?  What

13    are you referring to there?

14             Well, first, do you see that

15    sentence?

16       A.    Yes, I do.

17       Q.    Okay.

18             What are you referring to?

19       A.    That is Jim Hale faxed them a copy of

20    the letter that we mentioned to pay -- to apply

21    our payment to the tax, and they would get it

22    applied on the correct date.

23       Q.    And who told you that?

24       A.    Jim.  That's who I was talking to

25    because I talked to Chris or Jim through this
```

II 0125

1    whole process.

2        Q.    All right.

3                    And what letter is that referring

4    to?

5        A.    The letter of January 28th that says to

6    apply the deposit to our tax, interest and

7    penalties, Exhibit 5.

8        Q.    Do you know if your request was ever

9    executed?

10        A.    I do not know.

11        Q.    Did you follow up on it?

12        A.    No, I did not follow up to make sure.

13        Q.    Was -- This E-mail here is dated

14    January 28th, and by "here," I mean page 137 of

15    Exhibit 23.

16        A.    Yes.

17        Q.    Is this the last communication you had

18    with Mr. Hale about this?

19        A.    I cannot say for sure.

20        Q.    You don't recall?

21        A.    Not if it's the last one, no.

22        Q.    So you don't recall any after this?

23        A.    I do not recall any after this.

24        Q.    Do you know if plaintiffs had any

25    further communications after January 28th with

1    the IRS about the January 28th letter?

2        A.    I cannot recall any specific ones right

3    now.

4        Q.    And this records that you were told by

5    Jim Hale that someone in St. Paul is not sure

6    how to do what you requested.  Is that accurate?

7        A.    That refers to the person in St. Paul

8    was not sure how to indicate on their system to

9    not issue a refund or -- well, issue a refund

10   once they get it applied.

11       Q.    All right.

12             Now, in this E-mail it also says,

13   "Chris will contact Nancy Beatty on Monday to

14   see if she can make sure no refunds are issued."

15             Do you see that?

16       A.    Yes.

17       Q.    But you have no recollection of whether

18   you followed up on this E-mail?

19       A.    No, I do not.

20       Q.    Now, also, just at the top, the second

21   sentence, it says, "He called Nancy Beatty's

22   boss in Cincinnati and she said they were not

23   the ones to apply the payment."

24             What did you mean by that?

25       A.    Jim Hale called Nancy Beatty.  Nancy

81

1    Beatty is the person in Cincinnati that we work

2    with a lot for our account, and she said that

3    she's not the one to apply the payment, so she

4    couldn't do it, apply the payment.

5        Q.    Is that what Jim told you?

6        A.    That's what Jim told me.

7        Q.    Does this E-mail, in your view,

8    accurately reflect your conversation with

9    Mr. Hale?

10       A.    Yes.

11       Q.    Do you recall the conversation today,

12   or is it just based on the fact --

13       A.    It's based on this.

14       Q.    The E-mail and your belief that you

15   would have recorded accurately an E-mail at the

16   time?

17       A.    That is correct.

18            (Exhibit No. 24 was marked for

19            identification by the reporter.)

20            MR. JEFFRESS:  Okay.

21            Exhibit 24, for the record, is a

22   memorandum, and it's PL.PRIN. 3.  Do you have

23   that, Counsel?

24            MR. GRAVES:  I have it.

25       Q.    Okay, Mr. Pullen.  Do you recognize

82

1   this memo?

2       A.   Yes, I do.

3       Q.   Did you write it?

4       A.   Yes, I did.

5       Q.   Who's Sharon Gordon?

6       A.   She is the taxpayer advocate that we

7   were working with to resolve the interest

8   calculations.

9       Q.   She's with IRS?

10      A.   She's with the Internal Revenue

11  Service.

12      Q.   Or was at this time, May of '05?

13      A.   At that time she was taxpayer advocate.

14  I don't know if that department associates with

15  the IRS, or how that --

16      Q.   Do you know if she was an IRS employee?

17      A.   She was an IRS employee.

18      Q.   Exhibit 24, do you know how that

