IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PRINCIPAL LIFE INSURANCE COMPANY, and PRINCIPAL FINANCIAL GROUP, INC. <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | NO. 1:07-cv-00006-FMA (Consolidated with Nos. 07-706, 08-135, and 08-605) <br><br> (Hon. Francis M. Allegra) |

**PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(c)(3) of the Rules of Court of Federal Claims ("RCFC"), Plaintiffs respectfully submit these proposed findings of uncontroverted fact in support of Plaintiffs' cross-motion for summary judgment (Plaintiffs' Appendix II with exhibits is attached):

1

1.      As a large taxpayer, Principal's returns for each year have consistently been audited by the Internal Revenue Service.  The audits were conducted on Principal's premises by a team of Internal Revenue Service agents who are there, more or less, continuously.  Each examination of a two-year cycle took about two years to complete.  When an examination for one two-year cycle is completed, the IRS team of agents moves to the next two-year cycle.

App. B[1], Ex. 10 at 11:8-12:13, at B00212-B00216.

App. II[2], Ex. A-1, 26:12-19 at II0006.

---

[1] "App. B" refers to Defendant's Appendix B with exhibits attached to Defendant's Proposed Findings of Uncontroverted Fact.
[2] "App. II" refers to Plaintiffs' Appendix II with exhibits attached to Plaintiffs' Proposed Findings of Uncontroverted Fact.

2.     The IRS team of agents in connection with the audits of Principal's tax returns included Christine Heth, who was team coordinator, and James Hale, the supervisory revenue agent.  Various people at Principal were involved with the IRS team during the audits.  They included John Schmidt, then Vice President & Senior Tax Counsel in Principal's Law Department, Richard Pullen, Financial Controller, Randy Bergstrom, Counsel in the Law Department, and Lillian Chen, Vice President for Corporate Tax.

App. B, Ex. 10 at 13:3-18 at B00214.

App. B, Ex. 9 at 8:1-11 at B00180.

App. B, Ex. 9 at 17:23-19:7 at B00185-B0087

App. B, Ex. 10 at 15:19-16:25 at B00216-B00217.

App. B, Ex. 7 at B0070.

App. B, Ex. 5, 6:17-19, 7:17-22 at B00032-B00032.

App. B, Ex. 5, 14:14-15:2 at B00035-B00036.

App. B, Ex. 5, 17:16-23 at B00038.

3.     During the audits of Principal's returns, the IRS team of agents spoke and met frequently with Principal's representatives to discuss procedures, processes, and issues, and came to know the representatives of Principal on a first-name basis.

App. B, Ex. 10, 15:15-17:11 at B00216-B00217.

App. B, Ex. 9, 18:11-19:25 at B00186- B00187.

App. II, Ex. A-4, 10:1-18; 12:10-15 at II0102; II0104.

App. II, Ex. N-1 at II0457.

App. II, Ex. N-2 at II0459-II0460.

4.     Christine H. Heth, who was first the IRS team coordinator and then senior team coordinator during the examinations of Principal's returns for the years here at issue, had been a revenue agent since 1984 and had worked with the large case group since 1991.  Her examination of Principal's returns began in 1996 with Principal's returns for 1993 and 1994, and she remained at Principal continuously for 11 years.

App. B, Ex. 10 at 8:15-9:2 at B00210-B00211.

App. B, Ex. 10 at 11:6-15:14 at B00212-00216.

App. II, Ex. B-2 at II0255-II0256.

5.      During the examinations of the taxable years here at issue, James F. Hale was a Supervisory Internal Revenue Agent in the Large Case Group of the IRS in Des Moines, Iowa. Hale had been with IRS since 1972 and had been a supervisor since 1980.  Mr. Hale reported to an IRS manager in Chicago with whom he was in daily communication.

App. B, Ex. 9, 7:11-8:23 at B00179-B00180.

App. II, Ex. A-2, 14:11-16:7 at II0021-II0023.

App. II, Ex. B-2 at II0256-II0257.

6.    Upon receipt of a revenue agent's report following completion of an IRS examination, it was Principal's normal practice to pay the tax shown due and later file claims for refund with respect to disagreed issues.

App. B, Ex. 11, 13:19-14:5 at B00235-B00236.

App. B, Ex. 11, 50:8-18 at B00247; 52:14-17 at B00249.

App. II, Ex. A-4, 53:1-10 at II0114.

App. II Ex. T ¶ 8 at II0498.

7.    The IRS knew that Principal usually paid the disputed tax and filed a claim for refund and that Principal did not take its disagreed issues into Tax Court in a deficiency case. The claims for refund would typically be followed by commencement of a refund suit in the Court of Federal Claims.

    App. B, Ex. 9, 20:24-21:15 at B00188-B00189.

    App. B, Ex. 11, 14:1-15:25 at B00236-B00237.

    App. B, Ex 10, 19:3-20:3 at B00220-B00221.

8.     Unlike previous IRS examinations of Principal that had resulted in issuance of revenue agents' reports, the 1999-2000 examination resulted in the issuance of a statutory notice of deficiency to Principal on December 29, 2004.

App. B, Ex. 10, 19:3-11 at B00220.

App. II, Ex. D at II0279-II0280.

App. B, Ex. 5, Pullen/Chen Deposition Exhibit 2 (excerpts from Notice of Deficiency at B00062-B00067).

9.      As a result of extensions of time (Forms 872) executed by Principal, the regular 3-year statute of limitations under Section 6501(a) for assessment of deficiencies for the taxable years 1999 and 2000 was scheduled to expire on December 31, 2004.  As a result of extensions of time (Forms 872) executed by Principal, the regular 3-year statute of limitations under Section 6501(a) for assessment of deficiencies for the taxable year 1998 expired on June 30, 2003.

App. II, Ex. C. at II0277j-II0277m.

App. II, Ex. C at II0278.

App. II, Ex. B-1 at II0251.

10.     Principal's 2001 return had shown a net operating loss and capital loss.  The NOL
had been carried back five taxable years and the capital loss was carried back for three years.

App. II, Ex. M-1 at II0449.

App. II, Ex. D at II0288, II0291-II0293, II0294.

11.    As a result of carry-back of adjustments to net operating losses and capital losses from subsequent taxable years, the statutory notice issued to Principal on December 29, 2004 showed alleged deficiencies for 1996-1998, as well as for 1999-2000.   The amounts of the alleged deficiencies and penalties shown in the notice of deficiency were as follows:

| Tax Year | Deficiency | Penalty |
|---|---|---|
| 1996 | $   8,806,758 | $   961,609 |
| 1997 | 22,097,933 | 780,951 |
| 1998 | 37,509,413 | 7,491,744 |
| 1999 | 164,888,638 | 10,848,700 |
| 2000 | 128,727,605 | 7,294,419 |

App. II, Ex. D at II0279.

App. II, Ex. M-1 at II0449.

12.     One of the issues raised in the statutory notice related to investments made by Principal in partnerships known as Whispering Woods and Whistling Pines.  The statutory notice disallowed Principal's exclusion from its taxable income of its distributive share of the previously-taxed income received by these partnerships.

