# In The United States Court of Federal Claims

No. 07-0006T

(Filed:  November 12, 2010)

_____

| | |
|---|---|
| PRINCIPAL LIFE INSURANCE COMPANY AND SUBSIDIARIES,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | * Tax refund suit; Cross-motions for partial<br>* summary judgment; Relationship between<br>* tax liability, assessments, and<br>* overpayments; Timeliness of assessment;<br>* 26 U.S.C. § 6204; Relationship between 26<br>* U.S.C. §§ 6213(b)(4) and 6503(a);<br>* Conversion of deposit into payment;<br>* *Rosenman* and progeny; Rev. Procs. 84-58<br>* and 2005-18; Deposits versus payments<br>* under the decisional law; Assessment<br>* timely; Even if untimely, no overpayment<br>∗ under 26 U.S.C. § 6401(a). |

_____

## OPINION

_____

*Bruce Graves*, Brown Winick, P.L.C., Des Moines, Iowa, for plaintiff.

*Bart Duncan Jeffress*, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *John A. DiCicco*, for defendant.

**ALLEGRA, Judge**:

"The procedural aspects of the tax laws are of overriding importance in many controversies," one commentator has noted, "eclipsing or making moot substantive issues such as the allowance of deductions or credits, recognition or deferral of income, and methods of accounting."  Theodore D. Peyser, 627-3rd Tax Management Portfolio, "Limitations Periods, Interest on Underpayments and Overpayments, and Mitigation" at 1 (2010).  At times, the questions spawned by these procedures take on an almost "metaphysical" cast, *Baral v. United States*, 528 U.S. 431, 436 (2000), like "when is taxable income taxed?"  The ontology needed to solve such abstruse inquiries comes not from philosophical tomes, but from Chapters 63 through 66 of the Internal Revenue Code of 1986, which supply interfused rules mapping the contours of commonly-used, but frequently-misunderstood, tax concepts such as "assessment," "deposit," and "overpayment."

Though the background provided by these rules can be numbing in its intricacy, the dispute presented by the cross-motions for summary judgment pending before the court can be stated simply:  Plaintiff, Principal Life Insurance Company and Subsidiaries (plaintiff or Principal) argues that it is entitled to certain overpayments because its taxes were not timely assessed by the Internal Revenue Service (IRS).  Defendant responds that the taxes in question were timely assessed and that even if they were not, they are not recoverable as an overpayment.  Plaintiff is wrong; defendant is right.  It remains to explain why.

## I.   BACKGROUND

Plaintiff, an Iowa corporation with principal offices in Des Moines, is engaged, and at all times relevant to this action, was engaged, in the business of writing various forms of individual and group life and health insurance and annuities.

Plaintiff filed returns for its taxable years 1999 and 2000 and then entered into an agreement (on IRS Form 872) with the IRS extending the period to assess an income tax deficiency for those years until December 31, 2004.  On December 29, 2004, the IRS issued its notice of deficiency claiming the following additions to taxes and penalties due from Principal:

| Tax Year Ended | Tax Deficiency | Penalty | Total |
|---|---|---|---|
| Dec. 31, 1996 | $      8,806,758 | $         961,609 | $      9,768,367 |
| Dec. 31, 1997 | 22,097,933 | 780,951 | 22,878,884 |
| Dec. 31, 1998 | 37,509,413 | 7,491,744 | 45,001,157 |
| Dec. 31, 1999 | 164,888,638 | 10,848,700 | 175,737,338 |
| Dec. 31, 2000 | 128,727,605 | 7,294,419 | 136,022,024 |
| **Total** | **$   362,030,347** | **$   27,377,423** | **$   389,407,770** |

On January 13, 2005, in order to stop the accrual of underpayment interest, plaintiff remitted to the IRS, via wire transfer, $444 million.  That same day, plaintiff's attorney delivered a letter to the IRS designating the remittance as "a deposit in the nature of a cash bond" pursuant to section 6603 of the Code (26 U.S.C. § 6603) and section 4.01 of Revenue Procedure 84-58, 1984-2 C.B. 501, and designating portions of the deposit for each of plaintiff's taxable years 1996 through

2000.[1]  The letter also specified that the entire deposit was made "with respect to a 'disputable tax' as that term is defined in section 6603(d)(2)(A) of the Code."[2]

After several conversations with the IRS, on January 28, 2005, plaintiff delivered another letter to the IRS requesting that, "[i]n accordance with Sections 3.02 and 3.03 of Revenue Procedure 2002-26," the IRS "now (today) apply the deposit for each year to payment of the federal income tax, interest and penalty in the following amounts for each year in ascending order:"

| Year | Tax | Penalty | Interest |
|------|-----|---------|----------|
| 1996 | $    8,806,758 | $      961,609 | $   2,032,704.38 |
| 1997 | 22,097,933 | 780,951 | 1,728,429.98 |
| 1998 | 37,509,413 | 7,491,744 | 6,303,004.87 |
| 1999 | 164,888,638 | 10,848,700 | 24,358,720.79 |
| 2000 | 128,727,605 | 7,294,419 | 19,182,961.25 |

The letter further indicated that any portion of the deposit not applied to these amounts was to "be applied to payment of the deficiency for the year 2000 in the amount of $344,372.111," and

------

[1]  The letter designated the "deposits" as follows:

| Year | Amount |
|------|--------|
| 1996 | $  11,000,000 |
| 1997 | $  26,100,000 |
| 1998 | $  51,600,000 |
| 1999 | $202,000,000 |
| 2000 | $153,300,000 |
| **Total** | **$444,000,000** |

Principal's practice, in response to past IRS audits, was to pay the tax found due and later file claims for refund as to disagreed issues.  It did not do so in the present case because one of the adjustments set forth in the statutory notice related to purported investments that plaintiff made with Deutsche Bank.  Deutsche Bank agreed to indemnify Principal for taxes, interest and penalties arising out of these purported investments.  Principal made the deposit in order to stop the accrual of interest while seeking Deutsche Bank's consent to pay the taxes and penalties.

[2]  As will be discussed in greater detail below, section 6603 of the Code (26 U.S.C.) authorizes taxpayers to make deposits to suspend the running of interest on potential underpayments of tax.  A "disputable tax" is the amount of tax estimated by the taxpayer for an item of income, deduction, or credit over whose treatment the taxpayer and the IRS reasonably disagree.

that any deposit remaining after the payment "of all deficiencies (including interest) for these years should be refunded."[3]  Although the IRS received this letter, it did not post the deposits to plaintiff's accounts for taxable years 1996 through 2000, as payments of tax, interest, and penalty.

On May 27, 2005, the IRS assessed deficiencies in income tax and penalties against plaintiff for taxable years 1996 through 2000, as outlined in the notice of deficiency.  That same day, the IRS used plaintiff's deposit to pay the deficiencies assessed.  Most of the deficiencies assessed for plaintiff's taxable years 1996 through 2000 were attributable to net operating or capital loss carrybacks, with the exception of assessments totaling $31,552,157 in tax and $10,848,700 in penalties for 1999, and $59,062,216 in tax and $7,294,419 in penalties for 2000.

On various dates, plaintiff timely filed refund claims with the IRS for all of the income tax and penalties, plus interest, assessed for taxable years 1996 through 2000.  After receiving a notice of partial disallowance of these claims, plaintiff filed a tax refund suit in this court on January 4, 2007.  On September 4, 2009, defendant filed a motion for partial summary judgment, focusing on issues concerning the validity of the assessments of the taxes in question.[4]  On October 2, 2009, plaintiff filed a cross-motion for partial summary judgment regarding the same issues.[5]  After briefing on the motions was completed, the court, on April 29, 2010, conducted oral argument on the cross-motions.

---

[3]  By the time the January 28 letter was sent, Deutsche Bank had agreed to allow Principal to pay the tax and penalties at issue.  At this time, plaintiff did not intend to contest the alleged deficiencies in the Tax Court, but instead intended to file claims for refund and, if necessary, sue to recover the portion of its remittance that was attributable to IRS adjustments it believed were incorrect.

[4]  Initially, plaintiff challenged the timeliness of all the assessments made for its taxable years 1998 through 2000.  During discovery, however, it conceded the timeliness of all assessments that were attributable to net operating or capital loss carrybacks under section 172 of the Code (26 U.S.C.) and asserted that only the non-carryback portions of the assessments for tax years 1998, 1999 and 2000 were untimely, corresponding to an amount at issue totaling $108,757,492.

[5]  In its briefs, plaintiff cites various IRS private letter rulings and Chief Counsel Advisories in support of its arguments.  While plaintiff blithely claims otherwise, its reliance upon these materials plainly violates section 6110(k)(3) of the Code (26 U.S.C.), which prohibits such materials from being "used or cited as precedent."  *See Amergen Energy Co., L.L.C. v. United States*, 94 Fed. Cl. 413, 418 (2010); *Vons v. United States*, 51 Fed. Cl. 1 (2001).  In accordance with the statute, the court will not consider these materials in resolving the pending motions.

## II.     DISCUSSION

Plaintiff claims that certain of its tax liabilities were not timely assessed and that the portion of its "payments" attributable to these liabilities are overpayments which must be refunded.  It relies, in this regard, primarily on section 6401(a) of the Code, which provides that "[t]he term 'overpayment' includes that part of the amount of the payment of any internal revenue tax which is assessed . . . after the expiration of the period of limitations properly applicable thereto."  26 U.S.C. § 6401(a).  Defendant believes that this provision is inapplicable for two reasons.  First, it asserts that the liabilities in question were timely assessed, rendering this provision inapposite.  Second, it contends that even if the liabilities in question were not timely assessed, their payment did not result in "overpayments" refundable under section 6401(a).

To put these disputes in context, it is useful to begin by summarizing a few of the basic rules governing "assessments" and "overpayments."

