# In The United States Court of Federal Claims

Nos. 07-06T, 07-706T, 08-135T, & 08-605T

(Filed:  May 9, 2014)
_____

PRINCIPAL LIFE INSURANCE
COMPANY AND SUBSIDIARIES, *et al.*,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* Tax refund suit; Cross-motions for partial summary judgment; Loss deduction – section 165 of the Code; "Actual economic loss"; Basis allocation – Treas. Reg. § 1.61-6(a); "Carved-out income interests"; Allocation of basis in "Perpetuals" transaction violated Treasury Regulation; "Investment trusts"; "Sears Regulations" – Treas. Reg. § 301.7701-4; Multi-class "investment trust" not "trust" for tax purposes; Loss disallowed; Custodial arrangements and investment trusts not "trusts" for tax purposes; Income from Custodial Share Receipts includible in taxable income.

_____

## OPINION
_____

*Jay H. Zimbler*, Sidley Austin, LLP, Chicago, IL, for plaintiffs.

*Bart Duncan Jeffress*, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *David A. Hubbert*, for defendant.

**ALLEGRA, Judge:**

> *"[T]he tax could not be escaped by anticipatory arrangements and contracts however skillfully devised . . . by which the fruits are attributed to a different tree from that on which they grew."*[1]

Before the court, on cross-motions for partial summary judgment, is the next leg of this complex tax refund suit.[2]  At issue is the tax treatment of two distinct, but structurally-similar,

_____

[1] *Lucas v. Earl*, 281 U.S. 111, 115 (1930) (Holmes, J.).

series of investments made by Principal Life Insurance Company and Subsidiaries (PLIC).  Eight of these investments related to so-called "custodial share receipts" or "CSRs," while three others involved so-called "perpetual securities" or "Perpetuals."  The CSRs and Perpetuals were similar in that both sets of transactions involved carving out an interest in future income payments from a security.  In the case of the CSRs, those interests were carved out by a third party, which sold the residual equity interest to PLIC.  In the case of the Perpetuals, PLIC itself bought the securities, carved out and retained the income interest, and then sold the residual principal interests to a third party.

Springing from these transactions, so PLIC claims, are twin tax benefits:  the exclusion of approximately $21 million in income on the CSRs, and an approximately $291 million loss deduction generated by the sale of the Perpetuals principal interests.  PLIC asserts that its treatment of these items was impelled by the relevant provisions of the Internal Revenue Code of 1986,[3] and associated "common law" principles.  Not so, defendant remonstrates.  It asserts that PLIC was required to report income from the CSRs, which it claims involved partnerships under the controlling Treasury regulations.  It further argues that PLIC's claimed loss deduction stems from a gross misapplication of the loss provisions of section 165 of the Code and the rules for calculating the adjusted basis of the certificates sold.  For the reasons that follow, the court concludes that defendant is right.

# I.

A recitation of the underlying facts sets the context for this decision.

PLIC, an Iowa corporation with principal offices in Des Moines, is engaged, and at all times relevant to this action, was engaged, in the business of writing various forms of individual and group life and health insurance and annuities.  During the years in question (1996-2001), it filed consolidated returns as the parent corporation of a consolidated group of corporations.  During these years, and at all times relevant to this action, PLIC was a calendar-year, accrual-basis taxpayer subject to tax under the provisions of Subchapter L of the Code.

## A.

**The CSRs**.  Between September 1996 and October 2001, PLIC purchased residual interests in money market mutual fund shares from six separate sellers in eight separate transactions.  PLIC engaged a variety of entities to act as custodians or trustees associated with these transactions, including Wilmington Trust Company, the United States Trust Company of New York, the First Union Trust Company, and Chase Manhattan Bank.

---

[2]  *See Principal Life Ins. Co. & Subs. v. United States*, 95 Fed. Cl. 786 (2010); *Principal Life Ins. Co. v. United States*, 70 Fed. Cl. 144 (2006).

[3]  All references herein are to the Internal Revenue Code of 1986 (26 U.S.C.), as amended and in force during the years in question.

In these transactions, PLIC acquired a residual interest in each investment that entitled it to all dividends, appreciation, and voting rights in the specified shares, except for dividends paid out on the shares during a prescribed time period.

These transactions took one of three forms:

- Six of these investments used a custodial arrangement, in which an unrelated financial institution (the Depositor) transferred money market fund shares (or the money to buy such shares) to a custodian.  In return, the custodian issued to the Depositor both CSRs and Custodial Dividend Receipts (CDRs).  The Depositor then sold the CSRs to PLIC.

- One of the investments employed a trust in place of the custodial arrangement.  In this instance, the Depositor deposited the money market shares directly into a trust, which issued Dividend and Corpus Certificates. The Depositor then sold the Corpus Certificates to PLIC.

- The eighth and final investment employed two trusts.  The Depositor deposited money market fund shares (or the money to buy such shares) into a trust in exchange for Principal and Dividend Certificates.  The Principal Certificates were transferred to a second trust in exchange for a "Principal Unit" and a "Termination Unit."  PLIC then purchased the Principal Unit.

In each of these transactions, the Depositor, *i.e.*, the financial institution, retained a carved-out income interest in the underlying money market shares.  Via that interest, the Depositors were entitled to all dividends paid in connection with the money market shares for a prescribed period of between 20 and 23 years (the Restricted Period).  At the end of the Restricted Period, the Depositors had no future right to the shares.  The interests purchased by PLIC represented a residual interest in the money market shares and entitled PLIC, after the expiration of the Restricted Period, to either the money market shares or any amount paid with respect to those shares.

To guard against the possibility that the money market shares held in the custodial arrangement would be prematurely redeemed or lose their money market status, PLIC entered into a "Termination Agreement" with each Depositor.  Under this agreement, upon the occurrence of an adverse event, PLIC was required to purchase the CDRs (or the equivalent) from the Depositor at a price designed to prevent the Depositor from losing the value of the dividends for the Restricted Period.  Absent bad faith, nothing in any other agreement created obligations running from the Depositor to PLIC.  Nonetheless, PLIC had the right to terminate certain of the custodial arrangements at any time, and take possession of the corresponding money market shares, as long as it provided the Depositors with a valid, perfected, first-priority security interest in the shares.

The annual internal economic yields for the eight CSR investments, before taxes, ranged from 7.225 to 9.903 percent.  PLIC claimed that in addition to the expected yields, the CSRs presented attractive benefits for its long-term portfolio.  For example, in contrast to holding money market shares directly, the CSRs did not present reinvestment risk, in that the yields built up internally at a fixed rate without creating cash flows that might have had to be reinvested at lower market interest rates.  As a result, PLIC asserts that they could be confident that its initial investments in the CSRs would yield fixed amounts at pre-specified times in the future, at which time that income would be needed to satisfy specific long-term liabilities such as payouts under life insurance policies.  On its returns for its tax years 1999 through 2001, PLIC reported no income from the CSRs.

<strong>B.</strong>

**The Perpetuals**.  PLIC entered into three Perpetuals investments in 2000 and 2001.  These transactions were known as "Asgard," "Seve," and "Evergreen," named after the primary trusts involved.  As will be seen, Morgan Stanley & Co. (Morgan Stanley) was involved in each of the Perpetuals transactions in a variety of ways.  The Perpetuals were similar to the CSRs, in that PLIC retained the carved-out interests in the underlying perpetual securities while selling the residual equity interests.  The CSR and Perpetuals transactions differed, however, in that in the former the financial institutions stripped out the carved-out income interests from the residual interests, while in the latter, PLIC did so.  Each of the Perpetuals transactions involved a double-trust structure similar to that employed in the eighth CSR transaction described above.

The Perpetuals transactions were similar in structure.  At the inception of each transaction, PLIC engaged an investment banker – Morgan Stanley – to buy a portfolio of eight to ten perpetual floating-rate securities from third parties in the secondary market assertedly at arm's length prices.  Morgan Stanley then sold the securities to PLIC, earning a spread on the transaction.  PLIC held the securities in its portfolio for a relatively brief period of time (one to two months).  At the end of this holding period, on the "Transaction Date," PLIC deposited the securities into a "Primary Trust."  Chase Manhattan Bank was the trustee of each of these Primary Trusts.  The Primary Trust issued to PLIC a series of "Interest Certificates" and "Principal Certificates."  Each of the Interest Certificates entitled the holder to the interest paid on the underlying perpetual security from the inception of the Primary Trust to a specified "Redemption Date," 16 to 18 years after the Transaction Date, unless a defined "Reference Event" occurred.  The Principal Certificates entitled the holder to the underlying perpetual security on the Redemption Date and any other distributions or payments received by the Primary Trust, other than the interest payable to the Interest Certificate holder.  On the Transaction Date, PLIC sold the Principal Certificates to Morgan Stanley; it retained the Interest Certificates.

To protect itself against the risk of a Reference Event occurring before the Redemption Date, PLIC entered into Termination Agreements with Morgan Stanley Credit Products, Ltd. (MSCPL), a Cayman entity.  The Termination Agreements were documented through a master agreement between PLIC and MSCPL; MSCPL's ultimate parent, Morgan Stanley Dean Witter, guaranteed its subsidiary's obligations under the master agreement.  Under the Termination

Agreements, PLIC was obligated to pay MSCPL a one-time premium.[4]  In exchange, MSCPL became obliged to pay PLIC a calculated amount upon the occurrence of a Reference Event. There were three Reference Events under the agreements:  (i) a default with respect to the perpetual securities; (ii) a bankruptcy, insolvency, liquidation or winding up of the perpetual security issuer; or (iii) a mandatory redemption of the perpetual securities at the election of the issuer.[5]  PLIC admits that it likely would not have entered into the Perpetual transactions without the Termination Agreements (or at least would have done so at a different price).

On each of the Transaction Dates, Morgan Stanley deposited the Principal Certificates into an "Issuer Trust" and, in exchange, received two units – a Principal Unit and a Termination Unit.  The Termination Units entitled the holder to a declining percentage of any payments received by the Issuer Trust during a time period specified in the Trust Agreements.  The Principal Units entitled the holder to all payments received by the Issuer Trust in connection with the Principal Certificates, other than the payments required to be made to the Termination Units.  Morgan Stanley sold the Principal Units to unrelated financial institutions.  Morgan Stanley transferred the Termination Units to its affiliate, Morgan Stanley International Ltd., a United Kingdom broker-dealer.

The Perpetuals produced a positive yield while having a "negative duration."  The latter refers to the price sensitivity an asset has to changes in market interest rates.  An asset has a "negative duration," for this purpose, when its rate of return floats with the market.  The Interest Certificates were projected to yield a before-tax economic return from 6.059 to 7.517 percent per annum.  In each of these transactions, PLIC allocated all its tax basis in each underlying perpetual security to the corresponding Principal Certificate – even though the Interest Certificate reflected 80 percent of the cost of the overall security.  As a result, when it sold the Principal Certificates, PLIC claimed a capital loss equal to the difference between its basis in the Principal Certificates and the price at which PLIC sold them.  Under this approach, PLIC

---

[4]  Defendant notes that, at closing, PLIC paid the premium owed under the three Termination Agreements ($45,000 for Asgard/Valhalla, $80,000 for Seve/Olivia, and $50,000 for Evergreen/Holly), but that Morgan Stanley then paid these amounts back to PLIC as part of the purchase price of the Principal Certificates.

[5]  The Primary Trust agreements defined a "Reference Event" more specifically, as follows:

(a)  a Default with respect to such Notes;

(b)  a bankruptcy, insolvency, liquidation or winding up (or other similar event) with respect to the Note Issuer (excluding any merger or non-bankruptcy related corporate reorganization of such issuer); or

(c)  a mandatory redemption of all outstanding Notes prior to the applicable Redemption Date, for tax reasons or otherwise at the election of the Note Issuer pursuant to the terms of the underlying trust deed or any other instrument governing the Notes (a "Call Event").

recognized ordinary income from the Interest Certificates, without any reduction for basis recovery. Owing to this practice, PLIC claimed loss deductions totaling approximately $291 million on its tax returns for 2000 and 2001.

