# In The United States Court of Federal Claims

Nos. 07-06T, 07-706T, 08-135T, & 08-605T

(Filed: February 4, 2015)

_____

| | |
|---|---|
| PRINCIPAL LIFE INSURANCE COMPANY AND SUBSIDIARIES, *et al.*, <br><br>Plaintiffs, <br><br>v. <br><br>THE UNITED STATES, <br><br>Defendant. | * Tax; Cross-motions for partial summary <br> * judgment; Refund of taxes relating to <br> * previously taxed income (PTI); Income from <br> * controlled foreign corporation; Partnership – <br> * *Culbertson*; Existence of partnership with <br> * bona fide partners raised questions of fact; <br> * Debt/equity analysis; Review of debt/equity <br> * factors; Existence of partnership raises <br> * questions of fact; Section 705(a)(1)(B) – <br> * basis adjustment; Whether basis of <br> * plaintiffs' interest in LLCs must be increased <br> * by distributive share of PTI distributions; <br> * Application of section 705 and Subpart F <br> * provisions raises questions of fact. <br> * |

_____

**OPINION**

_____

*Jay H. Zimbler*, Sidley Austin, LLP, Chicago, IL, for plaintiffs.

*Cory Arthur Johnson*, United States Department of Justice, Washington, D.C., with whom was Deputy Assistant Attorney General *David A. Hubbert*, for defendant.

**ALLEGRA, Judge:**

Before the court, on cross-motions for partial summary judgment, is the next phase of this complex refund suit.[1]  At issue is whether Principal Life Insurance Company and Subsidiaries (Principal Life or plaintiffs) is owed a refund on taxes relating to a transaction involving

---

[1] *See Principal Life Ins. Co. & Subs. v. United States*, 116 Fed. Cl. 82 (2014); *Principal Life Ins. Co. & Subs. v. United States*, 95 Fed. Cl. 786 (2010); *Principal Life Ins. Co. & Subs. v. United States*, 70 Fed. Cl. 144 (2006).

previously taxed income (PTI).[2]  PTI is income of a controlled foreign corporation (CFC) that has already been included in the gross income of a United States shareholder (U.S. shareholder) under section 951(a) of the Internal Revenue Code (26 U.S.C.),[3] and, therefore, is not included in gross income for a second time if it is distributed to a U.S. shareholder.  The resolution of plaintiffs' refund suit ultimately turns on whether:  (i) the Limited Liability Corporations (LLCs) were properly labeled as partnerships with Principal Life as a *bona fide* partner; and (ii) Principal Life correctly adjusted its outside basis in the partnerships to reflect the distributions of PTI.  Because of the existence of genuine issues of fact, the court **DENIES** defendant's motion for partial summary judgment and **DENIES**, as well, plaintiffs' cross-motion for partial summary judgment.  Instead, the court sets this portion of the case down for trial.

**I.**

Principal Life, an Iowa corporation with principal offices in Des Moines, is engaged, and at all times relevant to this action, was engaged, in the business of writing various forms of individual and group life and health insurance and annuities.  During the years in question (1999–2003), it filed consolidated returns as the parent corporation of a consolidated group of corporations.  During these years, and at all times relevant to this action, Principal Life was a calendar-year, accrual-basis taxpayer subject to tax under the provisions of Subchapter L of the Code.

**A.**

Before delving into the merits of this case, the court pauses to review in greater detail the statutory backdrop against which the subject transactions were made.

In general, the United States only taxes the income of foreign corporations under two scenarios:  when it derives from investments or businesses in the United States or when it is actually distributed to a United States shareholder.  *See* 26 U.S.C. §§ 61, 871, 881; *see also Barclay & Co. v. Edwards*, 267 U.S. 442, 448 (1925); *Nat'l Paper & Type Co. v. Bowers*, 266 U.S. 373 (1924); 1 Mertens Law of Fed. Income Tax'n §§ 4:37, 45:1 (2015) (Mertens).[4]  In the

---

[2] Penalties under 26 U.S.C. § 6662 are also at issue in this case, but are not the subject of the pending motions.

[3] All citations herein are to the Internal Revenue Code, 26 U.S.C., unless otherwise noted.

[4] Congress enacted Subpart F as part of the Revenue Act of 1962, P.L. 87-834, 76 Stat. 960 (1962), in response to a proposal drafted by the Kennedy Administration.  *See* S. Rep. No. 1881 (1962); H.R. Rep. No. 1447 (1962).  Congress and the Kennedy Administration perceived that the then current tax rules that applied to foreign corporations owned by U.S. taxpayers improperly encouraged foreign investment by providing for deferral of U.S. tax on foreign source income earned by foreign corporations.  *See* H.R. Conf. Rep. No. 2508 (1962).  Subpart F was enacted to reduce this perceived tax incentive for foreign investment by taxing currently U.S. investors in controlled foreign corporations on certain undistributed income of such

latter instance, earnings are not taxed until they are brought into the United States, typically as a dividend to a shareholder.  *See* Christopher Hanna, Cym Lowell, Mark Martin, Michael Donahue and Daniel Leightman, *Corporate Income Tax Acc.*, WGL Corp. Inc. Tax Acct., "Controlled Foreign Corporations" § 9.08 (2015) ("Corporate Income Tax Acc."); James Eustice & Thomas Brantley, *Fed. Income Tax'n of Corp. & Shareholders*, ¶15.01 (2015) (hereinafter "Eustice").  Because of this, a corporation may defer taxation by holding its earnings offshore.  *See Corporate Income Tax Acc.*, § 9.08; Eustice, ¶15.05[1], 15.61.