19  relates to your, plaintiffs', untimely

20  assessment claims?

21      A.   No, I do not.

22      Q.   Okay.

23              (Exhibit No. 25 was marked for

24              identification by the reporter.)

25      Q.   Exhibit 25 is PL.PRIN. 8.

86

1    half, it says, "if you were going to court on

2    the assessment issue."

3        A.    My interpretation of that, looking back

4    four years, was if we need it as a proof of when

5    the assessment was made, we could get a copy of

6    that.

7                    (Exhibit No. 26 was marked for

8                    identification by the reporter.)

9        Q.    Okay.

10                    For the record, Exhibit 26 is

11    PL.PRIN. 9 through PL.PRIN. 16.

12                    First of all, are you familiar

13    with the documents in Exhibit 26?

14        A.    Yes.

15        Q.    They don't all go together; right?

16        A.    That is correct.

17        Q.    Let's start with PL.PRIN. number 9, and

18    I'd like you to explain that one to me, if you

19    can.  Can you?

20        A.    Yes.  That was a schedule I put

21    together to reconcile the amount of tax,

22    interest and penalty we were going to pay to

23    what caused our -- the payment by year, so was

24    it a change in the tax due to carrybacks or

25    other issues.

87

1    Q.   Okay.

2              So in the top, the box on page 9

3    there, those numbers are -- What are those

4    numbers referring to?  Are they referring to the

5    statutory notice of deficiency?

6    A.   The top box is the tax payment and the

7    penalty agree to the statutory notice of

8    deficiency.

9              The "Interest Paid" line I am not

10   sure right now.  It does not agree to -- it was

11   not assessed in the statutory notice of

12   deficiency.  I don't know without looking if

13   that agrees to the interest calculated by the

14   IRS.

15   Q.   Okay.

16             You don't know if that's the

17   interest that was ultimately actually assessed?

18   A.   Correct.

19   Q.   Now, let's go to the next sort of block

20   there.  It starts with "Tax Payment."

21             Do you see that?

22   A.   Yes.

23   Q.   And then "Adjustments per Statutory

24   Notice"?

25   A.   Yes.

1    Q.    Okay.

2              Can you just explain that, that

3    sort of box there going from, I guess, '96

4    through "Total"?

5    A.    The top line is the actual tax we were

6    paying with the statutory notice.  You can see

7    that agrees to the top box.

8              Then I divided -- put the

9    adjustments for the statutory notice and just

10    divided it out between the carrybacks that were

11    disallowed and the -- everything else went in

12    the non-carryback issues, and that was the --

13    then that just sums down to how that affects our

14    tax before any changes in the credits in the

15    alternative minimum tax.

16    Q.    Which is in the next box?

17    A.    Which is in the next box.

18    Q.    Staying with that first box, let's look

19    at 1996.

20    A.    Yes.

21    Q.    There's a tax payment there of

22    approximately 8.8 million.

23              Do you see that?

24    A.    Yes, I do.

25    Q.    And then down from that there is a

89

1    number, approximately 44.9 million, and it's

2    associated in this chart with 2001 NOL.

3                    Do you see that?

4    A.    Yes, I do.

5    Q.    Did I accurately describe that?

6    A.    Yes, you did.

7    Q.    Okay.

8                    And does that mean that the tax

9    there, the 8.8 million, resulted from

10   disallowance of the 2001 carryback?

11   A.    No.  It resulted from the adjustments

12   to the -- our taxable income that was made

13   in 2001.  The IRS audited the year 2001, so that

14   is actual assessments or changes in our net

15   operating loss in 2001, so they allowed that

16   carryback from 2001 to 1996 when they adjusted

17   it because they had audited the year 2001, so

18   the 2001 NOL was still getting carried back.  It

19   just got adjusted.

20   Q.    Okay.

21                   So the 44.9 million reflects a

22   disallowance of a portion --

23   A.    That is correct.

24   Q.    -- of the 2001 carryback; is that

25   correct?

92

1    are affected --