App. II, Ex. D at II0287, II0289-II0290.

13.    Principal's partners in these investments were affiliates of Deutsche Bank, A.G. Deutsche Bank agreed to indemnify Principal for any losses it might incur as a result of its investments not being respected in accordance with their form for U.S. federal income tax purposes.

App. B, Ex. 11, Pullen/Chen Deposition Exhibit 3 at B00254.

App. II, Ex. O-1 at II0466-II0467.

App. II, Ex. O-2 at II0468.

14.    In the days immediately following issuance of the notice of deficiency, Principal had discussions with IRS about making payment of the amounts referred to in the notice of deficiency plus the accrued underpayment interest, in order to avoid further underpayment interest.

App. II, Ex. A-4, 36:22-37:6 at II0105-II0106.

App. II, Ex. A-4 at 50:2-19 at II0112.

App. II, Ex. A-4, 71:9-23 at II0120.

App. II, Ex. Q-2 at II0472.

App. II, Ex. T ¶4 at I0497.

App. II, Ex. Q-4 at II0474.

App. II, Ex. J at II0428.

15.    Principal, however, did not want to do anything that might impair Deutsche Bank's indemnification obligation.  Specifically, in the early days immediately following receipt of the notice of deficiency, Principal, out of an abundance of caution, did not want to take any steps, such as payment of the deficiencies and penalties, that might preclude a petition to the Tax Court should Deutsche Bank decide that the Tax Court, as opposed to a refund proceeding, was the best forum to pursue this matter.  Thus,  Principal made its deposit in order to stop the accrual of the underpayment interest and continued to seek Deutsche Bank's consent to apply the deposit to a payment of the taxes and penalties.

App. B, Ex. 11, Pullen/Chen Deposition Exhibit 3 at B00254.

App. II, Ex. Q-7 at II0478.

App. II, Ex. Q-5 at II0475-II0476.

App. II, Ex. Q-6 at II0477.

App. II, Ex. Q-8 at II0480.

App. II, Ex. A-5, 31:24-32:3; 35:6-36:14; 50:16-51:14 at II0144-II0145, II0146-II0147,
      II0154-II0155.

App. II, Ex. A-4, 44:14-45:11 at II0109-II0110.

16.     In order to avoid the running of underpayment interest while it awaited Deutsche Bank's consent Principal on January 13, 2005 wire transferred $444,000,000 to the Minneapolis Federal Reserve Bank and hand-delivered to IRS a letter designating such sum as a "deposit in the nature of a cash bond" under Section 6603 and Rev. Proc. 84-58 in the following amounts with respect to the following taxable years.

| Year | Amount |
|------|--------|
| 1996 | $  11,000,000 |
| 1997 | 26,100,000 |
| 1998 | 51,600,000 |
| 1999 | 202,000,000 |
| 2000 | 153,300,000 |
| **Total** | 444,000,000 |

App. B, Ex. 2 at B00016-B00017.

App. II, Ex. B-1 at II0239.

App. II, Ex. B-2 at II0258-II0259.

17.    Every taxpayer that files a tax return has an account in IRS's computerized "Master File."  Upon receipt of the wire transfer and Principal's letter, the IRS made an entry as of January 13, 2005 on Principal's records in its Master File for each of the years referred to in the letter.  Principal's deposit was entered with Transaction Code 640 and appeared on the transcript of Principal's account as a credit balance designated "Advance Payment of Deficiency, Cash Bond Credit," thus indicating that the IRS treated Principal's January 13, 2005 remittance as a cash bond deposit under § 6603.

App. II, Ex. A-3, 9:17-21 at II0053.

App. II, Ex. B-1 at II0239.

App. B, Ex. 6, Bassett Deposition Exhibit 2 at B00121.

App. B, Ex. 6, 30:22-34:2 at B00083-B00087.

App. B, Ex. 6, Bassett Deposition Exhibit 2 at B00125.

App. B, Ex. 6, 40:14-41:13 at B00093-B00094.

18.     There is no evidence that the funds wire transferred by Principal on January 13, 2005 were deposited by IRS into any kind of a suspense account.

App. II, Ex. A-3, 24:25-25:4 at II00061-II00062.

19.     During the period from January 13 to January 28, 2005, Principal continued to work on interest calculations in an effort to minimize its underpayment interest cost.  It compared the interest rate payable on its cash bond deposit with the rate of accrual for underpayment interest.  During this period, Principal also had discussions with IRS personnel about the interest calculations.

App. II, Ex. N-4 at II0463--II0464.

App. II, Ex. Q-7 at II0478-II0479.

App. II, Ex. Q-9 at II0481.

App. II, Ex. Q-10 at II0482.

App. II, Ex. M-2 at II0450-II0456.

App. II, Ex. Q-11 at II0483.

App. II, Ex. Q-13 at II0485.

App. II, Ex. A-4, 66:23-25 at II0117.

App. II, Ex. A-4, 70:3-71:14 at II0119-I0120.

App. II, Ex. T ¶ 7 at II0498.

App. II, Ex. J at II0429-II0432.

20.     Principal sought to make payment of the accrued underpayment interest at the same time it paid the taxes and penalties. Principal thought that it needed to make payment of the taxes by January 28, 2005 in order to avoid the "hot interest" applicable to large corporate underpayments (an additional 2% on top of the regular underpayment rate) that would then be imposed under Section 6621(c)(5)(i), and it therefore formulated an intention to convert its cash bond deposit to a payment of the taxes, interest, and penalties on or before that date.

App. II, Ex. A-4, 50:3-11 at II0112.

App. II, Ex. A-4, 71:3-14 at II0120.

App. II, Ex. A-4, 53:18-54:16 at II0114-II0115.

App. II, Ex. A-4, 70:1-11 at II0119.

App. II, Ex. T ¶ 8 at II0498.

App. II, Ex. A-5, 36:21-24 at II0147; 39:1-9 at II0149.

App. II, Ex. A-6, 126:21-128:13, 134:4-135:15, 192:21-193:16, 194:8-197:13, 200:23-201:11, 202:6-14 at II0183-II0187, II0191-II0199.

App. II, Ex. Q-7 at II0478-II0479.

App. II, Ex. Q-8 at II0480.

App. II, Ex. Q-9 at II0481.

App. II, Ex. Q-10 at II0482.

App. II, Ex. Q-11 at II0483.

App. II, Ex. Q-13 at II0485.

App. II, Ex. Q-14 at II0486.

App. II, Ex. N-5 at II0465.

21.     During this same period, Principal continued to seek Deutsche Bank's consent to make payment of the taxes on or before January 28.

App. II, Ex. Q-5 at II0475-II0476.

App. II, Ex. Q-6 at II0477.

App. II, Ex. Q-7 at II0478.

App. II, Ex. Q-8 at II0480.