### A.     (Very) General Rules Involving Assessments and Overpayments

Liability of any corporate taxpayer for federal income tax arises upon its receipt of "taxable income."  26 U.S.C. § 11(a).  The fixing of that liability does not depend upon any subsequent "assessment" – the latter term a reference to "a 'recording' of the amount the taxpayer owes the Government."  *Hibbs v. Winn*, 542 U.S. 88, 100 (2004) (quoting 26 U.S.C. § 6203).[6]  This view is confirmed by various provisions of the Code, among them 26 U.S.C. § 6151(a), which specifies that "when a return of tax is required . . . the person required to make such return shall, without assessment . . . pay such tax to the internal revenue officer with whom the return is filed, and shall pay such tax at the time and place fixed for filing the return."  *See also* 26 U.S.C. §§ 6012(a); 6072(b).  Hence, on the date a return is filed, "the taxpayer has a positive obligation to the United States to pay its tax."  *Manning v. Seeley Tube & Box Co.*, 338 U.S. 561, 565 (1950); *see also Fleetboston Fin. Corp. v. United States*, 68 Fed. Cl. 177, 179 (2005) ("The last date prescribed for the payment of tax is the due date for the tax return on which the tax is reported.").  And this obligation arises and persists whether *vel non* that tax is assessed.  *See Baral*, 528 U.S. at 1009; *United States v. Kelley*, 539 F.2d 1199, 203 (9th Cir. 1976), *cert. denied*, 419 U.S. 963 (1976) ("Tax liability is imposed by statute independent of any

---

[6]  *See also United States v. Galletti*, 541 U.S. 114, 122 (2004) ("In its numerous uses throughout the code, it is clear that term 'assessment' refers to little more than the calculation or recording of a tax liability.").  Mechanically speaking, an assessment is made when an IRS official signs a summary record of assessment identifying the taxpayer, the character or the liability assessed, the taxable period (if any), and the amount of the assessment.  *See* 26 U.S.C. § 6203; Treas. Reg. § 301.6203-1.

administrative assessment."); Philip N. Jones, "The Supreme Court Clarifies the Role of Assessments in Tax Controversies," 92 J. Tax'n 275, 277 (2000) (hereinafter "Jones").[7]

So if an "assessment" does not fix a taxpayer's income tax liability, what does it do? Even a cursory review of the Code reveals that the concept is important to the administration of the tax laws.  Thus, section 6201(a) of the Code provides that "[t]he Secretary is authorized and required to make . . . assessments of all taxes . . . imposed by this title which have not been duly paid . . . at the time and in the manner provided by law," including "all taxes determined by the taxpayer or by the Secretary as to which returns or lists are made under this title."  *See also Hibbs*, 542 U.S. at 100 n.3 (discussing this provision).  Section 6501(a) of the Code further proclaims that "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed," adding that "no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period."  26 U.S.C. § 6501(a).  And section 6303(a) states that within 60 days of the assessment, the Secretary is required to "give notice to each person liable for the unpaid tax, stating the amount and demanding payment thereof."  26 U.S.C. § 6303(a).

Cases analyzing these provisions have characterized assessments as serving a "collection-propelling function," *Hibbs*, 542 U.S. at 102 – one that facilitates the collection of unpaid taxes.  Whereas the IRS may enforce a taxpayer's tax obligations in various ways, its broadest enforcement powers, such as the use of liens and levies, are available only when an assessment is made.  *See* 26 U.S.C. §§ 6331(a), 6322 (lien shall arise "at the time the assessment is made"), 6502; *Hibbs*, 542 U.S. at 102 ("'assessment' serves as the trigger for levy and collection efforts").[8]  Moreover, "[w]here the assessment of any tax imposed by this title has been made within the period of limitation properly hereto," the period in which "such tax may be collected by levy or by a proceeding in court" is extended from three years to "10 years after the assessment."  26 U.S.C. § 6502; *cf.* 26 U.S.C. § 6501(a); *see also Hibbs*, 542 U.S. at 102; *Galletti*, 541 U.S. at 119.  Ascribing further significance to the concept, the Supreme Court has long held that "[t]he assessment supersedes the pleading, proof, and judgment necessary in an action at law, and has the force of such a judgment."  *Bull v. United States*, 295 U.S. 247, 260

---

[7]  Many ramifications flow from this principle.  For example, a taxpayer may be convicted of failing to pay a tax even though the tax was not assessed.  *See United States v. Silkman*, 156 F.3d 833, 836-37 (8th Cir.1998), *cert. denied*, 531 U.S. 1129 (2001) (holding that proof of a valid assessment is not an essential element of criminal tax evasion).  And a debtor's tax liability survives even if the assessment thereof is subsequently declared to be void under the bankruptcy laws.  *See In re Goldston*, 104 F.3d 1198, 1100, 1200 (10th Cir. 1997) (claim for taxes may be brought by IRS even if assessment of taxes is declared void under the automatic stay provisions of 11 U.S.C. § 362).

[8]  *See also* Peyser, 627-3rd T.M. 1-B at 7 ("A timely assessment permits the IRS to collect the tax by levy or by a judicial collection proceeding . . . .  The assessment also gives rise to a lien against all property or rights to property belong to the taxpayer.").

(1935).[9]  And because an assessment is entitled to a legal presumption of correctness, it "can help the government prove its case against a taxpayer in court."  *United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 242 (2002); *see also United States v. Janis*, 428 U.S. 433, 440 (1976).

But, what if the assessment of a tax liability is untimely – that is, not made within the statute of limitations prescribed by the Code?  Does that convert remittances made with respect to the liability into a refundable overpayment?  The latter, of course, is precisely the question posed by plaintiff here.  But, before reaching that question, the court must examine the essential premise upon which it is based and determine whether the assessment here was untimely.

### B.      Was the Assessment Here Timely?

Although section 6501 of the Code generally gives the IRS three years after a return is filed within which to assess the tax reflected thereon, the actual statute of limitations applicable to a given assessment may vary in particular cases.  For one thing, special rules apply where the IRS claims additional taxes are owed beyond those reflected on the original return.  Section 6204 of the Code thus provides that "[t]he Secretary may, at any time within the period prescribed for assessment, make a supplemental assessment whenever it is ascertained that any assessment is imperfect or incomplete in any material respect."  Such assessments come into play where the Secretary, after an audit, finds that there is a tax deficiency.  *See id*. at § 6204(b); *Singleton v. United States*, 128 F.3d 833, 837-38 (4th Cir. 1997).  Upon finding a tax deficiency, the IRS is required by section 6213(a) of the Code to send the taxpayer a notice of deficiency and wait ninety days to see whether the taxpayer files "a petition with the Tax Court for a redetermination of the deficiency."  26 U.S.C. § 6213(a).  In this regard, Section 6213(a) provides that "no assessment of a deficiency in respect of any tax . . . shall be made . . . until such notice had been mailed to the taxpayer, nor until the expiration of such 90-day . . . period, . . . nor, if a petition has been filed with the Tax Court, until the decision of the Tax Court has become final."  26 U.S.C. § 6213(a).  To account for this delay, section 6503(a)(1) of the Code suspends the running of the statute of limitations on assessments in section 6501, using the following terms:

> The running of the period of limitations provided in section 6501 . . . on the making of assessments . . . . shall (after the mailing of a notice under section

---

[9]  *See also Moran v. United States*, 63 F.3d 663, 666 (7th Cir. 1995), *overruled in part, on other grounds*, *Malichinski v. Comm'r of Internal Revenue*, 268 F.3d 497 (7th Cir. 2001) (assessment "permits the government to bring its administrative apparatus to bear in collecting a tax"); *Beloff v. Comm'r of Internal Revenue*, 996 F.2d 607, 616 (2d Cir. 1990) ("an assessment has the binding force of judgment to establish an immediate liability against the taxpayer"); *Cohen v. Gross*, 316 F.2d 521, 522-23 (3d Cir. 1963) (an assessment "has consequences somewhat similar to the reduction of a claim to judgment."); Donald T. Kramer, "Suspension of Running of Period of Limitation, under 26 U.S.C.A. § 6503, for Federal Tax Assessment or Collection," 160 A.L.R. Fed. 1, §2[a] (A tax assessment "does not create the tax liability, but merely operates in the nature of a judgment and thus allows for the collection of the tax liability.").

6212(a)) be suspended for the period during which the Secretary is prohibited
from making the assessment . . . (and in any event, if a proceeding in respect of
the deficiency is placed on the docket of the Tax Court, until the decision of the
Tax court becomes final), and for 60 days thereafter.

*Id*. at § 6503(a)(1); *see also Pesko v. United States*, 918 F.2d 1581, 1582 (Fed. Cir. 1990).

There are several exceptions to the prohibition on assessments in section 6213(a), one of
which, found in section 6213(b)(4) of the Code, provides, in relevant part, that "[a]ny amount
paid as a tax or in respect of a tax may be assessed upon the receipt of such payment
notwithstanding the provisions of subsection (a)." The parties dispute how this rule interacts, if
at all, with the suspension provision in section 6503(a)(1) of the Code. And assuming there is
such a relationship, the parties also dispute whether plaintiff made a "payment" so as to trigger
section 6213(b)(4).

### 1.  The Relationship (if any) Between Sections 6213(b)(4) and 6503(a)(1)

In this case, the IRS issued a notice of deficiency to plaintiff on December 29, 2004, which
both parties agree was two days before the statute of limitations on assessments for plaintiff's
1999 and 2000 taxable years was to expire. Plaintiff asserts that on January 28, 2005, when it
requested that the IRS apply its deposit to the payment of the specified income tax, interest and
penalties, the IRS was authorized to assess those tax items under section 6213(b)(4) of the Code.
And it contends that because the IRS, via the conversion of its deposit into a "payment," was
allowed to assess those liabilities under section 6213(b)(4), the statute of limitations on
assessment began to run again. More specifically, plaintiff argues that, when it made its
"payment," the IRS had, under section 6503(a)(1) of the Code, sixty-two days within which to
assess those liabilities – the two days remaining in the assessment period at the time the notice of
deficiency was issued plus the sixty days added to the period by section 6503(a)(1). Under this
theory, the statute of limitations on assessments ran, at least as to the liabilities in question, on
May 25, 2005. It is undisputed that the IRS assessed those liabilities on May 27, 2005 – in
plaintiff's view, two days late. Defendant contends, however, that the IRS' assessment was timely
because the January 28, 2005, request should not be viewed as converting plaintiff's deposit into a
payment.

Plaintiff presumes – albeit without supporting analysis or citations – that if the deposit in
question was converted into a payment, the statute of limitations in section 6501 began running
again under section 6503(a)(1) because the amount so paid could then be assessed under section
6213(b)(4). This is so, it claims, even though the ninety days in which plaintiff could have
challenged the deficiencies in question at the U.S. Tax Court had not run when plaintiff submitted
its January 28 letter. Defendant, for its part, does not challenge this legal conclusion. But, is this
view correct?

Upon closer review, section 6503(a)(1) does not quite say that the running of the period of
limitations is suspended only when the Secretary is prohibited from making an assessment. To be

sure, it talks about that prohibition.  But, it then states, in a parenthetical, that, where a notice of deficiency is issued, the limitations period is suspended "in any event, if a proceeding in respect of the deficiency is placed on the docket of the Tax Court, until the decision of the Tax Court becomes final."  Section 6213(b)(4), in fact, anticipates the filing of such a petition, stating that "[i]n any case where [an] amount is paid after the mailing of a notice of deficiency under section 6212, such payment shall not deprive the Tax Court of jurisdiction over such deficiency determined under section 6211 without regard to such assessment."  In the court's estimation, these provisions, taken together, raise the prospect  that section 6503(a) suspends the statute of limitation on assessments for at least 150 days – until sixty days after the ninety days in which a Tax Court petition could be filed, and, if that suit is filed, until the decision of the Tax Court is final.  And this is so irrespective of whether a "payment" was effectuated during this suspension period.