## C.

On December 29, 2004, the Internal Revenue Service (IRS) mailed a statutory notice of deficiency to PLIC for its tax years 1996 through 2001.[6] The notice disallowed the approximately $291 million in capital losses claimed by PLIC with respect to the three Perpetuals. It also determined that PLIC was taxable on approximately $21 million on CSR-related income for its taxable years 1999-2001. Overall, the notice determined that PLIC owed additional tax and penalties for its tax years in the amounts of $362,030,347 (tax) and $27,377,423 (penalties). On May 27, 2005, the IRS assessed the deficiencies determined in the notice of deficiency. Thereafter, taxpayer paid the assessed amounts and filed refund claims seeking the refund of income taxes and penalties attributable to the adjustments made by the IRS.

After receiving a notice of partial disallowance of its claims, PLIC filed a tax refund suit in this court on January 4, 2007. Subsequently, the court, at the parties' request, broke this case into a series of tranches, allowing decisions on certain issues to proceed while discovery is occurring on other issues. On July 23, 2012, PLIC filed a motion for partial summary judgment as to one of those tranches, that involving the Perpetuals and CSR transactions.[7] On November

_____

[6] While the notice of deficiency in the record relates to PLIC's taxable years 1996 through 2000, it appears from that notice that PLIC's taxable year 2001 was also at issue and the parties have proceeded on that assumption.

[7] Prior to filing its summary judgment motion, PLIC, on December 14, 2011, filed a motion to compel the production of certain documents by defendant relating to the Perpetuals. It claimed that the IRS had improperly withheld various internal documents that addressed the same subjects as documents that had been disclosed, namely, internal IRS documents discussing the reasonableness of PLIC's position with respect to the Perpetuals transactions. On December 22, 2011, the court denied PLIC's motion, indicating that "[a]n opinion explaining the basis for this ruling will follow."

Federal Rule of Evidence 502(a) provides that when a disclosure is made in a federal proceeding with a waiver of the attorney-client privilege, "the waiver extends to an undisclosed communication or information . . . only if" the waiver is intentional, the disclosed and undisclosed communications or information concern the same subject matter, and "they ought in fairness to be considered together." Fed. R. Evid. 502(a). This waiver "is limited to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner." Fed. R. Evid. 502(a), adv. comm. notes 2007. A party that makes such a presentation "opens itself to a more complete and accurate presentation." *Id.*

While "[t]here is no bright line test for determining" when this waiver applies, *Eden Isla Marina, Inc. v. United States*, 89 Fed. Cl. 480, 503 (2009), it is safe to assume that a party may not compel the production of materials that are irrelevant simply because the other side has

8, 2012, defendant filed a cross-motion as to these issues, expanding the scope of the motion to include penalties.  Oral argument on the cross-motions was held on November 12, 2013.

## II.

We begin with common ground.  Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* RCFC 56; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Id.* at 248.  However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party."  *Id.*; *see also Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When making a summary judgment determination, the court is not to weigh the evidence, but to "determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("a [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004).  The court must determine whether the evidence presents a disagreement sufficient to require fact finding, or, conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson*, 477 U.S. at 251-52; *see also Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) ("'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" (quoting *Matsushita*, 475 U.S. at 587)).  Where there is a genuine dispute, all facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion.  *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Stovall v. United States*, 94 Fed. Cl. 336, 344 (2010); *L.P. Consulting Grp., Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).  Where, as here, a court

------

already disclosed related materials that are also irrelevant.  The internal IRS documents PLIC sought – and the internal IRS documents already produced that were the basis for PLIC's motion – are both irrelevant as far as the court is concerned and, hence, are not subject to discovery.  *See* RCFC 26(b)(1); *see also Pinkard v. Baldwin Richardson Foods, Inc.*, 2013 WL 1308713, at *8 (W.D.N.Y. Mar. 28, 2013) (fairness did not require production of witnesses' report where defendant did not "proffer[] any reason to believe that any other portion of the report, let alone the entirety of the report, is relevant").  Tax refund cases are *de novo* proceedings.  *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932).  "As such, this court's determination of plaintiff's tax liability must be based on facts and merits presented to the court and does not require (or even ordinarily permit) this court to review findings or a record previously developed at the administrative level." *Vons Cos., Inc. v. United States*, 51 Fed. Cl. 1, 6 (2001).  Why a given IRS employee felt that penalties should be imposed on PLIC has nothing to do with this litigation.

considers cross-motions for (partial) summary judgment, it must view each motion, separately, through this prism.[8]

PLIC claims a loss deduction, pursuant to section 165(a) of the Code, allegedly generated upon its sale of the Principal Certificates associated with the three Perpetuals transactions.  It also seeks to exclude from taxable income the income generated on the eight CSR transactions.  Defendant objects on both counts, contending that PLIC was entitled neither to the loss deduction claimed, nor the income exclusion it seeks.  Although the CSR transactions somewhat predate the Perpetuals, the court, for reasons that will become obvious, will deal with the proper tax treatment of the latter first.

## III.

PLIC argues that the losses it claims on the Perpetual transactions were deductible on its 2000 and 2001 returns under section 165 of the Code.  That section allows for a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. § 165(a).[9]  To qualify for this deduction, a taxpayer must prove the existence and amount of the claimed loss.  *Boehm v. Comm'r of Internal Revenue*, 326 U.S. 287, 294 (1945); *Stivers v. Comm'r of Internal Revenue*, 360 F.2d 35, 40 (6th Cir. 1966); *Goeller v. United States*, 109 Fed. Cl. 534, 539 (2013).  While defendant offers a host of reasons why the losses claimed here are not deductible, its primary assertions are that:  (i) the losses claimed were not "bona fide" within the meaning of section 165 and the related Treasury Regulations, as they did not relate to an "actual economic loss;" (ii) PLIC failed to calculate its loss properly because, in subdividing the perpetual securities, it wrongly allocated all of its costs to the tax basis of the Principal Certificates; and (iii) the transactions involving the Perpetuals produced no losses because, under the so-called "Sears Regulations," they led to the creation not of trusts, but of partnerships.  The court will consider these claims, and PLIC's responses thereto, *seriatim*.

---

[8]  *See Chevron U.S.A. Inc. v. Mobil Producing Tex. & N.M.*, 281 F.3d 1249, 1252-53 (Fed. Cir. 2002); *see also Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010); *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc.*, 598 F.3d 257, 264 (6th Cir. 2010); *Northrop Grumman Computing Sys., Inc. v. United States*, 93 Fed. Cl. 144, 148 (2010).

[9]  The deduction for losses has one of the oldest lineages of any provision in the Code.  The first section authorizing such a deduction was included in the Revenue Act of 1867, which allowed as a deduction "losses actually sustained during the year arising from fires, shipwreck, or incurred in trade."  Revenue Act of 1867, ch. 169, § 13, 14 Stat. 471, 477 (1867).  That Act famously was declared unconstitutional in *Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429 (1895), leading to the passage of the Sixteenth Amendment.  Following that amendment, language similar to the current section 165(c) was added to the statute in the Revenue Act of 1916, ch. 463, § 5(a)(4), 39 Stat. 756 (1916).  *See* John Seidman, Seidman's Legislative History of the Federal Income Tax Laws (1938-1861) 962-63 (1938); *see also Ambrose v. United States*, 106 Fed. Cl. 152, 156 n.5 (2012).

### A.

Defendant first contends that by allowing a deduction only for "any loss sustained," section 165(a) requires that there be an "actual economic loss" before a deduction is permitted. Treasury Regulation § 1.165-1(b) states that "[o]nly a bona fide loss is allowable," adding that "[s]ubstance and not mere form shall govern in determining a deductible loss." *See also Cottage Sav. Ass'n v. Comm'r of Internal Revenue*, 499 U.S. 554, 567-68 (1991). But, this regulation does not, in so many words, say that only "actual economic losses" are deductible. Nor, for that matter, does it define how one determines whether a loss is "bona fide." *See Cottage Sav.*, 499 U.S. at 568; *Higgins v. Smith*, 308 U.S. 473, 475-76 (1940); *see also* Marvin A. Chirelstein & Lawrence A. Zelenak, "Tax Shelters and the Search for a Silver Bullet," 105 Columb. L. Rev. 1939, 1952 n.45 (2005). In asserting that there is, nonetheless, an overarching "actual economic loss" requirement for deductibility under section 165, defendant offers two cases – *United States v. Flannery*, 268 U.S. 98 (1925) and *Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005). But, the court is unconvinced these cases support defendant's claims.

In *Flannery*, the taxpayer purchased stock prior to March 1, 1913, and sold it in 1919 for more than its cost, but for less than its value on March 1, 1913. Section 202(a)(1) of the Revenue Act of 1918, 40 Stat. 1060, stated that in computing loss on the sale of property acquired prior to March 1, 1913, the fair market value as of that date should be used to calculate gain or loss. Although the taxpayer actually realized a profit upon the sale in 1919, he claimed a deductible loss because the sale price was less than his basis, *i.e.*, the March 1, 1913, value of the stock. The Supreme Court held, however, that the special basis provisions for property acquired prior to March 1, 1913, could not be utilized to provide a deduction on account of loss. This was because "the Act of 1918 imposed a tax and allowed a deduction to the extent only that an actual gain was derived or an actual loss sustained from the investment," with the reference to market value on March 1, 1913, constituting "a limitation upon the amount of the actual gain or loss that would have otherwise have been taxable or deductible." 268 U.S. at 103; *see also McCaughn v. Ludington*, 268 U.S. 106, 107 (1925) (*Flannery* held "that the Act allowed a deduction to the extent only that an actual loss was sustained from the investment, as measured by the difference between the purchase and sale prices of the property").

*Flannery* is among an assortment of Supreme Court decisions in the 1920s and early 1930s construing section 202(a)(1) (or its predecessor provision, the Revenue Act of 1916, § 5(a), 39 Stat. 756). These cases presented varying fact patterns concerning how section 202(a)(1) should be applied where the cost of the asset sold varied from its fair market value on March 1, 1913. Some of them focused on whether a transaction yielded a deductible loss, while others focused on whether a transaction resulted in a taxable gain.[10] Curiously, *Flannery* has not

---

[10]   *See Burnet v. Houston*, 283 U.S. 223, 227 (1931) (extent of deductible loss, if any, on disposition of stock acquired in 1906 and sold in 1920, was to be measured against lower of fair market value of stock on March 1, 1913 and price of stock when acquired); *Lucas v. Alexander*, 279 U.S. 573 (1929) (taxpayer liable for gain equal to value of insurance policy upon disposition minus value of policy in 1913); *United States v. Ludey*, 274 U.S. 295 (1927) (taxpayer liable for gain on the sale of oil wells and equipment, resulting from application of depreciation rules,

been cited by the Supreme Court since 1931 – which is particularly puzzling if, as defendant contends, that case inaugurated a broad and enduring rule governing the nondeductibility of losses.[11]  So why have precedents like *Flannery* fallen into disuse, even in the face of many cases involving tax-advantaged transactions driven by losses?  As is often the case in tax law, the answer is multi-faceted.