To avoid the potential for abuse, there are important exceptions to these rules.  Subpart F of the Code provides a comprehensive set of rules governing income generated by CFCs and limiting the deferral of taxes.  *See* 26 U.S.C. § 951(a); Treas. Reg. § 1.957-1(a); *Rodriguez v. Comm'r of Internal Revenue*, 722 F.3d 306, 309 (5th Cir. 2013) (Subpart F "intended to limit the deferral of taxes").  In general, these rules are designed to prevent U.S. taxpayers from using CFCs to shift their earnings to lower-taxed foreign jurisdictions.  *See* 26 U.S.C. §§ 951(a)(1), 956(a); *Schering-Plough Corp. v. United States*, 651 F. Supp. 2d 219, 224 (D.N.J. 2009), *aff'd sub nom.*, *Merck & Co., Inc. v. United States*, 652 F.3d 475 (3d Cir. 2011); *Elec. Arts, Inc. v. Comm'r of Internal Revenue*, 118 T.C. 226, 272 (2002); 12 Mertens, § 45E:179.[5]  This is accomplished by eliminating the deferral benefits of retaining certain types of earnings in a foreign corporation.  *Rodriguez*, 722 F.3d at 309; 12 Mertens, §§ 45E:179, 181; Allison Christians, Samuel A. Donaldson, & Philip F. Postlewaite, United States International Taxation ¶ 17.09.  In this fashion, subpart F "imposes United States taxation on United States shareholders of controlled foreign corporations . . . even though funds may not have been received by the United States shareholder."  12 Mertens, § 45E:1.

Certain other subpart F rules preserve the proper treatment of subpart F income when it is actually distributed to the U.S. shareholders, where it has already been included in gross income pursuant to section 951 of the Code.  Because this income was taxed when earned, it is not included in the shareholder's income when the earnings are subsequently distributed pursuant to section 959(a) of the Code.  Such amounts are typically given the designation previously-taxed income or PTI.  The subpart F rules provide a set of offsetting adjustments to the shareholder's basis in the CFC stock.  When the subpart F income is included in the gross income of the

---

corporations. *Id.*; *see generally* Lowell Yoder, Damon Lyon & David Noren, Tax Mgmt. Portfolio 926-3rd, CFCs – General Overview.

[5] A CFC is any corporation, more than 50 percent of the total value or of the total combined voting power of which is owned directly or indirectly, or constructively, by United States shareholders.  *See* 26 U.S.C. § 957; *Unisys Corp v. United States*, 30 Fed. Cl. 552, 556 (1994); 12 Mertens, § 45E:1; Eustice, ¶ 15.61.  A United States person may be any citizen or resident of the United States, or a domestic partnership, a domestic corporation or a domestic estate or trust. 26 U.S.C. § 7701(a)(30); 12 Mertens, § 45E:1; Eustice, ¶ 15.61.  Section 951 inclusions do not constitute actual dividends because actual dividends require a distribution by a corporation and receipt by the shareholder; there must be a change in ownership of something of value. 26 U.S.C. §§ 951(a)(2), 959(d); *Rodriguez*, 722 F.3d at 309.

shareholder, its basis in the stock is increased by "the amount required to be included in [its] gross income." 26 U.S.C. § 961(a). This adjustment prevents the shareholder from incurring a second tax on the same amount if it were to sell its interest in the CFC before the distribution of the PTI. Mertens, § 45E:179; Eustice, ¶ 15.61. Once PTI amounts are actually distributed, however, there is no need for a basis adjustment to protect the shareholders from tax in the event of a sale. Accordingly, the basis increase is reversed, in order to prevent a shareholder from taking a phantom loss. Mertens, § 45E:179 (after distribution of PTI, shareholder's "basis of his or her stock in the [CFC] must then be reduced"); Eustice, ¶ 15.61. Accordingly, under section 961(b) of the Code, when a shareholder receives a distribution of PTI, it reduces its basis of the stock by the amount of that distribution. S. Rep. No. 1881 at 3397.

**B.**

A recitation of the basic facts sets the context for the remainder of this decision.

In the late 1990s and early 2000s, Deutsche Bank (DB) and its affiliates marketed several "standardized structured products" to taxpayers. One of these products, based on PTI, was developed to monetize certain tax attributes that DB had – specifically, net operating losses (NOLs)[6] and foreign tax credits (FTCs).[7]

At issue in this case are two transactions between Principal Life and DB: the Whispering Woods LLC (Woods) transaction that was initiated in 1999 and the Whistling Pines LLC (Pines) transaction that initiated in 2001. In both transactions, Principal Life received distributions of PTI through its membership in a LLC. The parties dispute whether Principal Life owed taxes on the PTI it received through the LLCs or, alternatively, owed more capital gains taxes on the transactions than Principal Life determined in its tax returns.

The two transactions at issue in this case were similarly structured, in accordance with DB's promotional materials. The transactions began with the creation of an LLC, intended to be treated as a partnership, with Principal Life and a DB subsidiary as the only two members. Principal Life paid cash ($500 million in the case of Woods; $370 million in the case of Pines) in exchange for a Class A Member interest in the LLC. DB received a Managing Member interest in the LLC in exchange for its contribution of 100 percent of the stock of several CFCs, which were created for these transactions and contained PTI transferred to them by another Cayman Islands affiliate of DB.

---

[6] Section 172(b) of the Code allows a taxpayer which suffers a net operating loss in one taxable year to offset income of taxable years just before and after the year of the loss. *See* 26 U.S.C. § 172(b); *see also Goeller v. United States*, 109 Fed. Cl. 534, 550 n.37 (2013).

[7] Section 901(a) of the Code allows a taxpayer to claim a credit against its income tax liability for certain taxes paid to a foreign country. *See* 26 U.S.C. § 901(a); *see also PPL Corp. v. Comm'r of Internal Revenue*, 133 S.Ct. 1897, 1901-02 (2013).