2        Q.    Right.

3        A.    -- by that.

4        Q.    Right.

5              Do you know where in the notice

6    of deficiency the adjustments are that are

7    linked with this 230,000, or do you know

8    offhand?

9        A.    I would have to spend a little time to

10   identify the exact numbers and where that number

11   came from.

12       Q.    Okay.

13             But they can be found in the

14   notice of --

15       A.    They can be found, yes.

16       Q.    All right.

17             Let's go back to PL.PRIN. 9 on

18   Exhibit 26.  The 1999 year, there's -- the first

19   number there is the 164 million.

20             Do you see that number?

21       A.    Yes, I do.

22       Q.    And that number is taken from the

23   statutory notice; correct?

24       A.    Yes.

25       Q.    Just describe the next three numbers

93

1    under that for me.

2        A.   The next, 87,568,101, is adjustments in

3    the 1999 year for items that we deducted or

4    included income in 1999.

5        Q.   On the '99 tax return?

6        A.   On the '99 tax return.

7                   The 112 million and

8    the 369 million, the 112 million is the 2001

9    capital losses that were reduced.  As you can

10   see, in 2001 we had a decrease for $282 million

11   of capital losses.  That was carryback affected

12   at '98 and '99 year, and the 369 million is the

13   total capital loss carried back into 2002 that

14   was disallowed because 2002 had not been audited

15   yet.

16       Q.   Okay.

17                   So of the 164 million tax

18   for 1999, how much of that would be -- would

19   result from non-carryback issues?  Is

20   it 35 percent of approximately 87.5 million?

21       A.   That's the easy way to do it, but as

22   you see --

23       Q.   It's affected by the lower box there?

24       A.   Affected by the AMT and that all each

25   year.

94

1    Q.    The 35 percent of 87.5 million would be

2    a rough?

3    A.    Would be a rough calculation.

4    Q.    And so the rest of that 164.8 million

5    in tax results from these disallowed carrybacks?

6    A.    That's correct.

7    Q.    From '01 and '02?

8    A.    Yes, that is correct.

9    Q.    Let's just go through the same exercise

10   here for the 2000 year.

11   A.    Okay.

12         For 2000 our non-carryback issues

13   was 165 million, so that was for issues right

14   into year 2000, and then they disallowed

15   the 119 million carryback from the 2003 capital

16   loss.

17   Q.    All right.

18         So in that year, non-carryback

19   issues, adjustments to the 2000 tax return, the

20   resulting tax from that is roughly 35 percent

21   multiplied by the 165.6 million?

22   A.    Correct.

23   Q.    Let's go to PL.PRIN. 10.

24         Do you know what this is?

25   A.    Yes.  This is a schedule we attach to

**II 0136**

116

1
2                    C E R T I F I C A T E

3           I, the undersigned, a Certified Shorthand
     Reporter and Notary Public of the State of Iowa,
4    do hereby certify that I acted as the Certified
     Shorthand Reporter in the foregoing matter at
5    the time and place indicated herein; that I took
     in shorthand the proceedings had at said time
6    and place; that said shorthand notes were
     reduced to print under my supervision and
7    direction by means of computer-aided
     transcription, and that the foregoing pages are
8    a full and correct transcript of the shorthand
     notes so taken; that said deposition was
9    submitted to the witness for signature, if
     requested to do so by a party or the witness;
10   that any changes, if any, requested by the
     witness are attached hereto.

11          I further certify that I am neither
     attorney nor counsel for, or related to or
12   employed by any of the parties in the foregoing
     matter, and further that I am not a relative or
13   employee of any attorney or counsel employed by
     the parties hereto, or financially interested in
14   the action.

15          IN WITNESS WHEREOF, I have hereunto set my
     hand and seal this 20th day of March, 2009.

16

17

18                    _____
                      CERTIFIED SHORTHAND REPORTER
19                    and NOTARY PUBLIC

20

21

22

23

24

25

**II 0137**