22.    Likewise, discussions were continuing with Heth and other IRS personnel during this same period.  On January 20 and January 28, 2005 Rich Pullen talked with Chris Heth about interest calculations and other matters.  The calendar of Christine Heth reflects those conversations.  Rich Pullen also had conversations with Jim Hale and Nancy Beatty at the IRS.

App. II, Ex. Q-10 at II0482.

App. II, Ex. Q-16 at II0488.

App. II, Ex. A-4, 66:1-67:2-4 at II0117-II0118.

App. II, Ex. A-4, 70:2-8 at II0119.

App. II, Ex J at II0429-II0432.

App. II, Ex. T ¶ 9 at II0498.

App. II, Ex. A-2, 69:13-18 at II0043.

23.    One of the subjects of those discussions was Principal's intention to convert the cash bond deposit to payment of the tax and how best to go about doing so. Electronic mail messages sent by Rich Pullen reflect conversations he had with Chris Heth about questions concerning the procedures for converting the bond to a payment of tax. Those messages indicate that Chris Heth did not know the answers to Rich's questions and referred them to Jim Hale, who passed them on to others in the IRS. Heth's calendar also reflects those conversations.

App. II, Ex. Q-13 at II0485.

App. II, Ex. J at II0429-II0432.

24.     Jim Hale and other IRS personnel were concerned that upon the designation of the $444 million cash bond deposit to a payment, because there had not been an assessment, the payment might appear to the IRS computer system to be an overpayment and the IRS computer system might automatically generate a refund check. Chris Heth or Jim Hale advised Rich Pullen of that concern and advised him that if payment of the deficiencies referred to in the statutory notice generated a refund check from the Service, Principal should not cash the check, and Pullen notified Principal's tax department personnel accordingly.

App. II, Ex. A-2, 26:12-28:16 at II0025-II0027.

App. II, Ex. A-2, 70:4-24 at II0044.

App. II, Ex. A-3, 97:12-98:3 at II0090-II0091.

App. II, Ex. Q-17 at II0489.

App. II, Ex.A-4, 75:6-79:9 at II0122-II0126.

App. II, Ex. T ¶9 at II0498.

25. By January 28, 2005, Principal had received Deutsche Bank's approval to convert the cash bond deposit to payment of the taxes and penalties, and on that date Principal hand-delivered to IRS team leader Heth on Principal's premises a letter which referenced the January 13 letter, the wire transfer, and the cash bond deposit. The letter was addressed to IRS supervisor Hale and to Nancy Beatty. Nancy Beatty was an IRS employee in Cincinnati who worked with Principal frequently on matters related to its tax account.

App. II, Ex. T ¶10 at II0499.

App. B, Ex. 7 at B00169-B00170.

App. II, Ex. A-4, 80:25-81:2 at II0127-II0128.

26.     Principal's January 28, 2005 letter referenced the amounts it had initially remitted on January 13, 2005 and then requested "that the Internal Revenue Service now (today) apply the deposit for each year to payment of the federal income tax, interest and penalty in the following amounts for each year in ascending order:"

| Year | Tax | Penalty | Interest |
|------|-----|---------|----------|
| 1996 | $8,806,758 | $961,609 | $2,032,704.38 |
| 1997 | $22,097,933 | $780,951 | $1,728,429.98 |
| 1998 | $37,509,413 | $7,491,744 | $6,303,004.87 |
| 1999 | $164,888,638 | $10,848,700 | $24,358,720.79 |
| 2000 | $128,727,605 | $7,294,419 | $19,182,961.25 |
| **Total** | $362,030,347 | $27,377,423 | $53,605,821.27 |

App. B at B00170.

27.  Principal's January 28, 2005 was received by revenue agent Heth, who acknowledged receipt on a copy of the letter that she gave to Principal.

App. II, Ex. P at II0469.

App. II, Ex. B-1 at II0240.

App. II, Ex. B-1 at II0241.

App. II, Ex. A-1, 28:20-29-11 at II0007-II0008.

28.     Through the letter dated January 28, 2005, Principal intended to and believed it did convert its cash bond deposit made on January 13, 2005 to a payment of the taxes and penalties referred to in the statutory notice dated December 29, 2005.  John Schmidt and Rich Pullen repeatedly expressed this intent prior to January 28 and Schmidt reiterated that understanding thereafter.  Lillian Chen testified in her deposition that Principal's intent in sending the January 28, 2005 letter, which she signed, was "to convert our tax bonds to the tax payment."

App. II, Ex. Q-6 at II0477.

App. II, Ex. Q-8 at II0480.

App. II, Ex. Q-12 at II0484.

App. II, Ex. Q-13 at II04485.

App. II, Ex. Q-18 at II0490.

App. II, Ex. A-4, 38:11-39:5 at II0107-II0108; 70:1-11 at II0119.

App. II, Ex. T ¶8 at II0498.

App. II, Ex. A-5, 20:13-15 at II0141; 35:19-25 at II0146; 39:5-9 at II0149; 51:12-14 at II0155.

29.    At the time the January 28, 2005 letter was delivered to IRS, Principal had no intention of contesting the alleged deficiencies in Tax Court; instead, it intended to file claims for refund and, if necessary, a suit for refund to recover the portions of its payments that were attributable to IRS adjustments it believed were incorrect.

App. II, Ex. Q-1 at II0471.

App. II, Ex. Q-2 at II0472.

App. II, Ex. A-5, 28:9-29:8 at II0142-II0143.

App. II, Ex. A-5, 44:15-45:19 at II0151-II0152.

App. II, Ex. Q-3 at II0473.

App. II, Ex. Q-8 at II0480.

App. II, Ex. Q-18 at II0490.

App. II, Ex. Q-19 at II0491.

30.    In connection with the preparation of Principal's audited financial statements and its 10-K Report for the year ended December 31, 2004, Greg Elming prepared a first draft of tax disclosure language, that was reviewed and revised by John Schmidt and then circulated by Craig McComas. This income tax disclosure language reported the taxes, interest, and penalties set forth in the Statutory Notice sent to Principal as having been paid.

App. II, Ex. K-4 at II0441-II0444.

App. II, Ex. D at II0279-II0280.

App. B, Ex. 16 at B00277.

31.     In the audited financial statements prepared for Principal Financial Group, Inc. for the year ended December 31, 2004, the taxes and penalties referred to in the IRS's statutory notice of deficiency dated December 29, 2004, were reported as paid.   The audited financial statements of Principal Life Insurance Company for the same period, prepared both on the basis of GAAP and on a statutory basis, set forth the same tax report.   Likewise, Principal's 10-K Report filed with the Securities and Exchange Commission for the year ended December 31, 2004, reported those taxes as paid.

App. II, Ex. K-1 at II0433-II0435.

App. II, Ex. K-2 at II0436-II0438.

App. II, Ex. K-3 at II0439-II0440.

App. B, Ex. 11, Pullen/Chen Deposition Exhibit 34 at B00257-B00263.