This reading of the statute finds support in  legislative history.  The predecessor of section 6503(a)(1) was first enacted as section 277(b) of the Revenue Act of 1926, ch. 27, 44 Stat. 9.  It suspended the period of limitations upon assessment only for the period after a notice of deficiency was mailed and leading up to the potential filing of a case before the Board of Tax Appeals, during which time the Commissioner was "prohibited from making the assessment." *Id*.[10]  In section 504 of the Revenue Act of 1928 (the 1928 Act), ch. 852, 45 Stat. 870, Congress amended section 277 to include the "in any event" parenthetical quoted above.[11]  The reports accompanying that amendment suggest that Congress intended the limitations period to be suspended for the entire time leading up to and through any proceeding before the Board of Tax Appeals (the predecessor of the Tax Court), whether *vel non* a tax actually could have been assessed during this period under some other provision of the Code.  *See* H.R. Rep. No. 70-2, at 23-24 (1928); *see also* S. Rep. No. 70-960, at 31-32 (1928).  Congress apparently was concerned with the uncertainty engendered by the 1926 provision as to whether and when "the statute of

---

[10]  *See* S. Rep. No. 69-1, at 28 (1926) ("The House bill in section 277(b) provides that the running of the statute of limitations upon the making of assessments or collections shall be suspended for the period during which the commissioner is prohibited from making the assessment or collection."); H. R. Rep. No. 69-356, at 42 (1926) (Conf. Rep.).

[11]  The 1928 version of this statute read as follows:

The running of the statute of limitations . . . on the making of assessments and the beginning of distraint or a proceeding in court for collection, in respect of any deficiency, shall (after the mailing of a notice under section 272(a)) be suspended for the period during which the Commissioner is prohibited from making the assessment or beginning distraint or a proceeding in court (and in any event, if a proceeding in respect of the deficiency is placed on the docket of the Board, until the decision of the Board becomes final), and for 60 days thereafter.

45 Stat. at 870.

limitations on assessment is actually suspended." H.R. Rep. No. 70-2, at 23; S. Rep. No. 70-960, at 31. Wishing to avoid the specter of having an assessment unexpectedly barred by the limitations provisions, the reports emphasized that, under the amendment, the suspension was to apply for the full period even if "paper filed [with the Board of Tax Appeals] was not sufficient to constitute a petition" or "where a taxpayer files a waiver of the restrictions on the commissioner as to assessment or collection where the legal sufficiency of the waiver may not be determined for a considerable period of time after it is filed." H.R. Rep. No. 70-2, at 24; *see also* S. Rep. No. 70-960, at 32.

Viewing the statutory language through this historical prism, various courts have held that the statute of limitations on assessments is suspended for the entire time leading up to, and including, any Tax Court proceeding, even where the Commissioner might have made an assessment during that period.[12] Indeed, several cases have gone so far as to hold this even where the Commissioner made a jeopardy assessment prior to the issuance of the notice of deficiency.[13] In broadly construing the suspension provision of section 6503(a), these decisions follow a long line of cases that have held that limitation provisions barring assessments should be construed strictly in the government's favor. *See Badaracco v. Comm'r of Internal Revenue*, 464 U.S. 386, 392 (1984); *E.I. Dupont de Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924) ("Statutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government."); *Federal Nat. Mortg. Ass'n v. United States*, 469 F.3d 968, 973 (Fed. Cir. 2006), *cert. denied*, 522 U.S. 1139 (2008) (same). Their interpretation of section 6503(a) lessens the possibility that revenue will be lost due to inadvertence, reducing the likelihood that the Commissioner will either prematurely make an assessment that is later found to be invalid, or fail to make an assessment only to find out later that the statute of limitations was not tolled and has run.

In the case *sub judice*, plaintiff did not file a Tax Court petition, opting instead to file a refund suit. At first blush, this would seem to preclude any reliance here on the "in any event" parenthetical in section 6503(a). But, there is a reasonable argument that the subsection suspends

---

[12] *See Martin*, 436 F.3d at 1223-24 (suspension applied even where Tax Court petition was defective); *O'Neill v. United States*, 44 F.3d 803, 805 (9th Cir. 1995) (suspension applied even where Tax Court petition was void under the Bankruptcy Code); *see also Olds & Whipple v. United States*, 22 F. Supp. 809, 815 (Ct. Cl. 1938), *cert. denied*, 299 U.S. 547 (1936) ("Although the taxpayer may pay the tax first determined in a decision entered by the board and continue to prosecute his appeal, such payment does not start the running of the statute of limitations against the government . . .").

[13] *See United States v. Maxwell*, 459 F.2d 22, 23 (5th Cir. 1972) (per curiam) (provision applied even where there was a jeopardy assessment); *United States v. Shahadi*, 340 F.2d 56, 58-59 (3d Cir.), *cert. denied*, 381 U.S. 903 (1965) (same); *Am. Nat. Gas Co. v. United States*, 13 F. Supp. 69, 71 (Ct. Cl. 1936) (limitations period was suspended "[w]hether a jeopardy assessment could or should have been made").

the limitations period for a flat 150 days after a notice of deficiency is mailed, whether *vel non* a Tax Court petition is filed.  This argument views the phrase – "the period during which the Secretary is prohibited from making the assessment" – as a temporal reference to the full, ninety-day period described in section 6213(a) of the Code, unaffected by any other provision that might permit the Commissioner to make an assessment during that period.  This interpretation makes sense in light of the overall structure of the Code because, as it turns out, there are a number of provisions that authorize the Commissioner to make an assessment during this ninety-day period – suggesting that it is a bit of misnomer to talk of the Commissioner ever being "prohibited" from making an assessment.[14]  This interpretation, moreover, finds support in the legislative history of section 6503(a) by providing the Commissioner with needed certainty – allowing him to know, in more clearly-defined terms, whether the statute of limitations on assessments is suspended before the taxpayer, faced with a notice of deficiency, decides whether to file an action in the Tax Court.[15]  And, importantly, this interpretation has long been embodied in the relevant Treasury

---

[14]  Aside from the exception in section 6213(b)(4), the Secretary is also allowed to make a variety of other types of assessments despite the general prohibition in section 6213(a), including those: (i) needed to correct a mathematical or clerical error, 26 U.S.C. § 6213(b)(1); (ii) required to effectuate an order of criminal restitution, 26 U.S.C. § 6201(a)(4); (iii) taking the form of a jeopardy assessment, 26 U.S.C. §§ 6851, 6861, 6852; (iv) taking the form of a termination assessment, 26 U.S.C. §§ 6851-52; or (v) made in a bankruptcy or receivership case, 26 U.S.C. § 6871(a).  *See* Treas. Reg. § 301.6213-1(a)(2) (cataloguing some of these).

[15]  Consider the following hypothetical.  Suppose a case in which the statute of limitations on assessments, unless suspended, would run five days into the ninety-day period leading up to the filing of a Tax Court petition.  Suppose further that on the first day of this ninety-day period, the taxpayer waives any restrictions on the assessment of the tax liability in question.  Under the "in any event" parenthetical in section 6503(a), if the taxpayer files a petition in the Tax Court, the limitations period for assessments would be suspended for the ninety days leading up to that filing, plus while the Tax Court suit is pending, as well as sixty days more – even though the Commissioner could have assessed the taxes during this period.  But, if section 6503(a) were construed to trigger the ninety-day suspension only if a Tax Court petition were filed, the Secretary, in our hypothetical, would be compelled to act much sooner because he would not know at the time the statute was about to run (*i.e.*, the sixty-first day), whether the taxpayer later would file a Tax Court petition.  Indeed, if the full ninety-day suspension arises only if a Tax Court petition is filed, the assessment period really is not suspended in this hypothetical at all.  Rather, it runs on the sixty-first day, only to be "resurrected" if a Tax Court petition is filed.  But, any such interpretation of section 6503(a) clashes with its legislative history, which states that the suspension is to occur unqualifiedly "where a taxpayer files a waiver of the restrictions on the commissioner as to assessment or collection."  H. Rep. No. 70-2, at 24; *see also* S. Rep. No. 70-960, at 32.  Unless one is prepared to discard this history – and this court is not – one cannot read the statute in the limiting fashion plaintiff urges.  *See United States v. C.E. Mathews, Inc.*, 263 F.2d 814, 817 (5th Cir. 1959) ("In a field where there is unavoidably so little certainty, indeed so much uncertainty, as the inescapably broad generalities of the Internal Revenue Code are applied

Regulations.  Those regulations thus do not talk in terms of the suspension lasting only until an
assessment is no longer "prohibited," but rather speak in the absolute terms of the assessment
limitations period being suspended for a set number of days irrespective of whether an assessment
can be made, *to wit*, "for 90 days after the mailing of a notice of such deficiency . . . plus 60 days
thereafter."  Treas. Reg. § 301.6503(a)-1(a)(1).[16]  Under these regulations, the assessment in
question appears timely.

For reasons unexplained, however, defendant has not argued this.  And the court thus will
not decide this case on this basis.  Odd as it may seem, the court has discussed this issue for two
reasons.  First, so as not to leave the impression that it too acquiesces in plaintiff's
misconstruction of the statute.  And, second, because the foregoing discussion provides a good
foundation for considering the argument that defendant does make – that there was no "payment"
of the taxes during the period in question and that, as a result, section 6213(b)(4) did not authorize

---

by taxing agencies or courts, we should be slow to import considerations of the very kind which
the legislation was designed to overcome.").

[16]  This regulation, which was originally promulgated in 1967, 32 Fed. Reg. 15241 (Nov.
3, 1967), states in its entirety –

> Upon the mailing of a notice of deficiency for income, estate, gift, chapter 41, 42,
> 43, or 44 tax under the provisions of section 6212, the period of limitation on
> assessment and collection of any deficiency is suspended for 90 days after the
> mailing of such deficiency if the notice of deficiency is addressed to a
> person within the States of the Union and the District of Columbia, or 150 days if
> such notice of deficiency is addressed to a person outside the States of the Union
> and the District of Columbia (not counting Saturday, Sunday, or a legal holiday in
> the District of Columbia as the 90th or 150th day), plus an additional 60 days
> thereafter in either case.  If a proceeding in respect of the deficiency is placed on
> the docket of the Tax Court, the period of limitation is suspended until the
> decision of the Tax Court becomes final, and for an additional 60 days thereafter.
> If a notice of deficiency is mailed to a taxpayer within the period of limitation and
> the taxpayer does not appeal therefrom to the Tax Court, the notice of deficiency
> so given does not suspend the running of the period of limitation with respect to
> any additional deficiency shown to be due in a subsequent deficiency notice.