        To start, a careful reading of these cases suggests that they did not enunciate some broad rule of nondeductibility, but instead focused, more narrowly, on the transition provisions passed by Congress to phase in the modern income tax, provisions like section 202(a)(1) of the Revenue Act of 1918.  The Court interpreted these transition provisions consistent with their limited purpose – to avoid the Constitutional problems that would have arisen had Congress taxed gains accruing prior to the passage of the Sixteenth Amendment – and refused to allow taxpayers to reap additional tax benefits through transactions that bridged the transitional period.  Other cases decided around this time recognized that the Supreme Court's focus was limited and refused to treat its opinions as somehow supplanting the Code's provisions for calculating gain and loss.  *See Basch v. Comm'r of Internal Revenue*, 30 B.T.A. 305, 306-07 (1934) (finding that *Flannery*, *McCaughn* and *Burnet*, were "not in point here" and applying instead the provisions of the Revenue Act of 1926); *see also Rands, Inc. v. Comm'r of Internal Revenue*, 34 B.T.A. 1094, 1104 (1936).  So held this court's predecessor, in *Davison v. United States*, 6 F. Supp. 236, 239 (Ct. Cl. 1934), where Judge Green, commenting on *Ludey*, wrote that "[t]he decision . . . has sometimes been treated as if it had ignored the provisions of the statute which require the basis to be the March 31, 1913, value, but the language used in the opinion in this case as well as that in [*Flannery*] and in the companion case, [*McCaughn*], should, as we think, be considered only as applying each instance to the case then before the court."  *See also Pfleghar Hardware Specialty Co. v. Blair*, 30 F.2d 614, 618 (2d Cir. 1929).

_____

notwithstanding that sale price was lower than purchase price); *McCaughn v. Ludington*, 268 U.S. 106, 107 (1925) (taxpayer, upon disposing of stock in 1919, could deduct the value of the stock less its purchase price, rather than the value of the stock less its price on March 1, 1913); *Walsh v. Brewster*, 255 U.S. 536, 537-38 (1921) (first transaction: upon disposition in 1916, taxpayer did not have gain when the sale price was the same as the 1909 purchase price, even though the price on March 1, 1913 was lower than the sale and purchase prices; second transaction: upon disposition in 1916, taxpayer had gain in the amount of the difference between sale price and purchase price, notwithstanding that March 1, 1913 price was lower than either sale or purchase price); *see also Goodrich v. Edwards*, 255 U.S. 527 (1921); *Pioneer Cooperage Co. v. Comm'r of Internal Revenue*, 53 F.2d 43, 44 (8th Cir. 1931), *cert. denied*, 284 U.S. 686 (1932).

        [11]  Some of the other cases cited above dealing with the 1916 and 1918 Revenue Acts have been cited by the Supreme Court more recently, but not for any proposition remotely like the one defendant posits.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 134 (1998) (citing *Lucas*, 279 U.S. at 577, for the doctrine of constitutional avoidance).

Now *Flannery* might be viewed as presaging the anti-abuse doctrines enunciated by the Supreme Court in the late 1930s, in now-famous cases like *Gregory v. Helvering*, 293 U.S. 465, 469-70 (1935); *Minn. Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938); and *Griffiths v. Helvering*, 308 U.S. 355, 357 (1939).[12]  But, the very existence of these familiar precedents (none of which cites *Flannery*, by the way) casts doubt on the notion that, a decade or so earlier, the Court established a far broader anti-abuse doctrine, *i.e.*, that only "actual economic losses" are deductible.  Why craft these other anti-abuse doctrines – substance over form; sham transaction; step transaction – if this field were already superintended by *Flannery*, particularly since a few of the *Helvering* cases also involved loss deductions?  *See, e.g.*, *Griffiths*, 308 U.S. at 357; *see also Helvering v. Southwest Consol. Corp.*, 315 U.S. 194 (1942).  At the least, one must surmise that the Supreme Court felt that the refinements that came with these later anti-abuse doctrines were important.  True, like defendant's rule, these anti-abuse doctrines focus on "'economic realities, not legal abstractions,'" *PPL Corp. v. Comm'r of Internal Revenue*, 133 S. Ct. 1897, 1905 (2013) (quoting *Comm'r of Internal Revenue v. Southwest Exploration Co.*, 350 U.S. 308, 315 (1956)), and admittedly do so with a degree of imprecision.[13]  But, they are neither as sweeping, nor as fuzzily-defined, as the rule defendant would have this court "distill" from *Flannery*.[14]

Indeed, in its zeal to prevent the perceived abuse of the loss deduction, defendant glosses over the difficulties associated with determining whether a given transaction results in an "actual economic loss."  Congress, after all, has supplied a myriad of rules on this subject, which belie the notion that the deductibility of a loss as to a given asset turns simply on subtracting the price received from the price paid.  This is particularly true where the asset involved is wasting, *e.g.*, amortizable or depreciable, and, especially so, where, as here, the asset originally acquired is later subdivided (and part sold).

For these reasons, neither *Flannery* nor its progeny should be regarded as laying down any overarching "actual economic loss" rule that governs, as a matter of law, the deductibility of losses under section 165(a).  *Centex* – the other case upon which defendant relies – certainly is not to the contrary.  As an aside, *Centex* was not a tax refund suit, but a *Winstar*-type, breach of

---

[12]  Guy Tresillian Helvering was appointed Commissioner of Internal Revenue by President Franklin D. Roosevelt in 1933, and served in that capacity until he was appointed to the federal bench in 1943.

[13]  *See, e.g.*, *Frank Lyon Co. v. United States*, 435 U.S. 561, 584 (1978) (economic substance doctrine); *Stewart v. Comm'r of Internal Revenue*, 714 F.2d 977, 988 (9th Cir. 1983) (substance-over-form doctrine); *King Enters., Inc. v. United States*, 418 F.2d 511, 516 (Ct. Cl. 1969) (step transaction doctrine).

[14]  In *H.J. Heinz Co. & Subs. v. United States*, 76 Fed. Cl. 570, 580 (2007), this court observed that "while these various doctrines overlap, they also have different criteria that bring into relief the nuances of various transactions, as well as the importance of particular features therein."  *See also* Lewis R. Steinberg, "Form, Substance and Directionality in Subchapter C," 52 Tax Law. 457, 458 n.8, 499 (1999); Marvin A Chirelstein, "Learned Hand's Contribution to the Law of Tax Avoidance," 77 Yale L.J. 440, 472 (1968).

contract case,[15] in which the Federal Circuit reviewed this court's damage calculations.  There, the appellate court agreed that "the ordinary rule [is] that a loss deduction may not be taken in the absence of actual economic loss."  395 F.3d at 1293.  But, it hastened to add that there are exceptions to this "ordinary rule."  *Id.*  Indeed, it held that it was "far from clear that those general principles" applied to the loss deductions in question, which the court held were controlled by "special tax rules" that Congress had enacted during the 1980s.  *Id.* at 1294.  Ultimately, the Federal Circuit "reject[ed] the government's submission that this case can be resolved simply by applying the general rule that reimbursed losses do not give rise to the right to take a deduction."  *Id.* at 1294-95.  Hence, in *Centex*, the Federal Circuit eschewed the very rule that defendant would have this court apply here – *to wit*, that a taxpayer must always end up poorer as a precondition to taking a loss deduction.[16]

To be fair, *Centex* is not alone in essaying that tax losses, to some degree, should correspond to "actual" or "genuine" economic losses.  See *ACM Partnership v. Comm'r of Internal Revenue*, 157 F.3d 231, 252 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999) ("Tax losses such as these  . . . which do not correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue Code and regulations."); *Scully v. United States*, 840 F.2d 478, 486 (7th Cir. 1988) (to be deductible, a loss must be a "genuine economic loss"); *Shoenberg v. Comm'r of Internal Revenue*, 77 F.2d 446, 448 (8th Cir. 1935), *cert. denied*, 296 U.S. 586 (1935) (to be deductible, a loss must be "actual and real").  But, the question is – to **what** degree?  Tellingly, all these cases share an important feature with *Centex* – the "economic loss" phraseology ultimately played no role in the decisions.  Instead, all these cases ultimately determined whether a loss was deductible by employing the loss calculation rules of the Code (and the regulations thereunder), supplemented,

---

[15]  *See United States v. Winstar*, 518 U.S. 839 (1996).

[16]  Several examples serve to illustrate why defendant's "actual economic loss" concept is overly simplistic.  For example, section 1014(a) of the Code  provides generally for a stepped-up basis for property transferred from a decedent.  26 U.S.C. § 1014(a).  Such a basis can far exceed the original cost of acquiring the property.  Yet, there is no doubt that if upon a sale or disposition, the amount realized is less than the stepped-up basis, the seller may be entitled to a loss deduction even though in actual economic terms the property was sold at an extraordinary gain.  How can this be?  It is a simple matter of applying the Code by its terms.  *See Janis v. Comm'r of Internal Revenue*, 469 F.3d 256 (2d Cir. 2006) (discussing how these rules work).  And similar results occur in various other settings where the adjusted basis of an asset is not its historical cost, such as like-kind exchanges under 26 U.S.C. § 1031, or gifts under 26 U.S.C. § 1015(a).  One must wonder whether defendant has considered the ramifications if its "actual economic" rule were applied to gains taxable under section 61 of the Code.  After all, the *Flannery* line of cases emphasized that the transition rules were a two-way street, applicable to losses as well as gains.  What if, under such an approach, a taxpayer argued that no income is produced on the sale of a capital asset if the appreciation of that asset has not kept pace with inflation?  In the latter instance, there is no "actual economic" gain, yet the IRS undoubtedly would take the position that if the amount realized exceeds the asset's tax basis, gain, for purposes of section 61 of the Code, is produced.

as necessary, by the traditional anti-abuse doctrines described above.  *See ACM Partnership*, 157 F.3d at 260; *Scully*, 840 F.2d at 484; *Shoenberg*, 77 F.2d at 448-49.  This approach makes good sense as it recognizes that the Code and the application of the anti-abuse doctrines are not "'independent' of one another."  *United States v. Woods*, 134 S. Ct. 557, 567 (2013).  And that approach should be ours, too.

## B.

So what are the statutory and regulatory rules that apply here?  The Code generally takes account of increases and decreases in the value of property only when gains or losses are realized and recognized.  *See* John Mertens, 4 Mertens Law of Fed. Income Tax'n § 22:7 (2014) (hereinafter "Mertens").  The realization requirement is found in section 1001(a) of the Code, which provides that –

> The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

26 U.S.C. § 1001(a); *see also* Treas. Reg. § 1.1001-1(a) ("Except as otherwise provided in subtitle A of the Code, the gain or loss realized from the conversion of property into cash, or from the exchange of property for other property differing materially either in kind or in extent, is treated as income or as loss sustained"); *see also Cottage Sav. Ass'n*, 499 U.S. at 559.  The recognition requirement derives from Section 1001(c) of the Code, which states that "[e]xcept as otherwise provided in this subtitle, the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized."  26 U.S.C. § 1001(c); *see also* Treas. Reg. § 1.1002-1(a) ("The general rule with respect to gain or loss realized upon the sale or exchange of property as determined under section 1001 is that the entire amount of such gain or loss is recognized except in cases where specific provisions of subtitle A of the code provide otherwise.").[17]

To apply these provisions to a sale or exchange, one must determine a property's "adjusted basis."  Section 1012 defines "basis" of property as "the cost of such property, except as otherwise provided in this subchapter and subchapters C . . ., K . . ., and P . . ."  26 U.S.C. § 1012.  Section 1011(a) defines "adjusted basis" as "the basis (determined under section 1012 . . .), adjusted as provided in section 1016."  *Id*. at § 1011(a).  Section 1016 then lists a lengthy

---

[17]  Like section 165, section 1001 of the Code has a long lineage.  *See* Revenue Act of 1924, ch. 234, § 203(a), 43 Stat. 256.; H.R. Rep. No. 179, at 13 (1924); S. Rep. No. 398, at 14 (1924).  The statutory distinction between realization and recognition was, perhaps, easier to see in the 1954 version of the Code, in which the recognition rule of present-day section 1001(c) stood apart in its own section of the Code, Section 1002.  The provisions of old section 1002 became section 1001(c) in 1976.  Tax Reform Act of 1976, Pub. L. No. 94-455, Tit. XIX, § 1901(a)(121), 90 Stat. 1784.  This amendment was not intended to have any substantive effect. *See* S. Rep. No. 938, at 512 (1976).

set of potential adjustments, none of which, however, is pertinent here.  *Id*. at § 1016.  The Treasury Regulations under section 165 make explicit reference to these provisions, stating that "[t]he amount of loss allowable as a deduction under section 165(a) shall not exceed the amount prescribed by § 1.1011-1 as the adjusted basis for determining the loss from the sale or other disposition of the property involved."  Treas. Reg. § 1.165-1(c).  Importantly, a long-standing regulation, Treas. Reg. § 1.61-6(a), further provides, in unequivocal language, that

> [w]hen a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part.