In each transaction, the LLC invested the cash received from Principal Life in a domestic corporation (USCO) in exchange for stock in the USCO. DB and the CFCs also contributed cash to the USCO in exchange for stock, with the result that DB was the controlling shareholder of the USCO. The USCO then used the cash to purchase DB debt securities and non-DB debt securities that met certain agreed-upon investment guidelines.

Separate from the LLC transaction, Principal Life and DB entered into a series of bond forward agreements, based on the bonds purchased with Principal Life's investment in the LLC. Each agreement provided Principal Life with the return on a referenced bond over the two-year term of the agreement, minus an annual fixed-rate payment to DB. The payment rate was equal to the swap rate plus the credit spread, which reflected DB's borrowing rate at the time. Principal Life selected the bonds to be covered under the bond forwards. Technically, DB had the authority to select the bonds that were purchased by the USCO, but in both transactions DB selected the same bonds that were subject to the bond forward agreements.

During the two-year term of the LLC, the CFCs issued two after-tax, fixed-rate payments to the LLC from their reserves of PTI. The LLC then distributed 99 percent of the PTI to Principal Life and one percent to the DB subsidiary. The amount of PTI distributed was calculated by the parties before they entered into the transaction based upon DB's current borrowing/lending rate plus an enhanced yield. The enhanced yield, also called the priority return, is what made the transactions profitable for Principal Life, which received this enhanced yield over what it would have received from investing in the bonds on its own. DB also profited, since it used the fixed-rate payments associated with the bond forward agreements to monetize its excess tax attributes.

The expected result of each transaction was that, at the end of two years, Principal Life would acquire the bonds pursuant to the bond forward agreements and would have received a combined return from the transaction equal to the interest, gains and losses on the bonds for the two-year term plus the additional enhanced yield.

### C.

In 1998, Bankers Trust, an entity that later merged with DB, reached out to Principal Life to propose a structured PTI transaction. On October 8, 1999, Principal Life's Investment Committee approved Principal Life's participation in Woods, the first of three transactions that DB and Principal Life would enter into involving PTI.[8]

On November 18, 1999, Principal Life and World Trading (Delaware) Inc. (World Trading), a subsidiary of DB, signed an Operating Agreement for Woods. The Operating Agreement made World Trading the Managing Member of Woods with "all powers to control and manage the business and affairs of the Company," and prohibited the Class A Member (Principal Life) from participating in the management and control of the company. However, if

---

[8] The Woods and Pines transactions are at issue in this case. The third transaction, entitled Glacier Mountain, is the subject of other pending litigation.

the Managing Member undertook activities not explicitly permitted in the Operating Agreement, Principal Life could veto the action. The LLC was only authorized to hold specified assets that would be necessary to carry out the agreed-upon transaction. The Operating Agreement also set the priority return rate at 4.70936 percent per year on an after-tax basis, and determined how profits and losses would be allocated to guarantee that Principal Life would receive its priority return. The partnership was set to liquidate on November 20, 2001, unless the members unanimously voted to liquidate sooner or Woods failed to pay Principal Life its priority return.

The Operating Agreement contained several provisions to protect Principal Life's priority return and reduce its risks. First, if Woods was unable to pay Principal Life its priority return, Principal Life could become the interim manager of Woods, with the authority to force the payment or initiate the liquidation of Woods. Second, World Trading represented and warranted that the CFCs had the money needed for the distributions and that the money was in the form of PTI. Third, the Operating Agreement indemnified Principal Life from certain tax risks, including, in relevant part: (i) "the failure of the Class A Member to have its distributive share of PTI be excludable from the gross income of the Class A Member;" (ii) "the failure of the allocation of Profits to the Class A Member . . . to result in an increase in such Member's basis pursuant to Code Section 705(a);" and (iii) "the characterization of the Company as a publicly traded partnership or as other than a partnership, or of the Class A Member's Interest in the Company as other than a partnership interest."

On the same day that the Operating Agreement was signed, Bankers Trust executed a Guaranty and Indemnification Agreement in favor of Principal Life, guaranteeing that World Trading would perform its obligations according to the Operating Agreement. If World Trading failed to perform any of its obligations, Bankers Trust would indemnify Principal Life for the costs of a breach and perform the obligation itself.

On November 18, 1999, the transaction commenced with Principal Life paying $500 million in cash in exchange for a Class A Member interest in Woods. World Trading contributed $83 million worth of stock in four CFCs to Woods in exchange for a Managing Member interest.[9]

Woods exchanged the $500 million received from Principal Life for 500,000 Class A shares of stock in Bluewater Creek Management Co. (Bluewater), the USCO for this transaction. DB paid $2.4 billion for 2.4 million Class B shares of Bluewater stock, making DB the controlling shareholder of Bluewater. Bluewater used the $500 million from Principal Life to purchase non-DB bonds. It used the cash from DB to purchase other DB securities. The Certificate of Incorporation and Bylaws for Bluewater limited the types of assets it could hold

---

[9] The four CFCs involved in Woods were: Bleeker Investments Limited, Broome Investments Limited, MacDougal Investments Limited, and Varick Investments Limited. All four were created for the purposes of this transaction and received the PTI from CNS Cayman Holdings One Limited. The CFCs engaged in no business activities other than the transfer of PTI and the purchase of stock in the USCO.

and required that the Class A shares, held by Principal Life, would receive priority payment in the case of liquidation. Bluewater was set to wind up whenever Woods was liquidated.



Structure of the Whispering Woods Transaction

— November, 1999, inception of transaction
— November, 2000, cash flow
---- November, 2001, cash flow

The parties also entered into a series of bond forward agreements, based on the bonds purchased with Principal Life's $500 million investment. Each agreement provided Principal Life with the return on a referenced bond over the two-year term of the agreement, minus an annual fixed-rate payment to DB at a pre-tax rate of 6.41 percent, which was DB's current borrowing/lending rate. While Principal Life's return on the bonds would vary based on the bonds' performance, the downside risk was capped by a put option on the bonds, which essentially required DB to buy back the bonds at 95 percent of their original value if their value decreased. Principal Life selected the bonds to be covered under the bond forwards. Principal Life also changed the composition of the bond forwards on at least two occasions during the two-year term.