32.     It was clear to IRS team leader Heth and IRS supervisor Hale that Principal by its letter of January 28, 2005 intended that its previous cash bond deposit be applied to payment of the taxes, interest, and penalties as designated in the letter.  In the week following the receipt of the January 28, 2005 letter, Hale made about a dozen phone calls to IRS people in the processing section trying to make sure that Principal's payment did not generate a refund because there was no assessment at that time.

App. II, Ex. A-2, 26:12-28:16 at II0025-II0027.

App. II, Ex. A-1, 28:20-29:13 at II0007-II0008; 32:6-12 at II0009.

33.    Hale understood that in the January 28, 2005 letter that Principal delivered to the IRS, Principal was informing the IRS how Principal wanted the deposit applied.    Upon his receipt of the letter, he spoke with Nancy Beatty in the processing section at the IRS in Cincinnati to make sure she had received the letter and to ask her to follow Principal's instructions in it and he also informed his supervisor Jim Roosey at the IRS in Chicago about the letter.    Hale made various phone calls to IRS personnel in an attempt to follow Principal's directions about how the monies should be applied.

App. II, Ex. A-2, 29:5-9 at II0028; 30:7-10 at II0029; 30:16-31:9 at II0029-II0030; 33:4-16 at II0031; 37:22-38:12 at II0033-II0034.

34.    Hale believed Principal had made full payment of the amounts shown in the notice of deficiency.

App. II, Ex. A-2, 54:16-55:1 at II0038-II0039.

App. B, Ex. 11, 64:2-22 at B00195.

App. II, Ex. S at II0495.

35.     Because of the large amounts involved, Hale, his supervisor in Chicago, Heth, and the people in the IRS processing centers were all paying considerable attention to Principal's case.  As of February 23, 2005, the IRS Technical Services Reviewer in its St. Louis processing center, like Hale, also believed the amounts shown in the notice of deficiency had been paid in full.

App. II, Ex. A-2, 57:7-58:2 at II0040-II0041.

App. II, Ex. R at I0492.

App. II, Ex. R at II0494.

36.    The "hot interest" applicable to large corporate underpayments (an additional 2% on top of the regular underpayment rate) that would then be imposed under Section 6621(c)(5)(i), was not asserted by the Defendant against, or paid by, Principal for the years 1999 or 2000.

App. II, Ex. B-5 at II0277i.

App. II, Ex. E-1, E-2, E-3, E-4, E-5 at II0295-II0363l;

App. II, Ex. F-1, F-2, F-3, F-4, F-5 at II0364-II0410.

App. II, Ex. A-6, 126:12-131:15 at II0183-II0185c.

37.    By May 18, 2005, processing of Principal's case had moved from the St. Louis processing center to the IRS Service Center in Ogden, Utah, and that office believed that the statute of limitations for assessment for the years 1996-2000 would expire on May 30, 2005.

App. II, Ex. R at II0493.

38.    After receipt of Principal's January 28, 2005 letter, the IRS did not convert the previously posted cash bond deposits into posted payments of tax, interest, and penalty between January 28, 2005 and May 26, 2005. No entry was made by the IRS to its Master File, Audit Information System (AIMS), or other computer system that would show payment of tax (for Principal's taxable years 1996 through 2000) from Principal on January 28, 2005 on any Form 4340 (Certificate of Assessments, Payments, and Other Specific Matters) subsequently generated. The Defendant does not think that the IRS had an obligation to take action in response to the letter dated January 28, 2005. Heth simply filed Principal's January 28, 2005 letter in her files of the case. After completion of an examination, case files are usually sent in boxes from the IRS field offices to the processing or service centers.

App. II, Ex. B-1 at II0242.

App. II, Ex. B-3 at II0268-II0274.

App. II, Ex. B-4 at 277c, 277f.

App. II, Ex. A-1, 29:3-13 at II0008.

App. II, Ex. A-1, 32:20-34:2 at II0009-II0011.

App. II, Ex. A-6, Boucher Deposition Exhibit 2 ¶29 at II0230.

App. II, Ex. A-3, 81:25-82:11 at II0079-II0080.

App. II, Ex. A-2, 12:20-13:3 at II0019-II0020.

App. II, Ex. A-2, 53:8-14 at II0037.

39.    There are different formats of IRS statements or transcripts of a taxpayer's account in the Master File system.  Certified copies of two different types of IRS transcripts of Principal's account for the tax years involved, Form 4340 and the TXMOD, are set forth in Appendix II, Exhibit E and Exhibit F.

App. II, Ex. A-1, 46:12-22 at II0012.

App. II, Ex. A-2, 50:2-5 at II0036.

App. II, Ex. A-3, 20:12-22:24 at II0057-II0059.

App. II, Ex. A-3, 66:19-25 at II0073.

App. II, Ex. A-6, Boucher Deposition Exhibit 2 ¶¶23 and 24 at II0229.

40.     There is currently no provision in the IRS transcripts for reporting a taxpayer's conversion of a cash bond deposit to a payment of tax, penalty and or interest.  In most cases, nothing is done to record the designation other than to retain a copy of the taxpayer's letter in the case file.

App. II, Ex. A-6, Boucher Deposition Exhibit 2 ¶29 at II0230.

App. II, Ex. A-6, 233:11-237:8 at II0202-II0206.

41.    Accordingly, no entry was made in the IRS Master File system to show conversion by Principal of its cash bond deposit to payment of the taxes and penalties on January 28, 2005, and the various IRS's transcripts of Principal's accounts for each of the taxable years in suit show no record of application of Principal's cash bond deposit to payment of taxes, interest, or penalties on January 28, 2005.

App. II, Ex. B-1 at II0242.

App. II, Ex. A-6, Boucher Deposition Exhibit 2, ¶29 at II0230.

App. II, Ex. 6, 233:11-237:8 at II0202-II0206; 243:12-244:10 at II0207-II0208.

App. II, Ex. E-1, E-2, E-3, E-4, E-5 at II0295-II0363. (Form 4340 1996-2000).

App. II, Ex. F-1, F-2, F-3, F-4, F-5 at II0364-II0410 (TXMOD 1996-2000).

42.     IRS Form 490 Activity Summary for each of the taxable years 1996, 1998, and 1999 contains various entries made with respect to Principal's account in the IRS Master File, including records of payments made, credits applied, credits transferred, abatements, and entries with respect to interest.  The forms 490 were generated in October, 2005, but contain no entry recording any payment by Principal on January 28, 2005.  The header on the Form 490 states: "LCU Interest Date:  LCU Interest is OFF."

App. II, Ex. G at II0411-II0413, II0414.

43.    In addition to their failure to reflect Principal's payment of the taxes, interest, and penalties on January 28, 2005, the IRS official transcripts, Forms 4340, for the taxable years in suit are simply erroneous because they contain entries showing extensions of the statute of limitation to May 30, 2005 and April 14, 2008.  The TXMODs are also erroneous because they contain entries showing a Form 870 signed by Principal with respect to one or more of the years in suit.  Principal never signed a Form 870 and never agreed to extend the statute of limitations for the years 1999 and 2000 beyond December 31, 2004.

App. II, Ex. E-1 at II0310 (Form 4340 1996).