Treas. Reg. § 301.6503(a)-1(a)(1).  To illustrate the application of this rule, the regulation
provides an example in which a notice of deficiency was sent to a taxpayer on the last day
possible day, April 15, 1977 and explains:  "If in this example the taxpayer had failed to file a
petition with the Tax Court, the running of the period of limitation for assessment would then be
suspended from April 15, 1977 (the date of the notice), to September 12, 1977 (that is, for the 90-
day period in which he could file a petition with the Tax Court, and for 60 days thereafter)."  *Id*.
at § 301.6503(a)-1(a)(2).

the Commissioner to assess an amount corresponding to that phantom "payment."  If this is so, defendant states, then the statute of limitations on assessment was suspended for the full period in which plaintiff might have filed a Tax Court petition and for sixty days thereafter.  And, under that view, the assessment made on May 27, 2005, was, therefore, timely.  It is time to test these propositions.

### 2.    Did Plaintiff's Letter Convert its Deposit into a Payment?

Defendant contends that plaintiff's letter did not convert its "deposit" into a "payment" for purposes of section 6213(b)(4).  Before turning to its reasons, it makes sense to highlight the basic differences between a "deposit" and a "payment."

### a.    *Rosenman* and its Progeny

Mr. Justice Frankfurter, writing for a unanimous court in *Rosenman v. United States*, 323 U.S. 658, 662-63 (1945), first described a remittance that was not a "payment" of a tax, but rather "a deposit made in the nature of a cash bond for the payment of taxes thereafter found to be due." But, neither the term "deposit" nor Frankfurter's concept of one "made in the nature of a cash bond for the payment of taxes thereafter found to be due" could be found in any of the income tax provisions in the 1939 Code.  *See New York Life Ins. Co. v. United States*, 118 F.3d 1553, 1556 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1094 (1998).  Yet, in *Rosenman* and succeeding cases, this concept took on a variegated coat of tax consequences, judicially woven by negative implication, that is to say, based not so much on what "deposits" are, but on what they are not.[17]  In these decisions, the concept of a "deposit" took form particularly in contradistinction to a "payment" made in satisfaction of a tax liability.  Like payments, deposits were deemed to stop the running of interest and certain penalties on underpayments.[18]  But, unlike payments, they did not prevent a

---

[17] *See New York Life*, 118 F.3d at 1558 (finding taxpayer made a deposit rather than a payment because taxpayer's remittance "to cover 'a payment . . . of taxes expected to accrue in the future,' upon assessment," could not be "a payment of taxes 'erroneously or illegally assessed, or collected'"); *Cohen v. United States*, 995 F.2d 205, 209 (Fed. Cir. 1993) (finding the taxpayer's remittance to be an assessment because the facts and circumstances – the taxpayer contested the additional tax and the IRS failed to make a timely assessment – "negates payment here."); *Charles Leich & Co. v. United States*, 329 F.2d 649, 653 (Ct. Cl. 1964) (finding taxpayers remittance to be a deposit because "the factors of 'contest,' coupled with the fact of no assessment, are sufficient to negate 'payment'").

[18] *See VanCanagan v. United States*, 231 F.3d 1349, 1353 (Fed. Cir. 2000) ("When a taxpayer makes a deposit, the taxpayer . . . avoids interest and penalties on any tax subsequently assessed."); *Cohen v. United States*, 23 Cl. Ct. 717, 725 n.11 (1991), *aff'd*, 995 F.2d 205 (Fed. Cir. 1993) (noting that a "deposit is treated as a payment for the limited purpose of stopping the running of interest on an underpayment").

taxpayer from challenging a proposed deficiency in the Tax Court.[19]  Nor, as *Rosenman* itself held, did they trigger the statute of limitations for filing a refund claim.[20]  And, indeed, they could be recouped by a taxpayer, albeit without the government paying interest thereon, through the expediency of a simple request,[21] with neither the formality of filing a claim for refund nor the need to show that there had been an overpayment of tax.[22]  Given the desirability of these features, it is not surprising that, over time, the decisions in this area focused less on the tax attributes of deposits, and more on whether a particular remittance was a "deposit" versus a "payment." Forced to recognize this concept, the IRS eventually issued a series of revenue procedures, designed to provide taxpayers with guidance as to how "deposits" should be made and would be processed.  *See* Rev. Proc. 84-58, 1984-2 C.B. 501; Rev. Proc. 82-51, 1982-2 C.B. 839; Rev.

---

[19]  *See Baral*, 528 U.S. at 439 n.2 ("[T]he taxpayer will often desire treatment of the remittance as a deposit – even if this means forfeiting the right to interest on an overpayment – in order to preserve jurisdiction in the Tax Court, which depends on the existence of a deficiency . . . a deficiency that would be wiped out by treatment of the remittance as a payment."); *LaRosa's Intern. Fuel Co., Inc. v. United States*, 499 F.3d 1324, 1331 (Fed. Cir. 2007), *cert. denied*, 128 S. Ct. 2871 (2008) (same).

[20]  *Rosenman*, 323 U.S. at 662 (holding that taxpayer's refund claim was not time-barred even though the taxpayer filed claim three years after remitting funds to the IRS because remittance was a deposit and deposits, unlike payments, do not trigger the three year statute of limitations for refund claims); *VanCanagan*, 231 F.3d at 1352-53 (finding that the taxpayer's remittance triggered the statute of limitations for a refund because the remittance was a payment and not a deposit); *DiStasio v. United States*, 22 Cl. Ct. 36, 53 (1990) (holding that because the bankrupt estate's remittance to the IRS did not constitute a payment of tax for the purposes of statute of limitations on refund, the bankrupt estate's claims were not time barred).

[21]  *See VanCanagan*, 231 F.3d at 1353 ("When a taxpayer makes a deposit, the taxpayer can obtain a refund on request."); *Stanley v. United States*, 140 F.3d 1023, 1029 (Fed. Cir. 1998) (holding that because taxpayer's remittance was a deposit and not a payment, the IRS was not free to apply deposit as a repayment of an erroneous refund and the IRS must return deposit at taxpayer's request); *New York Life*, 118 F.3d at 1560 (finding that amount taxpayer remitted to the government as a tentative settlement in an income tax dispute was a deposit, in part, because taxpayer reserved the right to recover the remittance at any time).

[22]  *See New York Life*, 118 F.3d at 1559 (holding that taxpayer could recover remittance without adhering to the administrative refund claim requirements because the remittance was a "deposit and taxpayer had a right to a return of its deposit whenever it wished"); *Miller v. United States*, 2000 WL 1868947 at *3 (Fed. Cl.  Nov. 9, 2000) ("The importance of the [deposit payment] distinction is if the remittance is determined to be a 'deposit,' then the taxpayer is entitled to recover it . . .[and] if it is a 'payment' then the taxpayer can recover the money only if it files a timely claim for a refund."); *see also*  H.R. Rep. No. 108-755, at 647-48 (2004) (Conf. Rep.).

Proc. 64-13, 1964-1 C.B. 674; Rev. Proc. 63-11, 1964-1 C.B. 497; *see also Baral*, 528 U.S. at 439 n.2 (noting the existence of this guidance).

This patchwork of judicial decisions and IRS pronouncements was supposed to be replaced by the passage, in 2004, of section 6603(a) of the Code. *See* The American Jobs Creation Act of 2004, Pub. L. No.108-357, § 842, 118 Stat. 1418, 1598-1600.[23] That section provides: "A taxpayer may make a cash deposit with the Secretary which may be used by the Secretary to pay any tax . . . which has not been assessed at the time of the deposit." 26 U.S.C. § 6603(a). It further states that "[s]uch a deposit shall be made in such manner as the Secretary shall provide." *Id*.; *see also* H.R. Rep. No.108-755, at 647 (providing that "[t]he Secretary may issue rules relating to the making, use, and return of deposits" under section 6603). Section 6603(b) also provides that "[t]o the extent that such deposit is used by the Secretary to pay tax, for purposes of section 6601 (relating to interest on underpayment), the tax shall be treated as paid when the deposit is made." Section 6603(c) further provides that "[f]or purposes of section 6611 (relating to interest on overpayments) . . . a deposit which is returned to a taxpayer shall be treated as a payment of tax for any period to the extent (and only to the extent) attributable to a disputable tax for such period."[24]

---

[23] In passing this section, Congress believed that "an improved deposit system" was needed –

> The Committee believes that taxpayers should be able to limit their underpayment interest exposure in a tax dispute. An improved deposit system will help taxpayers better manage their exposure to underpayment interest without requiring them to surrender access to their funds or requiring them to make a potentially indefinite-term investment in a non-interest bearing account. The Committee believes that an improved deposit system that allows for the payment of interest on amounts that are not ultimately needed to offset tax liability when the taxpayer's position is upheld, as well as allowing for the offset of tax liability when the taxpayer's position fails, will provide an effective way for taxpayers to manage their exposure to underpayment interest. However, the Committee believes that such an improved deposit system should be reserved for the issues that are known to both parties, either through IRS examination or voluntary taxpayer disclosure.

H.R. Rep. No. 108-548, pt. 1, at 305 (2004); *see also* H.R. Rep. No. 108-755, at 633-634; S. Rep. No. 108-192, at 207-208 (2003); H.R. Rep. No. 108-393, at 225-226 (2003).

[24] Section 6603(d)(2) of the Code defines a "disputable tax" as "the amount of tax specified at the time of the deposit as the taxpayer's reasonable estimate of the maximum amount of any tax attributable to disputable items." 26 U.S.C. § 6603(d)(2). Section 6603(d)(3)(A), in turn, defines a "disputable item" as "any item of income, gain, loss, deduction, or credit if the taxpayer – (i) has a reasonable basis for its treatment of such item, and (ii) reasonably believes

Despite the grant of legislative rulemaking authority found in Section 6603(a), the Secretary has promulgated no rules under this section.  Instead, continuing the pattern established before the statute's passage, the Secretary issued a new revenue procedure, Rev. Proc. 2005-18, 2005-1 C.B. 798, to set forth the procedures to be used by taxpayers when remitting section 6603 deposits.[25]  Defendant claims that the deposit made by plaintiff could not be converted into a payment under this revenue procedure.  Plaintiff disagrees.

### b.    Converting a "Deposit" into a "Payment"

Under section 4.01(1) of Rev. Proc. 2005-18, a taxpayer may make a deposit by remitting a check or money order "accompanied by a written statement designating the remittance as a deposit," denominating "the type(s) of tax" and "the tax year(s)" for which the deposit is made, and identifying the amount of the deposit, if any, that is a "disputable tax."  2005-1 C.B. at 799.  For deposits made upon the completion of an examination, Rev. Proc. 2005-18 states –

> Upon completion of an examination, if a taxpayer who has made a deposit does not execute a waiver of restrictions on assessment and collection or otherwise agree to the full amount of the deficiency, the Service will mail a notice of deficiency and the taxpayer will have the right to petition the Tax Court.  The portion of the deposit that is not greater than the determined deficiency plus any interest that has accrued on that deficiency will be posted to the taxpayer's account as a payment of tax upon the expiration of the 90 or 150-day period during which assessment is stayed, unless the taxpayer files a petition with the Tax Court and requests in writing before the expiration of that period that the deposit continue to be treated as a deposit during the applicable Tax Court proceeding.