Treas. Reg. § 1.61-6(a).  This regulation indicates that "[t]he sale of each part is treated as a separate transaction and gain or loss shall be computed separately on each part."  *Id*.  As this court stated in *Fisher v. United States*, 82 Fed. Cl. 780, 784 (2008), *aff'd*, 333 Fed. Appx. 572 (Fed. Cir. 2009), the apportionment required by the regulation "is done by dividing the cost basis of the larger property among its components in proportion to their fair market values at the time they were acquired."[18]

### 1.

Courts have been relatively steadfast in applying the apportionment rules in Treas. Reg. § 1.61-6(a) to all forms of property.  With the exception of an outlier or two (discussed below), courts, including the Tax Court, have rejected the notion that the regulation governs only the subdivision of real property, concluding instead that real property is the main, but not the sole, focus of the regulation.  *See Fisher*, 82 Fed. Cl. at 785 (discussing the history of the regulation).[19]  Rather, as its plain language suggests,[20] the regulation applies to any "collection

---

[18]  *See Beaver Dam Coal Co. v. United States*, 370 F.2d 414, 416–17 (6th Cir. 1966); *Fasken v. Comm'r of Internal Revenue*, 71 T.C. 650, 656-57 (1979); *Fairfield Plaza, Inc. v. Comm'r of Internal Revenue*, 39 T.C. 706, 712 (1963); *Ayling v. Comm'r of Internal Revenue*, 32 T.C. 704, 711 (1959); *Cleveland–Sandusky Brewing Corp. v. Comm'r of Internal Revenue*, 30 T.C. 539, 545 (1958); *see also Gladden v. Comm'r of Internal Revenue*, 262 F.3d 851, 853 (9th Cir. 2001).

[19]  In *Fisher*, this court noted, *inter alia*, that the progenitor of Treas. Reg. § 1.61-6 (Treas. Reg. 45, art. 43 (1921)) dealt only with the subdivision of real estate, but that the language of the regulation was changed in 1957 to encompass all forms of property.  *Fisher*, 82 Fed. Cl. at 785, 789 (citing Computation of Taxable Income, 22 Fed. Reg. 9419, 9422 (Nov. 26, 1957)).  The Supreme Court discussed the pre-1957 version of the regulation in *Heiner v. Mellon*, 304 U.S. 271, 280-81 (1938).  Notably, while the Court there indicated that Article 43 of Treas. Reg. 45 was limited to real estate, it pointed out that "[a] like rule has been applied where the taxpayer had purchased personal property in block and was engaged in selling it in parcels."  304 U.S. at 275-76.

or bundle of rights with respect to . . . property" and "is not limited to the subdivision of real property." *Fasken v. Comm'r of Internal Revenue*, 71 T.C. 650, 656 (1979); *see also Norwest Corp. & Subs. v. Comm'r of Internal Revenue*, 111 T.C. 105, 139 (1998) (*Fasken* holds that Treas. Reg. § 1.61-6(a) "is not limited to the severance of realty into two or more parcels, but applies with respect to parts of the bundle of rights comprising property").[21]   Consistent with this view, the apportionment rules have been directed to a wide range of tangible and intangible property:  shares of stock received in the demutualization of insurance companies,[22] shares of stock purchased in bulk but sold in lesser parcels,[23] water rights,[24] oil leases,[25] ground rents,[26] materials used in shipbuilding,[27] portions of a pipeline,[28] antique furniture,[29] revenue rights obtained in the purchase of a basketball team,[30] gold coins,[31] cement mixing equipment,[32] and

---

[20]   Black's Law Dictionary (9th ed. 2009) (property:  "the right to possess, use, and enjoy a determinate thing (either a tract of land or a chattel) . . . ; [a]ny external thing over which the rights of possession, use, and enjoyment are exercised."); John Salmond, Jurisprudence 423-24 (Glanville L. Williams ed., 10th ed. 1947) ("property" includes "proprietary rights" in things like "land, chattels, shares, and the debts due him").

[21]   *See also* Anthony P. Polito, "Borrowing, Return of Capital Conventions, and the Structure of the Income Tax:  An Essay in Statutory Interpretation," 17 Va. Tax Rev. 467, 534 (1998) ("If a taxpayer disposes of a portion of an asset, the general rule calls for apportionment of basis between the portion of the asset sold and the portion retained.").

[22]   *Dorrance v. United States*, 2013 WL 1704907, at *5 (D. Ariz. Apr. 19, 2013); *Reuben v. United States*, 2013 WL 656864, at *4 (C.D. Cal. Jan. 15, 2013); *Fisher*, 82 Fed. Cl. at 784.

[23]   *Bancitaly Corp. v. Comm'r of Internal Revenue*, 34 B.T.A. 494, 503-05 (1936).

[24]   *Gladden v. Comm'r of Internal Revenue*, 262 F.3d 851, 853 (9th Cir. 2001).

[25]   *Columbia Oil & Gas Co. v. Comm'r of Internal Revenue*, 118 F.2d 459, 461 (5th Cir. 1941).

[26]   *Welsh Homes, Inc. v. Comm'r of Internal Revenue*, 279 F.2d 391, 395 (4th Cir. 1960).

[27]   *Am. Industrial Corp. v. Comm'r of Internal Revenue*, 20 B.T.A. 188, 197-98 (1930).

[28]   *Santa Maria Gas Co. v. Comm'r of Internal Revenue*, 10 B.T.A. 1412, 1414-15 (1928).

[29]   *Andrew Crispo Gallery, Inc. v. Comm'r of Internal Revenue*, 63 T.C.M. (CCH) 2152 (1992), *aff'd in part, and vacated in part, on other grounds*, 16 F.3d 1336 (2d Cir. 1994).

[30]   *First Northwest Industries of Am., Inc. v. Comm'r of Internal Revenue*, 649 F.2d 707, 710 (9th Cir. 1981).

[31]   *Daniels v. Comm'r of Internal Revenue*, 2014 WL 700347, at *3-4 (U.S. Tax Court Feb. 24, 2014).

[32]   *Kunz v. Comm'r of Internal Revenue*, 21 T.C.M. (CCH) 1454 (1962), *aff'd*, 333 F.2d 556 (6th Cir. 1964).

accounts receivable.[33]  In some of these cases, the property was divided into interests described spatially, while in others the division was temporal.[34]  Careful adherence to this fractional, divisible view of property is important, as it avoids having the sale of a part of a larger property become an opportunity for income deferral.  *See Foster v. Comm'r of Internal Revenue*, 80 T.C. 34, 216-17 (1983), *aff'd in part*, *vacated in part on other grounds*, 756 F.2d 1430 (9th Cir. 1985), *cert. denied*, 474 U.S. 1055 (1986); *Fasken*, 71 T.C. at 655-57; *see also* Stephen B. Cohen, "Apportioning Basis:  Partial Sales, Bargain Sales and the Realization Principle," 34 San Diego L. Rev. 1693, 1703 (1997).

But, despite these many cases, PLIC insists that the apportionment rules do not apply to "a carved-out income interest like the one under consideration."  It asserts, in effect, that the regulation has a tacit exception, that is, it does not address situations in which an income interest is carved out from a financial instrument.  In that situation, PLIC claims, the proper tax treatment is governed not by the Treasury Regulations, but by "80 years of common law, which Congress and the Treasury have knowingly left in place."  PLIC cites, as evidence of this, a line of authority that it claims demonstrates not only the existence of carve-out interests, but also the fact that the normal basis allocation rules do not apply to them.  It contends that this lineament well-illustrates that the basis allocation performed by PLIC here – in which all of its cost in acquiring the Perpetuals was allocated to the residual equity interest – was quite appropriate.  But, as will be seen, PLIC's invocation of these cases – and the supposed "common law" rules they embody – turns out to be something of a *clupeidae roseus* (or perhaps a school of them).  A brief overview of how income is taxed under the Code helps explain why.

**2.**

Section 61(a) of the Code provides that "gross income means all income from whatever source derived."  A fundamental principle underlying this provision is that income must be taxed to the one who earns it – "that income is taxed to the party who earns it and that liability may not be avoided through an anticipatory assignment of that income."  *United States v. Basye*, 410 U.S. 441, 447, 449-50 (1973); *see also Lucas v. Earl*, 281 U.S. 111, 114-15 (1930).  Under section 61, a taxpayer realizes income if he controls the disposition of that which it could have received, even if it diverts the income to another.  *See Helvering v. Horst*, 311 U.S. 112, 116-17 (1940); *Wheeler v. United States*, 768 F.2d 1333, 1335-36 (Fed. Cir. 1985), *cert. denied*, 474 U.S. 1081 (1986).  In such circumstances, the receipt of income by the third party stems from the taxpayer's economic gain – and that gain, therefore, is included in the gross income of the taxpayer, not that of its assignee.  *See Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 605-06 (1948); *Horst*,

---

[33]  *R.M. Smith v. Comm'r of Internal Revenue*, 69 T.C. 317, 335 (1977), *aff'd*, 591 F.2d 248 (3d Cir. 1979), *cert. denied*, 448 U.S. 828 (1979).

[34]  *Compare Welsh Homes*, 279 F.2d at 395 (temporal – ground rents) with *Santa Maria Gas*, 10 B.T.A. at 1414-15 (spatial – pipeline); *see, however,* Jeffrey L. Kwall, "The Income Tax Consequences of Sales of Present Interests and Future Interests:  Distinguishing Time from Space," 49 Ohio St. L.J. 1 (1988) (arguing that spatial and temporal divisions should be treated differently).

311 U.S. at 116-17; *see also Yankee Atomic Elec. Co. v. United States*, 782 F.2d 1013, 1016-17 (Fed. Cir. 1986).  The exceptions to this rule are purposely narrow.  For example, the rule does not apply where the taxpayer which may be thought to have earned the income is precluded from receiving it by operation of law.  *See Comm'r of Internal Revenue v. First Sec. Bank*, 405 U.S. 394, 406-07 (1972); *Yankee Atomic Elec.*, 782 F.2d at 1016.

So how do these rules apply where B owns an income-producing asset and conveys a present interest to A for cash considerations, retaining either the remainder of the asset itself or a reversion?  Is this a sale by B, requiring A to report the income until B's reversion takes effect, or is it to be treated merely as a loan from A to B to be repaid by B from the income produced by the asset and reported by B?  How about the reverse – A owns an income-producing asset and conveys the remainder therein to B, while reserving a present income interest in itself?  To what extent, if any, is B subject to federal income tax on amounts received by A with respect to the property?  *See* Kenneth F. Joyce and Louis A. Del Cotto, "The AB (ABC) and BA Transactions: An Economic and Tax Analysis of Reserved and Carved Out Income Interests," 31 Tax L. Rev. 121 (1975-1976) (extensively discussing these transactions); *see also* Jeffrey L. Kwall, "The Income Tax Consequences of Sales of Present Interests and Future Interests:  Distinguishing Time from Space," 49 Ohio St. L. J. 1 (1987).  According to PLIC, these questions are readily answered by its "80 years of common law."