As planned, the four CFCs issued two annual, after-tax, fixed-rate payments consisting of PTI to Woods, 99 percent of which were allocated to Principal Life and one percent of which was allocated to World Trading. The post-tax rate of payment was 4.70936 percent, which reflected DB's current borrowing/lending rate plus an enhanced yield of 80 basis points. Principal Life received $24.1 million and $23.8 million respectively from the two payments.

These two payments varied from the amounts estimated by the parties before the transaction began by only a few dollars.[10]

On November 19, 2001, when Woods' two-year term ended, DB bought out Principal Life's membership interest in Woods for $499,949,895.69 and Woods was wound up. Principal Life used the proceeds of the sale to repurchase the bonds held by Bluewater pursuant to the bond forward agreements.

**D.**

On September 7, 2001, Principal Life and DB entered into a second PTI transaction involving a new LLC called Whistling Pines. The structure was similar to the Woods transaction, with only a few notable differences in the terms and the entities involved.

On September 7, 2001, Principal Life and a DB affiliate called Charlton (Delaware), Inc. (Charlton) signed the Operating Agreement for Pines. Principal Life invested $370 million into Pines in exchange for a Class A Member interest. Charlton contributed roughly $51.4 million worth of stock from two CFCs[11] to Pines in exchange for a Managing Member interest. Like in Woods, Bankers Trust executed a Guaranty and Indemnification Agreement in favor of Principal Life guaranteeing that Charlton would fulfill its obligations pursuant to the Operating Agreement.

Pines used the $370 million to purchase stock in Cedar Investment Co. (Cedar), a USCO that played the same role as Bluewater in the Woods transaction. Cedar used the $370 million to purchase bonds. DB invested $2 billion into Cedar and became its controlling shareholder. Principal Life and DB entered into separate bond forward agreements regarding the bonds held by Cedar with a timeline of two years.

---

[10] In the November 15, 1999, final term sheet for the deal, the parties estimated that the first payment would be $24,070,057.58. The first payment was actually $24,070,062.22. The term sheet estimated that the second payment would be $23,808,426.52. The actual second payment was $23,808,431.11.

[11] The two CFCs involved in the Pines transaction were DB Warren Investments Limited and DB Rivington Investments Limited.



This time, Principal Life negotiated an enhanced yield of 85 basis points. The fixed-rate payments were also different for Pines, because the swap rate and swap spread had changed. Principal Life agreed to pay DB a fixed return of 4.815 percent on the bond forwards. DB agreed to have PTI distributed to Principal Life at the after-tax priority return rate of 3.701 percent.

In 2002 and 2003, Principal Life received two PTI distributions from Pines of roughly $13.96 million and $15.8 million, respectively.[12] The second payment was larger than expected because the parties agreed to extend the transaction for almost two months – from September 8, 2003, to October 29, 2003 – as they debated whether to enter into a third transaction or simply extend Pines for additional years. The payment still reflected the agreed-upon priority return rate, but accrued over the slightly longer period of time.

On October 29, 2003, DB bought out Principal Life's interest in Pines for $369,865,848.58. However, the bond forwards were not settled at this time because the parties agreed to extend the bond forwards and roll them into a third PTI transaction called Glacier Mountain.

---

[12] In the September 6, 2001, final term sheet for Pines, the parties estimated that the first payment would be $13,960,128.19. The first payment was actually $13,959,966.39. The second payment was estimated to be $13,846,010.72. In actuality, it was $15,785,793.06.

**E.**

For income tax purposes, Principal Life treated its interests in Woods and Pines as partnership interests. Principal Life recorded no gain or loss for the acquisition of the partnership interests in Woods and Pines. Principal Life also excluded the distributions of PTI from its gross income pursuant to 26 U.S.C. § 959(a), based on its belief that the PTI had already been taxed and was distributed through Principal Life's membership in Woods and Pines.

Principal Life paid capital gains on the sale of its partnership interests in Woods and Pines.[13] Over the course of the Woods and Pines transactions, Principal Life adjusted its outside basis in the partnerships upon the occurrence of certain events. For instance, Principal Life's original basis in Woods was $500 million. When the first distribution of PTI was made in 2000, Principal Life adjusted its basis in three ways to reflect the distribution. First, Principal Life increased its basis in Woods by roughly $24 million to reflect its distributive share of the tax-exempt income of Woods when the LLC received the PTI from the CFCs. Second, Principal Life reduced its basis by one percent of the distribution, roughly $240,000, to represent its share of the loss to Woods when its basis in the CFC stock decreased due to the distribution of PTI. This was in accordance with the Operating Agreement that allocated 99 percent of Woods' profits to Principal Life and 99 percent of Woods' losses to World Trading. Third, Principal Life reduced its basis by $24 million to reflect the cash distribution that it received from Woods. When the second distribution of PTI occurred in 2001, Principal Life adjusted its basis in the same three ways, resulting in only a small net effect on its outside basis. In the Pines transaction, Principal Life again adjusted its outside basis in the same three ways for both distributions of PTI. As a result of this and other non-disputed adjustments to its basis, Principal Life reported capital gains on the sale of its membership interests of only $571,019 for Woods and $175,221 for Pines.