App. II, Ex. E-2 at II0324 (Form 4340 1997).

App. II, Ex. E-3 at II0333 (Form 4340 1998).

App. II, Ex. E-4 at II0341 (Form 4340 1999).

App. II, Ex. E-5 at II0351, II0355 (Form 4340 2000).

App. II, F-1 at II0372 (TXMOD 1996).

App. II, Ex. F-2 at II0381 (TXMOD 1997).

App. II, Ex. F-4 at II0394 (TXMOD 1999).

App. II, Ex. F-5 at II0402 (TXMOD 2000).

App. II, Ex. F-5 at II0405 (TXMOD 2000).

App. II, Ex. F-5 at II0407(TXMOD 2000).

App. II, Ex. A-3, 48:15-49:9 at II0065-II0066; 78:8-80:23 at II0076-II0078; 83:5-84:19 at II0081-II0082; 87:22-89:18 at II0083-II0085.

App. II, Ex. B-1 at II0250.

44.     Terri Bassett is the Lead Tax Examining Technician in the IRS's Ogden Service Center, identified by the Defendant as its witness pursuant to Rule 30(b)(6), R.C.F.C. authorized to testify concerning IRS practices and procedures. Bassett has been employed by the IRS for 23 years. As Lead Tax Examining Technician, Bassett answers technical questions posed to her by other IRS personnel on a daily basis and gives on-the-job instruction to newly hired IRS employees. Bassett testified that taxpayers usually designated in writing how their remittances were to be applied and that the IRS honored those written designations. Bassett's testimony was supported by the testimony of Plaintiffs' expert witness, David Boucher. Boucher testified and reported that when the IRS receives a letter of designation requesting conversion of a deposit to a payment, the IRS considers the two-year statute of limitations on refunds to begin on the date of the letter of designation, that letters of designation are used to define the accrual of overpayment interest, deduction of underpayment interest, for global interest netting, and application of hot interest on large corporate underpayments.

App. B, Ex. 6, 5:8-23 at B00074.

App. II, Ex. A-3, 6:19-9:6 at II0050-II0053.

App. II, Ex. A-3, 90:21-91:9 at II0086-II0087; 95:5-10 at II0088; 118:18-23 at II0097.

App. II, Ex. A-6, Boucher Dep. Ex. 2 ¶¶ 13-16, 29, 39, 40-46, 55 at II0227-II0228, II0230, II0232-II0237.

App. II, Ex. A-6, 74:9-19, 75:22-76:8, 77:18-79:29; 82:10-20, 84:21-85:4, 93:6-9, 97:19-20, 102:1-106:14, 112:14-113:11, 114:9-13, 116:21-24, 143:24-145:10, 211:11-14, 212:3-9, 263:7-16, 272:16-24, 285:2-286:5 at II0163-II0172, II0174-II0182, II0188-II0190, II0200-II0201, II0210, II0213, II0220-II0221.

45.    The IRS could have recorded on Principal's account in its Master File payment of the taxes, interest, and penalties by Principal in accordance with Principal's letter of January 28, 2005, by using the following three Transaction Codes: (1) 640 (Advance Payment of Determined Deficiency)(without Blocking Series "990-999" and without Designated Payment Code 12) to post the payment of tax; (2) 680 (Designated Interest Payment) to post the payment of interest; and (3) 690 (Designated Penalty Payment) to post the payment of the penalties.    At the same time, the IRS would have reversed the January 13, 2005 Transaction Code 640 posting (Advance Payment of Deficiency) by entering Transaction Code 640R (Reversal) and Transaction Code 642 (Correction of TC 640 Processed in Error).

App. II, Ex. B-2 at II0258-II0260; II0261-II0264.

App. II, Ex. B-1 at II0243-II0246; II0247-II0249.

App. II, Ex. A-6, Boucher Deposition Exhibit 2, ¶30 at II0231.

App. II, Ex. A-6, 250:1-23 at II0209.

46.    In order to resolve questions that arise, IRS representatives in its processing centers sometimes place telephone calls to either the local field agent or to the taxpayer directly. Therefore, had there been any question about Principal's instructions in its January 28, 2005 letter, the IRS processing center personnel could have contacted Principal directly by telephone.

App. II, Ex. A-3, 95:15-96:23 at II0088-II0089.

47.    After IRS field agents complete examinations of taxpayers, processing of the cases is done at IRS processing centers and service centers.  Assessments are done by the IRS's processing centers and service centers.  The assessments of the taxes, interest, and penalties against Principal for the years that are at issue in this matter were accomplished by filling out one or more IRS Forms 2859 for each year.  Those Forms 2859 were prepared manually by Lola Parker, an assessment officer in the Ogden service center on May 26, 2005.  Each Form 2859 shows a "23C Date" of May 27, 2005.  Lead Tax Examining Technician Terri Bassett testified that a specific 23C date is specified in this manner when the assessment must be made very quickly on a specified date.  Each of the Forms 2859 also states that the assessment is to be done manually.    Terri Bassett testified that manual assessments are done when the statute of limitations is imminent because it takes more than 60 days when assessments are entered directly into the IRS computer without using Form 2859.

App. II, Ex. H-1 at II0416 (2859 1996).

App. II, Ex. H-2 at II0417 (2859 1997).

App. II, Ex. H-3 at II0418 (2859 1997).

App. B, Ex. 6, Bassett Deposition Exhibit 4 at B00132 (2859 1998).

App. B, Ex. 6, Bassett Deposition Exhibit 4 at B00133 (2859 1999).

App. II, Ex. H-6 at II0421 (2859 1999).

App. B., Ex. 6, Bassett Deposition Exhibit 4 at B00134 (2859 2000).

App. B, Ex. 6, Bassett Deposition Exhibit 4 at B00135 (2859 2000).

App. II, Ex. A-3, 46:8-19 at II0063; 49:10-17 at II0066;  50:1-11 at II0067; 51:3-17 at II0068.

48.    As part of the processing of the Forms 2859, IRS Revenue Accounting prepared Forms 3552(C).  The Forms 3552(C) show an assessment date of May 27, 2005 and an 870 Agreement Date of January 13, 2005.  The IRS Summary Record of Assessments was signed by an assessment officer on May 27, 2005, and showed assessment of tax in the amount of $364,236,226 and penalty in the amount of $27,277,423.

App. II, Ex. I-1 at II0424 (Form 3552 (C) 1998).

App. II, Ex. I-2 at II0425 (Form 3552 (C) 1999).

App. II, Ex. I-3 at II0426 (Form 3552 (C) 1999).

App. II, Ex. I-4 at II0427 (Form 3552 (C) 2000).

App. II, Ex. A-3. 53:2-17 at II0069.

App. II, Ex. L at II0445-II0448.

App. II, Ex. A-3, 63:18-66:4 at II0070-II0073.

49.    The Defendant has admitted that not all of the deficiencies in Plaintiffs' federal income taxes for the years at issue determined in the statutory notice of deficiency dated December 29, 2004 are attributable to the carryback of any net operating loss or capital loss, or any combination thereof, from any subsequent taxable years.