2005-1 C.B. at 799.  Under this provision – which echoes Treas. Reg. § 301.6503(a)-1(a)(1) in assuming that assessments are stayed during the entire period between the issuance of a notice of deficiency and the potential filing of a Tax Court petition – the IRS will not treat a "deposit" as a "payment" until there has been an assessment.  Consistent with this view, section 6.01 of Rev. Proc. 2005-18 states that "[a] deposit made pursuant to section 6603 is not subject to a claim for credit or refund as an overpayment until the deposit is applied by the Service as payment of an **assessed** tax of the taxpayer."  2005-1 C.B. at 800 (emphasis added).  In so providing, these provisions track the House Conference Report for section 6603, which states that "[a]ny amount on deposit may be used to pay an underpayment of tax that is ultimately assessed" and further

that the Secretary also has a reasonable basis for disallowing the taxpayer's treatment of such item."  26 U.S.C. § 6603(d)(3)(A).

[25]  In this regard, Rev. Proc. 2005-18, states:  "The legislative history for section 6603 provides that the Secretary may issue rules relating to the making, use, and return of the deposits."  *See* H.R. Conf. Rep. No. 755, 108th Cong, 2d Sess. 647 (2004).  The following procedures implement the requirements of section 6603."  2005-1 C.B. at 799.

provides that "[a] deposit is not a payment of tax prior to the time the deposited amount is used to pay a tax." H.R. Rep. No. 108-755, at 647.

Accordingly, with one exception not pertinent herein,[26] Rev. Proc. 2005-18 makes no provision for a taxpayer to convert a deposit into a payment of a tax which has not yet been assessed. While plaintiff makes a brief attempt to recharacterize what the revenue procedure provides (ignoring, for this purpose, the supporting legislative history), ultimately, it concedes that its attempt to convert its deposit into a payment was not envisioned by the 2005 revenue procedure. Undaunted, it contends that Rev. Proc. 2005-18 does not apply to its case as it was issued nearly six weeks after its January 28, 2005, letter. Plaintiff argues that, given this timing, the revenue procedure ought not control whether its letter converted its deposit into a payment. Ruling to the contrary, plaintiff asseverates, would defy common sense and be unfair. But though this claim, at first blush, might appear compelling, it ultimately misses the mark.

Practically speaking, of course, it is undeniable that Rev. Proc. 2005-18 was issued after plaintiff's January 2005 letters to the IRS.[27] Absent prescience, plaintiff asks, how can it be expected to comply with a procedure that did not then exist? Yet, in making its deposit, plaintiff invoked the newly-enacted section 6603 no doubt mindful of the section's instruction that "[s]uch a deposit shall be made in such manner as the Secretary shall prescribe." And it did not need to be prescient to anticipate that the Secretary's rules would reflect the structure of the provisions surrounding section 6603 and, in particular, would treat preassessment deposits consistently with the legislative history of section 6603. Then there are the terms of the revenue procedure itself. In arguing that Rev. Proc. 2005-18 is not controlling, plaintiff emphasizes section 9 thereof, which states that "Rev. Proc. 84-58 is superseded, effective with respect to remittances made on or after March 28, 2005." 2005-1 C.B. at 801. It notes, of course, that its remittance was made before the referenced date. But, other provisions of the revenue procedure plainly state that it "applies to

---

[26] The only instance in which the revenue procedure envisions that a deposit may be applied to the payment of an unassessed tax is where the deposit exceeds the amount of tax ultimately determined to be due, in which instance the taxpayer may elect to apply the excess "against another assessed or unassessed liability." Rev. Proc. 2005-18, 2005-1 C.B. at 799-800. "For example," the revenue procedure explains, "a taxpayer under examination for several different years may request that a deposit made for one type of tax in one year be applied to another type of tax in another year." *Id*.

[27] The IRS sometimes issues notices or announcements in advance of promulgating regulations and rulings to provide taxpayers with guidance. *See, e.g.*, "Instructions for Payment of Interest on Tax Deficiencies," Announcement 86-108, 1986-45 I.R.B. 20 (1986). But, apparently, it did not do so in the current situation.

deposits made after October 22, 2004."[28]  And Rev. Proc. 2005-18 provides several transition rules that specifically apply to deposits made after October 22, 2004.[29]

But can Rev. Proc. 2005-18 be retroactive validly?  Fortunately, the court need not decide this thorny question[30] for several reasons, none the least of which is that like Rev. Proc. 2005-18,

---

[28]  Notably, this provision tracks the effective date provisions for section 6603.  Thus, paragraph (2) of the section enacting this provision stated:

> In the case of an amount held by the Secretary of the Treasury or his delegate on the date of the enactment of this Act [Oct. 22, 2004] as a deposit in the nature of a cash bond deposit pursuant to Revenue Procedure 84-58, the date that the taxpayer identifies such amount as a deposit made pursuant to section 6603 of the Internal Revenue Code [this section] (as added by this Act) shall be treated as the date such amount is deposited for purposes of such section 6603.

The American Job Creation Act of 2004, Pub. L. No. 108-357, § 842, 118 Stat. 1599, 1599-1600.

[29]  Thus, the revenue procedure states –

> In the case of a deposit that is made after October 22, 2004, and before March 28, 2005, the deposit will be treated as made on the date remitted for purposes of section 6603(d) if the taxpayer provides the written statement designating the amount as a deposit made pursuant to section 6603 as provided under section 4.01 before May 27, 2005.  In the case of an amount that was held as a deposit in the nature of a cash bond pursuant to Rev. Proc. 84-58 on October 22, 2004, the deposit will be treated as made on October 23, 2004, for purposes of section 6603(d) if the taxpayer provides the written statement identifying the amount as a deposit made pursuant to section 6603 as provided under section 5 before May 27, 2005.

Rev. Proc. 2005-18, 2005-1 C.B. at 801.

[30]  Odd as it might seem, some courts have held that, under section 7805 of the Code, revenue procedures relate back to the effective date of the statute they implement, unless they prescribe otherwise.  *See Cohen v. Comm'r of Internal Revenue*, 910 F.2d 422, 427 (7th Cir. 1990); *Shore v. Comm'r of Internal Revenue*, 631 F.2d 624, 628 n.8 (9th Cir. 1980) ("Revenue Rulings and Procedures are normally given retroactive application.");*United States v. Lavi*, 2006 WL 1305288, at *3 (E.D.N.Y. March 30, 2006), *aff'd*, 168 Fed. Appx. 454 (2d Cir. 2006) ("Section 7805 of Title 26 of the United States Code applies to both Revenue Rulings and Revenue Procedures and requires both to be applied retroactively unless the Treasury Secretary states otherwise."); *cf. Matson Navigation Co. v. Comm'r of Internal Revenue*, 68 T.C. 847, 852-55 (1977) (rejecting this view).

Rev. Proc. 84-58 anticipated that a deposit made after the completion of an examination would remain just that – a "deposit" – until at least the time expired for filing a Tax Court petition. Thus, paragraph 3 of section 4.02 of Rev. Proc. 84-18 states as to "deposits in the nature of a cash bond" –

> Upon completion of an examination, if a taxpayer who has made a deposit does not execute a waiver of restrictions on assessment and collection or otherwise agree to the full amount of the deficiency, the Service will mail a notice of deficiency and the taxpayer will have the right to petition the Tax Court. That part of the deposit that is not greater than the deficiency proposed plus any interest that has accrued on the deficiency will be posted to the taxpayer's account as a payment of tax at the expiration of the 90 or 150-day period unless the taxpayer rerequests in writing before the date that the deposit continue to be treated as a deposit after the mailing of the notice of deficiency.

Rev. Proc. 84-58, 1984-2 C.B. at 502. Moreover, like Rev. Proc. 2005-18, section 6.04 of Rev. Proc. 84-58 indicates that a taxpayer could not designate that a deposit be applied to particular taxes, penalties and interest until the IRS assessed a tax liability and then applied the deposit to

---

That said, there are several reasons to question whether the IRS, without any prior warning, may establish procedures that apply retroactively. First, it is well-established that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also Durr v. Nicholson*, 400 F.3d 1375, 1380 (Fed. Cir. 2005). Nothing in section 6603 provides such an "express" power. And it is debatable whether section 7805 of the Code does so, as the Secretary's authority thereunder to issue retroactive regulations deals primarily, if not exclusively, with interpretative rules. Legislative regulations, by comparison, are generally viewed as springing from the specific enactment language and not from the general authorization for the Secretary to "prescribe all needful rules and regulations" found in section 7805(a). *See E.I. duPont de Nemours & Co. v. Comm'r of Internal Revenue*, 41 F.3d 130, 135 n.20 (3d Cir. 1994). Second, it is unclear whether the Secretary may use a revenue procedure to effectuate a grant of legislative rulemaking authority, even a grant that, unlike some, does not explicitly require the issuance of "regulations." *Cf.* 26 U.S.C. § 2663 ("The Secretary shall prescribe such regulations . . ."). Affording such a revenue procedure the weight of a legislative regulation seems particularly problematic if, as happened here, the IRS issues the procedures without complying with the notice-and-comment requirements of the Administrative Procedure Act, 5 U.S.C. § 553(b) – the ones that normally apply to legislative rules. *See Schwalbach v. Comm'r of Internal Revenue*, 111 T.C. 215, 220 (1998) (Secretary must comply with APA, 5 U.S.C. § 553(b) when he prescribes legislative regulations); *see also Fransen v. United States*, 191 F.3d 599, 600 (5th Cir. 1999).

pay them.  *Id*. at  504.[31]  In short, then, neither Rev. Proc. 2005-18 nor Rev. Proc. 84-58 authorizes the preassessment conversion that plaintiff attempted here, making it somewhat academic which of them is controlling.[32]

There is a third possibility – that, these revenue procedures aside, plaintiff was entitled to have its deposit under section 6603 of the Code be converted into a payment simply upon request. Plaintiff, however, offers no explanation as to why, in a world governed by statutes and regulatory materials, the court should approach this issue as if plaintiff had a unilateral contractual right to redesignate its deposit as payment.  That approach might make sense had neither the Congress passed section 6603 nor the IRS issued its revenue procedures, all of which were designed to avoid putting the IRS in the position of deciding, on an *ad hoc* basis, whether a particular remittance was a deposit or a payment.[33]  Nor does plaintiff's situation fall within the interstices of these statutory and administrative procedures.  In fact, the process employed by plaintiff in supposedly converting its deposit into a payment clashes with the provisions of the revenue procedures, which appear to preclude the IRS from honoring plaintiff's designations as to which taxes, penalties and interest were to be paid at least until either plaintiff agreed to the deficiency or the time for filing a Tax Court petition had elapsed.  Yet, plaintiff still argues that there is a third rail here – one dependent neither upon section 6603 nor upon the revenue procedures, but based solely upon its manifested expectations.