Of course, none of the dozen or so cases PLIC cites truly involve "common law," at least in the way that a tax lawyer would use the phrase.  Instead, by and large, these cases involve the application of particular rules in the Code to the transactions presented.  Though they make occasional reference to the anti-abuse rules, like the substance-over-form doctrine, these cases bottom on the assignment of income doctrine discussed above, which, in turn, has its roots firmly fixed in section 61 itself.  Be that as it may, PLIC asserts that a long and uninterrupted line of cases holds that a taxpayer carving out an income interest and selling the residual is required to allocate its entire basis in the original investment to the residual interest sold.  But, though its discussion of these cases is lengthy, PLIC is hard-pressed to quote anything from them that actually says what it says.  Indeed, as the following discussion reveals, one searches in vain for anything in these cases that even approximates PLIC's basis allocation rule.

PLIC begins with four cases in which the owner of stock transferred it to a third party, but retained the right to receive dividends.  *Peck v. Comm'r of Internal Revenue*, 77 F.2d 857 (2d Cir. 1935), 77 F.2d 857 (2d Cir. 1935); *Bettendorf v. Comm'r of Internal Revenue*, 40 F.2d 49 F.2d 173, 174-75 (8th Cir. 1931); *Morton v. Comm'r of Internal Revenue*, 23 B.T.A. 930, 935 (1931), *aff'd*, 61 F.2d 1036 (2d Cir. 1932); *Heminway v. Comm'r of Internal Revenue*, 44 T.C. 96, 97-98 (1965).  The courts held that the original owner of the stock was taxable on the retained dividends.  Those holdings, however, rested not upon any notion that the assignment-of-income principle could be so easily avoided, but upon a finding that the recipient of the transferred stock received the dividends in a trustee or fiduciary capacity, and not as a beneficiary.  *See Peck*, 77 F.2d at 858*; Bettendorf*, 49 F.2d at 175; *Heminway*, 44 T.C. at 100-01; *Morton*, 23 B.T.A. at 935.  The courts held that there was no anticipatory assignment of future income in such an instance, as it was the "tree and not the fruit which [was] being sold."

*Heminway*, 44 T.C. at 102.  None of these cases suggests that the same result would obtain were there no such trust relationship.

A fifth case cited by PLIC involving stock is *Estate of Stranahan v. Comm'r of Internal Revenue*, 472 F.2d 867 (6th Cir. 1973).  There, a father had a large interest deduction available to use and wanted to accelerate his income to avoid losing that deduction.  He assigned his son $122,820 in anticipated stock dividends in exchange for the immediate payment of $115,000.  The father reported the $115,000 as ordinary income; the son reported the dividend income received that same year (reduced by an amount he believed corresponded to his basis).  *Id.* at 868.  The Tax Court concluded that this transaction, "though conducted in the form of an assignment of a property right, was in reality a loan to [the father] masquerading as a sale and so disguised lacked any business purpose."  30 T.C.M. (CCH) 1078 (1971).  It held that the father received income when the dividend was declared paid.  *Id.*  The Sixth Circuit reversed, holding that the assignment-of-income principles in cases like *Lucas* and *Horst* did not apply because "this was a transaction for good and sufficient consideration, and not merely gratuitous."  472 F.2d at 870.  As further grounds for this conclusion, the court emphasized that the transfer was complete and that the seller (the father) bore the risk of not receiving the future income.  *Id.* at 871.  Accordingly, the court held that the dividends were taxable to the son when received and that the son's cash payment was income to the taxpayer in the year received.  *Id.*; *see also* Mertens, *supra*, at §§ 5:54, 38B:40.

Any notion that *Stranahan* represents some exception to the assignment-of-income principles, applicable to carved-out income interests, rather than an isolated anomaly, requires the court to ignore a number of similar cases that have come out differently.  These cases have refused  to recognize the existence of an assignment where there was a risk as to whether the future income assigned by the owner of an asset would be realized.  Such was the holding in *Martin v. Comm'r of Internal Revenue*, 56 T.C. 1255, 1259 (1971), *aff'd*, 469 F.2d 1406 (5th Cir. 1972), which involved a purported sale of future rents by the owner of an apartment building, and in *Hydrometals, Inc. v. Comm'r of Internal Revenue*, 31 T.C.M. (CCH) 1260 (1972), *aff'd*, 485 F.2d 1236 (5th Cir. 1973), *cert. denied*, 416 U.S. 938 (1974), which involved a purported sale of future manufacturing revenues by a manufacturing company.  An assignment was likewise disregarded in *Mapco, Inc. v. United States*, 556 F.2d 1107 (Ct. Cl. 1977).[35]  There, the taxpayer, in return for $4 million in cash, assigned to Rock Creek a 75 percent interest in its future, unearned pipeline revenues, until such time as Rock Creek had received back $4 million (plus interest).[36]  The taxpayer attempted to accelerate its income in this fashion to make use of an expiring net operating loss.  Reviewing prior law, the Court of Claims distinguished the case before it from *Stranahan*, and analogized it instead to *Martin* and *Hydrometals*.  Illuminating the "principal difference" between these cases, the court explained:

----

[35]  In *Mapco*, the Court of Claims, as it sometimes then did, adopted the decision of the trial judge with modifications.  556 F.2d at 1108.

[36]  Rock Creek borrowed the $4 million from Chemical Bank; as security for this loan, it assigned its interest in Mapco's future revenues.  Mapco used the $4 million to purchase certificates of deposit issued by Chemical Bank.  *Mapco*, 556 F.2d at 1109.

> [I]n *Stranahan*, the seller of the future income was not under any obligation
> whatever to produce such income for the benefit of the purchaser, who was
> compelled to look solely to a third person . . . for future income that he had
> purchased, whereas in the *Martin* and *Hydrometals* cases the purported sellers of
> future income were themselves obligated to produce future income for the benefit
> of the purported buyers.  Thus, in substance, the transactions in the *Martin* and
> *Hydrometals* cases were more like loans that were to be repaid, with interest, by
> the borrowers out of their own productive efforts, than like true sales agreements.

*Mapco*, 556 F.2d at 1116-17.  Finding that, as in *Martin* and *Hydrometals*, Mapco was obligated
to produce future revenues from the pipeline, the Court of Claims held that the assignment of
pipeline revenues was, in fact, "a loan-type investment secured by the right to future revenues."
*Id*. at 1110; *see also Schering-Plough Corp. v. United States*, 651 F. Supp. 2d 219, 257-59
(D.N.J. 2009), *aff'd*, 652 F.3d 475 (3d Cir. 2011); *Johnston v. Comm'r of Internal Revenue*, 35
T.C.M. (CCH) 642 (1976).[37]

The remainder of the cases PLIC cites in support of its "common law" vision are a
hodge-podge, particularly when viewed in the context of related decisions.  For example, PLIC
cites *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260 (1958) and *Hort v. Comm'r of Internal
Revenue*, 313 U.S. 28 (1941), suggesting that the Supreme Court, in excluding property
representing income items from the general definition of "capital asset," more broadly signaled
that income carve-outs are not subject to the normal basis rules.  But, the Court rejected a similar
spin on these precedents in *Arkansas Best Corp. v. Comm'r of Internal Revenue*, 485 U.S. 212,
217 (1988), which involved whether a loss arising from the sale of bank stock was a capital or
ordinary loss.  The Court noted there that the results in *P.G. Lake* (which involved proceeds from
the sale of oil payments rights) and *Hort* (which involved payments to a lessor for the
cancellation of the unexpired portion of a lease), reflected the Code's narrow definition of
"capital asset" and the unique features of the property at issue, rather than any broader
sentiments regarding the character of income-carve outs, observing that "these items are property

---

[37]  In so concluding, the court was persuaded by the fact that Mapco had invested the $4
million in proceeds in Chemical Bank certificates of deposit, which the court took as indication
that Mapco had "indirectly guaranteed repayment."  *Mapco*, 556 F.2d at 1111.  The court noted
that the maturity dates of the certificates of deposit were specifically selected to coincide with
the anticipated dates for the repayment to Chemical Bank of the $4 million borrowed from that
bank by Rock Creek.

Taxpayers, in seeking to avoid having their sale of an income carve-out be viewed as a
loan, have sometimes analogized their situations to the receipt of production payments in
conjunction with oil and gas leases.  That was the situation in another case cited by PLIC, *Bryant
v. Comm'r of Internal Revenue*, 399 F.2d 800 (5th Cir. 1968).  There, the seller of a farm sought
to reserve a portion of the farm's future income.  Refusing to treat this transaction as a sale of a
carved-out income interest, the Fifth Circuit instead viewed it as involving a loan in which the
"production payments" constituted a part of the purchase price.  *Id*. at 805.  The court held that
the seller of the property was taxable on the farm income.  *Id*.

in the broad sense of the word." *Arkansas Best*, 485 U.S. at 217 n.5.[38]  *P.G. Lake* and *Hort* were focused primarily on preventing taxpayers from circumventing ordinary income tax rates by "selling" rights to future ordinary income payments in exchange for a lump sum.  And, as with almost all of PLIC's "common law" recitation, these cases shed no light on the basis allocation issue presented here.  *See Womack v. Comm'r of Internal Revenue*, 510 F.3d 1295, 1299-1300 (11th Cir. 2007); *Prebola v. Comm'r of Internal Revenue*, 482 F.3d 610, 611-12 (2d Cir. 2007).

In fact, only one case cited by PLIC, *Apex Corp. v. Comm'r of Internal Revenue*, 42 T.C. 1122 (1964), addresses the allocation of basis rule in Treas. Reg. § 1.61-6.  In *Apex*, the taxpayer purchased equipment, leased it to outside parties and then sold all of its rental and lease rights to Murdock Acceptance Corporation.  A new corporation was formed to which the taxpayer sold its reversionary interest in the equipment subject to the leases.  The taxpayer reported the sales of the leases to Murdock as ordinary income and claimed ordinary losses on the sale to the new corporation of the reversion rights, to the extent the price received for the reversionary interest was less than the basis of the equipment.  Among the issues presented to the court was whether basis should be allocated between the equipment and the rental or lease rights the taxpayer had sold, or instead should be allocated entirely to the equipment (allowing the taxpayer to deduct a loss on the sale of the equipment).  *Id*. at 1123.  In holding that the taxpayer was entitled to use his entire basis and deduct the loss from the sale, the Tax Court rejected the Commissioner's reliance on Treas. Reg. § 1.61-6, finding that the regulation related only to "the acquisition of a tract of land followed by the sale of a portion of it."  42 T.C. at 1126-27.

But, *Apex*'s holding on this point is simply wrong and cannot be squared with the plain wording of the regulation, at least after it was modified in 1957 to encompass all forms of property.  *See Fisher*, 82 Fed. Cl. at 785, 789.  This was later recognized by the Tax Court itself in cases like *Norwest* and *Fasken*.  In those reviewed opinions,[39] the Tax Court flatly rejected the claim that the regulation applies only to real estate and held instead that it applies to all forms of property.  *Norwest*, 111 T.C. at 139; *Fasken*, 71 T.C. at 656-57; *see also Gladden v. Comm'r of Internal Revenue*, 262 F.3d 851, 853 (9th Cir. 2001) ("This regulation tells us that when property is acquired in a lump-sum purchase but then divided and sold off in parts, the cost basis of the property should generally be allocated over the several parts.").  *Apex* thus provides little reason

---

[38]  *See also United States v. Midland-Ross Corp.*, 381 U.S. 54, 56 (1965) ("not everything which can be called property in the ordinary sense . . . qualifies as a capital asset"); *Comm'r v. Gillette Motor Transport*, 364 U.S. 130, 133-35 (1960); *see generally*, Stanley S. Surrey, "Definitional Problems in Capital Gains Taxation," 69 Harv. L. Rev. 985, 988 n.7 (1956).