For statutory accounting purposes, Principal Life recorded its investments in Woods and Pines on Schedule BA, line 0499999, for "Fixed or Variable Interest Rate Investments That Have the Underlying Characteristics of Bonds." However, the accounting department at Principal Life later determined that this was an error and they should have been recorded on line 0799999 of Schedule BA, for "Joint Venture, Partnership or LLC Interests That Have the Underlying Characteristics of Fixed Income Instruments." For Generally Accepted Accounting Principles (GAAP) purposes, Principal Life recorded its investments in Woods and Pines as "investment income" and "an Available for Sale Fixed Maturity Security." On its Annual Statements, Principal Life reported income from Woods and Pines as accrued income that began accruing immediately for financial reporting purposes, as opposed to lump payments paid annually.

---

[13] The amount of capital gains earned by a partner is determined by the difference between the amount realized and the partner's final outside basis in the partnership. *See* Treas. Reg. § 1.741-1(a); 9 Mertens, § 35:89.

**F.**

The IRS determined deficiencies in Principal Life's Federal income tax and assessed accuracy-related penalties as follows:

| Year | Deficiency | Penalty sec. 6662 |
|---|---|---|
| 1999 | $164,888,638 | $10,848,700 |
| 2000 | $128,727,605 | $ 7,294,419 |
| 2001 | $ 1,030,548 | $ Ø |
| 2002 | $ 13,848,463 | $ 556,877 |
| 2003 | $ 55,478,996 | $ 247,247 |

During plaintiffs' 1999 through 2003 taxable years, some of the taxes that the IRS found to be deficient stemmed from the Woods and Pines transactions. The IRS assessed taxes for Woods on two grounds. First, the annual payments of PTI were determined to be taxable income in 1999, 2000 and 2001. Second, Principal Life was determined to have a capital gain of $47.8 million in 2001 on its sale of its interest in Woods. The IRS assessed taxes for Pines in 2001, 2002 and 2003, solely on the grounds that the annual payments of PTI were taxable income.

On or about January 26, 2007, Principal Life filed a timely Amended Return/Claim for Refund seeking the refund of some of the federal income taxes and penalties paid in 1999, 2000 and 2001, plus deficiency interest and statutory interest. On or about February 12, 2008, Principal Life filed a timely Amended Return/Claim for Refund seeking refund of some of the federal income taxes and penalties paid for 2002 and 2003, plus deficiency interest and statutory interest.

On January 4, 2007, plaintiffs filed a complaint in this court seeking a refund of taxes for the 1995 and 1996 tax years. On November 27, 2007, plaintiffs filed an amended complaint. On May 2, 2008, the court issued an order directing the Clerk to consolidate this case with two other tax refund cases filed by Principal Life, cases Nos. 07-706T and 08-135T. Case No. 08-135T included claims for refund relating to the Woods transaction for 1999, 2000, and 2001 and the Pines transaction for 2001. On October 6, 2008, plaintiffs filed a second amended complaint. On October 8, 2008, the court issued an order consolidating this case with another tax refund case filed by Principal Life, case No. 08-605T, which included claims for refund relating to the Pines transaction for 2002 and 2003.

Because of the complexity of this case, the case was broken into multiple phases. The PTI transactions are part of Phase II. Certain claims that were part of Phases I and II have been decided by this court. *See, e.g.*, *Principal Life Ins. Co. & Subs. v. United States*, 116 Fed. Cl. 82 (2014); *Principal Life Ins. Co. & Subs. v. United States*, 95 Fed. Cl. 786 (2010). Other issues remain for further proceedings.

On August 9, 2013, defendant filed a motion for partial summary judgment on the PTI transactions. On October 29, 2013, plaintiffs filed a cross-motion for partial summary judgment

and response.  Subsequent briefing on these motions has been completed.  On November 10, 2014, oral argument was held in this case.

## II.

We begin with common ground.  Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Biery v. United States*, 753 F.3d 1279, 1286 (Fed. Cir. 2014).  Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment.  *Anderson*, 477 U.S. at 248.  However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party."  *Id.*; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Biery*, 753 F.3d at 1286; *Principal Life*, 116 Fed. Cl. at 88-89; *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When making a summary judgment determination, the court is not to weigh the evidence, but to "determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("a [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004).  The court must determine whether the evidence presents a disagreement sufficient to require fact finding, or, conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson*, 477 U.S. at 251-52; *see also Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) ("'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" (quoting *Matsushita*, 475 U.S. at 587)).  Where there is a genuine dispute, all facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion.  *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Stovall v. United States*, 94 Fed. Cl. 336, 344 (2010); *L.P. Consulting Grp., Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).  Where, as here, a court considers cross-motions for (partial) summary judgment, it must view each motion, separately, through this prism.[14]

Principal Life bears the burden of proving its entitlement to the refund in question.  *See Helvering v. Taylor*, 293 U.S. 507, 515 (1935) ("[u]nquestionably the burden of proof is on the taxpayer"); *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932); *UnionBanCal Corp. & Subs. v. United States*, 113 Fed. Cl. 117, 128 (2013).  More specifically, in a case such as this, "it is the taxpayer's burden to demonstrate that the form of its transaction accords with its substance."  *Principal Life*, 70 Fed. Cl. at 160; *see also Goldberg v. United States*, 789 F.2d 1341, 1343 (9th

---

[14] *See Chevron U.S.A. Inc. v. Mobil Producing Tex. & N.M.*, 281 F.3d 1249, 1252-53 (Fed. Cir. 2002); *Principal Life*, 116 Fed. Cl. at 89; *see also Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010); *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc.*, 598 F.3d 257, 264 (6th Cir. 2010); *Northrop Grumman Computing Sys., Inc. v. United States*, 93 Fed. Cl. 144, 148 (2010).

Cir. 1986) ("The burden is therefore on the taxpayer to show that the form of the transactions reflect their substance."); *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 165–66 (D. Conn. 2004), *aff'd*, 150 Fed. Appx. 40 (2d Cir. 2005) (unpublished) (same); *see generally, United States v. Janis*, 428 U.S. 433, 440 (1976). This qualification cabins a taxpayer's otherwise admitted right to arrange its affairs to minimize its taxes. *See Helvering v. Gregory*, 69 F.2d 809 (2d Cir. 1935), *aff'd*, 293 U.S. 465 (1935) (Hand, J.) ("Any one may so arrange his affairs that his taxes shall be as low as possible . . . .").