App. II, Ex. B-3 at II0275.

App. II, Ex. B-5 at II0277h.

50.     IRS Form 4340 for Plaintiffs' taxable years at issue show that the assessments of the taxes and penalties and underpayment interest thereon, referred to in the notice of deficiency dated December 29, 2004, were made by IRS on May 27, 2005.  That is the date on which the IRS deemed the taxes, interest, and penalties paid by Principal for purposes of the statute of limitations on assessments.

App. B, Ex.6, Bassett Deposition Exhibit 10 at B00159.

App. B, Ex.6, Bassett Deposition Exhibit 10 at B00166.

App. B, Ex. 6, Bassett Deposition Exhibit 7 at B00138.

App. II, Ex. E-4 at II0341-II0342.

App. II, Ex. E-5 at II0352.

App. II, Ex. A-3, 103:2-104:5 at II0092-II0093; 105:1-9 at II0094.

App. II, Ex. 6, Boucher Deposition Exhibit 2, ¶29 at II0230.

App. II, Ex. B-3 at II0268-II0274.

51.     By signing IRS Form 870, a taxpayer waives the restrictions on assessment contained in Section 6213(a) and thereby consents to an immediate assessment. If a Form 870 is signed by the taxpayer, the case is treated as an "agreed" case by the IRS processing or service center. The IRS's "TXMOD" transcripts of Principal's account contain entries that were input into the Master File indicating that a Form 870 had been signed by Principal on January 13, 2005, the same date that the cash bond deposit was made. Likewise, the IRS Forms 2859 filled out by the designated assessment officer also showed Principal's case as "agreed." However, those entries were in error because, following issuance of the notice of deficiency on December 29, 2004, no Form 870 was signed by Principal for the years 1999 and 2000. Moreover, no form 872 extending the statute of limitations for assessment to either May 30, 2005 or April 14, 2008 was ever signed by Principal with respect to any of the taxable years 1996 through 2000.

App. II, Ex. A-3, 105:14-106:9 at II0094-II0095.

App. II, Ex. F-1 at II0372 (TXMOD 1996).

App. II, Ex. F-2 at II0381 (TXMOD 1997).

App. II, Ex. F-4 at II0394 (TXMOD 1999).

App. II, Ex. F-5 at II0402 (TXMOD 2000).

App. II. Ex. A-3, 48:15-49:7 at II0065-II0066; 106:7-9 at II0095; 108:5-12 at II0096.

App. II, Ex. H-1 at II0416.

App. II, Ex. H-2 at II0417.

App. II, Ex. H-3 at II0418.

App. B, Ex.6, Bassett Deposition Exhibit 4 at B00132.

App. B, Ex. 6, Bassett Deposition Exhibit 4 at B00133.

App. II, Ex. H-6 at II0421.

App. B, Ex. 6, Bassett Deposition Exhibit 4 at B00134.

App. B, Ex. 6, Bassett Deposition Exhibit 4 at B00135.

App. II., Ex. B-1 at II0250.

App. II, Ex. B-1 at II0251.

52.    IRS supervisor Hale believed any assessments against Principal would be made by the IRS processing center in either St. Paul, Minnesota or St. Louis, Missouri. He thought, however, that the IRS was precluded from assessing the taxes, interest, and penalties against Principal upon receipt of the January 28, 2005 letter because Principal had not signed any waiver of restrictions on assessment (Form 870) and in such circumstances IRS could not make any assessment until the expiration of 90 days from the issuance of the notice of deficiency. The Defendant has admitted that the absence of a signed Form 870 was the reason no assessment was made following receipt of Principal's January 28, 2005 letter.

App. II, Ex. B-1 at II0249a-II0249c.

App. II, Ex. A-2, 36:13-37:15 at II0032-II0033; 38:22-39:7 at II0034-II0035; 68:8-12 at
    II0042.

53.     Principal filed refund claims with the IRS for the taxable years 1996 through 2000, seeking refunds of certain portions of the income tax and all of the penalties, plus interest, paid with respect to the notice of deficiency.  Table 53-1 on the following page shows the dates and amounts of the amended returns/claims for refund filed by Principal for each of the taxable years 1996-2000 after receipt of the notice of deficiency.  As shown in Table 53-1, the total tax claimed in all such claims for refund filed for the years 1996-2000 is $254,624,434, which, when added to the penalties, refund of which was also claimed in the aggregate amount of $27,377,423, results in an aggregate refund claimed of $282,001,857, contrary to the Defendant's assertion that this case involves $500 million. (Def's. Br. 1)

Table 53-1 appears on the following page.

See also:

Case 1:07-cv-00006-FMA, Document 12-3 Filed 09/26/2007 at 1-4 (1996).

Case 1:07-cv-00006-FMA, Document 12-8 Filed 09/26/2007 at 1-6 (1996).

Case 1:07-cv-00006-FMA, Document 22-3 Filed 04/07/2008 at 1-4 (1996).

Case 1:07-cv-00006-FMA, Document 22-8 Filed 04/07/2008 at 1-6 (1996).

Case 1:07-706-FMA, Document 1 Filed 09/28/2007.

Appendix I, Exhibit A at 1, 1.1 (1997)

Appendix I, Exhibit B at 1, 31-36 (1997)

Appendix I, Exhibit C at 1, 1.1 (1998)

Appendix I, Exhibit D at 1-5, 58-63 (1998)

Case 1:08-cv-00135-FMA, Document 1-3 Filed 03/06/2008, at 5, 6 (1999)

Case 1:08-cv-00135-FMA, Document 1-4 Filed 03/06/2008 at 32-37, 39-40 (1999)

Case 1:08-cv-00135-FMA, Document 1-6 Filed 03/06/2008 at 4, 5, 55-60 (2000)