---

[31]  In this regard, the revenue procedure stated:

> Taxpayers may not make designations of remittances treated as deposits in the
> nature of a cash bond.  If a liability is ultimately assessed and the deposit applied
> as a payment of tax, the Service will allocate the payments in accordance with any
> designation then made by the taxpayer.

Rev. Proc. 84-18, 1984-2 C.B. at 504.

[32]  *See* Gerald A. Kafka & Rita Cavanagh, Litigation of Federal Civil Tax Controversies, ¶ 13.05 (2010) (hereinafter "Kafka & Cavanagh") (discussing both revenue procedures and noting thereunder that a "remittance designated as a deposit . . . will be treated as a payment only on the date of assessment").

[33]  Commenting on the law prior to the enactment of section 6603, one commentator has observed that the lack of a clear standard as to what was a payment, "creat[ed] a potential trap for the Service," observing that "[i]f a taxpayer made an ambiguous remittance, the IRS might treat it as a deposit and not assess it as a payment.  When the statute of limitations on making assessments later expires, the taxpayer could then argue that the remittance was actually a deposit, which the taxpayer could demand be repaid regardless of the true tax liability."  Jones, *supra*, at 279.

In seeking to have effect given to those expectations, plaintiff points out that it could have withdrawn its deposit on one day and, on the very next day, remitted the same amount as a payment of the taxes, penalty and interest subject to the pending notice of deficiency.  But would that latter remittance really have been a "payment"?  Answering this question obliges the court to harken back to distinctions made between "deposits" and "payments" in the prior decisional law – the same cases that this court might have considered had it concluded that Rev. Proc. 2005-18's attempt to supply retroactively the procedures to be employed under section 6603 was somehow invalid.[34]

As noted above, the use of deposits to meet anticipated tax liabilities "is a judicially-created concept that stems from the Supreme Court's decision in *Rosenman*." *VanCanagan*, 231 F.3d at 1352; *see also New York Life*, 118 F.3d at 1557-58.  While some courts use a bright-line approach to distinguish between a deposit and a payment, in this circuit, it has long been the case that the determination whether "a remittal of money against an assessed or likely tax liability . . . constitute[s] . . . a payment or a deposit of taxes" depends upon the "circumstances."  *New York*

---

[34] If Rev. Proc. 2005-18 is invalid to the extent that it is retroactive, the cases suggest that the task of figuring out how to apply section 6603 becomes one of effectuating Congress' intent, as reflected in the statute's language and structure, and perhaps its legislative history.  *See Int'l Multifoods Corp. v. Comm'r of Internal Revenue*, 108 T.C. 579, 587 (1997); *Estate of Neumann v. Comm'r of Internal Revenue*, 106 T.C. 216, 220 (1996); *Occidental Petroleum Corp. v. Comm'r of Internal Revenue*, 82 T.C. 819, 829 (1984).  There is, however, considerable debate as to how far a court may go in supplying "phantom legislative regulations" not adopted by the Secretary.  *See* Amandeep S. Grewal, "Substance Over Form?  Phantom Regulations and the Internal Revenue Code," 7 Hous. Bus. & Tax. L. J. 42 (2006); Phillip Gall, "Phantom Tax Regulations:  The Curse of Spurned Delegations," 56 Tax Law. 413 (2003); *see also* Farley P. Katz, "The Infernal Revenue Code," 50 Tax Law. 617 (1997).

*Life*, 118 F.3d at 1557; *see also VanCanagan*, 231 F.3d at 1353; *Cohen*, 995 F.2d at 209.[35]   Thus, in its 1964 decision in *Charles Leich*, the Court of Claims stated –

> [t]he question whether [a] remittance is a payment of tax or a mere deposit to stop the running of interest is complicated by the widely differing circumstances which prompt taxpayer to take such action.  These surrounding factors are usually determinative on the question whether the remittance is a payment or a deposit.

329 F.2d at 652.  More specifically, the court found that "the factors of 'contest' coupled with the fact of no assessment are sufficient to negate 'payment.'"  *Id*. at 653  *see also Cohen*, 995 F.2d at 208-09; *Reading Co. v. United States*, 98 F. Supp. 598, 599 (1951) (remittance was payment where based on uncontested estimate of tax liability); *Huskins v. United States*, 75 Fed. Cl. 659, 670-71 (2007).  Under this standard, if a taxpayer "made a voluntary remittance based upon a *bona fide* estimate of tax then due," the remittance would be treated as a payment.  *Charles Leich*, 329 F.2d at 653; *see also Northern Nat. Gas Co. v. United States*, 354 F.2d 310, 315 (Ct. Cl. 1965) (where taxpayer conceded liability in a Tax Court petition for certain asserted deficiencies, its remittance in response to a notice of deficiency would be treated as a payment).  If, on the other hand, "it is clear that throughout the entire period the taxpayer was contesting the proposed liability" and makes a remittance prior to assessment, the remittance should not be treated as a payment, but rather as a deposit.  *Charles Leich*, 329 F.2d at 654; *see also Cohen*, 995 F.2d at 209 ("The fact that the Cohens at all times disputed additional tax liability for 1980, coupled with the

---

[35] The Fifth and Eighth Circuits originally read *Rosenman* as creating a *per se* rule under which there can be no payment of taxes until there has been a formal assessment, requiring that all remittances made before assessment be treated as deposits.  *See United States v. Dubuque Packing Co.*, 233 F.2d 453, 462 (8th Cir. 1956); *Thomas v. Mercantile Nat'l Bank at Dallas*, 204 F.2d 943, 944 (5th Cir. 1953).  More recent decisions of these courts purport either to reject this rule or limit its application.  *See Deaton v. Comm'r of Internal Revenue*, 440 F.3d 223, 231 (5th Cir. 2006); *Essex v. Vinal*, 499 F.2d 226, 229-30 (8th Cir. 1974), *cert. denied*, 419 U.S. 1107 (1975).  The Federal Circuit, along with the Second, Third, Fourth, Sixth and Seventh Circuits have eschewed this *per se* rule in favor of a multi-factored approach, in which the lack of an assessment is but one consideration.  *See Ertman v. United States*, 165 F.3d 204, 206 (2d Cir. 1999); *Moran*, 63 F.3d at 668-69; *Blatt v. United States*, 34 F.3d 252, 255 (4th Cir. 1994); *Cohen*, 995 F.2d at 208; *Ewing v. United States*, 914 F.2d 499, 504 (4th Cir. 1990), *cert. denied*, 500 U.S. 905 (1991); *Ameel v. United States*, 426 F.2d 1270, 1274 (6th Cir. 1970); *Fortugno v. Comm'r of Internal Revenue*, 353 F.2d 429, 435 (3d Cir. 1965); *Charles Leich*, 329 F.2d at 652.  Yet another line of cases holds that the issue whether a given remittance is a deposit or a payment turns on the statutory context underlying the disputes, with certain provisions in the Code (or the regulations thereunder) "deeming" a remittance to be a payment even when it is made before an assessment.  *See Ott v. United States*, 141 F.3d 1306, 1308 (9th Cir. 1999); *Gabelman v. Comm'r of Internal Revenue*, 86 F.3d 609, 613 (6th Cir. 1996).  Some of these decisions rely upon *Baral*, 528 U.S. at 437, which involved one such "deemed payment" provision, section 6513(b)(1) of the Code.  *See, e.g.*, *Deaton*, 440 F.3d at 230-31; *see also* Kafka & Cavanaugh, *supra*, ¶ 13.05.

failure of the IRS to make a timely assessment of deficiency negates payment here, as was the case in *Charles Leich*.").

To be sure, the standards for resolving the deposit/payment dichotomy enunciated by the Court of Claims and, in turn, the Federal Circuit were developed in cases in which the taxpayer was arguing that a given remittance was a deposit rather than a payment. Yet, there is no reason why this analysis cannot be reciprocal, and thereby govern cases in which the taxpayer is arguing that a remittance is a payment. And, indeed, the facts here are substantially identical to those in many of the cases involving attempts to characterize a remittance as a deposit. Here, as in *New York Life Insurance* and *Cohen*: (i) the taxpayer received a ninety-day letter from the IRS proposing a deficiency; (ii) it remitted money to the IRS and allocated the money between the deficiency and interest thereon; (iii) the taxpayer, despite the remittance, made clear that it was protesting the proposed deficiency and reserved the right to recover; and (iv) all this was done before there was any assessment. *See New York Life*, 118 F.3d at 1560; *Cohen*, 995 F.2d at 209 ("The remittance made by the Cohens, under protest, after a notice of deficiency but in clear circumstances of contest prior to expiration of the period for assessment, was a deposit as a matter of law."). Moreover, it is notable that in many of these cases, the courts treated a remittance as a deposit even though the taxpayer, in communications with the IRS, described the remittance as a "payment" – again, precisely the situation here.[36]

Despite these cases, plaintiff argues that its recharacterization of its deposit as a payment should be controlling. It cites several cases employing multi-factored approaches that have identified the "taxpayer's intent" with respect to the remittance as a factor. *See, e.g.*, *Ertman*, 165 F.3d at 207; *Moran*, 63 F.3d at 668; *Ewing*, 914 F.2d at 503. But, neither these decisions, nor, particularly, those of the Federal Circuit and Court of Claims discussed above, make the label assigned to a remittance by the taxpayer controlling, particularly in the face of contradictory circumstances. And whether plaintiff likes them or not, the cases in this circuit remain good law,

---

[36]   *See also Rosenman*, 323 U.S. at 658, 660-61 (preassessment remittance was a deposit even though letter transmitting remittance stated, "We are delivering to you . . . an Estate check payable . . . for $120,000, as a payment . . . . This payment is made under protest and duress, and solely for the purpose of avoiding penalties and interest, since it is contended by the executors that not all of this sum is legally or lawfully due."). In arguing to the contrary, plaintiff quotes a few sentences from one of the government's briefs in *Ford Motor Co. v. United States*, No. 08-12960, 2009 WL 29922875 (E.D. Mich. Sept. 9, 2009). But, these ambiguous tidbits, plainly taken out of context, hardly provide a basis here for invoking the doctrine of judicial estoppel. *See Abbott Labs. v. United States*, 84 Fed. Cl. 96, 108 n.19 (2008), *aff'd*, 573 F.3d 1327 (Fed. Cir. 2009). Indeed, if anything, they serve only to highlight the lack of decisional support for plaintiff's principal arguments.

binding upon this court, and apposite to the issues at hand – and they strongly suggest that what plaintiff called a payment, the IRS was entitled to treat as a deposit.[37]

Moreover, the situation here is hardly one in which plaintiff's intentions were clear.  To hold otherwise, the court would have to don blinders to the fact that: (i) plaintiff's letter invoked the procedures in Rev. Proc. 2002-26, 2002-1 C.B. 746, which are inapplicable to the remittance in question;[38] (ii) plaintiff followed a conversion procedure of its own making which neither Rev. Proc. 2005-18 nor Rev. Proc. 84-58 authorized; and (iii) plaintiff first invoked Rev. Proc. 84-58

---

[37] While plaintiff asserts that the analysis in these cases was altered by *Baral*, the Federal Circuit has held otherwise.  Thus, in *VanCanagan*, it held that its prior test remains good law, except in cases involving a "deemed payment" provision:

> In *Baral v. United States*, 528 U.S. 431 . . . (2000), the Supreme Court held that under section 6513(b)(1) of the Internal Revenue Code, remittances of estimated income tax were "paid" on the due date for the taxpayer's income tax return. The Court made clear in *Baral* that it was not overruling *Rosenman*, and that its decision was based on its interpretation of section 6513, which provides that "[a]ny amount paid as estimated income tax for any taxable year shall be deemed to have been paid on the last day prescribed for filing the return . . . ." 26 U.S.C. § 6513(b)(1); *Baral*, 528 U.S. at [435].  We need not determine whether a remittance that accompanies Form 4868 is of an estimated income tax within the meaning of section 6513, since we conclude that even when analyzed under the principles of *Rosenman*, the remittance here was a payment rather than a deposit.