[39]  Decisions of the Tax Court are issued by a single judge, but the chief judge may direct that a decision be reviewed by the full Tax Court.  *See* 26 U.S.C. § 7460(b); *see also Arbitrage Trading, LLC v. United States*, 108 Fed. Cl. 588, 603 n.23 (2013); *see generally Ballard v. Comm'r of Internal Revenue*, 544 U.S. 40, 72 (2005).  Under the conference procedures adopted by the Tax Court, the affirmative vote of a majority of the judges may overrule a prior decision.  *See Rent-A-Center, Inc. v. Comm'r of Internal Revenue*, 142 T.C. 1, 20 (2014).

for this court to disregard the basis allocation rules in dealing with the transactions presented here.[40]

So the upshot is this:  nothing about this *tour d'horizon* convinces the court that it can – or should – depart from the plain language of Treas. Reg. § 1.61-6 in analyzing the basis allocation issue here.  PLIC essentially ignores – and by ignoring fails to account for – the plain language of the regulations.  The court sees no reason why the allocation rules ought not to apply where a taxpayer takes an income-producing security and subdivides it into two parts, selling one and retaining the other.[41]  In that instance, the original cost basis in the security must, in the words of the regulation, be "equitably apportioned among the several parts" in accordance with the fair market values of the respective parts.  26 C.F.R. § 1.61-6(a).  This is so, even if, as a result of the division, the taxpayer ends up with a residual interest whose primary value relates to

---

[40]  PLIC argues that the basis allocation rules were also disregarded in *Moberg v. Comm'r of Internal Revenue*, 365 F.2d 337 (5th Cir. 1966).  *Moberg* was one of a series of five conflicting appellate cases dealing with transfers of Dairy Queen franchise rights in exchange for various payments, including gallonage rights.  The Fifth Circuit held that the gallonage payments did not represent proceeds from the sale of sub-franchises.  365 F.2d at 339.  On brief, PLIC claims that the Fifth Circuit "required the taxpayer to allocate all of its tax basis to the transferred sub-franchise rights in order to determine the gain or loss on the sale of those rights."  But, there is no discussion of this basis allocation issue anywhere in the opinion.  Rather, a passing reference in the opinion merely indicates that, in response to an earlier remand order by the Fifth Circuit, *see* 305 F.2d 800 (5th Cir. 1962), the Tax Court permitted the Mobergs to allocate a part of the cost of the master franchise to the subfranchises.  365 F.2d at 338.  There is no indication whatsoever that the court permitted the Mobergs to allocate *all* of the cost of the master franchise to the subfranchises – or if it did, that the Fifth Circuit focused on this issue in the slightest.

[41]  PLIC retreats behind a fig leaf, *to wit*, that Congress has not passed a specific provision that controls the basis allocation here, seemingly suggesting that this inaction blesses its view of the "common law" in this area.  To paraphrase Hand, this is "mere cant."  *Comm'r of Internal Revenue v. Newman*, 159 F.2d 848, 850-51 (2d Cir. 1947) (dissenting).  To give PLIC's argument on this count any credence, one must don blinders to 2004 legislative history concerning modifications to the rules governing stripping transactions, in which Congress, in describing present law, stated that transactions of the sort at issue here may be challenged under existing "Code-based and common law-based authorities," including "section[] 165 . . . and the regulations thereunder," "authorities that recharacterized certain assignments or accelerations of future payments as financings," and the anti-abuse doctrines (*e.g.*, substance-over-form).  H.R. Rep. 108-548, at 277 n. 286 (2004); *see also* H.R. Conf. Rep. 108-755, at 617 n. 518 (2004).  PLIC cites a Senate Report accompanying the original passage of the interest-stripping rules in 1982, in which it is noted that under present law, it is "arguable" that all of a taxpayer's basis in a debt instrument "is allocated to corpus," S. Rep. 97-494, at 215 (1982).  But, of course, that was a description of the law that Congress was modifying – an action it took because it felt that prior law allowed "artificial loss[es]."  *Id.*  at 216; *see also* H.R. Conf. Rep. 97-760, at 554 (1982).  In general, the court finds the ambiguous tidbits of legislative history offered by plaintiff to be unhelpful in deciding the technical issues presented here.

the appreciation of principal, and an income interest whose value lies in a stream of payments that constitute ordinary income. Nor does it make any difference that the former of these is a capital asset and the latter is not.[42] Nothing – nothing at all – suggests that in such a situation all the taxpayer's basis goes to principal and none to the carved-out income interest – by anyone's reckoning (even PLIC's), there is no room for such an argument in the plain terms of the Treasury Regulations. Indeed, even if equitable apportionment were not explicitly required by that regulation, the court would imply such a requirement, if only to conform the interpretation of section 61 with logic and common sense. *See, e.g., Columbia Oil & Gas Co. v. Comm'r of Internal Revenue*, 118 F.2d 459 (5th Cir. 1941). Only in a parallel universe, where the "too good to be true" rule of taxation reigns not, should the result be different.

So where does this leave us? In a refund suit, it is axiomatic that a taxpayer must prove, by a preponderance of the evidence, that the assessment or determination is incorrect and that it is entitled to a specific refund. *See Helvering v. Taylor*, 293 U.S. 507, 515 (1935) ("[u]nquestionably the burden of proof is on the taxpayer"); *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932), *modified*, 284 U.S. 599 (1932); *see also Deseret Management Corp. v. United States*, 112 Fed. Cl. 438, 447 (2013). This rule incontestably extends to deductions. *See Interstate Transit Lines v. Comm'r of Internal Revenue*, 319 U.S. 590, 593 (1943) ("[A]n income tax deduction is a matter of legislative grace and . . . the burden of clearly showing the right to the claimed deduction is on the taxpayer."). PLIC, of course, is not required to prove its entire case at this juncture. But nor can it stand pat in the face of clear indication that its position is erroneous as a matter of law. To defeat defendant's motion, PLIC must show that, as to the basis allocation issue, there are genuine issues of material fact and that defendant is not entitled to judgment as a matter of law. *See, e.g., United States v. Humer*, 1995 WL 653161, *3 (S.D. Fla. Aug. 30, 1995); *Burns v. United States*, 242 F. Supp. 947, 949 (D.N.H. 1965). It has not. Since the loss deduction PLIC seeks is based upon a basis allocation that is erroneous, as a matter of law, and since it has offered no alternative to this allocation, the court finds that defendant has established that it is entitled to judgment as a matter of law on the loss issue. *Dorrance*, 2013 WL 1704907, at *5 ("Taxpayers must prove their bases in property by a preponderance of the evidence and substantiate the amount of the refund they seek"); *Burns*, 242 F. Supp. at 949 ("Since the amount plaintiff claims is based on a computation which is inappropriate under the regulations, he cannot prevail.").

## C.

In most cases, our discussion of PLIC's loss deduction would be at an end. But this is not *most* cases. Defendant contends that the deduction is faulty for another reason – one that proves

---

[42] On brief, PLIC claims that "if a taxpayer [is] not permitted to offset the basis of property out of which an income interest [is] carved against the proceeds from the sale of that income interest, the basis **must** be allocable to the residual interest." But, this syllogism is based on a faulty premise, as there is nothing in the Code or the regulations that prohibits a taxpayer from allocating basis to a carved-out income interest and using that basis for whatever purposes the Code permits. Whether the asset is sold or retained, in the short or long run – so that its basis can be fully recovered by a particular taxpayer – is quite irrelevant.

important, particularly as it also impacts the second issue in this case, involving the CSR transactions.

Defendant asserts that the investment trusts employed in the Perpetuals transactions do not qualify as trusts for income tax purposes.  Under this theory, PLIC's sale of the Principal Certificates to Morgan Stanley would be viewed as the sale of a membership interest in a single-member disregarded entity, transforming that entity into a partnership.  The transaction would then be treated as a sale of a portion of PLIC's ownership interest in each of the Perpetuals, followed by the contribution by both PLIC and Morgan Stanley of their respective interests in the securities to a partnership in exchange for partnership interests.  *See* Treas. Reg. § 301.7701-2(a) (defining a partnership as a business entity that is not a corporation and that has at least two members).  Because its *pro rata* basis in the portion of each security sold in this fashion would be the same as the amount it received from the sale, PLIC would be viewed as having sustained no loss.  All of this depends, of course, on whether the Primary Trusts qualify as trusts – while defendant contends that under the controlling regulation, they do not, PLIC, not surprisingly, asserts otherwise.

The controlling regulation in this regard is Treas. Reg. § 301.7701-4, commonly known as the "Sears Regulations," which are part of the entity classification rules used to distinguish among trusts, partnership and associations taxable as corporations for federal income tax purposes.  *See* 26 U.S.C. § 7701; Treas. Regs. §§ 301-7701-1 through 301.7701-4.[43]  An "ordinary trust" is defined broadly under subsection (a) of this provision as "an arrangement created either by a will or by an *inter vivos* declaration whereby trustees take title to property for the purpose of protecting or conserving it for the beneficiaries . . ." Treas. Reg. § 301.7701-4(a).  Subsection (b) of this provision recognizes that there are other arrangements, known as business or commercial trusts, that are not classified as trusts for federal tax purposes because they are not simple arrangements to protect or conserve property, but rather are created by the beneficiaries to carry on a profit-making business that normally would be carried on through business organizations, like a corporation or a partnership.  *Id*. at 4(b).  Subsection (c) of the regulation then defines what are known as "investment trusts," that sometimes qualify as trusts and other times are classified as business entities.  *Id*. at 4(c); *see also* Boris I. Bittker & Lawrence Lokken, Fed. Tax'n Income, Est. & Gifts ¶ 58.2 (2014) (hereinafter "Bittker & Lokken").

Under the regulations, an investment trust with two or more classes of ownership interests is generally classified as a business entity.  Treas. Reg. § 301.7701-4(c)(1); Bittker & Lokken, ¶ 58.2.  By way of distinguishing these situations, subsection (c)(1) of Treas. Reg. § 301.7701-4 states that –

> An "investment" trust will not be classified as a trust if there is a power under the trust agreement to vary the investment of the certificate holders. . . .  An investment trust with a single class of ownership interests, representing undivided beneficial interests in the assets of the trust, will be classified as a trust if there is

---

[43]  "The Internal Revenue Code prescribes the classification of various organizations for federal tax purposes."  Treas. Reg. § 301.7701-1(a)(1).

no power under the trust agreement to vary the investment of the certificate holders.  An investment trust with multiple cases of ownership interests ordinarily will be classified as a business entity under § 301.7701-2; however, an investment trust with multiple classes of ownership interests, in which there is no power under the trust agreement to vary the investment of the certificate holders, will be classified as a trust if the trust is formed to facilitate direct investment in the assets of the trust and the existence of multiple classes of ownership interests is incidental to that purpose.

Treas. Reg. § 301.7701-4(c)(1).  So, a trust with single class of ownership interests may be classified as a trust if, under the trust agreement, no one may vary the investment of the certificate holders (the "no vary" rule).[44]  An investment trust with multiple classes of ownership may be classified as a trust if it meets the "no vary" rule and, in addition, is formed to facilitate direct investment in the assets of the trust, with the existence of multiple classes of ownership being only "incidental" to that purpose (the "incidental" rule).  *Id.*; *see also* Wendy S. Goffe, "Oddball Trusts and the Lawyers Who Love Them or Trusts for Politicians and Other Animals," 46 Real Prop. Tr. & Est. L. J. 543, 563 (2012); Alan S. Acker, 852-3d Tax Mgmt. Portfolio (BNA), Income Taxation of Trusts and Estates, A-20 (2007); James M. Peaslee, "Investment Trusts in the Age of Financial Derivatives," 49 Tax L. Rev. 419, 431-32 (1995) (hereinafter "Peaslee"); *see generally, North Am. Bond Trust*, 122 F.2d at 546.

        To illustrate the application of the "incidental" rule, the regulations offer four examples.  In the first two of these, a corporation transfers a portfolio of residential mortgages to a bank, which delivers back to the corporation certificates evidencing rights to payments from the pooled mortgages.  In both examples, two classes of certificates are created.