### III.

Initially at issue in this case is whether the LLCs here were properly labeled as partnerships, with Principal Life constituting a *bona fide* partner – put another way, the question is whether the partnerships in question were real or fictitious. For the reasons that follow, the court concludes that questions of fact preclude the court from resolving this question in either party's favor.

A partnership is created "'when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses.' . . . A partnership is, in other words, an organization for the production of income to which each partner contributes one or both of the ingredients of income – capital or services." *Comm'r of Internal Revenue v. Culbertson*, 337 U.S. 733, 740 (1949) (quoting *Eisner v. Macomber*, 252 U.S. 189 (1920)); *see also Historic Boardwalk Hall, LLC v. Comm'r of Internal Revenue*, 694 F.3d 425, 449 (3d Cir. 2012), *cert. denied* 133 S.Ct. 2734 (2013) (a partnership exists for federal tax purposes when two or more parties "in good faith and acting with a business purpose intend to join together in the present conduct of the enterprise").[15] Whether a partnership exists ordinarily presents a genuine issue of fact. *See*, *e.g.*, *Culbertson*, 337 U.S. at 742; *Comm'r of Internal Revenue v. Tower*, 327 U.S. 280, 287 (1946); *Lieber v. United States*, 119 F. Supp. 951, 952 (Ct. Cl. 1954). As the Supreme Court observed long ago in *Culbertson*, the totality of the facts must be considered –

> the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income

---

[15] *See* 26 U.S.C. § 7701(a)(2). In theory, an LLC "offers the best of both worlds – the limited liability of a corporation and the favorable tax treatment of a partnership." *Canterbury Holdings, LLC v. Comm'r of Internal Revenue*, 98 T.C.M. (CCH) 60, 61 n.1 (2009). Generally, an LLC is a pass-through entity that does not pay federal income tax. *See* 26 U.S.C. § 701; Treas. Reg. § 301.7701–3(a). Rather, profits and losses "pass through" the LLC to its owners, called members, who pay individual income tax on their allocable shares of the tax items. *See* 26 U.S.C. §§ 701–04, 6031. Although an LLC with just one owner is, for tax purposes, disregarded as an entity separate from its owner for tax purposes, an LLC with two or more members is classified as a partnership for tax purposes unless it elects to be treated as a corporation. Treas. Reg. § 301.7701–3(b)(1).

>and the purposes for which it is used, and any other facts throwing light on their true intent.

*Culbertson*, 337 U.S. at 742; *see also Consol. Cable, Ltd. v. Comm'r of Internal Revenue*, 995 F.2d 222 (5th Cir. 1993); *Spector v. Comm'r of Internal Revenue*, 641 F.2d 376, 381 (5th Cir.), *cert. denied*, 454 U.S. 868 (1981); *Cain v. United States*, 135 F. Supp. 516, 518 (Ct. Cl. 1955), *cert. denied*, 352 U.S. 890 (1956). The Supreme Court likewise has treated the issue of intent to form a partnership as a question of fact. *Tower*, 327 U.S. at 287; *Culbertson*, 337 U.S. at 741; *Spector*, 641 F.2d at 381; *Freese v. United States*, 455 F.2d 1146, 1151 (10th Cir.), *cert. denied*, 409 U.S. 879 (1972); *Lieber*, 119 F. Supp. at 952.[16] No one factor is determinative. *Culbertson*, 337 U.S. at 742; *Kenna Trading, LLC v. Comm'r of Internal Revenue*, 143 T.C. No. 18, slip op. at 49 (Oct. 16, 2014).

The court believes that genuine issues of fact preclude the court from determining whether a true partnership was formed here. Among the questions at issue are: First, the parties disagree as to "'whether the partners really and truly intended to join together for the purpose of carrying on the business and sharing in the profits and losses or both.'" *Culbertson*, 337 U.S. at 741 (quoting *Tower*, 327 U.S. at 287). Second, the parties differ as to whether Principal Life was a *bona fide* partner because the payments Principal Life expected to receive from the LLCs were essentially fixed and relatively secure. On this count, "the totality of the circumstances" leaves open, for now, the question whether the secured interests in question should be treated as a partnership interest. *See Historic Boardwalk Hall*, 694 F.3d at 449; *Va. Historic Tax Credit Fund 2001 L.P. v. Comm'r of Internal Revenue*, 639 F.3d 129, 137 (4th Cir. 2011); *see also* IRS Notice 2008-80, 2008-2 C.B. 820 (2008). Finally, there are questions of fact as to whether the existence of a preferred equity interest in a partnership, providing a relatively secure return, is sufficient to treat the holder of the interest as other than a partner. *Culbertson*, 337 U.S. at 742.

Even if a partnership exists, "consideration whether an interest has the prevailing character of debt or equity can be helpful in analyzing whether, for tax purposes, the interest should be deemed a *bona fide* equity participation in a partnership." *TIFD III-E, Inc. v. United States,* 459 F.3d 220, 232 (2d Cir. 2006); *see also TIFD III-E, Inc. v. United States*, 666 F.3d 836, 837 (2d Cir. 2012); *Chemtech Royalty Assocs., L.P. ex rel. Dow Europe, S.A. v. United States*, 2013 WL 704037, at *25-26 (M.D. La. 2013). A party will not be considered a *bona fide* partner in a partnership if its interest is more akin to a debt-like interest, with little or no risk aside from credit risk, than to an equity participation, a share of ownership in which the party takes on true entrepreneurial risk in the partnership venture. *TIFD III-E,* 459 F.3d at 232; *see also Historic Boardwalk Hall*, 694 F.3d at 449-463. In the court's view, significant questions of fact remain as to how the interests in question should be treated in this regard, precluding a ruling on summary judgment. *See TIFD III-E*, 459 F.3d at 222-40; *Chemtech Royalty*, 2013 WL 7040737, at *25.