## Table 53-1
### Amended Returns/Claims for Refund For Amounts Paid Following Notice of Deficiency

| Tax Year | Claim for Refund* | Claim for Refund Date* | Amount** | Complaint Date | Complaint Reference | Answer Date | Answer Reference | Case |
|---|---|---|---|---|---|---|---|---|
| 1996 | Second Amended Return | January 26, 2007 | $8,293,351 | November 27, 2007 | 1st A. Compl. ¶25 Case 1:07-cv-00006-FMA. Doc. 16, Pg.1. | March 25, 2008 | 1st A. Compl. ¶25 Case 1:07-cv-00006-FMA. Doc. 21, Pg. 2. | No.07-6T |
| Total | | | $8,293,351 | | | | | |
| | | | | | | | | |
| 1997 | Second Amended Return | January 26, 2007 | $6,276,923 | September 28, 2007 | Compl. ¶15 Case 1:07-cv-00706-FMA. Doc.1, Pg.6. | March 25, 2008 | Ansr. ¶15 Case 1:07-cv-00706-FMA.Doc.13, Pg.7. | No.07-706T |
| 1997 | Third Amended Return | February 12, 2008 | $16,890,298 | October 6, 2008 | 2nd A.Compl. ¶17.1(2b) Case 1:07-cv-00006-FMA. Doc. 34, Pg. 4. | December 23, 2008 | Ansr. to 2nd A.Compl. ¶17.1(2b) Case 1:07-cv-00006-FMA. Doc. 39, Pg. 4 | No.07-706T |
| Total | | | $23,167,221 | | | | | |
| | | | | | | | | |
| 1998 | Second Amended Return | January 26, 2007 | $37,458,810 | September 28, 2007 | Compl. ¶ 27 Case 1:07-cv-00706-FMA. Doc.1, Pg.13. | March 25, 2008 | Ansr ¶ 27 Case 1:07-cv-00706-FMA.Doc.13, Pg.15. | No.07-706T |
| Total | | | $37,458,810 | | | | | |
| | | | | | | | | |
| 1999 | Amended Return | January 26, 2007 | $6,850,759 | March 6, 2008 | Compl.¶ 14 Case 1:08-cv-00135-FMA. Doc.1, Pg. 5. | May 12, 2008 | Ansr ¶14 Case 1:08-cv-00135-FMA. Doc. 26, Pg. 5. | No.08-135-T |
| 1999 | Second Amended, as amended | January 26, 2007 / February 7, 2008 | $[118,562,128] / $53,056,224*** | March 6, 2008 | Compl. ¶17 Case 1:08-cv-00135-FMA. Doc. 1, Pg. 9 .*** | May 12, 2008 | Ansr ¶17 Case 1:08-cv-00135-FMA. Doc. 26, Pg. 7** | No.08-135T |
| 1999 | Third Amended Return | February 12, 2008 | $77,409,241 | October 6, 2008 | 2nd A.Compl. ¶19.1(3b) Case 1:07-cv-00006-FMA. Doc. 34, Pg. 12. | December 23, 2008 | Ansr to 2nd A. Compl. ¶19.1(3b) Case 1:07-cv-00006-FMA. Doc. 39, Pg. 9. | No.08-135T |
| Total | | | $137,316,224 | | | | | |
| | | | | | | | | |
| 2000 | Amended Return | January 26, 2007 | $37,013,392 | March 6, 2008 | Compl. ¶27 Case 1:08-cv-00135-FMA. Doc. 1, Pg. 16. | May 12, 2008 | Ansr ¶27 Case 1:08-cv-00135-FMA. Doc. 26, Pg. 13. | No.08-135T |
| 2000 | Second Amended Return | February 12, 2008 | $11,375,436 | October 6, 2008 | 2nd A.Compl. ¶29.1(3f) Case 1:07-cv-00006-FMA. Doc. 34, Pg. 16. | December 23, 2008 | Ansr to 2nd A. Compl. ¶29.1(3f) Case 1:07-cv-00006-FMA. Doc. 39, Pg. 12. | No.08-135T |
| Total | | | $48,388,828 | | | | | |
| All | | | $254,624,434 | | | | | |

56

*Principal filed amended returns/claims for refund for 1996, 1997, and 1998 prior to issuance of the notice of deficiency, in the amounts of $30,351,882, $2,614,791, and $2,186,449, respectively. Those for 1997 and 1998 were filed on June 27, 2003, and the 1996 claim was filed on June 7, 2001. While such claims bore no relationship to the notice of deficiency, they are a part of the substantive issues in this case because they have never been allowed by IRS.

**The amounts shown do not include penalties in the aggregate amount of $27,377,423, refund of which was also claimed.

*** These references to the pleadings refer to the original claim for refund attributable to carryback issues to 1999, which was filed on January 26, 2007, in the amount of $118,562,128, which was amended downward on February 7, 2008 to $53,056,224.

53.1    On or about January 26, 2007, Principal filed a refund claim with the IRS for the taxable year 1999, seeking refund of a portion of the  income tax and all of the penalty, plus interest, paid for 1999 as a result of the notice of deficiency.  The refund claim for 1999 claimed a refund of tax attributable to non-carryback issues of $6,850,759, plus refunds of penalty in the amount of $10,848,700 and unstated amounts of deficiency interest paid for 1999 and overpayment interest allowable under Section 6611.  Also on January 26, 2007, Principal filed with IRS an additional and separate claim for refund for 1999 claiming refund of tax of $118,562,128 attributable to carryback issues from 2001.  Subsequently, Principal discovered that this latter claim for refund contained a calculation error and, accordingly, on February 7, 2008, Principal filed an amended 1999 claim for refund of tax attributable to carryback issues from 2001 in the amount of $53,056,224. On February 12, 2008, Principal filed another claim for refund for 1999 claiming refund of tax of $77,409,241 attributable to carryback issues from 2002.  Thus, Principal's claims for refund for 1999, including carryback issues from 2001 and 2002, totaled $137,316,224 in tax, exclusive of interest and penalty. This compares with a deficiency for 1999 of $164,888,638 in tax (including the carryback issues from 2001 and 2002) asserted in the December 29, 2004 notice of deficiency and paid by Principal.  Principal's refund claims for 1999 included challenges to the timeliness of the IRS' May 27, 2005, assessment based on Section 6213(b)(4).

App. II, Ex. D at II0279.

Case 1:08-cv-00135-FMA Document 1 filed 03/06/2008 ¶¶ 14, 17 at 5, 7.

Case 1:08-cv-00135-FMA Document 26 filed 05/12/2008 ¶¶ 14, 17 at 5, 7.

Case 1:07-cv-00006-FMA Document 34 filed 10/06/2008 ¶ 19.1(3b) at 12.

Case 1:07-cv-00006-FMA Document 39 filed 12/23/2008 ¶ 19.1(3b) at 9.

Case 1:08-cv-00135-FMA, Document 1-3 Filed 03/06/2008, at 5, 6, 32-37.

Case 1:08-cv-00135-FMA, Document 1-4 Filed 03/06/2008 at 32-37, 39-40.

53.2  Also on or about January 26, 2007, Principal filed a refund claim with the IRS for the taxable year 2000, seeking refund of a portion of the income tax and all of the penalty, plus interest, paid for 2000 as a result of the notice of deficiency.  The refund claim for 2000 claimed a refund of tax in the amount of $37,013,392 and unstated amounts of deficiency interest paid for 2000 and overpayment interest allowable under Section 6611.  Such claim for refund for 2000 included challenges to the timeliness of the IRS' May 27, 2005, assessment based on Section 6213(b)(4).  On February 12, 2008, Principal filed with the IRS an additional refund claim for the year 2000 seeking an additional refund of tax paid for that year in the amount of $11,375,436.  Principal's claims for refund filed for 2000, exclusive of penalty, therefore, totaled 48,388,828.  This compares with a total deficiency in tax for the year 2000 in the amount of $128,727,605 asserted by IRS in the December 29, 2004 notice of deficiency and paid by Principal.

Case 1:08-cv-00135-FMA Document 1 filed 03/06/2008 ¶¶ 27 at 16.

Case 1:08-cv-00135-FMA Document 26 filed 05/12/2008 ¶¶ 27 at 13.