*VanCanagan*, 231 F.3d at 1352-53.  Later in that decision, the Federal Circuit specifically reaffirmed its prior decisions in *New York Life Ins.* and *Cohen*.  231 F.3d at 1353.

[38] The January 28, 2005, letter, in which plaintiff requested that the IRS apply the deposit to the payment of certain taxes, interest and penalties, indicated that the request was being made "[i]n accordance with Section 3.02 and 3.03 of Revenue Procedure 2002-26," 2002-1 C.B. 746.  But, neither of these subsections actually applied to plaintiff's situation.  Section 3.02 of that revenue procedure applied only where "additional taxes, penalty, and interest for one more taxable periods have been assessed against a taxpayer (or have been mutually agreed to as to the amount and liability but are unassessed) at the time the taxpayer voluntarily tenders a partial payment." 2002-1 C.B. at 746.  The taxes, penalty and interest at issue, however, had neither been assessed nor mutually agreed to at the time taxpayer contends that it converted its prior deposit into a payment.  The "payment" in question likewise was not covered by section 3.03 of Rev. Proc. 2002-26, which applies only to "[p]ayments made pursuant to the terms of offers in compromise (or offers in compromise and collateral agreements) that have been accepted by the Government in compromise of outstanding liabilities, in accordance with § 7122 of the Internal Revenue Code." 2002-1 C.B. at 746.  As the existence of this case well illustrates, the taxes, penalty and interest at issue were (and are) still in dispute.

and section 6603, and then only fifteen days later "requested" the IRS to convert its deposit into a payment.  Indeed, plaintiff readily admits that the IRS did not convert its deposit into a posted payment of tax, interest, and penalty until May 26, 2005.[39]  Accordingly, a review of all the circumstances, and not merely the fact that plaintiff made a preassessment remittance under protest, suggests that plaintiff's initial deposit remained a deposit until applied in payment of its assessed tax liability for the years in question.

### B.      The Overpayment Provisions of Section 6401

Assuming *arguendo* that plaintiff's remittance became a payment on January 28, 2005, and that the statute of limitations on assessments ran two days before the IRS made its assessment, there is still a question as to whether the "payment" attributable to these tax liabilities is an overpayment that must be refunded.  Again, plaintiff contends that the "untimely" assessment created an "overpayment" within the meaning of section 6401(a), which must be refunded under section 6402(a).  Defendant asserts, however, that the former statute is inapplicable – that section 6401(a) does not retroactively transform a tax paid within the assessment deadline into an overpayment simply because the IRS fails to make a timely assessment.

Section 6401(a) of the Code is a definitional statute, providing that the "[t]he term 'overpayment' includes that part of the amount of the payment of any internal revenue tax which is assessed or collected after the expiration of the period of limitations properly applicable thereto."  Read in isolation this subsection supports plaintiff's claim that, assuming *arguendo* the assessment here was untimely, an "overpayment" occurred.  *See Williams-Russell & Johnson, Inc.*, 371 F.3d 1350, 1352 (11th Cir.), *cert. denied*, 543 U.S. 1022 (2004) (noting that a "literal reading" of the statute supports a claim like plaintiff's).  But such a reading of the statute is in tension with the surrounding provisions of the Code that further define when a taxpayer has a refundable overpayment.  Among these is section 6402(a) of the Code which provides that "[i]n the case of an overpayment, the Secretary . . . may credit the amount of such overpayment . . . against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall . . . refund any balance to such person."  26 U.S.C. § 6402(a).  It also ignores the settled meaning of terms like "overpayment" and "assessment," and their impact on

---

[39]  Plaintiff admits that no entry was made by the IRS to its Master File, Audit Information [Management] System (AIMS), or other computer systems that would show a payment of tax (for Principal's taxable years 1996 through 2000) on January 28, 2005 – a fact confirmed by the IRS' transcripts for each of the taxable years in question.  It further admits that the IRS did not think that it was obliged to act in response to the January 28, 2005, letter, and acknowledges that at least some IRS officials believed that the IRS was precluded from assessing the taxes, interest and penalties until the expiration of ninety days from the issuance of the notice of deficiency.  The parties agree that various IRS documents show that the assessments of the taxes, penalties and interest referenced in the notice of deficiency were made by the IRS on May 27, 2005.

whether taxes are due and refunds are owed.  *See Bachner v. Comm'r of Internal Revenue*, 109 T.C. 125, 128 (1997), *aff'd*, 172 F.3d 859 (3d Cir. 1988) (Table) (declining "to accept any argument that the term 'overpayment' is specifically and narrowly defined by section 6401(a)").  And plaintiff's reading of this statute flies in the face of this provision's legislative history, not to mention the literally dozens of cases which, over the last 82 years, have consistently rejected the identical argument made by plaintiff here.

Let us begin with the legislative history.  This provision originated as section 1106(a) of the Revenue Act of 1926, 44 Stat. 109, which provided that –

(a)  The bar of the statute of limitations against the United States in respect of any internal-revenue tax shall not only operate to bar the remedy but shall extinguish the liability; but no credit or refund in respect of such tax shall be allowed unless the taxpayer has overpaid the tax.  The bar of the statute of limitations against the taxpayer in respect of any internal revenue tax shall not only operate to bar the remedy but shall extinguish the liability; but no collection in respect of such tax shall be made unless the taxpayer has underpaid the tax.

In 1927, the Joint Committee on Taxation[40] recommended that the statute be changed to make clear that – "[a]s to amounts paid by the taxpayer before the expiration of the period of limitations on collections by the Government, no refund or credit should be allowed unless the amount paid is in excess of the correct tax."  1 Report of the Joint Committee on Internal Revenue Taxation 71 (1927).  In a segment entitled "Payments by taxpayer after limitation period," the Joint Committee took the opinion that "the taxpayer should be entitled to recover any payment made by him after the period [on assessment], whether voluntary or involuntary and whether or not under duress."  *Id*. at 72; *see also id*. at 16 (indicating that the recommendation focused on payments made "after the period").[41]

Swiftly responding to this report, the House of Representatives passed the following provision –

---

[40]  Created by section 1203 of the Revenue Act of 1926, ch.27, 44 Stat. 9, the Joint Committee originally consisted of five members of the House Ways and Means Committee and five members of the Senate Finance Committee, charged with the duty to investigate and report on the effect and operation of the federal tax laws.

[41]  Although not stated in the report, this recommendation may well have been prompted by the Supreme Court's opinion in *Bowers v. New York & Albany Lighterage Co.*, 273 U.S. 346 (1927), in which the Supreme Court held that limitations on the collection of taxes adopted by the Revenue Act of 1918 applied both to judicial proceedings and collection by distraint.  *See Graham & Foster v. Goodcell*, 282 U.S. 409, 416 (1931) (discussing the legislative history of section 611 of the Revenue Act of 1928).

(a)  Payment of Barred Taxes.   The payment of any portion of an internal revenue tax (or interest, penalty, additional amount, or addition to such tax) shall be considered as an overpayment if made –

>    (1)  after the expiration of the period of limitation on assessment, if no assessment thereof was made within such period, or

>    (2)  after the expiration of the period of limitation for collection by distraint or proceeding in court, if no distraint or proceeding for the collection thereof was begun within such period.

H.R. 1, 70th Cong., 1st Sess., § 607 (1927). The language of this provision clearly states that it applied only to payments "made . . . after the expiration of the period of limitation on assessment." *Id*.  In passing the bill, the Senate rephrased this provision to read as follows:

>    Any tax (or any interest, penalty, additional amount, or addition to such tax) assessed or paid . . . after the expiration of the period of limitation properly applicable thereto shall be considered an overpayment and shall be credited or refunded to the taxpayer if claim therefor is filed within the period of limitation for filing such claim.

H.R. 1 (Senate Version), 70th Cong., 2d Sess., § 607 (1928); *see also* J.S. Seidman, Seidman's Legislative History of Federal Income Tax Laws, 1938-1861, 565-66 (Prentice Hall 1953).  And it was this version of the statute that was enacted as section 607 of the Revenue Act of 1928, 45 Stat. at 874.

The wording of section 607 of the 1928 Act, like that of the current statute, is a bit cryptic. Yet, it is plain enough that this provision was intended to apply only to taxes that were paid or collected after the period of limitations on assessments expired.  If the rule were otherwise, the IRS would have been required to refund phantom overpayments – attributable to taxes that were "assessed . . . after the expiration of the period of limitation" on assessments, but never paid or collected.  Obviously, this was not Congress' intent, as the bill history above confirms.  That point is made even clearer by the accompanying reports.  The House Report thus described its version of the bill as providing that "regardless of the correct tax liability any payment shall be an overpayment *if made after the period of limitation on assessment* (no assessment having been made within such period). . . ."  H.R. Rep. No. 70-2, at 33 (1928) (emphasis added).  Likewise, the Senate Report stated that:

>    Section 607 provides that regardless of the correct tax liability any payment shall be an overpayment *if made pursuant to an assessment after the expiration of the period of limitation on assessment (no assessment having been made within such period)* or after the expiration of the period of limitation on collection by distraint or court proceedings (no distraint or court proceeding having been begun

within such period).  It is immaterial whether payment was voluntary or
involuntary, and duress is also of no significance in determining the right to
recover an amount paid after the statute has run.