- ● In **Example 1**, the holders of class A certificates are entitled to all payments of mortgaged principal until their certificates are retired; holders of class B certificates receive payments of principal only after all class A certificates have been retired.  The example notes that the different rights of the class A and B certificates serve to shift to the holders of the class A certificates the risk that mortgages in the pool will be prepaid, giving the holders of the class B certificates "call protection."[45]  Based on this, the example concludes that "[t]he trust thus serves to create investment interests with respect to the mortgages held by the trust that differ significantly from direct investment in the mortgages," leading to the

---

[44]    Even prior to the issuance of the regulations, the existence of a power to vary the beneficiaries' investment was sufficient to "turn the venture into a 'business.'"  *Comm'r of Internal Revenue v. North Am. Bond Trust*, 122 F.2d 545, 546 (2d Cir. 1941), *cert. denied*, 314 U.S. 701 (1942).

[45]    "In other words, those holders are protected against early retirement of their investment by directing mortgage payments to the earlier maturing class."  Peaslee, *supra*, at 432.

further conclusion that the existence of multiple classes of trust ownership is not incidental to any purpose of the trust to facilitate direct investment. This means, according to the example, that "the trust is classified as a business entity under § 301.7701-2."

- In **Example 2**, the holders of class C certificates are entitled to receive 90 percent of the payments of principal and interest on the mortgages; class D certificate holders are entitled to receive the other ten percent. The two classes of certificates are otherwise identical, except that, in the event of a default on the underlying mortgages, the payment rights of the class D certificate holders are subordinated to the rights of class C certificate holders. Under these facts, the example finds that though the trust has multiple classes of ownership interests and gives greater security to holders of the class C certificate holders, the interests of the certificate holders "are substantially equivalent to undivided interests in the pool of mortgages, coupled with a limited recourse guarantee running from [the corporation] to the holders of class C certificates." In these circumstances, the example holds, "the existence of multiple classes of ownership interests is incidental to the trust's purpose of facilitating direct investment in the assets of the trust," leading the investment trust to be classified as a trust.

In two additional examples, the drafters of the regulations again contrast two forms of investment.

- In **Example 3**, a promoter forms a trust into which shareholders can deposit their stock. When they do, the participant receives two certificates – one represents the right to dividends and the value of the underlying stock up to a specified amount; the other represents the right to appreciation in the stock's value above the specified amount. Investors can fulfill varying investment objectives by transferring one certificate and retaining the other. The example, however, views this flexibility as "creat[ing] investment interests with respect to the stock held by the trust that differ significantly from direct investment in such stock." In this scenario, the trust is not viewed as being "formed to facilitate direct investment in the assets of the trust," and is thus "classified as a business entity under § 301.7701-2."

- In **Example 4**, a corporation purchases a portfolio of bonds and transfers them to a bank under a trust agreement. The trustee delivers to the corporation certificates evidencing interest in the bonds, with each certificate representing the right to receive a particular payment with respect to a specific bond. The example states that under section 1286 of the Code, stripped coupons and stripped bonds are treated as separate

bonds for federal income tax purposes.[46]  As such, although the trust has multiple classes of ownership, those classes "simply provide each certificate holder with a direct interest in what is treated under section 1286 as a separate bond."  "Given the similarity of the interests acquired by the certificate holders to the interests that could be acquired by direct investment," the example holds, "the multiple classes of trust interests merely facilitate direct investment in the assets held by the trust."  This causes the trust to be "classified as a trust."

These examples yield several observations about the "incidental" rule.  First, it appears that whether the creation of multiple classes of trust interests is "incidental" to the trust's purpose of facilitating direct investment in the trust's assets depends on the extent to which the attributes of the trust interests differ from direct ownership of the trust assets.  *See* Peaslee, *supra*, at 431; Richard S. Millerick, "Federal Income Tax Aspects of Stripped Mortgage-Backed Securities," 12 Va. Tax Rev. 219, 226-27 (1992) (hereinafter "Millerick").  This view is confirmed in the preamble to the Sears Regulations,[47] which states that "[w]hether the existence of multiple classes of ownership interests is incidental to the use of an investment trust as a vehicle to facilitate direct investment, or instead reflects a purpose to provide investors with diverse interests in the trust assets, generally depends on the extent to which the investment attributes of interests in the trust diverge from direct ownership of the trust assets."  51 Fed. Reg. 9950, 9951 (March 24, 1986).  In this regard, the preamble further explains –

Multiple class trusts depart from the traditional form of fixed investment trust in that the interest of the beneficiaries are not undivided, but diverse.  The existence of varied beneficial interests may indicate that the trust is not employed simply to hold investment assets, but serves a significant additional purpose of providing investors with economic and legal interests that could not be acquired through direct investment in the trust assets.  Such use of an investment trust introduces the potential for complex allocations of trust income among investors, with correspondingly difficult issues of how such income is to be allocated for tax purposes.  These issues are properly foreign to the taxation of trust income, where

---

[46]  *See also* Mertens, *supra*, at § 22:3.

[47]  Where the text of a regulation is less than clear, the court may look to the preamble of the regulation to determine the administrative construction thereof.  *See Kingdomware Techs, Inc. v. United States*, 107 Fed. Cl. 226, 243 (2012); *see also Fidelity Fed. Sav. and Loan Ass'n v. dela Cuesta*, 458 U.S. 141, 158 n. 13 (1982); *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) ("Although the preamble does not 'control' the meaning of the regulation, it may serve as a source of evidence concerning contemporaneous agency intent."); *see generally* Lars Noah, "Divining Regulatory Intent:  The Place for a 'Legislative History' of Agency Rules," 51 Hastings L.J. 255, 307 (2000).  Although the preamble is not entitled to *Chevron* deference, it is still entitled to deference insofar as it has "the power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Kingdomware Techs.*, 107 Fed. Cl. at 243.

rules have not developed to accommodate the varied forms of commercial investment, and no comprehensive economic substance requirement governs the allocation of income for tax purposes.

*Id.*; *see also* Bittker & Lokken, *supra*, at ¶ 58.2.  The extent to which the attributes of the trust interests diverge from direct ownership of trust assets may, in turn, be revealed by determining whether the interests of the investors in a multiple class trust could be reproduced outside the trust without resort to the multiple classes of ownership.  Peaslee, *supra*, at 431; Millerick, *supra*, at 226.  Additional guidance on this point can again be gleaned from the preamble, which states that the extent of the "divergency may, in turn, be reflected by the extent to which the interests of the investors in a multiple class trust could be reproduced without resort to multiple classes of ownership."  51 Fed. Reg. at 9951.

These principles can be seen at work in the examples in the regulation.  Example 4 expressly sanctions the use of multiclass trust interests to facilitate the issuance of basic interest-only and principal-only securities.  Treas. Reg. § 301.7701-4(c)(2) (Ex. 4).  In the example, a group of bonds is transferred to a trust in exchange for multiple certificates, each of which represent the right to receive a particular payment of either principal or interest with respect to a specific bond.  *Id.*  In concluding that the trust is classified as a trust, the example emphasized that "the multiple classes simply provide each certificate holder with a direct interest in what is treated under section 1286 as a separate bond."  *Id.*  This suggests that the existence of the coupon stripping rules was key to the analysis because, under those rules, the interests of the investors in the trust could be reproduced without resort to multiple classes of ownership.  This leads to the conclusion that the use of multiple classes was "incidental" to the trust's purpose of facilitating direct investment in the trust assets.  This analysis implies that the same conclusion would not obtain if, outside of the trust regime, the coupon stripping rules did not exist.  Millerick, *supra*, at 227 (interest-only and principal-only "investment trust interests are permitted solely because of the existence of the coupon stripping rules."); Mertens, *supra*, at § 36:129.  The regulatory history surrounding the promulgation of the Sears Regulations confirms this.[48]

--------

[48]  As proposed in 1984, the Sears Regulations flatly prohibited multiple classes.  *See* Prop. Treas. Reg. § 301.7701, 49 Fed. Reg. 18741-02, 18743 (May 2, 1984).  The sole exception was for trusts formed to permit investors to own "specifically identifiable" stripped bonds and coupons, governed by section 1232B of the Code, the predecessor of current section 1286.  On this point, a notice accompanying the proposed regulation stated, in reference to what would become Example 4:

> In a third type of arrangement, a custodian holds one or more issues of bonds and issues certificates representing the right to specific interest or principal payments on the bonds.  Although this arrangement is similar to [one in which investors divide the income and appreciation elements inherent in a share of common stock], it is distinguishable in that the division of the property is only between the bonds and specific interest coupons thereon.  In section 1232B of the Code, Congress has provided a method for taxing transactions involving such "stripped bonds" and 'stripped coupons.'"  Thus, it would be inconsistent with section 1232B to treat typical "coupon stripping" arrangements in which bonds are held

The absence of a provision like section 1286 governing the splitting of common stock into interests likely accounts for why, in Example 3, in which shares of stock are converted into two classes of certificates (thereby allowing a separation of dividend income from capital appreciation), the regulations conclude that the investment trust violates the "incidental" rule. *See* Millerick, *supra*, at 229-30 ("In the case of corporate stock, however, there is no analogue to section 1286 which clearly characterizes the transaction as a separation of ownership interests [and] dictates how the investors are to be taxed . . . ."); Peaslee, *supra*, at 462 ("The fact that the favorable outcome in example 4 is linked to the application of the bond stripping rules means that similar arrangements for dividing up payments on a single bond that do not fall within those rules may fail to qualify as trusts.").[49]   A similar pattern, illustrating the impact of not having a provision like section 1286, is exhibited in the examples found in the Treasury Regulations dealing with real estate mortgage investment conduits (REMICs) – which, like true investment trusts are used to securitize real property mortgages. *See* Temp. Treas. Reg. § 1.67-3T(a) Ex. 2.[50]

---

> by a custodian and interests in specifically identifiable stripped coupons or bonds
> are sold as either associations or partnerships.

*Id.* at 779; *see also* Millerick, *supra*, at 227.

[49]   Consistent with this view, the investment trust described in Example 2 in the Sears Regulations is considered a trust because the feature under which one class's rights to principal and interest are subordinated to the entitlement of the other not only can be reproduced outside the trust, but, indeed, often are. *See* Treas. Reg. § 301.7701-4(c)(2) Ex. 2; Bittker & Lokken, *supra*, at ¶ 58.2.

[50]   Example 2 under these regulations is similar to Example 2 above, except that the REMIC includes a second regular interest represented by class E certificates.  The example goes on from there, as follows:

> The principal purpose of M in structuring the REMIC to include class E
> certificates is to avoid allocating allocable investment expenses to class C
> certificate holders.  The class E certificate holders are entitled to receive the
> payments otherwise due the class D certificate holders until they have been paid a
> stated amount of principal plus interest.  The fair market value of the class E
> certificate is ten percent of the fair market value of the class D certificate and,
> therefore, less than one percent of the fair market value of the REMIC.  The
> REMIC would not be classified as an investment trust under § 301.7701-4(c)(1)
> because the existence of the class E certificates is not incidental to the trust's
> purpose of facilitating direct investment in the assets of the trust.

Temp. Treas. Reg. § 1.67-3T(a) Ex. 2.  By comparison, REMICs with certificates that provide for floating or inverse floating rates of interest from a fixed rate REMIC certificate presumably would meet the "incidental" rule as REMICs are permitted to issue such interests to investors directly.  *See* Treas. Reg. §1.860G-1(a)(2), 1(a)(3); *see generally*, Willard B. Taylor,

Perhaps, these examples in the Sears Regulations could be clearer in mapping out the contours of the "incidental" rule. But, they are clear enough. Moreover, in the court's view, "any ambiguity [in the regulations] is dispelled by the preamble accompanying and explaining the regulation." *Fidelity Fed. Sav. and Loan Ass'n*, 458 U.S. at 158 & n.13. Moreover, it should not be overlooked that an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulations being interpreted." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (internal quotation marks omitted); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (holding that an agency's interpretation of its regulations is entitled to "substantial deference" unless "an alternative reading is compelled by the regulation's plain language"); *Mason v. Shinseki*, 743 F.3d 1370, 1374-75 (Fed. Cir. 2014). The court believes that regulations and the preamble amply demonstrate that the creation of multiple classes of trust interests is not "incidental" to the purpose of the arrangement if those interests could not be produced outside of the trust environment.