---

[16] While family partnership cases present some problems not present in arms-length partnerships, the general principles set out in *Tower* and *Culbertson* apply to all partnership situations. *Smith's Estate v. Comm'r of Internal Revenue*, 313 F.2d 724, 729 (8th Cir. 1963).

In moving for summary judgment, defendant asserts that Principal Life's investments in the LLCs must be characterized as debt for several reasons. Defendant, in particular, asserts that there was a reasonable expectation that Principal Life's investments would be repaid with a predetermined, fixed rate of return. *See Estate of Mixon v. United States*, 464 F.2d 394, 404 (5th Cir. 1972); *Pepsico Puerto Rico, Inc. v. Comm'r of Internal Revenue*, 104 T.C.M. (CCH) 322, 335-36 (2012); *NA Gen. P'ship & Subs. v. Comm'r of Internal Revenue*, 103 T.C.M. (CCH) 1916, 1919 (2012). Plaintiffs, however, note that a number of factors, beyond this basic repayment expectation, inform this debt/equity analysis. Indeed, plaintiffs argue that the fixed return and reasonable expectations upon which defendant relies do not serve to distinguish many types of secured debt instruments from preferred equity investments.[17] No mechanical scorecard suggests that a single characteristic (or even a couple) is decisive in this regard. *See TIFD III-E*, 459 F.3d at 236 n.15l; *Indmar Prods. Co., Inc. v. Comm'r Internal Revenue*, 444 F.3d 771, 777 (6th Cir. 2006); *Pritired 1, LLC v. United States*, 816 F. Supp. 2d 693, 722 (S.D. Iowa 2011); IRS Notice 94-47, 1994-1 C.B. 357 (1994). In the court's view, the parties cannot hope to distinguish whether the investments in question should be treated as equity versus debt without a further factual inquiry, *i.e.* a trial. *See TIFD III-E, Inc. v. United States*, 8 F. Supp. 3d 142, 150 (D. Conn. 2014).

### IV.

Admittedly, the questions seemingly most suitable for resolution via summary judgment here are those involving statutory interpretation. But, lurking beneath these provisions are genuine issues of fact associated with their application. For example, defendant contends that section 705(a) of the Code did not permit Principal Life to increase its tax basis in its LLC interests to reflect its distributive share of the PTI distributions received by the LLCs. Based on that view, Principal Life would be liable for a taxable gain on the disposition of its LLC interests attributable to such disallowed basis increases. Plaintiffs, however, maintain that the plain language of sections 705 and 959 states otherwise, and gives rise to basis adjustments that

---

[17] In various cases, among the factors to be considered in distinguishing debt from equity are: (i) whether there is an unconditional promise on the part of the issuer to pay a sum certain on demand or at a fixed maturity date that is in the reasonably foreseeable future, (ii) whether holders of the instrument possess the right to enforce payment of principal and interest, (iii) whether there is subordination to or preference over any indebtedness of the issuer, (iv) whether the instrument gives the holders the right to participate in the management of the issuer, (v) whether there is identity between holders of the instrument and equity holders of the issuer, (vi) the intent of the parties, (vii) the label placed upon the instrument, (viii) whether the issuer is thinly capitalized, (ix) the risk inherent in the instrument, (x) whether the funds are used to acquire capital assets, (xi) the ability of the issuer to obtain funds from outside sources, and (xii) whether the instrument is intended to be treated as debt or equity for non-tax purposes. *See Post Corp. v. United States*, 640 F.2d 1296, 1303 (Ct. Cl. 1981); *Roth Steel Tube Co. v. Comm'r of Internal Revenue*, 800 F.2d 625, 630 (6th Cir. 1986), *cert. denied*, 481 U.S. 1014 (1987); *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968); *AWG Leasing Trust v. United States*, 592 F. Supp. 2d 954, 991 (N.D. Ohio 2008); *Pepsico Puerto Rico*, 104 T.C.M. at 335; *see also TIFD III-E v. United States*, 8 F. Supp. 3d 142, 149 (D. Conn. 2014).

require the court to hold in plaintiffs' favor. In the court's view, however, the parties' positions again give rise to genuine issues of fact that must be resolved in a trial.

Section 705(a)(1)(B) of the Code expressly requires an upward basis adjustment to the basis of a partner's interest in a partnership to reflect the partner's distributive share of "income . . . exempt from tax." 26 U.S.C. §705(a)(1)(B). Under a "plain reading" of this provision and the regulations thereunder, *see* Treas. Reg. § 1.705-1(a)(2)(ii),[18] the adjusted basis of a partner's interest in a partnership must be increased by the partner's distributive share of "income of the partnership exempt from tax under this title." Long-standing regulations elaborate on this language, providing that a partner's basis is increased by the partner's distributive share of "[t]ax-exempt receipts of the partnership." Treas. Reg. § 1.705-1(a)(2)(ii); *see also Tigers Eye Trading, LLC v. Comm'r of Internal Revenue*, 138 T.C. 67, 113-14 (2012).[19] Plaintiffs assert that the Code and applicable Treasury Regulations do not contemplate any exception to this rule. If this is correct, if distributions of PTI constitute tax-exempt receipts, section 705(a)(1)(B) requires that Principal Life increase its basis in its partnership interests by its distributive share of such PTI distributions.