Case 1:07-cv-00006-FMA Document 34 filed 10/06/2008 ¶ 29.1(3f) at 16.

Case 1:07-cv-00006-FMA Document 39 filed 12/232008 ¶ 29.1(3f) at 12.

53.3   Table 53.3-1, appearing on the following page, shows the portions of the total tax set forth in the December 29, 2004 notice of deficiency that are attributable to carryback and non-carryback issues, as well as the tax attributable to the issue of late assessment, for each of the years 1996-2000.  Because all penalties for the years 1996-2000 set forth in the notice of deficiency arose from issues in 1999 and 2000, the untimely assessment issue also implicates all of the penalties for those years, as follows:

| | |
|---|---|
| 1996 | $961,609 |
| 1997 | $780,951 |
| 1998 | $7,491,744 |
| 1999 | $10,848,700 |
| 2000 | $7,294,419 |
| TOTAL | $27,377,423 |

As shown in the last two columns on Table 53.3-1, the total of the tax and penalties attributable to the untimely assessment issue claimed in Principal's claims for refund for the years 1996-2000 is $51,840,064 ($24,462,641 + $27,377,423), contrary to the Defendant's contention that the untimely assessment issue in this case involves $500 million (Def's Br. 1) or $100 million (Def's Br. 2)

App. II, Ex. D at II0279, II0286a-II0286b, II0293a, II0294a.

Table 53.3-1 appears on the following page.

**Table 53.3-1**

| Year | Tot. Tax, per Notice/ Defic. | Adjmts. Attrib. To Carrybacks# | Tax Thereon @ 35%[3] | Non-Carrybk Adjustments# | Tax Thereon[4] @ 35% | C/R on Late Assmnts | Penalties from 1999 & 2000 |
|---|---|---|---|---|---|---|---|
| 1996 | 8,806,758 | $ 44,922,511 | $ 8,806,758 | -0- | -0- | -0- | $961,609 |
| 1997 | 22,097,933 | 122,517,678 | 22,097,933 | (528,990) | -0- | -0- | 780,951 |
| 1998 | 37,509,413 | 170,081,777 | 37,450,757 | 230,728 | $ 58,656 | $58,656 | 7,491,744 |
| 1999 | 164,888,638 | 482,442,274 | 139,432,051 | 87,568,101 | 25,456,587 | 6,850,759[5] | 10,848,700 |
| 2000 | 128,727,605 | 119,751,949 | 54,029,476 | 165,617,443 | 74,698,129 | 17,553,226[6,7] | 7,294,419 |
| Total | $362,030,347 | $939,716,189 | $261,816,975 | $252,887,282 | $100,213,372 | $24,462,641[8] | $27,377,423 |

#From App. II, Ex. M-1 at II0449.
App. II, Ex. D at II0279, II0286a-II0286b, II0293a, II0294a.

---

[3] Computed by applying 35% tax rate to adjustments shown in preceding column and applying applicable credits proportionately. In the event the Court grants Plaintiffs' cross-motion for summary judgment, Plaintiffs request that the Court allow the parties an opportunity to compute and agree upon the correct amount of refund.

[4] Computed by applying 35% tax rate to adjustments shown in preceding column and applying applicable credits proportionately. In the event the Court grants Plaintiffs' cross-motion for summary judgment, Plaintiffs request that the Court allow the parties an opportunity to compute and agree upon the correct amount of refund.

[5] Add penalty of $10,848,700, for total of $17,699,459.

[6] 35% of $50,152,074 in heading of untimely assessment narrative included in claim for refund.

[7] Add penalty of $7,294,419, for total of $24,847,645.

[8] With aggregate penalties of $27,377,423, total amount at issue on untimely assessments is $51,840,064.

61

53.4     Principal agreed with, and did not file claims for refund with respect to, numerous adjustments reflected in the notice of deficiency and the tax attributable thereto.

App. II, Ex. M-1 at II0449b and II0449c.

54.     Cash bond deposits by taxpayers are infrequent and conversions of cash bond deposits to payments of tax are even more infrequent.  David Boucher, Principal's expert witness, is a certified public accountant whose proprietary computer software is licensed to and used regularly by the IRS in its various processing centers and to the Department of Justice and large accounting firms for computations of underpayment and overpayment interest. Boucher advises and represents large corporate taxpayers on interest and cash bond matters.

App. II, Ex. A-6, 75:9-76:8 at II0164-II0165; 116:7-24 at II0182; 268:1-269:23 at II0211-
    II0212; 277:10-279:7 at II0214-II0216; 281:24-282:23 at II0217-II0218.

App. II, Ex. A-3, 16:11-17:5 at II0055-II0056.

App. II, Ex. A-6, Boucher Deposition Exhibit 2, ¶4 at II0225.

55.    Boucher reported and testified that, based on his experience, when an over-payment is to be refunded to a taxpayer, the IRS computes overpayment interest from the date the cash bond deposit is converted to a payment of the tax by a letter of designation.  Boucher also reported and testified that the IRS measures the two-year statute of limitation for filing claims for refund under Section 6511 from the date the cash bond deposit is designated to a payment.  He further reported and testified that the IRS allows accrual basis taxpayers to deduct accrued underpayment interest in the taxable year in which a cash bond deposit has been converted to payment of the tax.

App. II, Ex. A-6, Boucher Deposition Exhibit 2, ¶29, ¶39; ¶ 40, ¶42, ¶43, ¶44, ¶45, ¶46 at II0230, II0232, II0233-II0235.

App. II, Ex. A-6, 74:10-19 at II0163;  75:22-76:8 at II0164-II0165; 77:18-79:20 at II0166-II0168; 82:10-20 at II0169 ;  84:21-85:4 at II0170-II0171; 93:6-9 at II0172; 102:1-106:21 at II0174-II0178; 112:14-113:11 at II0179-II0180; 114:9-13 at II0181; 116:21-24 at II0182.

56.    Boucher also reported and testified that in his opinion, based on his experience, Principal's letter of January 28, 2005 converted the January 13, 2005 cash bond deposits to payments of the taxes as of January 28, 2005 for purposes of allowance of overpayment interest, interest rate determination in cases of underpayments, global interest netting, determination of commencement of the statute of limitations, and determination of whether "hot interest" on large corporate underpayments under Section 6621(c)(1) applies.

App. II, Ex. A-6, Boucher Deposition Exhibit 2, ¶13, ¶14, ¶15, ¶16, ¶55 at II0227-II0228, II0236-II0237.

App. II, Ex. A-6, 143:2-145:10 at II0188-II0190.

Date: October 2, 2009.

/s/ *Bruce Graves*

Bruce Graves
Brown, Winick, Graves, Gross,
   Baskerville and Schoenebaum, P.L.C.
666 Grand Avenue, Suite 2000
Des Moines, IA 50309-2510
Telephone: 515/242-2400
Facsimile: 515/283-0231
E-mail: *graves@brownwinick.com*

ATTORNEY FOR PLAINTIFFS