S. Rep. No. 70-960, at 41 (1928) (emphasis added).  Both reports, then, referred to payments or
collections occurring after the respective period of limitations.  To cinch matters, the House
Conference Report, in adopting the Senate version of the bill, indicated that "[t]his is a clerical
amendment in the nature of a rephrasing and simplification of the provisions of the House bill
which do not, however, operate to change the legal effect."  H. R. Rep. No. 70-1882, at 22. (1928)
(Conf. Rep.).  This passage thus makes clear that the enacted version of section 607 was intended
to apply, as the language of the House version more plainly stated, only to "payment[s] made
. . . after the expiration of the period of limitation."  H.R. 1, *supra*, at § 607.[42]

        Three years after the statute passed, the Tenth Circuit decided *Lewis v. Reynolds*, 48 F.2d
515 (10ᵗʰ Cir. 1931).  In that case, an estate administrator sought a refund after paying taxes
following an audit.  *Id*. at 515.  The administrator claimed that deductions for state taxes should
have been allowed.  *Id*.  The IRS responded by determining that even if the administrator was
correct, the administrator had not been entitled to certain other deductions he had taken for
attorney's fees.  *Id*. at 516.  The administrator replied that because "the statute of limitations had
run against the assessment," the IRS could not offset against a valid refund claim an amount of
taxes allegedly owed, but basically uncollectible.  *Id*.  The Tenth Circuit rejected this claim,
holding that "[t]he action to recover on a claim for refund is in the nature of an action for money
had and received, and it is incumbent upon the claimant to show that the United States has money
which belongs to him."  *Id*.

        After granting the administrator's petition for certiorari, the Supreme Court affirmed.
*Lewis v. Reynolds*, 284 U.S. 281, *modified*, 284 U.S. 599 (1932).  It first quoted, with approval,
from the opinion of the court of appeals, explaining –

        While no new assessment can be made, after the bar of the statute has fallen, the
        taxpayer, nevertheless, is not entitled to a refund unless he has overpaid his tax.
        The action to recover on a claim for refund is in the nature of an action for money
        had and received and it is incumbent upon the claimant to show that the United
        States has money which belongs to him.

*Id*. at 283.  The Court further reasoned that "[a]lthough the statute of limitations may have barred
the assessment and collection of any additional sum, it does not obliterate the right of the United

--------------------------------------------------

        [42]  When Congress passed the current version of the statute in 1954, it changed the phrase
"assessed or paid" to "assessed or collected."  The legislative history, however, states that the
new language "makes no material change from existing law."  H.R. Rep. No. 83-1337, at A412
(1954); S. Rep. No. 83-1622, at 581 (1954).

States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded."  *Id*.

Plaintiff's proposition – that it can recover taxes that arguably are owed because they were not timely assessed – flies in the face of *Lewis* and is flatly contradicted by the two principles upon which that decision was based.  The first of those principles, as discussed above, is that "an assessment is not a prerequisite to tax liability," but rather is designed to facilitate collection.  Accordingly, while the failure to assess a tax timely impacts the ability of the IRS to pursue the unpaid amount, it does not prevent the IRS from retaining an amount paid with respect to that tax liability prior to expiration of the limitations period.  To put it bluntly, Principal either owes the taxes in question or does not – the IRS's failure to assess them timely does not change that fact.  The second principle is that a taxpayer is entitled to a refund of an overpayment only when the amount it paid exceeds its proper tax liability.  As noted by *Lewis* and its progeny, this principle derives from the fact that a refund suit is in the nature of action for *indebitatus assumpsit* – "in which the claimant's *onus probandi* is to show that the United States has money which belongs to it."  *Usebelli Coal Mine v. United States*, 54 Fed. Cl. 373, 376 (2002), *rev'd on other grounds*, 311 Fed. Appx. 350 (Fed. Cir. Jun. 25, 2008).[43]  As the legislative history of section 6501 well illustrates, Congress did not intend that provision to alter fundamentally this basic principle of income taxation, but merely intended to modify this rule as to payments made after the running of the statute of limitations on assessment.  The latter, of course, is not the case here.

Indeed, in the more than eight decades since the predecessor of section 6501(a) was first passed, literally dozens of taxpayers have made the same argument that plaintiff makes here.  And each and every time – without fail – that claim has been rejected.[44]  Calling for a different result,

---

[43]  Consistent with this view, the Supreme Court later defined the term "overpayment" as "any payment in excess of that which is properly due."  *Jones v. Liberty Glass Co.*, 332 U.S. 524, 531 (1947); *see also United States v. Williams*, 514 U.S. 527, 532 (1995); *United States v. Dalm*, 494 U.S. 596, 609 n.6 (1990); *Stone v. White*, 301 U.S. 532, 534 (1937); *Lewis*, 284 U.S. at 283; *Missouri Pac. R.R. Co. v. United States*, 338 F.2d 668, 670-71 (1964); Carr Ferguson, "Jurisdictional Problems in Federal Tax Controversies," 48 Iowa L. Rev. 312, 329-31 (1963).  Contrary to plaintiff's claims, *Liberty Glass* did not hold that an "erroneous or illegal" assessment automatically yields an overpayment, but merely held that the taxpayer had two years, rather than four, in which to file a claim for refund asserting that it had paid taxes in response to an erroneous or illegal assessment.  *Liberty Glass*, 332 U.S. at 531-33.  Nothing in this opinion purports to overrule *Lewis* – indeed, that case is not mentioned – nor the principles on which the latter case rests.  *See Liberty Glass*, 332 U.S. at 233 ("Whatever the reason, the payment of more than is rightfully due is what characterizes an overpayment.").

[44]  *See, e.g.*, *Williams-Russell & Johnson,* 371 F.3d 1350 at 1353 ("notwithstanding § 6401(a)'s language, an untimely assessment of taxes otherwise properly owed and paid within the statutory period for assessment and collection does not create an 'overpayment' entitling the 'late-assessed' taxpayer to a refund."); *Moran*, 63 F.3d at 670 (construing section 6401 as

plaintiff terms these cases the "misguided progeny" of *Lewis v. Reynolds*.  But, it never comes to grips with the rationale of these cases.[45]  Even if this court could depart from these precedents –

_____

applying to "amounts collected after the period of limitations"); *Ewing,* 914 F.2d at 504 n.13 (under section 6401(a), "a payment of properly owed taxes within the statutory period for assessment is not an overpayment even if there is no formal assessment"); *Crompton & Knowles Loom Works v. White*, 65 F.2d 132, 133 (1st Cir. 1933), *cert. denied*, 290 U.S. 669 (1933) ("It approaches absurdity to say that the mere making of an assessment on which nothing was ever collected [because the tax had already been voluntarily paid] entitled the taxpayer to a refund of the amount assessed."); *Hartwell Mills v. Rose*, 61 F.2d 441, 443-444 (5th Cir. 1932) (holding that a mere formal defect in assessment or collection will not avail taxpayer in suit for refund); *Champ Spring Co. v. United States*, 47 F.2d 1, 3 (8th Cir. 1931), *cert. denied*, 283 U.S. 852 (1931) (rejecting this argument and noting that "[a] statute of limitations is a statute of repose, to be invoked as a bar to the maintenance of an action, but it cannot be invoked as the basis for a cause of action, because a party's right to relief is dependent upon the strength of his own cause of action, and not the weakness of his adversary's defense or claim"); *Connor v. United States*, 72 A.F.T.R.2d 93-5971 (E.D.N.Y. 1993), *aff'd* , 23 F.3d 397 (2d Cir. 1994) (Rejecting plaintiff's argument that she was "entitled to a refund of taxes properly owed simply because of a procedural defect in the collection process" because the "cases are clear that if a payment of taxes is made within the statute of limitations, that payment can only be recovered in a refund suit if the taxpayer successfully contends, that on the merits"); *Anderson v. United States*, 15 F. Supp. 216, 224-25 (Ct. Cl. 1936), *cert. denied*, 300 U.S. 675 (1937) (holding that a tax timely paid in the correct amount by the person from whom it is legally due "could not be recovered even if no assessment had been made"); *Muir v. United States*, 3 F. Supp. 619, 621 (Ct. Cl. 1933) ("[I]t is not necessary that a tax be assessed before it can be legally collected.  If a tax is due and is collected without assessment, it cannot be recovered on that ground alone."); *Meyersdale Fuel Co. v. United States*, 44 F.2d 437, 446 (Ct. Cl. 1930), *cert. denied*, 283 U.S. 860 (1931) ("Taxes may be and often are collected without assessment . . . but, in such a case, the tax, if legally due, cannot be recovered merely because it had not been formally assessed.").

[45]  Plaintiff claims these cases are distinguishable as they all involve situations in which the IRS was asserting an offset.  But, that is simply not the case.  *See*, *e.g.*, *Williams-Russell & Johnson*, 371 F.3d at 1351; *Ewing*, 914 F.2d at 499; *see also* Peyser, *supra*, at I-B, n.13 ("An untimely assessment of taxes otherwise owed and paid within the statutory period for assessment and collection does not create an 'overpayment' entitling the late-assessed taxpayer to a refund."); Jones, *supra* at 279 ("The Service's discretion to assess or not has been partly responsible for litigation by taxpayers who, on learning that their timely tax payments were never assessed have brought suit for refund on the grounds that the Service failed to assess the tax within the limitations period of Section 6501 . . .   Those suits have uniformly been rejected.").  Nor does the rationale of these cases hinge on whether the IRS is formally asserting an offset, rather than merely considering whether taxes are owed that preclude a taxpayer from recovering an overpayment.  *See Fisher v. United States*, 80 F.3d 1576, 1580 (Fed. Cir. 1996) (noting that the rationale of *Lewis* is that "[a]n overpayment must appear before refund is authorized" and

and with several decisions of the Court of Claims among them, it cannot – it would be loathe to do so, particularly, given the compelling rationales for these decisions, and especially because the result plaintiff seeks, by its own admission, is inequitable.  While, as Mr. Justice McReynolds once stated, "[l]ogic and taxation are not always the best of friends," *Sonneborn Bros. v. Cureton*, 262 U.S. 506, 522 (1923), here, they are at least close acquaintances.

*        *        *        *        *

The assessment in question was timely.   And, even if it was not, plaintiff is entitled to no refund under section 6401(a) of the Code.  Instead, plaintiff will have to prove that it is entitled to a refund based on the merits of its claims.

## III.   CONCLUSION

Based on the foregoing, the court **DENIES** plaintiff's motion for partial summary judgment and **GRANTS** defendant's cross-motion for partial summary judgment.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

that in determining whether there has been an overpayment, the taxpayer's "entire liability under the particular tax return is . . . open for redetermination" (quoting *Dysart v. United States*, 340 F.2d 624, 628 (Ct. Cl. 1965)).  At all event, even if this rule of law were limited to formal offsets, there is no reason why the IRS could not make such a formal claim here, at this early stage of the proceedings.  *See* RCFC 15(a); *cf. Principal Life Ins. Co. v. United States*, 70 Fed. Cl. 144 (2006), *reconsideration denied*, 76 Fed. Cl. 326 (2007) (precluding the United States from raising an offset after trial and a decision on the merits).