Here, the multiple classes of ownership employed in the Perpetuals diverge from the interests that could be obtained by direct investment in the underlying securities. The trust arrangements serve to create investment interests with respect to the underlying securities that differ significantly from what could be obtained from the direct investment in those securities. For example, direct ownership of the perpetual securities entitled the holders to quarterly or semi-annual interest payments from the date of investment into perpetuity, while the holder of an Interest Certificate received interest only for the first 16 or 17 years (absent a Reference Event).[51] The splitting of interests encountered appears to be similar to that described in Example 3 of section 301.7701-4(c)(2). That the existence of multiple classes here is not "incidental" is all the more obvious giving the looming presence of the Termination Agreements. At the least, those agreements protect PLIC from the occurrence of a call or event of default with respect to the perpetual securities – an event that would impact the flow of interest on PLIC's retained Interest Certificates.[52] In the court's view, this type of protection is similar to the "call protection" that was deemed disqualifying in Example 1 of the Sears Regulations. *See* Treas. Reg. § 301.7701-4(c)(2) Ex. 1; *see also* Mertens, *supra*, at 38A:20 n.18; Bittker & Lokken,

---

"'Blockers,' 'Stoppers,' and the Entity Classification Rules," 64 Tax Law. 1, 27-30 (2010) (describing REMICs and comparing them to "investment trusts").

[51] PLIC also projected that, aside from any claimed tax savings, yields on the Interest Certificates would be lower than those of the securities and, conversely, yields of the Principal Certificates would be higher than those of the securities.

[52] Defendant sees the Termination Agreements as accomplishing much more. It asserts that, in the case of a Reference Event, the Termination Agreements potentially cause principal to flow back to PLIC in the form of payments corresponding to the Termination Units created by Morgan Stanley and assigned to MSIL. Because this interpretation of the agreements, however, presents questions of fact, the court does not rely upon it as a basis for decision here. By comparison, that the Termination Agreements provided some form of call protection seems evident.

*supra*, at ¶ 58.2.  In short, the "trust" arrangement in question was not formed to facilitate direct investment in the assets and the existence of multiple classes of ownership interests is not merely incidental to that purpose.  Nothing in the preamble, the body of the regulations, or the examples suggests otherwise.

Under the regulations, the custodial arrangements employed in these investments are properly classified as business entities under Treas. Reg. § 301.7701-2.  Those arrangements are not corporations, as defined under Treas. Reg. § 301.7701-2(b).  Under the regulations, that means that they are, as defendant contends, partnerships (or at least became so when Morgan Stanley acquired its interests).  Treas. Reg. § 301.7701-2(c).  The partnerships were jointly owned by PLIC and Morgan Stanley.  Under section 721(a) of the Code, PLIC recognized no gain or loss as a result of its contribution of property to the partnerships in exchange for interests therein.  *See* Rev. Rul. 99-5, 1999-1 Cum. Bull. 434 (Situation 1); *see also* Arthur B. Willis, John S. Pennell, Philip F. Postlewaite, Partnership Tax. ¶12.01 (2014) (hereinafter "Willis").  PLIC's deemed sale to Morgan Stanley resulted in no gain or loss because, under section 1001 of the Code, its basis allocated to the portion of the certificates sold equaled the amount realized.  *See also* Mertens, *supra*, at § 35A:47; Willis, *supra*, at ¶ 12.01.

*     *     *     *     *

Based on the foregoing, the court concludes that PLIC is not entitled to the loss deduction it claims under section 165 of the Code.  The court reaches this conclusion, as a matter of law, without addressing various alternative claims defendant has made under the anti-abuse rules.[53]  The court turns next to the tax treatment of PLIC's CSR transactions, which, as will be seen, incorporates some of the analysis above.

**IV.**

Recall that from 1996 to 2001, PLIC purchased interests in six custodial arrangements and in two trusts that hold shares (the Shares) in money market funds (the Issuers).  As described at the outset, these transactions took several forms.

In the six custodial arrangements, a Depositor transferred to a Custodian either the Shares or money to buy the Shares.  In return, the Custodian issued to the Depositor both custodial dividend receipts (CDRs) and custodial share receipts (CSRs).  The CDR holders have the right to dividends paid on the Shares until the maturity date (the Restricted Period).  The CSR holders represent other rights to the Shares exclusive of the right to receive dividends during the Restricted Period.  In connection with each of the custodial CSRs, PLIC entered into a Custody Agreement with a Custodian, which agreement, *inter alia*, granted PLIC the right to sell its CSRs to other investors.  PLIC also entered into a Termination Agreement with the Depositor that obliges it to buy the CDRs from the Depositor (or its successor) if the custodial arrangement

---

[53]  Defendant raises a host of other grounds upon which it believes the court should disallow PLIC's deduction, including arguments based on the so-called step-transaction doctrine.  Based on the conclusion reached above, the court need not reach these additional arguments.

terminates prematurely, either because the Issuer is about to liquidate or has failed to maintain its status as a money market fund under the Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq.*

In the first of the two trust transactions, a Depositor placed the Shares into a trust (the "REDI Trust") which issued Dividend Certificates and Corpus Certificates.  PLIC purchased the Corpus Certificates, which entitles it to receive the Shares in January 2020 and all dividends payable thereafter.  In a premature termination, the trust agreements require the trustee to divide trust assets between the holders of the Corpus and Dividend Certificates, under a schedule designed to give the holders of the Dividend Certificates the approximate value of what they would have received absent premature termination.  In the latter of the two trust transactions, the Depositor transferred either money or Shares into a trust (the "Primary Trust"), which issued a Principal Certificate and a Dividend Certificate.  The Depositor transferred the Principal Certificate to the "Issuer Trustee," which issued Principal Units and Termination Units.  PLIC purchased the Principal Unit, which generally entitled it to receive payments on the Principal Certificates during the Trust's existence and to receive the shares thereafter.  As with the REDI Trust, provisions were made in the trust agreement for premature termination.

On its federal income tax returns, PLIC treated the CSRs as long-term bonds.  It reported no taxable income on the accretions in the value of the CSRs that occurred during the Restricted Period.  In this regard, PLIC argued that because the money market shares are equity, it was not required neither to accrue original issue discount during the Restricted Period under section 1272 of the Code, nor to treat the shares as stripped bonds under section 1286 of the Code.[54]

In the court's view, the CSR arrangements all give rise, in one fashion or another, to the creation of "investment trusts," which, in turn, must be analyzed under the Sears Regulations discussed above.  Because these trusts all have multiple classes of shares, they may be treated as trusts only if they meet the "no vary" rule and the "incidental" rule."  As discussed above, whether the creation of multiple classes of trust interests is "incidental" to a trust's purpose of facilitating direct investment in its assets depends upon the extent to which the trust attributes differ from direct ownership of the trust assets.  Correspondingly, the extent to which the attributes of the trust interests diverge from direct ownership of trust assets depends upon whether "the interests of the investors in a multiple class trust could be reproduced without resort to the multiple classes of ownership."  T.D. 8080, 1986-1 C.B. 371.  As demonstrated above, these rules spring from the examples in Treas. Reg. § 301.7701-4(c)(2), as amplified by the preamble to the 1986 regulations.

In the CSRs, the CDR holder has the right to dividends paid on the money market shares for approximately 20 years, but no rights thereafter.  The CSR holder's rights to dividends pick up at this point.  This was true regardless of the CSR formats that PLIC employed.  In the court's

---

[54]  Original issue discount (OID) is "the excess (if any) of [a debt instrument's] stated redemption price at maturity, over . . . the issue price."  26 U.S.C. § 1273(a)(1).  Under the Code, the gain from OID is included in gross income as interest over the obligation's duration, rather than entirely at the time the debt instrument is issued or redeemed.  *Id*. at 1272(a)(1).

view, by virtue of this allocation of dividend rights, the certificates have attributes that diverge from the direct ownership of the money market shares.  Indeed, it appears, as defendant argues, that the investors wanted the CSRs and the CDRs precisely because their attributes diverged from the direct ownership of the trust assets.  Moreover, PLIC can draw no solace from Example 4 of the regulations because, by its own admission, there is no analogue to section 1286 that governs the money market shares in question.  And while the interests of the CSR and CDR holders could have been reproduced without a trust, that is not the standard.  Indeed, via modern derivatives, virtually any type of investment can be created.  Rather, the question is whether the investor interests could have been reproduced without resort to multiple classes of ownership.  And, despite PLIC's protestations to the contrary, the simple fact is that they could not.  To put it in the words of the regulations, the CSR arrangements thus were not "formed to facilitate direct investment in the assets of the trust."  Treas. Reg. § 301.7701-4(c).  Accordingly, the "investment trusts" employed in the CSR transactions are properly classified not as trusts, but as business entities under Treas. Reg. § 301.7701-2.

The custodial arrangements and investment trusts employed in the CSR transactions are not corporations, as defined under Treas. Reg. § 301.7701-2(b).  Under the applicable regulations, that means that they are, as defendant contends, partnerships.  Treas. Reg. § 301.7701-2(c).[55]  If that is so, for the years in question, PLIC must be allocated a portion of the partnership income that corresponds to its interests in the partnership and thereby must include in income a distributive share of each year's money-market dividends.  *See* 26 U.S.C. § 702(a); Treas. Reg. § 1.702-1(d); *see also id*. at § 705 (describing how the adjusted basis of partner's interest is calculated); *Prestop Holdings, Inc., LLC v. United States*, 96 Fed. Cl. 244, 246 (2010).  That means that PLIC's return positions, which reflect no receipt of income, are erroneous.[56]

## V.

For the years in question, the IRS assessed against PLIC a substantial understatement penalty under section 6662(d) of the Code, as well as a negligence penalty under sections 6662(a) and (b)(1) of the Code.  In the court's view, consideration of these penalties, including

---

[55]  PLIC acquired its first two CSRs in 1996.  Those transactions are not covered by current version of Treas. Reg. § 301.7701-2(c), but by an earlier regulation – Treas. Reg. § 301.7701-2(a) (1996).  Under those regulations, the Wilmington Trust arrangements are not corporations because they lack the corporate characteristics of limited liability and continuity of life.  *Id*. at § 301.7702-2(a)(1).  They are thus also classified as partnerships.  *Id*. at § 301.7701-2(b)(3).

[56]  Rather than urging that PLIC's allocation be rejected outright, defendant indicates that the allocation of taxable income allocable to PLIC is less than the amount the IRS determined in its notice of deficiency.  The court will permit the parties a reasonable period to perform and agree upon any necessary recomputation of overpayment of tax liability on this issue.

PLIC's defenses thereto, raise a number of material questions of fact that preclude this court from ruling now.  Those questions will be resolved at trial at an appropriate time. [57]

## VI.

Based on the foregoing, the court rules in defendant's favor on the liability issues associated with the Perpetuals and CSR transactions.  It declines to address defendant's penalty arguments at this time.  The court hereby **DENIES** plaintiffs' motion for partial summary judgment and **GRANTS, in part,** defendant's cross-motion for partial summary judgment.

**IT IS SO ORDERED**.

s/Francis M. Allegra
Francis M. Allegra
Judge

---

[57]  For example, defendant argues that the Perpetual transactions were "tax shelters" because a "significant purpose" of the transactions was to avoid or evade income tax, as per section 6662(d)(2)(C)(iii), because "creating capital losses to reduce tax was at a minimum a significant (*i.e.*, important or meaningful) purpose of PLIC's deals."  Further, defendant argues that PLIC cannot invoke any of the statutory defenses to the penalties because, in defendant's view, PLIC did not act in good faith with respect to the Perpetual transactions and did not have a reasonable cause to take the deductions.