But, what of the other provisions of the Code? According to plaintiffs, a distribution of PTI is a distribution of property made by a CFC to its shareholders out of the CFC's current or accumulated earnings and profits. *See* 26 U.S.C. § 959(a), (c). In plaintiffs' view, in the absence of special rules, such a distribution would be treated as a dividend includible in gross income. *Id.* at §§ 61(a)(7), 316(a). Consistent with this view, section 959(a) excludes distributions of PTI from a person's gross income:

---

[18] The "plain meaning" rule applies to Treasury Regulations. *See Intersport Fashions W., Inc. v. United States*, 103 Fed. Cl. 396, 404 (2012); *Long v. United States*, 10 Cl. Ct. 46, 54 (1986), *aff'd*, 824 F.2d 976 (Fed. Cir. 1987); *see also Roberto v. Dep't of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006) ("If the regulatory language is clear and unambiguous, the inquiry ends with the plain meaning.").

[19] In this regard, the Treasury Regulations state that –

the original basis of a partner's interest in a partnership shall be determined under section 722 (relating to contributions to a partnership) or section 742 (relating to transfers of partnership interests). Such basis shall be increased under section 722 by any further contributions to the partnership and by the sum of the partner's distributive share for the taxable year and prior taxable years of . . .

\*          \*          \*          \*          \*

(ii) Tax-exempt receipts of the partnership . . .

Treas. Reg. § 1.705-1(a)(2).

> For purposes of [chapter 1 of the Code], the earnings and profits of a foreign corporation attributable to amounts which are, or have been, included in the gross income of a United States shareholder under section 951(a) *shall not*, when –
>
> (1) such amounts are distributed to, or
>
> (2) such amounts would, but for this subsection, be included under section 951(a)(1)(B) in the gross income of,
>
> such shareholder (or [certain U.S. successors in interest]) directly or indirectly through a chain of ownership described under section 958(a), *be again included in the gross income* of such United States shareholder (or of such [successor]).

*Id.* at § 959(a) (emphasis added); *see also* Lowell Yoder & Larry Kemm, Tax Mgmt. Portfolio 930-2nd: CFCs – Sections 959-965 and 1248.  In plaintiffs' view, the Code thus requires that three adjustments be made in calculating the proper distribution here:  (i) an increase of the basis by Principal Life's distributive share of the PTI distribution to the LLCs, 26 U.S.C. § 705(a)(1)(B); (ii) a decrease of the basis by Principal Life's share of the expenditures of the LLCs, reflecting the reduction in basis of the CFC shares, *id.* at § 705(a)(2)(B); and (iii) a decrease of the basis by the full amount of the distribution to Principal Life, *id.* at § 961(b)(1). Under this reading of sections 705(a)(1)(B) and 959(a), the result is that PTI is viewed as income exempt from tax.[20]

Defendant, however, takes the contrary view that there can be only one reduction in basis here, effectuated by section 961(b)(1) of the Code – a reduction that would correspond to the amount of the PTI distribution to Principal Life.  Defendant argues that the only time there would be an increase in basis is when the PTI was originally earned pursuant to section 961(a) – before Principal Life had an interest in the CFCs.  According to defendant, a decrease in basis occurred when the PTI was distributed from the CFCs to the LLCs (*i.e.*, Whispering Woods or Whistling Pines) and distributed from the LLCs to Principal Life.  *See* Treas. Reg. § 1.961-2(a)(1); Yoder & Kemm, Tax Mgmt. Portfolio 930-2nd: CFCs – Sections 959-965 and 1248, Part IV. Adjustments to Basis for CFC Stock and Other Property.

But, plaintiffs assert that this could cause a partner's distributive share to be determined without proper reference to the partnership agreement – a result that plaintiffs contend is contrary not only to the statutory text, but to the Treasury Regulations and examples therein (*e.g.*, Treas. Reg. § 1.961-2(d) (Example 1(b)).  Defendant argues that PTI distributions are not tax-exempt income of the partnership, but merely the receipt of distributions that were previously included in

---

[20] According to plaintiffs, "[t]he Court thus must determine whether each distribution of PTI from the CFCs to the LLCs resulted in *two* partnership items (tax-exempt income and an offsetting non-deductible, non-capital expenditure), each giving rise to basis adjustments under § 705, or *zero* partnership items, with no change in outside basis."  *See also* 71 Fed. Reg. 51,155 (Aug. 29, 2006).

gross income and taxed under section 951.  Plaintiffs, however, contend that if PTI distributions are not income at all, it would render section 959(a) of the Code superfluous, undercutting defendant's interpretation not only of that section of the Code, but the plain language of section 705(a)(1)(B) of the Code as well, insofar as it relates to section 959(a).  This approach, according to plaintiffs, creates unintended consequences to the partners, including the application of information reporting requirements and end-of year basis adjustments, that would apply differently to each partner.  *See also* 26 U.S.C. § 702; Treas. Reg. § 1.702-1; Yoder & Kemm, Tax Mgmt. Portfolio 930-2nd: CFCs – Sections 959-965 and 1248, Part IV, C. (Increase in Basis).

For our purposes, the use of this approach raises still more issues of fact regarding the proper treatment not only of individual partners, but of income, losses, inside and outside basis calculations, and other forms of non-pro-rata allocations under the partnership agreement.  Plaintiffs contend that their position creates no questions of fact, while defendant's position at a minimum grossly does so; defendant, of course, espies the world entirely differently.  The conflicting results, in the court's view, serve only to raise genuine factual issues that again are unsuitable for resolution as a matter of law.  *See LeBlanc v. United States*, 90 Fed. Cl. 186, 196 (2009), *rev'd on other grounds*, 410 Fed. Appx. 323 (Fed. Cir. 2011).

**V.**

Based on the foregoing, the court concludes that questions of fact preclude resolution of the liability issues associated with the Woods and Pines transactions,  The court thus hereby **DENIES** both defendant's motion for partial summary judgment and plaintiffs' cross-motion for partial summary judgment.  Chambers will contact the parties to set up a status conference to discuss a trial schedule for the resolution of this matter.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge